Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

```
 1               UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                    ORLANDO DIVISION

 3            CASE NO.: 6:17-cv-00983-GKS-GJK

 4   FLOGROWN, LLC,

 5        Plaintiff,

 6   vs.

 7   DIXIE HERITAGE, LLC, ASHER
     TORGEMAN AND ALBERT TOURGEMAN,
 8
          Defendants.
 9

10   _____/

11   VIDEOTAPED
     DEPOSITION OF:      REBECCA GOODINE
12
     DATE:               THURSDAY, MARCH 22, 2018
13
     TIME:               10:00 A.M. - 11:43 A.M.
14
     PLACE:              EASTON PROFESSIONAL SUITES
15                       206 EASTON DRIVE
                         LAKELAND, FLORIDA 33803
16
     STENOGRAPHICALLY
17   REPORTED BY:        KATHY WESCOTT, CSR

18

19

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                                 2

```
 1   A P P E A R A N C E S:

 2   ANDREW S. RAPACKE, ESQUIRE
     OF: RAPACKE LAW GROUP
 3       1836 N. Pine Island Road
         Plantation, Florida 33322
 4       954-533-4396, FAX-954-206-0484
         Andy@arapackelaw.com
 5       APPEARING ON BEHALF OF THE PLAINTIFF

 6   LEIA LEITNER, ESQUIRE
     OF: WATSON, LLP
 7       189 S. Orange Avenue
         Suite 810
 8       Orlando, Florida 32801
         407-377-6634, FAX-407-377-6688
 9       Leia@watsonllp.com
         APPEARING ON BEHALF OF THE DEFENDANTS
10
     COLEMAN WATSON, ESQUIRE
11   OF: WATSON LLP
         189 S. Orange Avenue
12       Suite 810
         Orlando, Florida 32801
13       407-377-6634, FAX-407-377-6688
         Coleman@watsonllp.com
14       APPEARING ON BEHALF OF THE DEFENDANTS

15

16   ALSO PRESENT:

17       HUNTER MATHESON ORANGE LEGAL VIDEOGRAPHER
         DEREK GOODINE
18       YENISET TORGEMAN
         ASHER TORGEMAN
19

20

21

22

23

24

25
```



```
 1                    I N D E X

 2   TESTIMONY OF REBECCA GOODINE              PAGE

 3        DIRECT EXAMINATION BY MS. LEITNER      5

 4        CROSS-EXAMINATION BY MR. RAPACKE      54

 5        REDIRECT BY MS. LEITNER              57

 6        RE-CROSS BY MR. RAPACKE             58

 7   CERTIFICATE OF OATH                       60

 8   CERTIFICATE OF DEPOSITION TRANSCRIPT      61

 9   ERRATA SHEET                              62

10   NOTIFICATION LETTER                       63

11

12                    INDEX OF EXHIBITS

13   DEFENDANT'S EXHIBITS

14   EXHIBIT  12 (Subpoena to Testify at a Deposition in a
     Civil Action)                             6
15
     EXHIBIT  13 (Receipts)                    18
16
     EXHIBIT  14A (Goodine Interview)          25
17
     EXHIBIT  14B (Signed Statements)          31
18
     EXHIBIT  15 (Patti Rumore Statement)      33
19

20

21

22

23

24

25
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                                    4

```
 1                          ------

 2              S T I P U L A T I O N S

 3        It is hereby stipulated and agreed by and between

 4   the counsel for the respective parties and the deponent

 5   that the reading and signing of the deposition

 6   transcript be reserved.

 7                          ------

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    P R O C E E D I N G S

 2                       * * * * * * * * *

 3           VIDEOGRAPHER:  We're now on the record.

 4           Here begins videotape number 1, of the

 5      deposition of Rebecca Goodine.  Taken in the matter,

 6      case number 617-cv-00983-GKS-GJK, Flogrown, LLC,

 7      versus Dixie Heritage, LLC.

 8           This deposition is being conducted at 206

 9      Easton Drive, Lakeland, Florida 33803.  Today's

10      date, March 22, 2018.  The time 10:08 a.m..

11           The Court Reporter is Kathy Wescott.  And the

12      video specialist is Hunter Matheson, on behalf of

13      Orange Legal.

14           Counsel, please introduce yourselves.  After

15      which the Court Reporter will swear in the witness.

16           MR. RAPACKE:  Andrew Rapacke, attorney for the

17      Plaintiff Flogrown, LLC.

18           MS. LEITNER:  Leia Leitner, on behalf of

19      Defendants Dixie Heritage, LLC, Asher Torgeman and

20      Albert Tourgeman.

21           COURT REPORTER:  Would you raise your right

22      hand for me, please?

23           Do you solemnly swear the testimony that you're

24      about to give will be the truth, the whole truth,

25      and nothing but the truth?
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                        6

```
 1              THE WITNESS:  Yes, ma'am.

 2              COURT REPORTER:  Thank you.

 3                      DIRECT EXAMINATION

 4  BY MS. LEITNER:

 5      Q.   Good morning, Miss Goodine.

 6      A.   Good morning.

 7      Q.   Can you please state your full name for the

 8  record?

 9      A.   Yes.  Rebecca Lynn Goodine.

10      Q.   Have you ever been known by any other names?

11      A.   No, ma'am.

12      Q.   Have you ever been - or used, or been known by

13  any nicknames or aliases?

14      A.   Just Becky.

15              MS. LEITNER:  Okay.  And I'm going to hand the

16      witness a document, which is previously marked as

17      Defendant's Exhibit 12.

18              And I have a copy for you.

19              (Defendant's Exhibit Number 12, was marked for

20      Identification.)

21  BY MS. LEITNER:

22      Q.   Please take a second to familiarize yourself

23  with these documents.

24              Have you seen this document before?

25      A.   Yes.
```



**Orange Legal**
**800-275-7991**

```
 1      Q.   Are you familiar with it?

 2      A.   Yes.

 3      Q.   And what is it?

 4      A.   It's the subpoena --

 5      Q.   Okay.

 6      A.   -- for the deposition.

 7      Q.   Can you please read into the record the portion

 8  where it indicates the place, date and time?

 9      A.   Yes.  The place is Orange Legal.  1102 South

10  Florida Avenue, Suite 104, Lakeland, Florida 33803.  The

11  date and time is 2/22/2018 at 10 a.m.

12      Q.   Okay.  And as you stated on the record, your

13  deposition was previously scheduled on February 22nd.

14      A.   Yes.

15      Q.   But it was cancelled because you had an

16  emergency.

17      A.   Yes.  My daughter was sick.

18      Q.   And is your - so the emergency was, because

19  your daughter was sick?

20      A.   Yes.

21      Q.   Is she okay?

22      A.   Yes.  She was really sick all night, and had to

23  go to the hospital.

24      Q.   So you were at the hospital on February 22,

25  2018?
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                          8

1     A.    Yes.  That night, into the morning of February

2  22nd.

3     Q.    Okay.  And have you ever had your deposition

4  taken before?

5     A.    No.

6     Q.    I'm just going to go over the deposition rules,

7  since you haven't had one before.  These questions are

8  under oath.  The Court Reporter is taking everything

9  down and will prepare a transcript.  So the Court

10 Reporter cannot take things we do in our normal everyday

11 speech, such as uh-huh or un-uh.  And the Court Reporter

12 won't be able to understand any nods or shakes either.

13 So just, if you need to say yes or no, just do so.

14    A.    Okay.

15    Q.    If there's anything you don't understand,

16 please let me know so I can rephrase the question.

17          If you don't ask me to rephrase, I'll assume

18 that you understand the question.  Also, this is not a

19 test of endurance.  If you need to take a break at any

20 time, please let us - let me know, and we can take a

21 break.

22          But if you have a - if I have a question, you

23 need to finish it before we can take a break.  And then

24 if I - if you can just wait until I finish the question,

25 and then you can answer, that would be better for at



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                                    9

```
 1    least our Court Reporter.

 2            And you can answer the question even if the -

 3    your attorney objects.  And unless the attorney

 4    specifically instructs you to not answer, you would need

 5    to then answer the question.

 6            Are you taking any medications of any kind,

 7    which might make it difficult for you to answer my

 8    questions today?

 9    A.   No, ma'am.

10    Q.   Are you taking any medications that might make

11    it difficult to remember anything today?

12    A.   No, ma'am.

13    Q.   Are you taking any medications that might make

14    it difficult for you to tell the truth?

15    A.   No, ma'am.

16    Q.   Do you have any issues with your memory?

17    A.   No, ma'am.

18    Q.   Do you have anything that prevents you from

19    remembering past events, as we sit here today?

20    A.   No, ma'am.

21    Q.   Okay.  All right.  I'm just going to ask you

22    about your general background.

23            So what is your address?

24    A.   It's 1707 Reynolds Road, Lot 18, Lakeland,

25    Florida 33801.
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                    10

```
 1      Q.   And how long have you lived there?

 2      A.   About five years.

 3      Q.   Do you have any plans to move from that address

 4  in the near future?

 5      A.   Eventually, yes.

 6      Q.   Within the next year?

 7      A.   I'm not 100 percent sure.

 8      Q.   Okay.  And are you married?

 9      A.   Yes.

10      Q.   Who is your spouse?

11      A.   Derek Goodine.

12      Q.   Do you have any children?

13      A.   Yes.

14      Q.   How many children?

15      A.   Two.

16      Q.   And what are their names?

17      A.   Nevaeh and Niara.

18      Q.   Okay.  And what is your phone number?

19      A.   863-272-0925.

20      Q.   And what is your e-mail address?

21      A.   Rebeccalynn0712@yahoo.com.

22      Q.   Have you ever been previously arrested?

23      A.   No, ma'am.

24      Q.   Have you ever been previously convicted?

25      A.   No, ma'am.
```

```
 1        Q.    Okay.  I just want to go over your educational
 2   background.
 3        A.    Mm-hmm.
 4        Q.    Did you go to high school?
 5        A.    Yes.
 6        Q.    Okay.  And where did you attend?
 7        A.    It was Victory Christian Academy.
 8        Q.    Did you graduate?
 9        A.    No, ma'am.
10        Q.    Did you obtain any certificates - professional
11   certificates?
12        A.    No, ma'am.  I got my GED.  I had to go retake
13   it.
14        Q.    Okay.  Let's talk about your work history.
15        A.    Mm-hmm.
16        Q.    Can you please describe your work experience?
17              What was your first job following high school?
18        A.    A hairstylist.
19        Q.    When did you begin working as a hairstylist?
20        A.    2010, 2009.
21        Q.    Okay.  And then after that, where did you work?
22        A.    I worked at Regis, in the mall.  The hair
23   salon.  And then after that, the call center Sykes.
24        Q.    And after the call center?
25        A.    I moved to Ocala.  I worked at Golden Corral.
```

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE
                                                                            12

```
 1      Q.   And then after Golden Corral, where did you

 2   work?

 3      A.   We came back here.  And I currently work at

 4   Spectrum.

 5      Q.   Did you work at Dixie Heritage?

 6      A.   Yes.

 7      Q.   When did you work there?

 8      A.   Um, it's been about two years now.  Two or

 9   three years almost.  Two years.

10      Q.   So you worked there two years ago?

11      A.   Yes, it was about a year ago, because it was my

12   daughter's birthday.  It was about a year ago.

13      Q.   Do you know which Heritage store you worked at?

14      A.   The Lakeland Square Mall.

15      Q.   And how did you find out about the position?

16      A.   Just walking through the mall, I was filling

17   out applications.  And I stopped in there and filled out

18   the application.

19      Q.   Okay.  And then who interviewed you?

20      A.   Um, the first time I went in to ask about the

21   application, it was the manager, Patti.  And then when I

22   went in after that, I'm not sure who I talked to.  I

23   don't know which - which brother it was.  I can't

24   remember.

25      Q.   Okay.  And do you know who made the decision to
```



```
 1   hire you?

 2      A.   I don't.

 3      Q.   Okay.  So when you worked there, who was your

 4   supervisor?

 5      A.   Well, the manager was Patti.  And then of

 6   course the owners were, I guess, the supervisors.

 7      Q.   So you reported to Patti, but the owners were

 8   your supervisor?

 9      A.   Yeah.  Yes, because Patti was the manager.  And

10   then the owners were above her.

11      Q.   Okay.  And what were your duties and

12   responsibilities when you worked at Dixie Heritage?

13      A.   Um, it was retail, so we did cashier.  Greeting

14   customers.  Helping customers.  We did - um, cleaning

15   the store.

16      Q.   Anything else?

17      A.   We - um, nothing.  That was about it.  Yeah, I

18   mean, cashier.  Helped customers.  Helped them in the

19   fitting rooms, if need be.

20      Q.   Okay.  And what was your typical work schedule

21   at Dixie Heritage?

22      A.   I worked the closing shift.  So it was - um, I

23   worked until close.  Which was like 8 or 9.  And then I

24   went in about 4 or 5.

25      Q.   Did you work Monday through Friday?
```



1      A.   It varied.

2      **Q.   Okay.  Do you know if Dixie provided any**

3  **discounts for customers at their stores?**

4      A.   No.  Not that I know of.  They did not provide

5  discounts.  I mean, like, their merchandise sometimes

6  would be discounted.  But, not like a customer discount.

7      **Q.   Okay.  So you - you know - you're aware that**

8  **Dixie had some discounts for merchandise in their store**

9  **on occasion, is that --**

10     A.   Like, they would mark down their, like, their

11  items?

12     **Q.   Yes.**

13     A.   Um, I honestly don't remember.

14     **Q.   Did Dixie provide any specials for customers,**

15  **for any items?**

16     A.   Not that I remember.  I mean, I don't - I don't

17  remember.

18     **Q.   Is it your testimony that you don't recall if**

19  **they - if Dixie - ever provided any specials when you**

20  **worked there two years ago?**

21     A.   Yes.

22     **Q.   Okay.  And besides your experience at Dixie,**

23  **did you work in any other retail stores in the past?**

24     A.   Yes.

25     **Q.   Where did you work?**



```
 1     A.    I worked at Rainbow, in the mall.  So...

 2           COURT REPORTER:  I'm sorry, say it again.

 3           THE WITNESS:  Rainbow.

 4  BY MS. LEITNER:

 5     Q.    And what does Rainbow sell?

 6     A.    Clothing, jewelry and shoes.

 7     Q.    And what was your position at Rainbow?

 8     A.    A sales associate.

 9     Q.    And how long did you work there?

10     A.    It was only a few months.

11     Q.    So less than three months?

12     A.    It was about five months.  Five to six months.

13     Q.    Do you have any other retail experience?

14     A.    No, ma'am.

15     Q.    So just the Rainbow?

16     A.    Yes.

17     Q.    When you worked at Rainbow?  Okay.

18           Have you ever been disciplined by an employer?

19     A.    Um, no.

20     Q.    Have you ever been written up by an employer?

21     A.    No.

22     Q.    Have you ever been fired at a job?

23     A.    Um, no.

24     Q.    Okay.  So we're here today to talk about the

25  incident that occurred on December 8, 2016, while you
```

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                              16

```
 1   were working at Dixie Heritage at the Lakeland Square
 2   Mall.
 3            So did you work at Dixie Heritage, at the
 4   Lakeland Square Mall on that day?
 5        A.   Yes.
 6        Q.   Do you know who scheduled your shift, to work
 7   at Dixie on that day?
 8        A.   I'm not sure who.
 9        Q.   Do you know what day of the week that was?
10        A.   I don't.
11        Q.   Do you know if you specifically requested to
12   work at Dixie on that day?
13        A.   No.
14        Q.   And when did you start your shift at work at
15   Dixie?
16        A.   I'm not sure the exact day.
17        Q.   When you got to work, and you arrived there,
18   what happened?
19        A.   I don't remember specifically that day.  But
20   it's just an everyday, come to work.  Um, you know, make
21   sure everything was clean.  Everything was, you know,
22   hung up correctly.  Went over everything with the
23   manager as far as how the day went.  Then just proceeded
24   with a normal day.
25        Q.   Was anyone else present on your shift that day?
```



1    A.    The manager always was there for a little bit,

2    until everything was settled. And then she would leave.

3    **Q.    Who was she?**

4    A.    Patti.

5    **Q.    How long did you work with Patti on that day?**

6    A.    Not very long.  She was only there for maybe a

7    few minutes.  Just while she finished up what she had to

8    do.  Got her stuff and then left.  So maybe, 10 minutes.

9    **Q.    It was your testimony earlier that you said**

10   **that Dixie did not have any discounts for any items.**

11           **Do you know if Dixie had any discounts for any**

12   **items at the store on that day?**

13   A.    I don't remember.

14   **Q.    Were there any customers during your shift?**

15   A.    Yes.

16   **Q.    Who was it?**

17   A.    There's always customers.  Just random

18   customers.  I don't know, like, specifics.  There's just

19   always just people in the mall coming to shop.

20   **Q.    Did anybody buy anything at the store that day?**

21   A.    Yes.

22   **Q.    What were they buying?**

23   A.    People were buying clothes.  People were buying

24   purses.  Belts.  I don't remember specifics, as far as

25   what they bought.  But I'm sure people bought shirts,



```
 1    sweatshirts.

 2             MS. LEITNER:  Do you have the receipts?

 3             (Defendant's Exhibit Number 13, was marked for

 4        Identification.)

 5    BY MS. LEITNER:

 6        Q.    Okay.  I'm going to hand you a document that's

 7    marked as Defendant's Exhibit Number 13.

 8        A.    Okay.

 9        Q.    Can you take a second to look at that, those

10    two documents.

11             I have a copy for you.

12             Did you have enough time to review them?

13        A.    Mm-hmm.

14        Q.    Have you seen them before?

15        A.    Yes.  Mm-hmm.

16        Q.    Do you recognize them?

17        A.    Yes.

18        Q.    How --

19        A.    They're receipts from the store.

20        Q.    Okay.  Are these the receipts that you use to

21    ring up the customers to buy the items that you

22    mentioned earlier, at the store on the day - on that

23    day?

24        A.    Yes.

25        Q.    Can you please tell me how many receipts there
```



```
 1  are for this one - for this transaction?

 2      A.    Um, four.

 3      Q.    Can you tell me why you rang up four different

 4  receipts for this transaction?

 5      A.    Yes.  The system, um, when I put these - the

 6  orders in - and rung them up, it looks like they're

 7  custom items.  So the system only let me rang (sic) up

 8  so many items at a time.

 9      Q.    Do you see the time on those receipts?

10      A.    Mm-hmm.

11      Q.    Can you read, for the record, what the times on

12  each receipt?

13      A.    It is 6:42.  6:25.  6:44 and 6:34.

14      Q.    Do you know why there are four different times

15  on the receipts?

16      A.    Because they were rung up four different times.

17      Q.    Do you know why it took 15 minutes to ring up

18  each item?

19      A.    No, ma'am.

20      Q.    Were you aware that Dixie had a

21  buy-one-get-one-free discount for the sweatshirts on

22  that day?

23      A.    Not that I remember.

24      Q.    Is it your testimony today, that you didn't

25  ring - you didn't apply the discount because you didn't
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

20

```
 1   remember that there was a discount on that day?
 2        A.   I don't remember as far as that day, if there
 3   was a discount.  And why, or why not, it was never
 4   applied.
 5        Q.   So looking at these receipts, do you recall
 6   what the customers bought that day?
 7        A.   I don't.  I vaguely remember.  But as far as
 8   like the receipts, I don't know.  It just says "custom
 9   items."  So I'm not sure.
10        Q.   Did you ring those items up?
11        A.   Yes.
12        Q.   And you don't recall the merchandise that was
13   bought?
14        A.   I do know it was Flogrown.  But, I don't
15   remember specifically what t-shirts, what - which
16   specifics.  I just know it was Flogrown merchandise.
17        Q.   So was it all Flogrown?
18        A.   Yes.
19        Q.   Did you find it strange that the customers only
20   picked only Flogrown items?
21        A.   Yes.
22        Q.   And why do you find it strange?
23        A.   Because the - the lady and the man that came in
24   bought all of the - the Flogrown items, that were not
25   real Flogrown.  And that's why it was strange to me.
```



**Orange Legal**
**800-275-7991**

1    Q.    When you say "real," can you give me your

2    definition of real --

3    A.    Yeah.

4    Q.    -- Flogrown items?

5    A.    Um, yeah.  You just - you can tell, um, the

6    Flogrown items usually had their - their - um, like

7    where the tag is, it was usually, like, an iron-on.  Not

8    like a regular tag.  And it said, "Flogrown."

9          The ones that were not, they didn't say

10   "Flogrown."  They didn't have an iron-on.

11   Q.    Have you ever received any courses or

12   education, on (sic) training and/or identifying any

13   counterfeit goods with the naked eye?

14   A.    No.

15   Q.    Have you ever worked anywhere where you had to

16   identify any of these counterfeit goods with the naked

17   eye?

18   A.    Not those specifically.  No.  Not Flogrown,

19   specifically.

20   Q.    Did you call anyone before or after the

21   customers purchased the Flogrown items at the store?

22   A.    Yes.

23   Q.    Who did you call?

24   A.    After everything was done, I called Miss Yeni

25   (phonetic) and I let her know what happened.



```
 1        Q.   And what did Miss Yeni say to you?

 2        A.   She told me to take all the merchandise down,

 3   and then put it in the back.

 4        Q.   And did you do that?

 5        A.   Yes.

 6        Q.   What did you do next?

 7        A.   I just took everything down.  Put it in the

 8   back.  And then I believe it was the end of the night.

 9   So shortly after that, we closed up - or I closed up.

10        Q.   So did anyone tell you to bring the clothes -

11   the clothes back - the Flogrown items - in the back of

12   the store?

13        A.   Yes.

14        Q.   And who told you to do that?

15        A.   Miss Yeni.

16        Q.   Did anybody else tell you to do that?

17        A.   No. She was the one that I called.  And she's

18   the one that told me.

19        Q.   Did you talk to anybody else about these items,

20   from Dixie?

21        A.   I don't remember.  I'm sure I did.  I'm sure

22   one the other managers I did talk to.

23        Q.   Do you know which manager you may have talked

24   to?

25        A.   I'm not sure.
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE
23

```
 1     Q.   Do you know if anyone called the police that
 2  day?
 3     A.   Not that day.  No. Not that I know of.
 4          VIDEOGRAPHER:  Sir, would you mind moving your
 5     water back a little bit?
 6          MS. LEITNER:  Do you mind if we take a break
 7     for a second?
 8          VIDEOGRAPHER:  The time is 10:29.  And we're
 9     off the record.
10               (Recess.)
11          VIDEOGRAPHER:  Time is 10:35.  And we're back
12     on the record.
13  BY MS. LEITNER:
14     Q.   Okay.  Miss Goodine, I just have a few
15  follow-up questions.
16     A.   Mm-hmm.
17     Q.   Earlier today you mentioned that you - well, we
18  previously scheduled your deposition on February 22nd.
19  You had an unfortunate emergency.  And you had to take
20  your doctor (sic) - your daughter to the hospital.
21     A.   Yes.
22     Q.   Which hospital did you go to?
23     A.   Lakeland.
24     Q.   I'm not familiar with this area.  So is it just
25  Lakeland Hospital?
```



 1      A.    Lakeland Regional.

 2      Q.    **Lakeland Regional Hospital?**

 3      A.    (Nonresponsive.  Shaking head.)

 4      Q.    **Did the hospital give you medical records?**

 5      A.    No.

 6      Q.    **Which daughter was in the hospital?**

 7      A.    Niara.

 8      Q.    **Can you provide records for Niara, if we**

 9   **request them?**

10      A.    Um, I might be able to.  It was just a stomach

11   bug.

12      Q.    **Okay.  And then earlier when we were talking**

13   **about the receipts that are right in front of you.  It's**

14   **Defendant's Exhibit Number 13.**

15            **On there, if you can look at the - look under**

16   **"transaction" it says - can you read for the - on the**

17   **record what that says on - below transaction?**

18      A.    Twelve custom items.

19      Q.    **And then on the next one?**

20      A.    Four custom items.  Four custom items.  Four

21   custom items.

22      Q.    **Okay.  And then on the next sheet.**

23      A.    Five custom items.  And then 11 onesies.

24      Q.    **Okay.  And we talked about the custom items.**

25   **Did - does Dixie's system allow you to type Flogrown on**



 1   to the receipts?

 2       A.   I don't remember.

 3       Q.   Did Dixie ever provide training to you in how

 4   real Flogrown items are supposed to look like

 5   (phonetic)?

 6       A.   No.

 7       Q.   And then we talked about - it was your

 8   testimony earlier today, that after the customers

 9   purchased these items, you - that you called Yeni.  And

10   Yeni told me (sic) - told - what did - and Yeni told you

11   to take everything - all of the Flogrown items and take

12   them in the back.

13            Is that your testimony today?  I just want to

14   be clear for the record, that when you called Yeni, and

15   Yeni told you to take everything in the back, is that

16   correct?

17            MR. RAPACKE:  Objection.  Asked and answered.

18            MS. LEITNER:  You can answer.

19            THE WITNESS:  Yes.

20            MS. LEITNER:  Okay.

21            Defendant's Exhibit Number 14, was marked for

22       Identification.)

23   BY MS. LEITNER:

24       Q.   Okay.  Do you recall taking a recorded

25   statement on/or around February 16, 2017, with Detective



```
 1   Benthal?

 2       A.   Yes.

 3       Q.   Okay.  And I'm going to hand the witness a

 4   document identified as Defendant's Exhibit Number 14.

 5            What I've handed the witness is a trans -

 6   hearing transcript of your recorded statement taken on

 7   February 16, 2017, with this Detective Benthal.

 8            Can you please turn to page 5.  Where it says,

 9   "Detective Benthal," the second from the last line

10   (pointing.)  Can you please read for the record what

11   that says - states?  The second line from the bottom.

12       A.   The Detective line?

13       Q.   Yes.

14       A.   It says, "Detective Benthal.  So she said takes

15   - you called Yeni.  She said take all the Flogrown."

16       Q.   Okay.  Keep going.

17       A.   "The fake?"

18            "Yes, the fake Flogrown merchandise."

19       Q.   Keep going.

20       A.   "She said, fake Flogrown?"

21            "Okay."

22            "Yes, ma'am."

23            "How did she know you knew what fake Flogrown

24   was?"

25            "I'm not sure."
```



```
 1          "Okay."

 2          "I'm assuming because he previously came in and

 3   bought all of that stuff, so I'm not sure."

 4          "Okay.  So she told you to take it - all of the

 5   fake Flogrown - and do what with it?"

 6          "To take it down and put it in the back."

 7          "Okay."

 8          (Inaudible.)

 9          "It was Albie (phonetic) that called me - I

10   could be mistaken, it could have been Asher - but one of

11   them called me.  And I explained to him what happened.

12   And he said, oh gosh.  He said there's somebody that's

13   out to get us and cause trouble for us."  And he's like

14   - and I think it - that's who it was.  He says, "we'll

15   handle this tomorrow."  And I believe the next day was

16   Sunday, and I didn't work on Sundays, they did."

17      Q.    Keep going up until - keep going.

18      A.    Okay.  "So I said, okay.  So I wound up taking

19   everything down that I saw, and I put it in the back.

20          And I believe I happen to be in the mall the

21   next day or Monday, when I came into work, and

22   everything was put back out.  So..."

23      Q.    Okay.  That's perfect.

24          So is it your testimony today that you put

25   everything back, once the Flogrown items were purchased?
```



1    A.   I took everything down and put it in the back,

2   like I was told.

3    Q.   **And is it your testimony today, that Yeni said**

4   **the - that the Flogrown items were fake --**

5    A.   Yes.

6    Q.   **-- when you spoke with her?**

7    A.   Yes.

8    Q.   **Okay.  We'll come back to that.**

9         **Okay.  Before we were talking about that, we**

10  **were taking about what happened after the items were**

11  **purchased.  And I'd asked if anyone called the police on**

12  **that day.  And you mentioned that you - that it wasn't**

13  **that day.**

14        **Do you know if the police were called at any**

15  **time?**

16   A.   Yes.

17   Q.   **Okay.  When were they called?**

18   A.   I don't remember the day.  It was the day that

19  I went to go pick my paycheck up.  And I told them that

20  I resigned.

21   Q.   **And what day is that?**

22   A.   I don't remember the exact day.

23   Q.   **So when was the next time you came to Dixie?**

24   A.   That day that I picked up my paycheck.

25   Q.   **Give me just a second.**



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE
29

```
 1          Can you turn to page 6 of that transcript, and
 2   read for the record where it states, "Rebecca Goodine,
 3   the next day it was..."
 4          Can you please read for the record?
 5      A.   "The next day it was Patti.  She opened until
 6   5.  And then I came in at 5, and then closed by myself.
 7   So just her until maybe 10 to 15 minutes, until she
 8   left."
 9          "Was there any conversation about the items
10   that were back on the shelf or anything like that?"
11          "No."
12          "I might have mentioned that everything got put
13   back out.  And she said, that's how it was when I came
14   in. She said, I'm not sure what they're going to do.
15   But other than that it was nothing really."
16      Q.   And let me ask you.  So when you're referring
17   to the next day, what day were you referring to?
18      A.   The very next day, after the incident happened.
19      Q.   So that would be December 7th, correct?
20      A.   I'm not sure those are the right dates.
21      Q.   Because you just mentioned that it was the day
22   that you resigned, which was not the next day.  I just
23   wanted to be clear.
24      A.   I don't remember the exact day that it
25   happened.  I don't remember the exact day that I
```



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE
30

```
 1   resigned.
 2      Q.    Okay.  How long did you work at Dixie?
 3      A.    Just a couple of months.
 4      Q.    So you came back to Dixie and you provided your
 5   resignation.  What happened on that day?
 6      A.    I don't remember.
 7      Q.    Do you know who you talked to, to provide your
 8   resignation?
 9      A.    I don't remember.  It was one of the brothers.
10   I don't remember which one specifically.
11      Q.    Did you receive your last paycheck?
12      A.    Yes.  I went and picked it up.
13      Q.    Do you know who gave you your last paycheck?
14      A.    I don't remember.  One of the brothers.
15      Q.    When you arrived, did you - one of the - did
16   one of the brothers hand you your paycheck when you
17   arrived at Dixie that day?
18      A.    No.
19      Q.    What happened?
20      A.    I was told I had to sign a paper, before I
21   could get my paycheck, that stated I did not see them
22   put any of the - um, the - I don't know what you would
23   call the - not the stencil - but, I did not see them
24   make any of the fake merchandise.
25            Until I signed that paper, I could not get my
```



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                    31

```
 1   paycheck.
 2      Q.   Who handed you the statements?
 3      A.   I don't remember which one it was.  One of the
 4   - one of the managers - the brothers.
 5      Q.   And they told you - it's your testimony today,
 6   that they told you, that you are required to sign a
 7   statement before you get your paycheck?
 8      A.   Yes.
 9      Q.   And I just want to remind you that you're under
10   oath.
11      A.   Yes.
12      Q.   Okay.
13           (Defendant's Exhibit Number 14B, was marked for
14       Identification.)
15   BY MS. LEITNER:
16      Q.   Okay.  I'm handing the witness two documents.
17   Previously marked as Defendant's Exhibit 14.
18           Can you take a moment to read those.  There's
19   another.  Do you have the other?
20           Do you recognize these documents?
21      A.   Mm-hmm.
22      Q.   How do you recognize them?
23      A.   These were the documents that were there when I
24   had to sign to pick up my paycheck.
25      Q.   And that's your signature?
```



```
 1     A.    Yes.

 2     Q.    Okay.  Can you read for the record the

 3  statements on the paper?

 4     A.    My name.  And then it says, "Throughout my

 5  employment with Dixie Heritage Lakeland and/or Dixie

 6  Heritage, LLC."

 7           And it says, "(1), have not personally printed,

 8  pressed or in any manner reproduced the Flogrown brand,

 9  including but not limited to its trademark, logo(s)

10  and/or design(s).

11           (2), have never witnessed or known any staff,

12  manager, or owner of the companies print, press or in

13  any manner reproduce the Flogrown brand, including but

14  not limited to its trademark, logos(s) and/or design(s).

15           (3), to the best of my knowledge, have only

16  sold authentic trademarked merchandise, including

17  Flogrown's apparel and accessories."

18     Q.    Okay.  Do you agree with the statement?

19     A.    What do you mean, "Do I agree with" it?

20     Q.    Did you - you just testified earlier that you

21  signed - that's your signature there.

22     A.    Mm-hmm.

23     Q.    Do you agree with the statements?

24     A.    I agree with them to the extent of, I had to

25  sign this to get my paycheck.
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE
                                                                          33

1      Q.    Okay.   After you signed the statements, what
2    happened after that?
3      A.    I signed the statements.   He gave my daughter a
4    blanket.   I believe it was a Frozen blanket.   I got my
5    paycheck.   And I left.
6      Q.    Okay.
7         (Defendant's Exhibit Number 15, was marked for
8         Identification.)
9    BY MS. LEITNER:
10     Q.    Okay.   And I'm handing the witness a document
11   previously marked as Defendant's Exhibit 15.
12         Can you please read for the record the document
13   in front of you.
14     A.    You want me to read that out loud?
15     Q.    Yes, please.
16     A.    It says "I, Patti Rumore, hereby declare and
17   affirm as follows, (1), my name is Patti Rumore.   I'm
18   over 18 years of age.   I am competent and qualified to
19   make this declaration.
20         (2), I have personal knowledge of the facts
21   stated herein.   And to the best of my knowledge the
22   facts stated herein are true and correct.
23         (3), I'm a citizen of the State of Florida.
24   I'm a resident of Plant City, Florida.
25         (4), I am the store manager at Dixie Heritage



**Orange Legal**
**800-275-7991**

1    Lakeland.  Which means that I am responsible for dealing

2    with customer relations at the store, and working

3    closely with the stores' owner Albert Tourgeman, and its

4    employees Asher Torgeman and Rebecca Goodine."

5        **Q.    Keep going.**

6        A.    "(5), on December 3, 2016, I was scheduled to

7    work at Dixie from 10 a.m. to 5:30 p.m., alongside

8    Rebecca Goodine.

9            Goodine was scheduled to work from 12 p.m. to 9

10   p.m., which is a shift that she specifically requested

11   from Dixie's owners.

12           (6), after my shift ended around 5:30 p.m., I

13   left Dixie, and received a call from Goodine, who

14   advised that a young couple, who I later learned was

15   Jesse Welch and his girlfriend, came into the store to

16   purchase a large amount of Flogrown products.

17           I redirected Goodine to contact Albert

18   Tourgeman, the store's owner regarding the sale to Welch

19   and his girlfriend.  A few minutes later, I received

20   another call from Goodine indicating that Albert

21   Tourgeman asked her to place the Flogrown merchandise in

22   the back of the store.

23           Goodine told me that she placed the Flogrown

24   merchandise products in the back of the store, because

25   Albert Tourgeman instructed her to do so.  At that



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

1  point, I received a text message from Goodine that

2  contained a picture of a Flogrown t-shirt label, asking

3  if it was fake.  This was the first time, however, that

4  I had heard mention of any Dixie products being fake.

5          Number (7), on December 4, 2016, I was

6  scheduled to work at Dixie that day.  Goodine was also

7  scheduled to work at Dixie, but she was a

8  no-call-no-show.

9          When I arrived at the store Albert Tourgeman

10  and Asher Torgeman were in the stockroom moving the

11  Flogrown merchandise placed in the back, onto the store

12  floor.

13          Albert Tourgeman asked me why the Flogrown

14  items were placed in the back.  And I explained that

15  Goodine placed them there based on his instructions.  It

16  became apparent however, that Mr. Torgeman never asked

17  that Goodine place the Flogrown items in the back of the

18  store.

19          (8), furthermore the manner in which Goodine

20  ran Jesse Welch's purchase at the register was

21  inconsistent as to how she was trained.  And how she

22  typically ran transactions for other customers on that

23  day, because she failed to describe the items they

24  purchased, including the Flogrown products.  She failed

25  to complete the purchase order under one receipt.  And



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

1  instead used four receipts, spaced in time intervals,

2  which were inconsistent with a reasonable timed

3  transgression (sic) between two orders.

4       She did not provide the discount allotted to

5  the customers, buy one get one half off, on the

6  sweatshirts.  And Goodine failed to check Lakeland (sic)

7  - Welch's ID, which was required for any and all card

8  transactions, especially orders totaling over $800 in

9  merchandise, which is what Welch's purchase order

10  totaled.

11       Shortly after Welch's purchase at Dixie,

12  Goodine gave her resign - resignation.  And came into

13  the store and dropped her key off on December 12, 2017.

14       On that day Asher Torgeman and myself, met with

15  Goodine, where Asher Torgeman provided Goodine with her

16  paycheck in exchange for her store key.

17       Mr. Torgeman explained to Goodine that any

18  employees who resign, is asked to sign a termination

19  letter stating that the reason for his or her

20  termination.

21       With her paycheck in hand, Goodine read the

22  termination letter, and without hesitation signed the

23  letter that indicated that she was resigning for

24  personal reasons.

25       Additionally, Torgeman asked Goodine that



**Orange Legal**
**800-275-7991**

1  because of false statements made by Flogrown owners in

2  the past, Jesse Welch, he asked Goodine sign a statement

3  that she never witnessed or printed the Flogrown label

4  on any products sold at Dixie Heritage Lakeland.

5          Goodine signed the statement without

6  hesitation.  After that day, I suspected that Goodine

7  and Jesse Welch conspired to bring counterfeit claims

8  against Dixie and Albert Tourgeman, because she

9  specifically requested to work on that date of the

10  incident.

11          Constantly questioning the store's products'

12  authenticity.  Worked at Dixie for two months.  Quit

13  shortly after Welch made the Flogrown purchase at the

14  store.  And without having another position lined up,

15  when she often complained about economic difficulties.

16          Moreover, I have witnessed Goodine make several

17  false statements in the past, including but not limited

18  to, the allegation that Dixie's Melbourne location got

19  caught stealing counterfeit goods.

20          This is far from the truth.  The Melbourne

21  location has been open only a month prior to the time

22  Goodine made this claim.  It remains open today.  And

23  there has not been a complaint filed against Dixie for

24  counterfeit goods made at this location.

25          To the best of my knowledge, I have never



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE
                                                                    38

1   witnessed Albert Tourgeman or Asher Torgeman, nor any

2   employee or representative of Dixie, print the Flogrown

3   name or any other trademark or branded logo on any other

4   type of apparel sold at the store, throughout my

5   employment with Dixie.

6           In fact, most of the products and merchandise

7   brought in by either Albert Tourgeman or Asher Torgeman,

8   are contained in sealed boxes.  I have never made

9   mention of that - I have never made mention that any of

10  the stores' merchandise is counterfeit or fake to

11  anyone, as I do not have any reason to believe that

12  Dixie's products are fake or counterfeited."

13  **Q.   Thank you for that.**

14  **         So I have a few questions about that.  The**

15  **exhibits that I previously gave to you, Defendant's**

16  **Exhibit Number 14, one of them is a - the - one of the**

17  **documents - can you read this document - I mean,**

18  **actually, who signed it.**

19  **         Can you read for the record, as to who signed**

20  **the statement, in front of you?**

21  A.   Patti Rumore.

22  **Q.   Okay.  And the date.**

23  A.   It is 12/9/2016.

24  **Q.   So were you aware that it's a policy or**

25  **procedure of Dixie, to have their employees sign these**



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

1   types of statements?

2        A.    No.

3        Q.    Okay.  And do you agree with any of the

4   statements that you just read in Defendant's Exhibit

5   Number 15?

6        A.    Do I agree with it?  No.

7        Q.    Which part do you not agree with?

8        A.    The majority of it.

9        Q.    Which ones?  Can you tell me?

10       A.    Let's see.  Um, well, for one, she is the one

11  that shortly after I worked there told me --

12       Q.    Who's she?

13       A.    Patti.  That the merchandise, some of it was

14  fake.  So that I do not agree with there.

15       Q.    It's your testimony today that Patti Rumore

16  told you that these items were fake?

17       A.    Yes.

18       Q.    That were purchased on that day?

19       A.    No. When I - shortly after I started, she told

20  me that previously there was an issue with Flogrown,

21  about them selling fake merchandise.  And that the -

22  she's the one that showed me as far as the tag being

23  either a regular, like, tag on the t-shirts, or printed

24  on.

25            She's the one that told me that, shortly after



Orange Legal
800-275-7991

1    I worked there.

2       Q.   Did you see any of this - any of the

3    counterfeit goods that she was mentioning?

4       A.   Yes.

5       Q.   You saw them personally?

6       A.   Yes.

7       Q.   That on - when - we're talking about the - the

8    items and the Flogrown items that you were mentioning,

9    previously, before you worked there?

10      A.   No.  No.  I didn't even step into that store

11   before I worked there.  So, no.  I only went in there,

12   got the job.  And that's when I went in there.  But, I

13   didn't shop in there before that.

14      Q.   Okay.  What other statements do you disagree

15   with?

16      A.   I don't remember requesting to work that day,

17   that long. I don't remember asking to be scheduled at

18   that time.

19      Q.   Do you recall working on December 4, 2016, and

20   no call, no showing?

21      A.   I don't remember that either.  No.  I don't

22   remember.  Un-uh.  Um, let's see...

23      Q.   Who is Jesse Welch?

24      A.   I don't know.

25      Q.   You've never had any dealings with Jesse Welch



```
 1   before he walked into Dixie Store on that day --

 2       A.   No.

 3       Q.   -- is that correct?

 4       A.   I've never heard of him.  Never seen him.

 5       Q.   Okay.  And what else do you disagree with?

 6       A.   Um, let's see.  I do not remember texting her

 7   and asking her if it was fake, on whatever merchandise

 8   it is that she's stating.  I don't remember asking in a

 9   text message, is this fake for not?  Um, I don't --

10       Q.   What do you - what - what - what do you

11   remember on that day?

12       A.   I remember calling her.  I believe I called her

13   before I called Miss Yeni.  And I told her what

14   happened.  I said it was suspicious that somebody came

15   in and bought the majority of the Flogrown items, over

16   $800 worth of product.  And she told me to let one of

17   the managers know.  And to call one of them.  Which I

18   did.

19       Q.   Okay.  Because I just want to be clear.

20   Because earlier you stated that after the customers

21   purchased the Flogrown items that day, you just called

22   Yeni.

23            So now you're remembering - or now you're

24   saying that it's different --

25       A.   Yes.
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE
42

```
 1      Q.   -- and that you called Patti Rumore.

 2      A.   Yes, because she was my manager.  And then the

 3  owners.  So I called her and let her know.  She told me

 4  to call the managers.  And that's what I did.

 5      Q.   What else happened?  And what else did you see?

 6  What else did Patti say to you?

 7      A.   That was it, just to call the managers.

 8      Q.   Do you recall anything else that you forgot to

 9  mention earlier?

10      A.   No.  Because that's when they told me to take

11  all the merchandise down.

12           MS. LEITNER:  Can we take a break?  I'm going

13      to go through my notes to see if I missed anything.

14           VIDEOGRAPHER:  The time is 11 a.m., we're off

15      the record.

16                     (Recess.)

17           VIDEOGRAPHER:  The time is 11:10.  We're back

18      on the record.

19  BY MS. LEITNER:

20      Q.   Okay.  I just have a few more questions for

21  you.

22           Who is your attorney?

23      A.   I don't have an attorney.

24      Q.   You don't have an attorney.

25           So, if Mr. Rapacke is not your attorney, have
```



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE
43

```
 1   you had any conversations with him?

 2      A.   Just briefly, as far as time and date, where we

 3   were meeting today.

 4      Q.   Did you talk about anything else?

 5      A.   No.

 6      Q.   Just the logistics?

 7      A.   Yes.

 8      Q.   How many times did you talk to Mr. Rapacke?

 9      A.   I believe, it's only been twice.

10      Q.   Okay.  And if I gave you two t-shirts right now

11   that had the Flogrown mark on it, and one of them was

12   counterfeit, and one was not, can you tell me the steps

13   that you would go through to identify the counterfeit

14   t-shirts?

15      A.   I could try.

16      Q.   Okay.  Go ahead.

17      A.   Oh...

18      Q.   How would you do that?  Help me understand.

19   Walk me through the process.

20      A.   Basically, just like I said earlier, the

21   Flogrown has the tags ironed on.  The fake merchandise

22   had just regular tags.

23      Q.   So your process, just so that I'm clear, is

24   that you would identify it through the tag of the

25   t-shirt, correct?
```



1     A.    Yes.

2     Q.    Okay.  What about identifying whether the logo

3    itself was fake, versus real, or excuse me, authentic?

4     A.    That, I don't know.

5     Q.    Okay.  So how do you know the items that you

6    think are counterfeit, were not bought by Dixie, and

7    given to Flogrown?

8          Well, how - excuse me.  Strike that.

9          How do you know the items that you think were

10   counterfeit were bought on that day, by the customers,

11   by Jesse Welch?

12    A.    I don't know who it was that bought it that

13   day.

14    Q.    How do you know the customers that bought the

15   Flogrown items, the items that you saw on the receipts,

16   that totaled approximately $811 of Flogrown items, how

17   do you know that those were counterfeit?

18    A.    Because it was all the ones that had either the

19   regular tags, and then the - not the ironed on tags -

20   which was real.  And I believe there was mention of -

21   the man who bought all of the stuff - that they did not

22   make baby onesies.  And there was also Flogrown baby

23   onesies, that he bought also.

24    Q.    Earlier today we mentioned having conversations

25   with the man that bought the t-shirts.  You mentioned



```
 1    that you didn't have any conversations.

 2            So are you saying that you've now have - had

 3    conversations with the man that brought the Flogrown

 4    items?

 5        A.   I don't remember you asking me if he - if I had

 6    conversations.  But, of course, because, you know, in

 7    retail you have to help customers.  So when they came

 8    in, I said, "Hi.  How are you doing?  Anything that I

 9    can help you with?"

10            And then when he checked out, he - I vaguely

11    remember - but, he said about the Flogrown onesies, that

12    - um, I don't remember exactly what he said.  But

13    something along the lines of, "I didn't know Flogrown

14    made baby onesies."  Or, it was something along those

15    lines.

16        Q.   Earlier today you mentioned that you met Jesse

17    Welch that day.

18            How - how were you aware that he is - he is a

19    part of Flogrown?

20        A.   I wasn't.  I - I don't know who - even by that

21    name, I don't know who that is.  I didn't know the man

22    that bought all of those clothes.  I do not know him.

23    Which --

24        Q.   How - I'm sorry.  Go ahead.

25        A.   Also in here, um, which I believe it is one of
```



```
 1  these pages, she states that - um, where is it?  That I

 2  know him, or I work with him.  Which is not true,

 3  because I have no idea who he is.  Never knew him before

 4  he even came in the store.  Never even knew him when he

 5  was in the store.

 6      Q.   How does he know that Flogrown does not make

 7  onesies?

 8      A.   I don't.  I don't know if that's exactly what

 9  he said, is that Flogrown doesn't make onesies.  But he

10  questioned Flogrown, and having onesies from Flogrown.

11  He questioned that.

12      Q.   Did Dixie ever give any items to Flogrown, for

13  Flogrown to print the Flogrown logos on those items?

14      A.   I have no idea.

15      Q.   If you don't know, how do you know the items

16  that you think are counterfeit, were not brought by

17  Dixie and given to Flogrown?

18      A.   Can you repeat that?

19      Q.   You mentioned that you don't know if Flogrown -

20  if Dixie ever gives Flogrown items, for Flogrown to

21  print the Flogrown logos on them.

22           So how do you know that the items that you

23  think were brought, were counterfeit, and were not

24  bought by Dixie, and then given to Flogrown?

25      A.   Because all of the Flogrown, had the printed
```



 1   tag on it, and not the regular tags that - this was a

 2   flap tag on the back, with the size on 'em and stuff.

 3      Q.   Okay.  I just want to be clear.  So it's based

 4   on - your detection of counterfeit t-shirts, is based on

 5   the tag, is that your testimony today?

 6      A.   Yes.

 7      Q.   Okay.  And do you know how Patti knows that

 8   these items were counterfeit?

 9      A.   I don't.

10      Q.   She never explained the process --

11      A.   No.

12      Q.   -- as to how she identified these counterfeit

13   goods?

14      A.   (Nonresponsive.  Shaking head.)

15      Q.   So is it your testimony today, that Patti does

16   not know - or, I'm sorry.  Strike that.

17           Is it your testimony today, that Patti

18   mentioned that they were counterfeit, but did not

19   explain why?

20      A.   As far as I can remember, because I don't

21   remember exactly, I remember she brought it up one day,

22   that the - it was - there was fake merchandise.  I don't

23   remember if she explained to me if it was by the tag.  I

24   don't remember exactly.

25      Q.   So if Patti told you that Flogrown (sic) had



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

1  **sold counterfeit products before, why did you continue**

2  **to work there?**

3      A.   Because I wasn't sure it was 100 percent true.

4      **Q.   And how did you make sure?**

5      A.   I just - I wasn't sure it was 100 percent true.

6  And then, you know, everything seemed fine on a

7  day-to-day basis, until whoever it was came in and

8  bought over $800 worth of products.  Which then that

9  threw up a little red flag right there.  And then

10 shortly after that is then when I proceeded to resign.

11     **Q.   Okay.  So you just mentioned that when that**

12 **customer, who bought $811 of Flogrown items that day,**

13 **and then you also mentioned that the Flogrown items that**

14 **were on (sic) the store were taken to the back of the**

15 **store.**

16          **So which items were taken back on that day?**

17          **Jesse bought $811 worth of items, of Flogrown**

18 **items.  What Flogrown items were taken in the back?**

19     A.   It was all the Flogrown items that were out on

20 the store, is what I was told to put in the back.

21     **Q.   So was it a rack of things?**

22     A.   Yes.

23     **Q.   Was it --**

24     A.   It was t-shirts --

25     **Q.   -- piles?**



1    A.   -- baby onesies.  It was all different kinds of

2    t-shirts.  I believe that was about it; t-shirts and

3    onesies.

4    **Q.   Okay.  So I just want to be clear.  So your**

5    **testimony today is, Jesse bought $811 of Flogrown items.**

6    **And that there was still some Flogrown items that were**

7    **still available on that day, that you took on - to the**

8    **back of the store.  Is that correct?**

9    A.   Yes.

10   **Q.   Okay.  I just want to go back to the day that**

11   **you came back to the store, to put your resignation**

12   **letter in.**

13         **When you came back to the store, did you bring**

14   **anything back to give to the owners, or the manager?**

15   A.   The only thing had that happened is, I came

16   back.  I gave the key.  And then that's when I had to

17   sign the paper.  And then that was it.  I got my

18   paycheck and then left.

19   **Q.   At what point did you give the key back?**

20         **When you got there.  You went - you met the**

21   **owner and the manager.  At what point did you give your**

22   **key back?**

23   A.   As soon as I walked in, I had the key.  I don't

24   remember which brother it was, gave a blanket to my

25   daughter, who I had with me.  And then we might have



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

1   talked for maybe a few minutes.  I honestly don't

2   remember.

3        I gave 'em the key.  I went over the paper.  I

4   had to sign it before I could get my paycheck.  I got my

5   paycheck.  And then I walked out and left.

6   **Q.   Have you spoken to Jesse Welch since this**

7   **lawsuit started?**

8   A.   No.

9   **Q.   Have you spoken to the other customer, that was**

10  **with Jesse Welch on that day --**

11  A.   No.

12  **Q.   -- since this lawsuit?**

13  A.   No.  No, ma'am.

14       MS. LEITNER:  I'm just going to take one more

15       break.  We're almost done.  I just want to make sure

16       that I've covered everything.  And I think we'll be

17       wrapping up in the next 10 or 15 minutes.  Okay?

18       VIDEOGRAPHER:  The time is 11:20.  And we're

19       off the record.

20                 (Recess.)

21       VIDEOGRAPHER:  The time is 11:32.  We're back

22       on the record.

23  BY MS. LEITNER:

24  **Q.   Okay.  Earlier we - you talked about today, how**

25  **you could identify Flogrown items as to whether they're**



**Orange Legal**
**800-275-7991**

1  counterfeit or authentic based on their tags, on a

2  t-shirt.  Do you remember that?

3      A.   Yes.

4      Q.   Okay.  How do you know if all Flogrown apparel

5  has tags on them?

6      A.   I don't.

7      Q.   Do you know if any - if all Flogrown t-shirts

8  have tags on them?

9      A.   I don't.

10          Is there any way that we can go back real

11  quick?  Um, there is also something in here that I also

12  wanted to say.

13      Q.   We - we - if your - if the attorney wants to

14  talk about that, we can.  But we'll go back to that --

15          MR. RAPACKE:  I'm not her attorney.

16          MS. LEITNER:  I'm sorry.  If you have

17      questions, and if you want to talk about that,

18      that's fine.  But, I'm going to be asking questions,

19      and then you answer.  So we'll - we'll go with that

20      format.

21          Did you have something to say?

22          MR. RAPACKE:  (Nonresponsive.)

23  BY MS. LEITNER:

24      Q.   Okay.  And then let's go back on - well, when

25  you worked at Dixie, and the process of printing



1   t-shirts.  **Can you walk me through that process and how**

2   **you did that?**

3       A.   Yeah.  There was a little printer machine.

4   They had decals that were All American Outfitters.  Um,

5   there might have been another brand.  And then they had

6   decals along the wall.  So, you know, a customer would

7   choose, I want this.  And then we would basically just

8   get the plain t-shirt.  Put it on the printer.  Put the

9   decal on.  Put the thing down.  And then that was it.

10      **Q.   So did you ever print Flogrown logos for Dixie?**

11      A.   No.

12      **Q.   Did you print Flogrown logos for Jesse Welch on**

13  **the day that he purchased $811 of Flogrown items?**

14      A.   No.

15      **Q.   Okay.  I just wanted to go back to Defendant's**

16  **Exhibit Number 14.  And this is the statement that you**

17  **signed when you resigned at Dixie.**

18           **Can I just have you go through the first**

19  **sentence.**

20      A.   Mm-hmm.  It's my name, Rebecca Goodine.

21  "Throughout my employment with Dixie Heritage Lakeland

22  and/or Dixie Heritage, LLC, the companies, 1, have not

23  personally printed, pressed or in any manner reproduced

24  the Flogrown brand, including but not limited to its

25  trademark, logo(s) and/or design(s)."



 1      Q.    Okay.  I'm going to stop you right there.

 2            Earlier you testified today that you said that

 3   you didn't agree with the statement, because - and you

 4   signed the statement, because you wanted to get your

 5   paycheck.

 6            So with respect to this first statement, do you

 7   agree with the - with the statement?  Can you tell me

 8   yes or no?

 9      A.    Yes.  Because I did not print any Flogrown

10   products or anything brand-related.

11      Q.    Okay.  And the next sentence, can you please

12   read that for the record?

13      A.    "Have never witnessed or known any staff,

14   manager or owner of the companies print, press or in any

15   manner reproduce the Flogrown brand, including but not

16   limited to its trademark, logo(s) and/or design(s)."

17      Q.    And with that statement, do you agree with it?

18   Yes or no?

19      A.    Yes.  I never saw anybody print any of the fake

20   merchandise.

21      Q.    Okay.  And let's talk about the next sentence.

22      A.    "To the best of my knowledge, have only sold

23   authentic trademarked merchandise, including Flogrown's

24   apparel and accessories."

25      Q.    Do you agree with that statement?  Yes or no?



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

```
 1     A.   No.

 2     Q.   Why is that?

 3     A.   Because I do believe that the merchandise that

 4   was purchased was the fake merchandise.

 5     Q.   And your belief is based on the hanging tags,

 6   is that correct?

 7     A.   Yes.

 8     Q.   Is it - that based on anything else?

 9     A.   And the fact that somebody came in and bought

10   over $800 worth of clothes and merchandise.  Yes.

11     Q.   Within those clothes that were bought on that

12   day, did they include onesies?

13     A.   Yes.

14     Q.   Okay.  And when you put certain - the

15   merchandise that was wasn't purchased on that day - did

16   those merchandise, did that include onesies?

17     A.   I do not remember.

18          MS. LEITNER:  Okay.  I have no more further

19     questions.  No questions.

20          MR. RAPACKE:  I have a couple of questions.

21          MS. LEITNER:  Okay.

22                    CROSS-EXAMINATION

23   BY MR. RAPACKE:

24     Q.   Can I - Exhibit Number 14.  Strike that.  I

25   don't need that.
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                            55

1          Miss Goodine, did you call the police?

2     A.   Yes.

3     Q.   Why did you call the police?

4     A.   Well, one, because, you know, somebody came and

5  bought over $800 worth of merchandise, seemed suspicious

6  to me.  And then as far as knowing that it was fake

7  merchandise shortly after that, I resigned, because I

8  didn't want to be, you know, any part of it.  I didn't

9  want anything - you know, to - me to be wrapped up into

10  it.  And then once I signed this - I had to sign this to

11  get my paycheck - um, and it does say that to the best

12  of my knowledge, I have only sold authentic trademarked

13  merchandise.  Which I believe is not true.  So to get my

14  paycheck I had to sign this, which I thought was also

15  suspicious.  So when I left, I did call.

16     Q.   And just to confirm.  You've never met Jesse

17  Welch before working at Dixie Heritage, LLC, is that

18  correct?

19     A.   Correct.  Yes.

20     Q.   Who are the managers of Dixie Heritage, LLC?

21     A.   The manager was Patti.  And then the owners

22  were Asher and Albie.  And then Yeni.

23     Q.   Okay.  Were Asher and Albie the owners at the

24  same time?

25     A.   Yes, as far as I know.



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

1      Q.   Would they come in together?

2      A.   Um, sometimes.  Usually it was just one of

3  them.  But sometimes they did come in together.  Mm-hmm.

4      Q.   Okay.  When you received your paycheck that

5  day, do you recall the contents on the paycheck that

6  day?

7      A.   I don't remember.  No.

8      Q.   How much were you paid an hour?  Do you recall?

9      A.   I don't remember.

10      Q.   Who signed the paycheck?  Do you recall?

11      A.   Um, I don't.  It was one of the brothers.  I'm

12  not sure who it was.  It was the, um, the day that I

13  came in, I believe.

14      Q.   Okay.  Was your contact information on the

15  paycheck?

16      A.   It should have been.  But, I don't recall.

17      Q.   When you began working at Dixie Heritage, LLC,

18  what documents did you fill out?

19      A.   Um, I had to send in a copy of my license and

20  my Social Security card.  Um, and I don't really

21  remember filling anything out.

22      Q.   Okay.  Have you had any contact with Jesse

23  Welch since you resigned from Dixie Heritage, LLC?

24      A.   No.

25      Q.   Did Jesse Welch ever pay you to call the



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                     57

1   police?

2       A.    No.

3       Q.    Did Jesse Welch ever coerce you to call the

4   police?

5       A.    No.

6           MR. RAPACKE:   No further questions.

7                   REDIRECT

8   BY MS. LEITNER:

9       Q.    How do you know that Asher Torgeman owns Dixie

10  Heritage, LLC of Lakeland?  Have you seen a Sunbiz - I'm

11  sorry.

12          How do you know that Asher Torgeman owns Dixie

13  Heritage?

14      A.    I don't.  That's just - what I mean - I've just

15  always known that that's the owners.

16      Q.    Have you seen anything reflecting on Sunbiz

17  saying that Asher Torgeman owns Dixie Heritage, LLC of

18  Lakeland?

19      A.    I don't know.  Not that I recall.

20      Q.    And you - and before Jesse Welch purchased

21  those items - and I just want to clarify.  You were

22  saying that you've never spoken to Jesse Welch before

23  that day.

24      A.    Correct.

25      Q.    Is that correct?



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                          58

```
 1     A.    Correct.  I've never seen him.  I've never

 2  spoken to him.  Even to this day, I've never seen him or

 3  spoken to him.  I couldn't tell you who he is if we

 4  walked down the street and bumped into each other.

 5     Q.    Okay.

 6           MR. RAPACKE:  I have one more follow-up.

 7                        RECROSS

 8  BY MR. RAPACKE:

 9     Q.    Just on Exhibit 13.  You previously read

10  Exhibit 13 for the record.  Can you tell me on here,

11  just under the individual orders, what day this was?

12     A.    It was December 3, 2016.

13     Q.    Is that a true and accurate copy?

14     A.    I honestly don't remember the exact date.  So I

15  don't want to say yes or no, because I'm not - I don't

16  remember the exact date that it was.

17           MR. RAPACKE:  Okay.  Thank you.  No further

18      questions.

19           MS. LEITNER:  No further questions.

20           VIDEOGRAPHER:  The time is 11:41.  This ends

21      the deposition.

22           COURT REPORTER:  And did you need to order?

23           MS. LEITNER:  Are we ordering?

24           MR. WATSON:  We'll order.

25           COURT REPORTER:  And did you want a copy?
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                        59

```
 1          MR. RAPACKE:  Yes.

 2          MR. WATSON:  We do not need a hard copy,

 3    though.

 4          COURT REPORTER:  You just want an e-tran?

 5          MR. WATSON:  Yes.

 6          COURT REPORTER:  E-tran on both?

 7          MR. RAPACKE:  Yes.

 8          (Deposition concluded at 11:43 a.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                    60

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF POLK:

 5

 6       I, KATHY WESCOTT, CSR, Notary Public, State of

 7   Florida, do hereby certify that REBECCA GOODINE,

 8   personally appeared before me on March 22, 2018 and was

 9   duly sworn and produced a Florida Driver's License as

10   Identification.

11       Signed this 28th day of March, 2018.

12

13

14

15            Kathy Wescott

16            _____
              KATHY WESCOTT, CSR
17            Notary Public, State of Florida
              My Commission No.: GG125699
18            Expires: July 20, 2021

19

20

21

22

23

24

25
```



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                                61

```
 1                    CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA:

 3   COUNTY OF POLK:

 4

 5        I, KATHY WESCOTT, CSR, Notary Public, State of

 6   Florida, certify that I was authorized to and did

 7   stenographically report the deposition of REBECCA

 8   GOODINE; that a review of the transcript was requested;

 9   and that the foregoing transcript, pages 6 through 59,

10   is a true and accurate record of my stenographic notes.

11        I further certify that I am not a relative,

12   employee, or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16

17        DATED this 28th day of March, 2018.

18

19                   Kathy Wescott

20        _____
             KATHY WESCOTT, CSR
21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE                                                          62

```
 1                        ERRATA SHEET

 2        DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE

 3          IN RE:    FLOGROWN, LLC VERSUS DIXIE HERITAGE,
     LLC, ASHER TORGEMAN AND ALBERT TOURGEMAN
 4          CASE NO:   6:17-CV-00983-GKS-GJK
            DATE:      MARCH 22, 2018
 5          DEPONENT:  REBECCA GOODINE

 6

 7   PAGE NO. LINE NO.  CORRECTION & REASON

 8   _____  _____   _____

 9   _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true.

24   _____

25   DATE                          REBECCA GOODINE
```



**Orange Legal**
**800-275-7991**

 1  March 28, 2018

 2  Rebecca Goodine
    1707 Reynolds Road
 3  Lot 18
    Lakeland, Florida 33801

 4
    In Re:  March 22, 2018, Deposition of REBECCA GOODINE
 5
    Dear Rebecca Goodine:
 6
        This letter is to advise that the transcript for the
 7  above-referenced deposition has been completed and is
    available for review.  Please contact our office at
 8  (800)275-7991 to make arrangements for read and sign or
    sign below to waive review of this transcript.
 9
        It is suggested that the review of this transcript
10  be completed within 30 days of your receipt of this
    letter, as considered reasonable under Federal Rules*;
11  however, there is no Florida Statute to this regard.

12      The original of this transcript has been forwarded
    to the ordering party and your errata, once received,
13  will be forwarded to all ordering parties for inclusion
    in the transcript.

14
                            Sincerely,
15

16                          Kathy Wescott, CSR
                            Orange Reporting, Inc.
17

18  Waiver:

19  I,_____, hereby waive the reading and signing
    of my deposition transcript.
20
    _____  _____
21  Deponent Signature            Date

22  *Federal Civil Procedure Rule 30(e)/Florida Civil
    Procedure Rule 1.310(e)
23

24

25



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

### Exhibits

**032218_R. GOODINE_ Exhibit 12** 3:14 6:17,19

**032218_R. GOODINE_ Exhibit 13** 3:15 18:3,7 24:14 58:9,10

**032218_R. GOODINE_ Exhibit 14a** 3:16

**032218_R. GOODINE_ Exhibit 14b** 3:17 31:13

**032218_R. GOODINE_ Exhibit 15** 3:18 33:7,11 39:4,5

---

### $

**$800** 36:8 41:16 48:8 54:10 55:5

**$811** 44:16 48:12,17 49:5 52:13

---

### (

**(1)** 32:7 33:17

**(2)** 32:11 33:20

**(3)** 32:15 33:23

**(4)** 33:25

**(5)** 34:6

**(6)** 34:12

**(7)** 35:5

**(8)** 35:19

---

### 1

**1** 5:4 52:22

**10** 7:11 17:8 29:7 34:7 50:17

**100** 10:7 48:3,5

**104** 7:10

**10:08** 5:10

**10:29** 23:8

**10:35** 23:11

**11** 24:23 42:14

**1102** 7:9

**11:10** 42:17

**11:20** 50:18

**11:32** 50:21

**11:41** 58:20

**11:43** 59:8

**12** 6:17,19 34:9 36:13

**12/9/2016** 38:23

**13** 18:3,7 24:14 58:9, 10

**14** 25:21 26:4 31:17 38:16 52:16 54:24

**14B** 31:13

**15** 19:17 29:7 33:7, 11 39:5 50:17

**16** 25:25 26:7

**1707** 9:24

**18** 9:24 33:18

---

### 2

**2/22/2018** 7:11

**2009** 11:20

**2010** 11:20

**2016** 15:25 34:6 35:5 40:19 58:12

**2017** 25:25 26:7 36:13

**2018** 5:10 7:25

**206** 5:8

**22** 5:10 7:24

**22nd** 7:13 8:2 23:18

---

### 3

**3** 34:6 58:12

**33801** 9:25

**33803** 5:9 7:10

---

### 4

**4** 13:24 35:5 40:19

---

### 5

**5** 13:24 26:8 29:6

**5:30** 34:7,12

---

### 6

**6** 29:1

**617-cv-00983-gks-gjk** 5:6

**6:25** 19:13

**6:34** 19:13

**6:42** 19:13

**6:44** 19:13

---

### 7

**7th** 29:19

---

### 8

**8** 13:23 15:25

**863-272-0925** 10:19

---

### 9

**9** 13:23 34:9

---

### A

**a.m** 5:10

**a.m.** 7:11 34:7 42:14 59:8

**Academy** 11:7

**accessories** 32:17 53:24

**accurate** 58:13

**Additionally** 36:25

**address** 9:23 10:3, 20

**advised** 34:14

**affirm** 33:17

**age** 33:18

**agree** 32:18,19,23,24 39:3,6,7,14 53:3,7, 17,25

**ahead** 43:16 45:24

**Albert** 5:20 34:3,17, 20,25 35:9,13 37:8 38:1,7

**Albie** 27:9 55:22,23

**aliases** 6:13

**allegation** 37:18

**allotted** 36:4

**alongside** 34:7

**American** 52:4

**amount** 34:16

**and/or** 21:12 32:5, 10,14 52:22,25 53:16

**Andrew** 5:16

**apparel** 32:17 38:4 51:4 53:24

**apparent** 35:16

**application** 12:18, 21

**applications** 12:17

**applied** 20:4

**apply** 19:25

**approximately** 44:16

**area** 23:24

**arrested** 10:22

**arrived** 16:17 30:15, 17 35:9

**Asher** 5:19 27:10 34:4 35:10 36:14,15 38:1,7 55:22,23 57:9,12,17

**associate** 15:8

**assume** 8:17

**assuming** 27:2

**attend** 11:6

**attorney** 5:16 9:3 42:22,23,24,25 51:13,15

**authentic** 32:16 44:3 51:1 53:23 55:12

**authenticity** 37:12

**Avenue** 7:10

**aware** 14:7 19:20 38:24 45:18

---

### B

**baby** 44:22 45:14 49:1

**back** 12:3 22:3,8,11 23:5,11 25:12,15 27:6,19,22,25 28:1,8 29:10,13 30:4 34:22, 24 35:11,14,17 42:17 47:2 48:14,16, 18,20 49:8,10,11,13, 14,16,19,22 50:21 51:10,14,24 52:15

**background** 9:22 11:2

**based** 35:15 47:3,4 51:1 54:5,8

**basically** 43:20 52:7

**basis** 48:7

**Becky** 6:14

**began** 56:17

**begin** 11:19

**begins** 5:4



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

**behalf** 5:12,18

**belief** 54:5

**Belts** 17:24

**Benthal** 26:1,7,9,14

**birthday** 12:12

**bit** 17:1 23:5

**blanket** 33:4 49:24

**bottom** 26:11

**bought** 17:25 20:6, 13,24 27:3 41:15 44:6,10,12,14,21,23, 25 45:22 46:24 48:8, 12,17 49:5 54:9,11 55:5

**boxes** 38:8

**brand** 32:8,13 52:5, 24 53:15

**brand-related** 53:10

**branded** 38:3

**break** 8:19,21,23 23:6 42:12 50:15

**briefly** 43:2

**bring** 22:10 37:7 49:13

**brother** 12:23 49:24

**brothers** 30:9,14,16 31:4 56:11

**brought** 38:7 45:3 46:16,23 47:21

**bug** 24:11

**bumped** 58:4

**buy** 17:20 18:21 36:5

**buy-one-get-one-free** 19:21

**buying** 17:22,23

## C

**call** 11:23,24 21:20, 23 30:23 34:13,20 40:20 41:17 42:4,7 55:1,3,15 56:25 57:3

**called** 21:24 22:17 23:1 25:9,14 26:15 27:9,11 28:11,14,17 41:12,13,21 42:1,3

**calling** 41:12

**cancelled** 7:15

**card** 36:7 56:20

**case** 5:6

**cashier** 13:13,18

**caught** 37:19

**center** 11:23,24

**certificates** 11:10, 11

**check** 36:6

**checked** 45:10

**children** 10:12,14

**choose** 52:7

**Christian** 11:7

**citizen** 33:23

**City** 33:24

**claim** 37:22

**claims** 37:7

**clarify** 57:21

**clean** 16:21

**cleaning** 13:14

**clear** 25:14 29:23 41:19 43:23 47:3 49:4

**close** 13:23

**closed** 22:9 29:6

**closely** 34:3

**closing** 13:22

**clothes** 17:23 22:10, 11 45:22 54:10,11

**Clothing** 15:6

**coerce** 57:3

**companies** 32:12 52:22 53:14

**competent** 33:18

**complained** 37:15

**complaint** 37:23

**complete** 35:25

**concluded** 59:8

**conducted** 5:8

**confirm** 55:16

**conspired** 37:7

**Constantly** 37:11

**contact** 34:17 56:14, 22

**contained** 35:2 38:8

**contents** 56:5

**continue** 48:1

**conversation** 29:9

**conversations** 43:1 44:24 45:1,3,6

**convicted** 10:24

**copy** 6:18 18:11 56:19 58:13,25 59:2

**Corral** 11:25 12:1

**correct** 25:16 29:19 33:22 41:3 43:25 49:8 54:6 55:18,19 57:24,25 58:1

**correctly** 16:22

**Counsel** 5:14

**counterfeit** 21:13, 16 37:7,19,24 38:10 40:3 43:12,13 44:6, 10,17 46:16,23 47:4, 8,12,18 48:1 51:1

**counterfeited** 38:12

**couple** 30:3 34:14 54:20

**courses** 21:11

**Court** 5:11,15,21 6:2 8:8,9,11 9:1 15:2 58:22,25 59:4,6

**covered** 50:16

**CROSS-EXAMINATION** 54:22

**custom** 19:7 20:8 24:18,20,21,23,24

**customer** 14:6 34:2 48:12 50:9 52:6

**customers** 13:14,18 14:3,14 17:14,17,18 18:21 20:6,19 21:21 25:8 35:22 36:5 41:20 44:10,14 45:7

## D

**date** 5:10 7:8,11 37:9 38:22 43:2 58:14,16

**dates** 29:20

**daughter** 7:17,19 23:20 24:6 33:3 49:25

**daughter's** 12:12

**day** 16:4,7,9,12,16, 19,23,24,25 17:5,12, 20 18:22,23 19:22 20:1,2,6 23:2,3 27:15,21 28:12,13, 18,21,22,24 29:3,5, 17,18,21,22,24,25 30:5,17 35:6,23 36:14 37:6 39:18 40:16 41:1,11,21 44:10,13 45:17 47:21 48:12,16 49:7, 10 50:10 52:13 54:12,15 56:5,6,12 57:23 58:2,11

**day-to-day** 48:7

**dealing** 34:1

**dealings** 40:25

**decal** 52:9

**decals** 52:4,6

**December** 15:25 29:19 34:6 35:5 36:13 40:19 58:12

**decision** 12:25

**declaration** 33:19

**declare** 33:16

**defendant's** 6:17,19 18:3,7 24:14 25:21

26:4 31:13,17 33:7, 11 38:15 39:4 52:15

**Defendants** 5:19

**definition** 21:2

**deposition** 5:5,8 7:6,13 8:3,6 23:18 58:21 59:8

**Derek** 10:11

**describe** 11:16 35:23

**design(s)** 32:10,14 52:25 53:16

**detection** 47:4

**Detective** 25:25 26:7,9,12,14

**difficult** 9:7,11,14

**difficulties** 37:15

**DIRECT** 6:3

**disagree** 40:14 41:5

**disciplined** 15:18

**discount** 14:6 19:21, 25 20:1,3 36:4

**discounted** 14:6

**discounts** 14:3,5,8 17:10,11

**Dixie** 5:7,19 12:5 13:12,21 14:2,8,14, 19,22 16:1,3,7,12,15 17:10,11 19:20 22:20 25:3 28:23 30:2,4,17 32:5 33:25 34:7,13 35:4,6,7 36:11 37:4,8,12,23 38:2,5,25 41:1 44:6 46:12,17,20,24 51:25 52:10,17,21, 22 55:17,20 56:17, 23 57:9,12,17

**Dixie's** 24:25 34:11 37:18 38:12

**doctor** 23:20

**document** 6:16,24 18:6 26:4 33:10,12 38:17

**documents** 6:23



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

18:10 31:16,20,23
38:17 56:18

**Drive** 5:9

**dropped** 36:13

**duties** 13:11

———————

**E**

**e-mail** 10:20

**e-tran** 59:4,6

**earlier** 17:9 18:22
23:17 24:12 25:8
32:20 41:20 42:9
43:20 44:24 45:16
50:24 53:2

**Easton** 5:9

**economic** 37:15

**education** 21:12

**educational** 11:1

**em** 47:2 50:3

**emergency** 7:16,18
23:19

**employee** 38:2

**employees** 34:4
36:18 38:25

**employer** 15:18,20

**employment** 32:5
38:5 52:21

**end** 22:8

**ended** 34:12

**ends** 58:20

**endurance** 8:19

**events** 9:19

**Eventually** 10:5

**everyday** 8:10 16:20

**exact** 16:16 28:22
29:24,25 58:14,16

**EXAMINATION**
6:3

**exchange** 36:16

**excuse** 44:3,8

**Exhibit** 6:17,19
18:3,7 24:14 25:21
26:4 31:13,17 33:7,
11 38:16 39:4 52:16
54:24 58:9,10

**exhibits** 38:15

**experience** 11:16
14:22 15:13

**explain** 47:19

**explained** 27:11
35:14 36:17 47:10,
23

**extent** 32:24

**eye** 21:13,17

———————

**F**

**fact** 38:6 54:9

**facts** 33:20,22

**failed** 35:23,24 36:6

**fake** 26:17,18,20,23
27:5 28:4 30:24
35:3,4 38:10,12
39:14,16,21 41:7,9
43:21 44:3 47:22
53:19 54:4 55:6

**false** 37:1,17

**familiar** 7:1 23:24

**familiarize** 6:22

**February** 7:13,24
8:1 23:18 25:25 26:7

**filed** 37:23

**fill** 56:18

**filled** 12:17

**filling** 12:16 56:21

**find** 12:15 20:19,22

**fine** 48:6 51:18

**finish** 8:23,24

**finished** 17:7

**fired** 15:22

**fitting** 13:19

**flag** 48:9

**flap** 47:2

**Flogrown** 5:6,17
20:14,16,17,20,24,25
21:4,6,8,10,18,21
22:11 24:25 25:4,11
26:15,18,20,23 27:5,
25 28:4 32:8,13
34:16,21,23 35:2,11,
13,17,24 37:1,3,13
38:2 39:20 40:8
41:15,21 43:11,21
44:7,15,16,22 45:3,
11,13,19 46:6,9,10,
12,13,17,19,20,21,
24,25 47:25 48:12,
13,17,18,19 49:5,6
50:25 51:4,7 52:10,
12,13,24 53:9,15

**Flogrown's** 32:17
53:23

**floor** 35:12

**Florida** 5:9 7:10
9:25 33:23,24

**follow-up** 23:15
58:6

**forgot** 42:8

**format** 51:20

**Friday** 13:25

**front** 24:13 33:13
38:20

**Frozen** 33:4

**full** 6:7

**future** 10:4

———————

**G**

**gave** 30:13 33:3
36:12 38:15 43:10
49:16,24 50:3

**GED** 11:12

**general** 9:22

**girlfriend** 34:15,19

**give** 5:24 21:1 24:4
28:25 46:12 49:14,
19,21

**Golden** 11:25 12:1

**Good** 6:5,6

**Goodine** 5:5 6:5,9
10:11 23:14 29:2
34:4,8,9,13,17,20,23
35:1,6,15,17,19
36:6,12,15,17,21,25
37:2,5,6,16,22 52:20
55:1

**goods** 21:13,16
37:19,24 40:3 47:13

**gosh** 27:12

**graduate** 11:8

**Greeting** 13:13

**guess** 13:6

———————

**H**

**hair** 11:22

**hairstylist** 11:18,19

**half** 36:5

**hand** 5:22 6:15 18:6
26:3 30:16 36:21

**handed** 26:5 31:2

**handing** 31:16
33:10

**handle** 27:15

**hanging** 54:5

**happen** 27:20

**happened** 16:18
21:25 27:11 28:10
29:18,25 30:5,19
33:2 41:14 42:5
49:15

**hard** 59:2

**head** 24:3 47:14

**heard** 35:4 41:4

**hearing** 26:6

**Helped** 13:18

**Helping** 13:14

**Heritage** 5:7,19
12:5,13 13:12,21
16:1,3 32:5,6 33:25
37:4 52:21,22 55:17,
20 56:17,23 57:10,

13,17

**hesitation** 36:22
37:6

**high** 11:4,17

**hire** 13:1

**history** 11:14

**honestly** 14:13 50:1
58:14

**hospital** 7:23,24
23:20,22,25 24:2,4,6

**hour** 56:8

**hung** 16:22

**Hunter** 5:12

———————

**I**

**ID** 36:7

**idea** 46:3,14

**Identification** 6:20
18:4 25:22 31:14
33:8

**identified** 26:4
47:12

**identify** 21:16
43:13,24 50:25

**identifying** 21:12
44:2

**Inaudible** 27:8

**incident** 15:25 29:18
37:10

**include** 54:12,16

**including** 32:9,13,
16 35:24 37:17
52:24 53:15,23

**inconsistent** 35:21
36:2

**indicating** 34:20

**individual** 58:11

**information** 56:14

**instructed** 34:25

**instructions** 35:15

**instructs** 9:4



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

intervals 36:1

interviewed 12:19

introduce 5:14

iron-on 21:7,10

ironed 43:21 44:19

issue 39:20

issues 9:16

item 19:18

items 14:11,15 17:10,12 18:21 19:7,8 20:9,10,20,24 21:4,6,21 22:11,19 24:18,20,21,23,24 25:4,9,11 27:25 28:4,10 29:9 35:14,17,23 39:16 40:8 41:15,21 44:5,9,15,16 45:4 46:12,13,15,20,22 47:8 48:12,13,16,17,18,19 49:5,6 50:25 52:13 57:21

### J

Jesse 34:15 35:20 37:2,7 40:23,25 44:11 45:16 48:17 49:5 50:6,10 52:12 55:16 56:22,25 57:3,20,22

jewelry 15:6

job 11:17 15:22 40:12

### K

Kathy 5:11

key 36:13,16 49:16,19,22,23 50:3

kind 9:6

kinds 49:1

knew 26:23 46:3,4

knowing 55:6

knowledge 32:15 33:20,21 37:25 53:22 55:12

### L

label 35:2 37:3

lady 20:23

Lakeland 5:9 7:10 9:24 12:14 16:1,4 23:23,25 24:1,2 32:5 34:1 36:6 37:4 52:21 57:10,18

large 34:16

lawsuit 50:7,12

learned 34:14

leave 17:2

left 17:8 29:8 33:5 34:13 49:18 50:5 55:15

Legal 5:13 7:9

Leia 5:18

Leitner 5:18 6:4,15,21 15:4 18:2,5 23:6,13 25:18,20,23 31:15 33:9 42:12,19 50:14,23 51:16,23 54:18,21 57:8 58:19,23

letter 36:19,22,23 49:12

license 56:19

limited 32:9,14 37:17 52:24 53:16

lined 37:14

lines 45:13,15

lived 10:1

LLC 5:6,7,17,19 32:6 52:22 55:17,20 56:17,23 57:10,17

location 37:18,21,24

logistics 43:6

logo 38:3 44:2

logo(s) 32:9 52:25 53:16

logos 46:13,21 52:10,12

logos(s) 32:14

long 10:1 15:9 17:5,6 30:2 40:17

Lot 9:24

loud 33:14

Lynn 6:9

### M

machine 52:3

made 12:25 37:1,13,22,24 38:8,9 45:14

majority 39:8 41:15

make 9:7,10,13 16:20 30:24 33:19 37:16 44:22 46:6,9 48:4 50:15

mall 11:22 12:14,16 15:1 16:2,4 17:19 27:20

man 20:23 44:21,25 45:3,21

manager 12:21 13:5,9 16:23 17:1 22:23 32:12 33:25 42:2 49:14,21 53:14 55:21

managers 22:22 31:4 41:17 42:4,7 55:20

manner 32:8,13 35:19 52:23 53:15

March 5:10

mark 14:10 43:11

marked 6:16,19 18:3,7 25:21 31:13,17 33:7,11

married 10:8

Matheson 5:12

matter 5:5

means 34:1

medical 24:4

medications 9:6,10,13

logos(s) 32:14

meeting 43:3

Melbourne 37:18,20

memory 9:16

mention 35:4 38:9 42:9 44:20

mentioned 18:22 23:17 28:12 29:12,21 44:24,25 45:16 46:19 47:18 48:11,13

mentioning 40:3,8

merchandise 14:5,8 20:12,16 22:2 26:18 30:24 32:16 34:21,24 35:11 36:9 38:6,10 39:13,21 41:7 42:11 43:21 47:22 53:20,23 54:3,4,10,15,16 55:5,7,13

message 35:1 41:9

met 36:14 45:16 49:20 55:16

mind 23:4,6

minutes 17:7,8 19:17 29:7 34:19 50:1,17

missed 42:13

mistaken 27:10

Mm-hmm 11:3,15 18:13,15 19:10 23:16 31:21 32:22 52:20 56:3

moment 31:18

Monday 13:25 27:21

month 37:21

months 15:10,11,12 30:3 37:12

morning 6:5,6 8:1

move 10:3

moved 11:25

moving 23:4 35:10

### N

naked 21:13,16

names 6:10 10:16

Nevaeh 10:17

Niara 10:17 24:7,8

nicknames 6:13

night 7:22 8:1 22:8

no-call-no-show 35:8

nods 8:12

nonresponsive 24:3 47:14 51:22

normal 8:10 16:24

notes 42:13

number 5:4,6 6:19 10:18 18:3,7 24:14 25:21 26:4 31:13 33:7 35:5 38:16 39:5 52:16 54:24

### O

oath 8:8 31:10

Objection 25:17

objects 9:3

obtain 11:10

Ocala 11:25

occasion 14:9

occurred 15:25

on/or 25:25

onesies 24:23 44:22,23 45:11,14 46:7,9,10 49:1,3 54:12,16

open 37:21,22

opened 29:5

Orange 5:13 7:9

order 35:25 36:9 58:22,24

ordering 58:23



**orders** 19:6 36:3,8
58:11

**Outfitters** 52:4

**owner** 32:12 34:3,18
49:21 53:14

**owners** 13:6,7,10
34:11 37:1 42:3
49:14 55:21,23
57:15

**owns** 57:9,12,17

**P**

**p.m.** 34:7,9,10,12

**pages** 46:1

**paid** 56:8

**paper** 30:20,25 32:3
49:17 50:3

**part** 39:7 45:19 55:8

**past** 9:19 14:23 37:2,
17

**Patti** 12:21 13:5,7,9
17:4,5 29:5 33:16,17
38:21 39:13,15 42:1,
6 47:7,15,17,25
55:21

**pay** 56:25

**paycheck** 28:19,24
30:11,13,16,21 31:1,
7,24 32:25 33:5
36:16,21 49:18 50:4,
5 53:5 55:11,14
56:4,5,10,15

**people** 17:19,23,25

**percent** 10:7 48:3,5

**perfect** 27:23

**personal** 33:20
36:24

**personally** 32:7
40:5 52:23

**phone** 10:18

**phonetic** 21:25 25:5
27:9

**pick** 28:19 31:24

**picked** 20:20 28:24
30:12

**picture** 35:2

**piles** 48:25

**place** 7:8,9 34:21
35:17

**plain** 52:8

**Plaintiff** 5:17

**plans** 10:3

**Plant** 33:24

**point** 35:1 49:19,21

**pointing** 26:10

**police** 23:1 28:11,14
55:1,3 57:1,4

**policy** 38:24

**portion** 7:7

**position** 12:15 15:7
37:14

**prepare** 8:9

**present** 16:25

**press** 32:12 53:14

**pressed** 32:8 52:23

**prevents** 9:18

**previously** 6:16
7:13 10:22,24 23:18
27:2 31:17 33:11
38:15 39:20 40:9
58:9

**print** 32:12 38:2
46:13,21 52:10,12
53:9,14,19

**printed** 32:7 37:3
39:23 46:25 52:23

**printer** 52:3,8

**printing** 51:25

**prior** 37:21

**procedure** 38:25

**proceeded** 16:23
48:10

**process** 43:19,23
47:10 51:25 52:1

**product** 41:16

**products** 34:16,24
35:4,24 37:4 38:6,12
48:1,8 53:10

**products'** 37:11

**professional** 11:10

**provide** 14:4,14
24:8 25:3 30:7 36:4

**provided** 14:2,19
30:4 36:15

**purchase** 34:16
35:20,25 36:9,11
37:13

**purchased** 21:21
25:9 27:25 28:11
35:24 39:18 41:21
52:13 54:4,15 57:20

**purses** 17:24

**put** 19:5 22:3,7 27:6,
19,22,24 28:1 29:12
30:22 48:20 49:11
52:8,9 54:14

**Q**

**qualified** 33:18

**question** 8:16,18,22,
24 9:2,5

**questioned** 46:10,11

**questioning** 37:11

**questions** 8:7 9:8
23:15 38:14 42:20
51:17,18 54:19,20
57:6 58:18,19

**quick** 51:11

**Quit** 37:12

**R**

**rack** 48:21

**Rainbow** 15:1,3,5,7,
15,17

**raise** 5:21

**ran** 35:20,22

**random** 17:17

**rang** 19:3,7

**Rapacke** 5:16 25:17
42:25 43:8 51:15,22
54:20,23 57:6 58:6,
8,17 59:1,7

**read** 7:7 19:11 24:16
26:10 29:2,4 31:18
32:2 33:12,14 36:21
38:17,19 39:4 53:12
58:9

**real** 20:25 21:1,2
25:4 44:3,20 51:10

**reason** 36:19 38:11

**reasonable** 36:2

**reasons** 36:24

**Rebecca** 5:5 6:9
29:2 34:4,8 52:20

**Rebeccalynn0712
@yahoo.com.**
10:21

**recall** 14:18 20:5,12
25:24 40:19 42:8
56:5,8,10,16 57:19

**receipt** 19:12 35:25

**receipts** 18:2,19,20,
25 19:4,9,15 20:5,8
24:13 25:1 36:1
44:15

**receive** 30:11

**received** 21:11
34:13,19 35:1 56:4

**Recess** 23:10 42:16
50:20

**recognize** 18:16
31:20,22

**record** 5:3 6:8 7:7,
12 19:11 23:9,12
24:17 25:14 26:10
29:2,4 32:2 33:12
38:19 42:15,18
50:19,22 53:12
58:10

**recorded** 25:24 26:6

**records** 24:4,8

**RECROSS** 58:7

**red** 48:9

**REDIRECT** 57:7

**redirected** 34:17

**referring** 29:16,17

**reflecting** 57:16

**Regional** 24:1,2

**Regis** 11:22

**register** 35:20

**regular** 21:8 39:23
43:22 44:19 47:1

**relations** 34:2

**remains** 37:22

**remember** 9:11
12:24 14:13,16,17
16:19 17:13,24
19:23 20:1,2,7,15
22:21 25:2 28:18,22
29:24,25 30:6,9,10,
14 31:3 40:16,17,21,
22 41:6,8,11,12
45:5,11,12 47:20,21,
23,24 49:24 50:2
51:2 54:17 56:7,9,21
58:14,16

**remembering** 9:19
41:23

**remind** 31:9

**repeat** 46:18

**rephrase** 8:16,17

**reported** 13:7

**Reporter** 5:11,15,21
6:2 8:8,10,11 9:1
15:2 58:22,25 59:4,6

**representative** 38:2

**reproduce** 32:13
53:15

**reproduced** 32:8
52:23

**request** 24:9

**requested** 16:11
34:10 37:9

**requesting** 40:16



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

**required** 31:6 36:7

**resident** 33:24

**resign** 36:12,18 48:10

**resignation** 30:5,8 36:12 49:11

**resigned** 28:20 29:22 30:1 52:17 55:7 56:23

**resigning** 36:23

**respect** 53:6

**responsibilities** 13:12

**responsible** 34:1

**retail** 13:13 14:23 15:13 45:7

**retake** 11:12

**review** 18:12

**Reynolds** 9:24

**ring** 18:21 19:17,25 20:10

**Road** 9:24

**rooms** 13:19

**rules** 8:6

**Rumore** 33:16,17 38:21 39:15 42:1

**rung** 19:6,16

---

**S**

**sale** 34:18

**sales** 15:8

**salon** 11:23

**schedule** 13:20

**scheduled** 7:13 16:6 23:18 34:6,9 35:6,7 40:17

**school** 11:4,17

**sealed** 38:8

**Security** 56:20

**sell** 15:5

**selling** 39:21

**send** 56:19

**sentence** 52:19 53:11,21

**settled** 17:2

**shakes** 8:12

**Shaking** 24:3 47:14

**sheet** 24:22

**shelf** 29:10

**shift** 13:22 16:6,14, 25 17:14 34:10,12

**shirts** 17:25

**shoes** 15:6

**shop** 17:19 40:13

**shortly** 22:9 36:11 37:13 39:11,19,25 48:10 55:7

**showed** 39:22

**showing** 40:20

**sic** 19:7 21:12 23:20 25:10 36:3,6 47:25 48:14

**sick** 7:17,19,22

**sign** 30:20 31:6,24 32:25 36:18 37:2 38:25 49:17 50:4 55:10,14

**signature** 31:25 32:21

**signed** 30:25 32:21 33:1,3 36:22 37:5 38:18,19 52:17 53:4 55:10 56:10

**Sir** 23:4

**sit** 9:19

**size** 47:2

**Social** 56:20

**sold** 32:16 37:4 38:4 48:1 53:22 55:12

**solemnly** 5:23

**South** 7:9

**spaced** 36:1

**specialist** 5:12

**specials** 14:14,19

**specifically** 9:4 16:11,19 20:15 21:18,19 30:10 34:10 37:9

**specifics** 17:18,24 20:16

**Spectrum** 12:4

**speech** 8:11

**spoke** 28:6

**spoken** 50:6,9 57:22 58:2,3

**spouse** 10:10

**Square** 12:14 16:1,4

**staff** 32:11 53:13

**start** 16:14

**started** 39:19 50:7

**state** 6:7 33:23

**stated** 7:12 30:21 33:21,22 41:20

**statement** 25:25 26:6 31:7 32:18 37:2,5 38:20 52:16 53:3,4,6,7,17,25

**statements** 31:2 32:3,23 33:1,3 37:1, 17 39:1,4 40:14

**states** 26:11 29:2 46:1

**stating** 36:19 41:8

**stealing** 37:19

**stencil** 30:23

**step** 40:10

**steps** 43:12

**stockroom** 35:10

**stomach** 24:10

**stop** 53:1

**stopped** 12:17

**store** 12:13 13:15

14:8 17:12,20 18:19, 22 21:21 22:12 33:25 34:2,15,22,24 35:9,11,18 36:13,16 37:14 38:4 40:10 41:1 46:4,5 48:14, 15,20 49:8,11,13

**store's** 34:18 37:11

**stores** 14:3,23

**stores'** 34:3 38:10

**strange** 20:19,22,25

**street** 58:4

**Strike** 44:8 47:16 54:24

**stuff** 17:8 27:3 44:21 47:2

**subpoena** 7:4

**Suite** 7:10

**Sunbiz** 57:10,16

**Sunday** 27:16

**Sundays** 27:16

**supervisor** 13:4,8

**supervisors** 13:6

**supposed** 25:4

**suspected** 37:6

**suspicious** 41:14 55:5,15

**swear** 5:15,23

**sweatshirts** 18:1 19:21 36:6

**Sykes** 11:23

**system** 19:5,7 24:25

---

**T**

**t-shirt** 35:2 43:25 51:2 52:8

**t-shirts** 20:15 39:23 43:10,14 44:25 47:4 48:24 49:2 51:7 52:1

**tag** 21:7,8 39:22,23 43:24 47:1,2,5,23

**tags** 43:21,22 44:19 47:1 51:1,5,8 54:5

**takes** 26:14

**taking** 8:8 9:6,10,13 25:24 27:18 28:10

**talk** 11:14 15:24 22:19,22 43:4,8 51:14,17 53:21

**talked** 12:22 22:23 24:24 25:7 30:7 50:1,24

**talking** 24:12 28:9 40:7

**termination** 36:18, 20,22

**test** 8:19

**testified** 32:20 53:2

**testimony** 5:23 14:18 17:9 19:24 25:8,13 27:24 28:3 31:5 39:15 47:5,15, 17 49:5

**text** 35:1 41:9

**texting** 41:6

**thing** 49:15 52:9

**things** 8:10 48:21

**thought** 55:14

**threw** 48:9

**time** 5:10 7:8,11 8:20 12:20 18:12 19:8,9 23:8,11 28:15,23 35:3 36:1 37:21 40:18 42:14, 17 43:2 50:18,21 55:24 58:20

**timed** 36:2

**times** 19:11,14,16 43:8

**today** 9:8,11,19 15:24 19:24 23:17 25:8,13 27:24 28:3 31:5 37:22 39:15 43:3 44:24 45:16 47:5,15,17 49:5 50:24 53:2



Flogrown LLC vs Dixie Heritage LLC
REBECCA GOODINE

**Today's** 5:9

**told** 22:2,14,18
25:10,15 27:4 28:2,
19 30:20 31:5,6
34:23 39:11,16,19,
25 41:13,16 42:3,10
47:25 48:20

**tomorrow** 27:15

**Torgeman** 5:19
34:4 35:10,16 36:14,
15,17,25 38:1,7
57:9,12,17

**totaled** 36:10 44:16

**totaling** 36:8

**Tourgeman** 5:20
34:3,18,21,25 35:9,
13 37:8 38:1,7

**trademark** 32:9,14
38:3 52:25 53:16

**trademarked** 32:16
53:23 55:12

**trained** 35:21

**training** 21:12 25:3

**trans** 26:5

**transaction** 19:1,4
24:16,17

**transactions** 35:22
36:8

**transcript** 8:9 26:6
29:1

**transgression** 36:3

**trouble** 27:13

**true** 33:22 46:2 48:3,
5 55:13 58:13

**truth** 5:24,25 9:14
37:20

**turn** 26:8 29:1

**Twelve** 24:18

**type** 24:25 38:4

**types** 39:1

**typical** 13:20

**typically** 35:22

---
**U**
---

**uh-huh** 8:11

**un-uh** 8:11 40:22

**understand** 8:12,
15,18 43:18

**unfortunate** 23:19

---
**V**
---

**vaguely** 20:7 45:10

**varied** 14:1

**versus** 5:7 44:3

**Victory** 11:7

**video** 5:12

**videotape** 5:4

---
**W**
---

**wait** 8:24

**walk** 43:19 52:1

**walked** 41:1 49:23
50:5 58:4

**walking** 12:16

**wall** 52:6

**wanted** 29:23 51:12
52:15 53:4

**water** 23:5

**WATSON** 58:24
59:2,5

**week** 16:9

**Welch** 34:15,18
37:2,7,13 40:23,25
44:11 45:17 50:6,10
52:12 55:17 56:23,
25 57:3,20,22

**Welch's** 35:20 36:7,
9,11

**Wescott** 5:11

**witnessed** 32:11
37:3,16 38:1 53:13

**work** 11:14,16,21

12:2,3,5,7 13:20,25
14:23,25 15:9 16:3,
6,12,14,17,20 17:5
27:16,21 30:2 34:7,9
35:6,7 37:9 40:16
46:2 48:2

**worked** 11:22,25
12:10,13 13:3,12,22,
23 14:20 15:1,17
21:15 37:12 39:11
40:1,9,11 51:25

**working** 11:19 16:1
34:2 40:19 55:17
56:17

**worth** 41:16 48:8,17
54:10 55:5

**wound** 27:18

**wrapped** 55:9

**wrapping** 50:17

**written** 15:20

---
**Y**
---

**year** 10:6 12:11,12

**years** 10:2 12:8,9,10
14:20 33:18

**Yeni** 21:24 22:1,15
25:9,10,14,15 26:15
28:3 41:13,22 55:22

**young** 34:14



AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida ▾

|  |  |
|---|---|
| FLOGROWN, LLC, | ) |
| _Plaintiff_ | ) |
| v. | )   Civil Action No.   6:17-cv-00983-GKS-GJK |
| DIXIE HERITAGE, LLC, AHSER TORGEMAN AND ALBERT TOURGEMAN, | ) |
|  | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                              REBECCA GODINE
                    168 SHANNON DRIVE, LAKELAND, FL 33809

_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Orange Legal<br>1102 South Florida Avenue Suite 104<br>Lakeland, Florida 33803. | Date and Time:<br>02/22/2018 10:00 am |
|---|---|

The deposition will be recorded by this method:   Video; Audio; Stenographic

☐ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      02/07/2018

           _CLERK OF COURT_
                                              OR
                                                        /s/ Coleman W. Watson, Esq.
_____              _____
_Signature of Clerk or Deputy Clerk_                      _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Defendant
DIXIE HERITAGE, LLC, & TORGEMAN
                                        , who issues or requests this subpoena, are:

Coleman W. Watson, Esq.; 189 S. Orange Ave., Ste. 810, Orlando, FL 32801; coleman@watsonllp.com; (407) 377-6634

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT
# 12  3/22/18  KW
GOODINE
PENGAD 800-631-6989

AO 88A (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 6:17-cv-00983-GKS-GJK

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).



## DIXIE HERITAGE [Lakeland]
3800 HWY 98 N STE 126
LAKELAND, FL 33809
4079278444

No refunds. Exchanges available within 30
days with proof of purchase; exceptions
apply. Merchandise washed, used or
damaged by consumer cannot be returned or
exchanged; no exception. All sales of printed/
customized merchandise and swimwear are
FINAL.

# ORDER: 0239

Cashier: Rebecca
03-Dec-2016 6:42:08P

**Transaction 100157**

| | | |
|---|---|---|
| 12  Custom Item | | $203.88 |
| **Subtotal** | | **$203.88** |
| **Tax** | | **$14.27** |
| **Total** | | **$218.15** |
| CREDIT CARD SALE | | $218.15 |
| VISA 9548 | | |

03-Dec-2016 6:42:23P
$218.15 | Method: EMV
VISA CREDIT XXXXXXXXXXXX9548
Ref #: 633800507170 | Auth #: 01323G
MID: ••••••••5887
AID: A0000000031010
AthNtwkNm: VISA
SIGNATURE VERIFIED

Order FGJ7X3QNMH0SP

Follow us on Instagram and Facebook
@DixieHeritage to receive promotions.

Online: https://clover.com/
p/4W903EYK9Q7VY



4W903EYK9Q7VY



**Questions? Comments?**
**Feedback? Let us know!**



---



## DIXIE HERITAGE [Lakeland]
3800 HWY 98 N STE 126
LAKELAND, FL 33809
4079278444

No refunds. Exchanges available within 30
days with proof of purchase; exceptions
apply. Merchandise washed, used or
damaged by consumer cannot be returned or
exchanged; no exception. All sales of printed/
customized merchandise and swimwear are
FINAL.

# ORDER: 0241

Cashier: Rebecca
03-Dec-2016 6:45:29P

**Transaction 100159**

| | | |
|---|---|---|
| 4  Custom Item | | $79.96 |
| 4  Custom Item | | $159.96 |
| 4  Custom Item | | $119.96 |
| **Subtotal** | | **$359.88** |
| **Tax** | | **$25.19** |
| **Total** | | **$385.07** |
| CREDIT CARD SALE | | $385.07 |
| VISA 9548 | | |

03-Dec-2016 6:49:24P
$385.07 | Method: EMV
VISA CREDIT XXXXXXXXXXXX9548
Ref #: 633800507190 | Auth #: 01573G
MID: ••••••••5887
AID: A0000000031010
AthNtwkNm: VISA
SIGNATURE VERIFIED

Order KDHNTZZ9ZZJRA

Follow us on Instagram and Facebook
@DixieHeritage to receive promotions.

Online: https://clover.com/p/
FFP03XH2DDMEG



FFP03XH2DDMEG



**Questions? Comments?**
**Feedback? Let us know!**



## DIXIE HERITAGE [Lakeland]
3800 HWY 98 N STE 126
LAKELAND, FL 33809
4079278444

No refunds. Exchanges available within 30 days with proof of purchase; exceptions apply. Merchandise washed, used or damaged by consumer cannot be returned or exchanged; no exception. All sales of printed/customized merchandise and swimwear are FINAL.

## ORDER: 0239

Cashier: Rebecca
03-Dec-2016 6:42:08P

Transaction 100157

| | | |
|---|---|---|
| 12 | Custom Item | $203.88 |

| | |
|---|---|
| Subtotal | $203.88 |
| Tax | $14.27 |
| **Total** | **$218.15** |
| CREDIT CARD SALE | $218.15 |
| VISA 9548 | |

03-Dec-2016 6:42:23P
$218.15 | Method: EMV
VISA CREDIT XXXXXXXXXXXX9548
Ref #: 633800507170 | Auth #: 01323G
MID: ••••••••5887
AID: A000000031010
AthNtwkNm: VISA
SIGNATURE VERIFIED

Order FGJ7X3QNMH0SP

Follow us on Instagram and Facebook @DixieHeritage to receive promotions.

Online: https://clover.com/p/4W903EYK9Q7VY



4W903EYK9Q7VY

OWNERLISTENS



Questions? Comments? Feedback? Let us know!

---



## DIXIE HERITAGE [Lakeland]
3800 HWY 98 N STE 126
LAKELAND, FL 33809
4079278444

No refunds. Exchanges available within 30 days with proof of purchase; exceptions apply. Merchandise washed, used or damaged by consumer cannot be returned or exchanged; no exception. All sales of printed/customized merchandise and swimwear are FINAL.

## ORDER: 0241

Cashier: Rebecca
03-Dec-2016 6:45:29P

Transaction 100159

| | | |
|---|---|---|
| 4 | Custom Item | $79.96 |
| 4 | Custom Item | $159.96 |
| 4 | Custom Item | $119.96 |

| | |
|---|---|
| Subtotal | $359.88 |
| Tax | $25.19 |
| **Total** | **$385.07** |
| CREDIT CARD SALE | $385.07 |
| VISA 9548 | |

03-Dec-2016 6:49:24P
$385.07 | Method: EMV
VISA CREDIT XXXXXXXXXXXX9548
Ref #: 633800507190 | Auth #: 01573G
MID: ••••••••5887
AID: A000000031010
AthNtwkNm: VISA
SIGNATURE VERIFIED

Order KDHNTZZ9ZZJRA

Follow us on Instagram and Facebook @DixieHeritage to receive promotions.

Online: https://clover.com/p/FFP03XH2DDMEG



FFP03XH2DDMEG

OWNERLISTENS



Questions? Comments? Feedback? Let us know!



# Order

**Client**          **Coleman Watson**

**Order #**        **TC0678453505**

## How did we do?

☆☆☆☆☆

If you rate this transcript 3 or below, this agent will not work on your future orders

**Rate this transcript**

Need Help? **mailto:support@rev.com**
**Get this transcript** with table formatting



| | |
|---|---|
| Det. Benthal: | Today's date is Thursday, February 16th, 2017. The time is 18:13 hours. Our location is gonna be the residence of Rebecca Goodine, 1707 Reynolds Road #18. Present with me is Rebecca, myself Detective Benthal, Detective Anderstein. The time is 18:10 hours. This is gonna be in reference to LPD case number 17-1727 reference Dixie Heritage, 3800 U.S. Highway 98 North. |
| | Allright, Rebecca, as I've said to you that this is gonna be a sworn statement, so make sure that you tell me everything true and correct to the best of your ability, okay. |
| Rebecca Boodine: | Okay. |
| Det. Benthal: | We received a complaint, initiated by you, it would have been in December of 2016 ... |
| Rebecca Boodine: | Yes ma'am. |
| Det. Benthal: | ... In which you called in to advise that there were some items being sold at Dixie Heritage that were not authentic. |
| Rebecca Boodine: | Mmmhmmm. |
| Det. Benthal: | Can you basically tell me, just start from the beginning of when you started working there and how you learned of this behavior? |
| Rebecca Boodine: | I was only working there maybe two months, if that. I started pretty much right away, they hired me, it was only me and the manager, Miss Patty, and then the two owners. They only came in occasionally on Sundays or through the week, occasionally. And after I worked there for about a few weeks or so, it was weird, 'cause I didn't notice anything right off the bat. When the manager, Miss Patty at the time, she says that ... I'm not even sure how it came up in conversation to be honest, that the Flogrown was not ... they were printing it on themselves on some of the Flogrown and then marking it as regular Flogrown. I want to say it came up in conversation because we tagged ... You know you have that little plastic piece with the tag- |
| Det. Benthal: | The name tag? |
| Rebecca Boodine: | That says the brand and stuff. Well the Southern Attitude had another name on it. So I'm like, is this supposed to be on here, because I know sometimes manufacturers in the warehouse can get them mixed up, and I believe that's how it came up in conversation. She says that there was actually a previous store, again I'm not exactly which store it was, it might have been Melbourne, that got caught selling the fake Flogrown. The owners came into that store, this is what I heard since I work at the Lakewood store. She said the owners came |

GOODINE INTERVIEW                                                                                    Page 2 of 10

into that store and walked around the store, saw it and then said, this is my merchandise, but it's not real. So they told them to take everything off the shelves and not put it back up. So she said that that's what they did but then they wound up putting it back out so long later.

Det. Benthal: And this was all in Melbourne, from what you heard, right?

Rebecca Boodine: I'm not sure if it was the Melbourne store, but it was one of the other locations. I wanna say it was Melbourne though, 'cause they have the Lakeland, Melbourne, Oviedo, and I think they just opened up in Sanford. And so, I didn't think anything of it. I never personally saw them in the back do anything. Everything that they brought in, it was always in their car that they brought into the store and then put out.

Det. Benthal: Now did you see them bring bags or boxes of anything in from their car and put them on the floor?

Rebecca Boodine: Yeah, they would bring in boxes all the time of everything. You know, merchandise to put out. And then leave it in the back, and either they would put it out or we would put it out.

Det. Benthal: Now, the merchandise that you saw them bring in, was any of that what you came to know as the fake stuff?

Rebecca Boodine: Some of it was, yeah, 'cause after that I looked 'cause I asked her, I said, "How can you tell?" And so then I got curious. And basically the tags how like Hanes has their iron on, Flogrown has theirs ironed on on some of their real stuff. Well the knockoff stuff would be like Hanes or a knockoff brand from somewhere out of the country, from China or something. And then, the different tags on it too.

Det. Benthal: Who primarily would be the one that brought that stuff in?

Rebecca Boodine: The owners.

Det. Benthal: Which ones?

Rebecca Boodine: Asher and Avi? But towards the end when I was working there, they said that Avi was the main person from the Lakeland store, but I mean they're both brothers and own all the locations.

Det. Benthal: So Asher and Avi both brought in items that you later learned were fraudulent.

Rebecca Boodine: Yes.

Det. Benthal: Okay. Now, do you know where they were making these items, by chance?

Rebecca Boodine: That I have no idea. No.

| | |
|---|---|
| Det. Benthal: | Okay. So what, when you were told about these items. How were you told to look for it? I know you said that sometimes they have the ironed on tag. Was there anything about the item itself that you could tell? |
| Rebecca Boodine: | Some of the wording was a little off or maybe if you could look really close, I might find a little bit misplaced. But other than that, it was really just the tag, is what I noticed. |
| Det. Benthal: | Okay. Were there any items that maybe you guys didn't get as authentic that they put on something else. Let me clarify that. Let's say one particular company only sold shirts, and then you would notice that there were maybe cups or something else that didn't ... was there anything like that? |
| Rebecca Boodine: | There were cups and there were baby onesies. I'm not 100% sure if Flogrown ... I believe they do have cups, but I'm not 100% sure about the baby onesies. But before I left, when ... what I was to believe was the owner of Flogrown that came in and bought over $800 worth of stuff. He bought out all the baby onesies. He left maybe a few. |
| Det. Benthal: | Okay. And tell me about any conversations that you had. Let's go to that day. Based on the receipts from that transaction, in which it shows here, you were the cashier. |
| Rebecca Boodine: | Yes ma'am. |
| Det. Benthal: | So, that date was December 3rd. The time on the register receipt is showing 6:39 PM, 6:42- |
| Rebecca Boodine: | Yeah, it was in the evening. |
| Det. Benthal: | 6:49 and 6:44. Does that sound accurate? |
| Rebecca Boodine: | Yes. |
| Det. Benthal: | Okay. Now, why were there four different transactions? Can you tell me that? |
| Rebecca Boodine: | Well, the way they wanted me to ring things up were like, the hoodies specifically were buy one get one half off. Well, I don't know if it's maybe 'cause I was just doing something wrong, but I could only ring up so much stuff at a time. For that it kept telling me that it just ... I couldn't ring anything else up. And I was the only one there that night- |
| Det. Benthal: | Okay. So was the register the reason that you had to keep breaking it up? |
| Rebecca Boodine: | And it could have been me, but that's just ... I just. |

| | |
|---|---|
| Det. Benthal: | Okay. No, that's fine. I just was curious why there were in four different transactions. So, they ended up doing a total of, if you add up all the receipts, it turned out to be $811 and change. Was that the transaction that you're referencing? |
| Rebecca Boodine: | Yes ma'am. |
| Det. Benthal: | Okay, so the date on that one was December 3rd. Can you tell me about that? You're just there working the register and then what happens? |
| Rebecca Boodine: | Yep. I was there just like every other night. I worked by myself, it was from five to close I worked. And I had just checked out two or three people, and I looked up and I notice that him and this other young lady have armfuls of just merchandise. So I looked at them, to go see if they needed help, but then at the same time in my mind, I'm like, "That's all Flogrown." I said, "That's kinda suspicious." But I'm like, "I'm gonna let it be." |
| | And then I went to go around to go see if they needed help, but they were already walking up to the front. So they came up to the front and they handed me everything and I'm breaking everything up and then, I believe he made a statement about one of the hoodies, I think, not being exactly similar to another hoodie. And he asked me about it, why the writing was different. I said, "I'm not sure." And then I just continued to ring things up and then he made another statement about how it was right before Christmas, how everybody was getting really good gifts for Christmas. And it was a little weird in my head, because I'm like, well you got like 20 black hoodies. |
| | So then, she went got some more things and was rummaging through some other Flogrown things and then came up with more stuff. Then they left and then I called Patty, the manager and I let her know what happened, because Asher And Avi didn't know that I knew about that. So I called Patty and I was like, "Hey, this is what just happened. What do you want me to do?" And she says, "Call Avi or Asher." I said, "Okay." |
| | So I called, I'm not sure who I called first, but I think I would up calling one of their wives. I can't think of her name ... |
| Det. Benthal: | Yeni? |
| Rebecca Boodine: | Yes, I called Yeni and she said that to take everything down, all the Flogrown stuff that was fake down, and put it in the back. And then that one of them would be calling me. |
| Det. Benthal: | So she said take ... You called Yeni, she said take all the Flogrown- |
| Rebecca Boodine: | The fake, yes. The fake Flogrown merchandise. |

| | |
|---|---|
| Det. Benthal: | She said fake Flogrown? Okay. |
| Rebecca Boodine: | Yes ma'am. |
| Det. Benthal: | How did she know you knew what fake Flogrown was? |
| Rebecca Boodine: | I'm not sure. |
| Det. Benthal: | Okay. |
| Rebecca Boodine: | I'm assuming because he just previously came in and bought all that stuff. So, I'm not sure. |
| Det. Benthal: | Okay, so she told you to take it, all the fake Flogrown and do what with it? |
| Rebecca Boodine: | To take it down and put it in the back. |
| Det. Benthal: | Okay. |
| Rebecca Boodine: | So I was taking everything down, and I wanna say it was Avi that called me, I could be mistaken, it could have been Asher. But one of them called me and I explained to him what happened and he says, "Oh gosh." He said, "There's somebody that's out to get us and to cause trouble for us." And he's like, "And I think that was who it was." He says, "We'll handle this tomorrow." And I believe the next day was Sunday and I didn't work on Sundays, they did. |
| Det. Benthal: | Okay. |
| Rebecca Boodine: | So I said, "Okay." So I wound up taking everything down that I thought and I put it in the back. And I believe I happened to be in the mall the next day or Monday when I came into work and everything was put back out. So ... |
| Det. Benthal: | Okay. And then when you came back, who were you working with then? Who was in the store? |
| Rebecca Boodine: | The next day it was Patty. She opened until five and then I came in at five and then closed by myself. So just her until maybe 10-15 minutes 'til she left. |
| Det. Benthal: | Was there any conversation about the items that were back on the shelf or anything like that? |
| Rebecca Boodine: | No. I might have mentioned that everything got put back out and she said, "That's how it was when I came in." She says, "I'm not sure what they're gonna do." But other than that it was nothing really. |
| Det. Benthal: | Okay. So, from that point something occurred, I guess, in which you decided not to work there anymore? Tell me what led you to that decision. |

| | |
|---|---|
| Rebecca Boodine: | Well in the beginning ... Word of mouth. You know you can't really believe everything. Yes, I saw it, but I still wasn't so sure. And then when he came in and bought over $800 worth of stuff, that was a red flag, right there. So I didn't want to get wrapped up in anything for being there. So I just, my daughter's birthday was the 12th, and we went to Orlando that weekend, the 9th, 10th and 11th, and I didn't even put my two weeks in. I just told him, I said, "Hey. I have to resign, personal reasons." And then that's when I came back from Orlando they made me sign the paper, which I asked for a copy of and they never gave it to me, saying that I resigned and that they didn't fire me. And that there was another paper that they made me sign, saying that I personally didn't see them put the logo or anything Flogrown related on the merchandise. |
| Det. Benthal: | It said Flogrown on it? |
| Rebecca Boodine: | Yes ma'am. |
| Det. Benthal: | Okay. |
| Rebecca Boodine: | But the thing was, if I didn't sign those papers, they wouldn't have gave me my last paycheck, 'cause that's what they were holding. |
| Det. Benthal: | Okay. What day, if you had to guesstimate, what day that was? |
| Rebecca Boodine: | I might be able to tell you, I think I have a text message, because that night I believe I went in there. When I left, I asked for the copies. |
| Det. Benthal: | Okay. |
| Rebecca Boodine: | Let me see if I can find it. 'Cause he said he would either email me copies or send me copies and he didn't. |
| Det. Benthal: | Okay. So do you remember what your last day was, by chance? |
| Rebecca Boodine: | December 8th. I texted him saying I had to resign for personal reasons. And that I wasn't gonna be in town until Monday. |
| Det. Benthal: | Okay. So did you work that day that you said you're resigning or was that your ... ? |
| Rebecca Boodine: | That was at 1:44, so I don't believe so. |
| Det. Benthal: | Okay. So you never went back in. Okay, so December 8th was the day that you sent that, so what would have been your last work day, prior to that? |
| Rebecca Boodine: | The day before- |
| Det. Benthal: | So, the 7th. |

GOODINE INTERVIEW

| | |
|---|---|
| Rebecca Boodine: | ... Which would have been the 7th, yes ma'am. |
| Det. Benthal: | Okay, so December 7th was your last day, and then when you sent to him I'm resigning for personal reasons, did he respond in any way? |
| Rebecca Boodine: | Yes, and I told him because I had a key because I had to close, so I told him I wouldn't be back in town until Monday, 'cause that's went to Orlando for my daughter's birthday. "So I'll be able to drop the key off then," I said. "Or if I can have a family member drop it off," I said, "then I'll do that." |
| | And he says, "Okay. No problem. Thank you for working and helping us have a great day and good luck to you. And don't forget to drop the keys off before you leave for your vacation." |
| Det. Benthal: | Okay. So you brought the keys back that following Monday? |
| Rebecca Boodine: | Yes. |
| Det. Benthal: | And that was when the whole last paycheck thing happened? Okay. What was that Monday? |
| Rebecca Boodine: | I dropped the keys off because ... |
| Det. Benthal: | December 8th was a Thursday, so that Monday would have been the 12th. |
| Rebecca Boodine: | It looks like the ... I wanna say the 15th because on the 14th I said, "I'm not gonna be able to make it out there today." And he says, "Okay, come tomorrow." So I might have already dropped the key off and was waiting for my last pay stub, my last paycheck. |
| Det. Benthal: | Okay. |
| Rebecca Boodine: | But I would say around the 14th. |
| Det. Benthal: | Okay, so the 14th you sent that message, so you're thinking it was the 15th you went to meet him? |
| Rebecca Boodine: | Yeah. |
| Det. Benthal: | Okay. |
| Rebecca Boodine: | Yeah. |
| Det. Benthal: | So on December 15th you walk into the store and he's working the register? |
| Rebecca Boodine: | Yes. |

GOODINE INTERVIEW                                    Page 8 of 10

| | |
|---|---|
| Det. Benthal: | Okay, tell me what happened when you walked in. |
| Rebecca Boodine: | It was Asher, I believe that was working the register, because the 12th, I went to Asher's text messages and the 12th, I said, "I would like a copy of everything that I just signed, so if you can email it to me that would be great, or just send me a picture of it." |
| Det. Benthal: | On the 12th? |
| Rebecca Boodine: | And that was December 12th. |
| Det. Benthal: | Okay, so that was the Monday. |
| Rebecca Boodine: | So yes. |
| Det. Benthal: | Okay, so yeah, that was Monday, allright. So on Monday the 12th, you went in and that's when they presented you the paperwork. |
| Rebecca Boodine: | The paperwork. |
| Det. Benthal: | Okay. And so tell me what conversation you had with him, anything at all. |
| Rebecca Boodine: | Honestly, it was very, very vague. I had my two year old with me. He gave her a blanket and then he said, "How are you doin'?" I said, "I'm good." And then he says, "I need you to sign this, saying that we didn't fire you. You resigned." I said, "Okay." So I signed that, and then he says, "And I need you to sign this, saying you didn't see us print anything on any of the Flogrown merchandise." And he said again ... He says, "'Cause someone's trying to get us in trouble." And he's like, "And we're trying to cover. Cover ourselves." |
| Det. Benthal: | Now, did you read it? |
| Rebecca Boodine: | Yes. It said that I didn't physically see them and I didn't physically see them, but I knew that that's what they were doing. |
| Det. Benthal: | So all the paper said was I didn't see you print, did it say Flogrown on it? |
| Rebecca Boodine: | Yes. The Flogrown logos or anything on there. |
| Det. Benthal: | Allright, so you signed that paper, he gave you your last check, then you left. Has there been any kind of conversations with him since then, or either one of them? Okay. |
| Rebecca Boodine: | Nope. Just after when I left, I texted him, "Hey, can you email me the papers or ..." 'Cause I didn't wanna ... wanted to have their own ... me getting wound up involved and he says that he would and then he never did. And then, I'm pretty sure it was that same night is when I called you guys. |

| | |
|---|---|
| Det. Benthal: | Okay. Is there anything else that you can think of that might be pertinent, important to know, anything that you saw that was strange in the front or the back of the store? I know that you had the heat press that was in front, where you do the custom shirts. Was there any type of heat press in the back of the store or anything? |
| Rebecca Boodine: | Nope, not that I saw. That was really it. I know the Southern Attitude, the hoodies, those I also were told were ironed on. 'Cause they say Hanes on the hoodies, but I know for a fact that the Flogrown you can tell, but other than that, that's pretty much it. |
| Det. Benthal: | Do you solemnly swear that everything that you told me in this statement has been true and correct to the best of your knowledge? |
| Rebecca Boodine: | Yes ma'am. |
| Det. Benthal: | Okay. We're gonna conclude this interview at 18:32 hours. |

## How did we do?



If you rate this transcript 3 or below, this agent will not work on your
future orders

**Rate this transcript**

I, **Patti Rumore**, throughout my employment with Dixie Heritage Lakeland and/or Dixie Heritage, LLC. [the Companies]:

**1. have not personally printed, pressed or in any manner reproduced** the FloGrown brand, including but not limited to its trademark, logo(s) and/or design(s).

**2. have never witnessed or known of any staff, manager, or Owner of the Companies print, press or in any manner reproduce the FloGrown brand,** including but not limited to its trademark, logo(s), and/or design(s).

**3. to the best of my knowledge, have only sold authentic trademarked merchandise, including FloGrown's apparel and accessories.**

I hereby certify that the statements above are true and correct to the best of my knowledge.

Patti Rumore                                    12-9-2016

**Patti Rumore**                                 **Date**

Sohaib Zaben

Witness 1:

Dan Hill

Witness 2:





I, __Rebecca Goodine__, throughout my employment with Dixie Heritage Lakeland and/or Dixie Heritage, LLC. [the Companies]:

_____ 1. have not personally printed, pressed or in any manner reproduced the FloGrown brand, including but not limited to its trademark, logo(s) and/or design(s).

_____2. have never witnessed or known of any staff, manager, or Owner of the Companies print, press or in any manner reproduce the FloGrown brand, including but not limited to its trademark, logo(s), and/or design(s).

_____3. to the best of my knowledge, have only sold authentic trademarked merchandise, including FloGrown's apparel and accessories.

I hereby certify that the statements above are true and correct to the best of my knowledge.

_____          12 -12 - 2016

Signature                        Date

Printed Name: Rebecca Goodine

_____

Witness 1:

_____

Witness 2:

1

2

3

4

5 **UNITED STATES DISTRICT COURT**

6 **MIDDLE DISTRICT OF FLORIDA**

**ORLANDO DIVISION**

7

| | |
|---|---|
| FLOGROWN, LLC, | § |
| | § |
| Plaintiff, | §  Case No.:  6:17-cv-00983-GKS-GJK |
| | § |
| vs. | §  **DECLARATION OF PATTI RUMORE** |
| | § |
| DIXIE HERITAGE, LLC, ASHER | § |
| TORGEMAN AND ALBERT | § |
| TOURGEMAN, | § |
| | § |
| Defendants. | § |
| | § |
| | § |
| | § |

8

9

10

11

12

13

14

15

16 I, PATTI RUMORE, hereby declare and affirm as follows:

17
    1.    My name is Patti Rumore, and I am over 18 years of age.  I am competent
18
and qualified to make this Declaration.
19
    2.    I have personal knowledge of the facts stated herein, and to the best of my
20
knowledge, the facts stated herein are true and correct.
21
    3.    I am a citizen of the State of Florida, and I am a resident of Plant City,
22
Florida.
23
    4.    I am the store manager at Dixie Heritage Lakeland ("Dixie") which means
24
that I am responsible for dealing with customer relations at the store and working closely
25



DECLARATAION OF PATTI
Case No.:  6:17-cv-00983-GKS-

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

with the store's owner, Albert Tourjeman, and its employees, Asher Torgeman and Rebecca Goodine.

5.     On December 3, 2016, I was scheduled to work at Dixie from 10:00 a.m. to 5:30 p.m., alongside Rebecca Goodine.  Goodine was scheduled to work from 12:00 pm.-9:00 p.m., which is a shift that she specifically requested from Dixie's owners.

6.     After my shift ended at around 5:30 p.m., I left Dixie and received a call from Goodine who advised that a young couple, who I later learned was Jesse Welch and his girlfriend, came to the store to purchase a large amount of Flogrown products.  I re-directed Goodine to contact Albert Tourjeman, the store's owner, regarding the sale for Welch and his girlfriend.  A few minutes later, I received another call from Goodine indicating that Albert Tourjeman asked her to place the Flogrown merchandise in the back of the store.  Goodine told me that she placed the Flogrown products in the back of the store because Albert Tourjeman instructed her to do so.  At that point, I received a text message from Goodine that contained a picture of a Flogrown t-shirt label asking if it was "fake."  This was the first time, however, that I had heard mention of any Dixie product being "fake."

7.     On December 4, 2016, I was scheduled to work at Dixie that day. Goodine was also scheduled to work at Dixie, but she was a "no-call, no-show."  When I arrived at the store, Albert Tourjeman and Asher Torgeman were in the stock room moving the Flogrown merchandise placed in the back onto the store's floor.  Albert Tourjeman asked me why the Flogrown items were placed in the back and I explained that Goodine placed them there based on his instructions.  It became apparent, however,

DECLARATAION OF PATTI RUMORE - 2
Case No.:  6:17-cv-00983-GKS-GJK

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

1

2 that Mr. Tourjeman never asked that Goodine place the Flogrown items in the back of the

3 store.

4         8.     Furthermore, the manner in which Goodine ran Jesse Welch's purchase at

5 the register was inconsistent as to how she was trained, and how she typically ran

6 transactions for other customers on that day, because: (i) she failed to describe the items

7 being purchased, including, the Flogrown products; (ii) she failed to complete the

8 purchase order under one receipt and, instead, used four (4) receipts, spaced in time

9 intervals, which were inconsistent with a reasonable time transgression between two

10 orders; (iii) she did not provide the discount allotted to the customers (i.e. Buy One Get

11 One Half Off on the sweatshirts); and, (iv) Goodine failed to check Welch's ID, which is

12 required for any and all credit card transactions, especially orders totaling over $800.00

13 in merchandise, which is what Welch's purchase order totaled.

14         9.     Shortly after Welch's purchase at Dixie, Goodine gave her resignation and

15 came in to the store and dropped her key on December 12, 2017.  On that day, Asher

16 Torgeman and myself met with Goodine, where Asher Torgeman provided Goodine with

17 her paycheck in exchange for her store key.  Mr. Torgeman explained to Goodine that

18 any employee who resigns is asked to sign a termination letter stating the reasons for his

19 or her termination.  With her paycheck in hand, Goodine read the termination letter, and

20 without any hesitation, signed the letter and indicated that she was resigning for personal

21 reasons.

22         10.    Additionally, Torgeman asked Goodine that because of false statements

23 made by Flogrown's owner in the past, Jesse Welch, he asked Goodine to sign a

24

25

DECLARATAION OF PATTI RUMORE - 3
Case No.:  6:17-cv-00983-GKS-GJK

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

statement that she never witnessed or printed the Flogrown label on any products sold at Dixie Heritage, Lakeland.  Goodine signed the statement without any hesitation.

11.     After that day, I suspected that Goodine and Jesse Welch conspired to bring counterfeiting claims against Dixie and Albert Tourjeman because she specifically requested to work on the date of the incident, constantly questioned the store's products' authenticity, worked at Dixie for two months, quit shortly after Welch made the Flogrown purchases at the store, and without having another position lined-up when she often complained about economic difficulties..

12.     Moreover, I have witnessed Goodine make several false statements in the past, including, but not limited to, the allegation that Dixie's Melbourne location got caught selling counterfeit goods.   This is far from the truth.  The Melbourne location had been open only one month prior to the time Goodine made this claim, remains open today, and there has not been a complaint filed against Dixie for counterfeit goods made at this location.

13.     To the best of my knowledge, I have never witnessed Albert Tourjeman or Asher Torgeman, nor any employee or representative of Dixie, print the Flogrown name or any other trademarked or branded logo onto any type of apparel sold at the store throughout my employment with Dixie.  In fact, most of the products and merchandise brought in by either Albert Tourjeman and Asher Torgeman are contained in sealed boxes.

DECLARATAION OF PATTI RUMORE - 4
Case No.:  6:17-cv-00983-GKS-GJK

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

14.     I have never made mention that any of the store's merchandise is counterfeit or fake to anyone as I do not have any reason to believe that Dixie's products are fake or counterfeit.


**DATED** this _11_ day of March 2018.

I DECLARE under penalty of perjury that the foregoing is true and correct.


_Patti Rumore_
**Patti Rumore**

DECLARATAION OF PATTI RUMORE - 5
Case No.:  6:17-cv-00983-GKS-GJK

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

1

2    statement that she never witnessed or printed the Flogrown label on any products sold at

3    Dixie Heritage, Lakeland.  Goodine signed the statement without any hesitation.

4         11.    After that day, I suspected that Goodine and Jesse Welch conspired to

5    bring counterfeiting claims against Dixie and Albert Tourjeman because she specifically

6    requested to work on the date of the incident, constantly questioned the store's products'

7    authenticity, worked at Dixie for two months, quit shortly after Welch made the

8    Flogrown purchases at the store, and without having another position lined-up when she

9    often complained about economic difficulties..

10

11        12.    Moreover, I have witnessed Goodine make several false statements in the

12   past, including, but not limited to, the allegation that Dixie's Melbourne location got

13   caught selling counterfeit goods.   This is far from the truth.  The Melbourne location had

14   been open only one month prior to the time Goodine made this claim, remains open

15   today, and there has not been a complaint filed against Dixie for counterfeit goods made

16   at this location.

17        13.    To the best of my knowledge, I have never witnessed Albert Tourjeman or

18   Asher Torgeman, nor any employee or representative of Dixie, print the Flogrown name

19   or any other trademarked or branded logo onto any type of apparel sold at the store

20   throughout my employment with Dixie.  In fact, most of the products and merchandise

21   brought in by either Albert Tourjeman and Asher Torgeman are contained in sealed

22   boxes.

23

24

25

DECLARATAION OF PATTI RUMORE - 4
Case No.:  6:17-cv-00983-GKS-GJK

14.    I have never made mention that any of the store's merchandise is counterfeit or fake to anyone as I do not have any reason to believe that Dixie's products are fake or counterfeit.


**DATED** this _11_ day of March 2018.

I DECLARE under penalty of perjury that the foregoing is true and correct.


*Patti Rumore*
**Patti Rumore**

DECLARATAION OF PATTI RUMORE - 5
Case No.:  6:17-cv-00983-GKS-GJK

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688