Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

```
 1              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
 2                 ORLANDO DIVISION

 3                  CASE NO.:  6:17-cv-00983-GKS-GJK

 4

 5   FLOGROWN, LLC,

 6          Plaintiff,

 7   vs.

 8   DIXIE HERITAGE, LLC,
     ASHER TORGEMAN and
 9   ALBERT TOURGEMAN,

10          Defendants.

11

12              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13
     VIDEOTAPED
14   DEPOSITION OF:  DAVID ACOSTA

15   DATE:           April 5, 2018

16   TIME:           COMMENCED:  10:20 a.m.
                     CONCLUDED:  12:40 p.m.
17
     TAKEN BY:       Defendants
18
     PLACE:          Watson, LLP
19                   189 South Orange Avenue
                     Suite 810
20                   Orlando, Florida 32801

21   REPORTED BY:    Mae Fisher, RMR, CRR

22

23

24

25
```



```
 1              A P P E A R A N C E S:

 2    COLEMAN WATSON, ESQUIRE
      LEIA LEITNER, ESQUIRE
 3    Of:  Watson LLP
           189 South Orange Ave
 4         #810
           Orlando, Florida 32801
 5         (407) 377-6634
           Coleman@watsonllp.com
 6         Leia@watsonllp.com

 7          Counsel for the DEFENDANTS

 8
      ALSO PRESENT:
 9
      THOMAS MUNK
10    Videographer

11    ASHER TORGEMAN
      YENI TORGEMAN
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                                  3

```
 1                      I N D E X

 2   TESTIMONY OF DAVID ACOSTA

 3        DIRECT EXAMINATION BY MR. WATSON ......... 5

 4   CERTIFICATE OF OATH ........................... 123

 5   REPORTER'S DEPOSITION CERTIFICATE ............. 124

 6
                       E X H I B I T S
 7
     DEFENDANTS' EXHIBITS
 8
     Exhibit 1 - Photograph ........................ 87
 9
     Exhibit 2 - Photograph ........................ 88
10
     Exhibit 3 - Handwritten document............... 111
11

12
                  S T I P U L A T I O N S
13

14        It is hereby stipulated and agreed by and
     between counsel present for the respective parties, and
15   the deponent, that the reading and signing of the
     deposition are hereby WAIVED.
16

17

18

19

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

```
 1              P R O C E E D I N G S

 2         THE VIDEOGRAPHER:  Here begins the videotaped

 3    deposition of David Acosta, taken in the matter of

 4    Case Number 6:17-cv-00983-GKS-GJK, FloGrown, LLC

 5    versus Dixie Heritage, LLC, et al., to be heard in the

 6    United States District Court, Middle District of

 7    Florida, Orlando Division.  The deposition is being

 8    held at Watson, LLP, 189 South Orange Avenue, Suite

 9    810, Orlando, Florida 32801.  Today's date is April 5,

10    2018, and the time is 10:19 a.m.  The court reporter

11    is Mae Fisher and the video specialist is Thomas Munk

12    on behalf of Orange Legal.

13         Would counsel please introduce yourselves,

14    after which the court reporter will swear in the

15    witness.

16         MR. WATSON:  Coleman Watson for defendants.

17         MS. LEITNER:  Leia Leitner on behalf of

18    defendants.

19         THE COURT REPORTER:  Can you raise your right

20    hand, please.  Do you solemnly swear or affirm that

21    the testimony you are about to give in this cause will

22    be the truth, the whole truth, and nothing but the

23    truth?

24         THE WITNESS:  I do.

25                        DAVID ACOSTA,
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                5

```
 1   a witness herein, having been first duly sworn, was

 2   examined, and testified as follows:

 3                    DIRECT EXAMINATION

 4   BY MR. WATSON:

 5     Q.  Good morning, sir.  Can you please state your

 6   full name.

 7     A.  David Acosta.

 8     Q.  Okay.  Before we get started today, Mr. Acosta, I

 9   just want to say a couple things on the record, just for

10   our purposes.  I want to note that the attorneys for the

11   plaintiff, FloGrown, LLC, are not present today.  But I

12   did speak with counsel, Benjamin Bedrava at

13   (954) 951-0154 at 10:16 a.m.  He indicated to me over

14   the phone that they would not be attending today, but

15   they had no objection to us proceeding in their absence.

16          Now, with that out of the way, let me come back

17   to you and ask you a few questions.  For background,

18   have you ever sat for a deposition before?

19     A.  Yes.

20     Q.  Okay.  What kind of case did you sit for a

21   deposition in?

22     A.  Some contract cases, HOA dispute.

23     Q.  Okay.  So it's been multiple times you've been

24   deposed in the past?

25     A.  Yes.
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                6

```
1      Q.  Okay.  Were you a party to any of the lawsuits

2   that you were deposed in?

3      A.  Yes.

4      Q.  Okay.  So you're probably familiar with the rules

5   of depositions, but nonetheless, I'll just remind you of

6   those.  First of all, it's not meant to be an endurance

7   contest; it's just a fact-gathering exercise.  As the

8   lawyers involved in the case, we obviously know what

9   laws are going to apply, but we don't necessarily know

10  all the facts.  That's why you're here today, for me to

11  learn facts from you and to tell you facts as I think

12  them to be and see if you can confirm or, you know,

13  clarify that for me.

14      As I question you today, I want to have a couple

15  things that are our general understanding together.  The

16  first is, if I ask you a question and if you don't ask

17  me for clarification, I will assume that you understood

18  the question.  However, if I ask you something that's

19  not clear, please just ask me to rephrase or explain.

20  Sometimes something's very clear in my mind, but when I

21  speak to someone else, it's not very clear, and that's

22  just human nature, I think.

23      The next is, this is a very mechanical process.

24  It's very unusual, as you know.  It's unlike a

25  conversation you or I might have at Starbucks, we're
```



acquaintances talking about the activities of the day. It requires me to say my question completely before you start responding and for me, obviously, to allow you to say your answer completely before I jump in again so the record's nice and clean.

The next thing is, the court reporter needs an audible yes or no or an explanation, obviously, to the question, if one is so needed, rather than shaking your head up and down, because you can't transcribe that, or an uh-uh or uh-huh, something like that, and I'll try to remind you of that as we go through today, too. And I do it as well; it's just, again, a human nature thing.

Is there anything that you feel is causing you not to be able to sit for a deposition today?

A. No.

Q. Okay. So you feel ready to go, a full mind?

A. (Nods head.)

Q. I'm going to give you a little bit of an overview, because I've sat in your chair before as well, so I just want to give you a roadmap of what we're going to do today.

First of all, I don't think we'll be here more than a couple of hours. With that said, if you need a break at any time, just let me know, and we'll take a bathroom, restroom or coffee break if you need that.



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                 8

```
 1              The second thing is, when we start, I really just
 2      want to kind of get to know you first; want to know
 3      about your background, kind of know who you are.  And
 4      obviously, we know what the lawsuit's about, so we'll
 5      pivot more into FloGrown and then what your role was
 6      within FloGrown, so really, three parts today.
 7              So do you have any questions for me before we
 8      begin?
 9      A.  No.
10      Q.  Okay.  Well, let's just start at the beginning.
11      Can you tell me where you currently live.
12      A.  I live in Longwood.
13      Q.  Okay.  And how long have you lived in Longwood?
14      A.  This year will be 18 years.
15      Q.  All right.  Are you from Florida originally?
16      A.  No.  Pennsylvania.
17      Q.  Okay.  When did you move to Florida?
18      A.  2000, about July 2000.
19      Q.  And why did you move to Florida?
20      A.  Quality of life.
21      Q.  Okay.
22      A.  Wanted to trade 20-degree Februarys for palm
23      trees.
24      Q.  All right.  Well, that's a good reason.  Did you
25      move here alone?
```



1      A.  No.  My wife and my two kids.

2      **Q.  All right.  When you first moved to Florida, what**

3  **was your career?**

4      A.  So there were a couple of things that I was doing

5  at the time; I was a business consultant, and I had a

6  printing business as well.

7      **Q.  As to the business consultant, what were you**

8  **consulting on?**

9      A.  So business development, marketing strategy, how

10  to build companies, fundraising, generally advising

11  small business owners how to build their companies.

12      **Q.  Was there a certain type of business industry**

13  **that you were targeting --**

14      A.  No.  It was horizontal.  I did financial

15  services, pharmaceuticals, electronics, manufacturing,

16  over -- that's a career that I started in the '80s.

17      **Q.  And was it a company that you had that did that**

18  **consulting?**

19      A.  It was just a sole proprietorship under my own

20  name.

21      **Q.  Okay.  So then you acted as maybe an independent**

22  **contractor to companies?**

23      A.  Independent consultant, yes.

24      **Q.  Okay.  So they would hire you and you would give**

25  **them advice on how to --**



```
1     A.   Correct.
2     Q.   -- make their businesses more efficient or
3   anything else, more productive, things like that?
4     A.   Yes.
5     Q.   Okay.  And what was the second thing you said you
6   did besides business consulting?
7     A.   I had a printing business.
8     Q.   Okay.
9     A.   Large-format digital printing business.
10     Q.   And what kind of printing did you do?
11     A.   We did -- at that time, we did color
12   electrostatic printing; we did large-format ink-jet
13   printing, and those were the two main printing
14   technologies that I used at the time.
15     Q.   Okay.  One of the things I should have said at
16   the beginning today is that you're going to know a lot
17   more than me than -- about a lot of areas, and so I'm
18   going to ask you a lot today to tell me what terms mean.
19   It's not to test your knowledge on it; it's really
20   because I don't know what they mean, because I'm a
21   lawyer in the case, so obviously, I don't know the
22   facts.
23          So, with that said, can you just clarify more
24   about what you mean by the electrostatic printing; what
25   is that?
```



1       A.   So color electrostatic printing is a technology

2    that was around for, I think the late -- started in the

3    late '70s.  It's not really practical anymore to use it,

4    but it's a technology where you print using liquid-based

5    toners.  You print on paper.  Once the toner goes on

6    to -- let me back up.  So you're printing on

7    diazo-coated paper, electric -- paper that's set up to

8    receive an electrical charge.  The printhead charges the

9    paper everywhere where there's supposed to be a yellow

10   dot or cyan dot, magenta or black, and the liquid -- and

11   the paper goes over a toner bath, and so the ink sticks

12   to the paper, so that's the printing method.  And then

13   once the ink's on the paper, then you have a full color

14   print in large format.  We were able to print up to

15   about 52 inches.

16       The purpose of using that technology is that you

17   were able to then take that print and put it onto other

18   materials, a banner material or vinyl.  And that's how

19   you would -- that's how we were able to get vinyl with

20   full color without screen printing.  This is a

21   completely digital process.  That's color electrostatic

22   printing.

23       **Q.   Okay.  Now, you said without screen printing on**

24   **the end, when you just said your description.**

25       A.   Right.



1     **Q.  Were you referring to screen printing like on**

2     **paper?**

3     A.  We -- we didn't do any screen printing.

4     **Q.  Okay.**

5     A.  The digital technology was -- at that time was

6     encroaching, making big roads, inroads into screen

7     printing.  So think about printing a 52-inch wide sheet

8     by, let's say 8 feet high.  To screen print something

9     like this is cost prohibitive.  You've got the films,

10    you've got the screens, and you put ink down.  Got to do

11    that for each color; cyan, magenta, yellow, and black.

12    It's just cost prohibitive.

13         With a digital, you could go, tap, and you got

14    the thing coming out of the printer.  So we never got

15    into the screen printing side; we were always on the

16    digital side.

17    **Q.  Okay.  What was the name of the business?**

18    A.  Promo Point.

19    **Q.  Promo Point.  Was that your business?**

20    A.  Yes.

21    **Q.  Okay.  Was it an LLC or incorporated or --**

22    A.  Promo Point was an LLC, yes.

23    **Q.  Okay.  Were there any other members in the LLC?**

24    A.  No.

25    **Q.  Okay.  Was the business already started when you**



1    moved to Florida, or did you start it here?

2      A.   Yes.   It was a Pennsylvania LLC.

3      Q.   Did you convert it to a Florida LLC when you

4    moved here?   Do you remember?

5      A.   I don't recall.   I think we did.

6      Q.   Is the company still active today?

7      A.   No.   We got out of it in about 2002.

8      Q.   And why is that?

9      A.   The transition to -- to Florida didn't go well.

10   The facility that we were going into, that we were

11   moving into -- it was about an 8,400-square foot

12   facility -- was inadvertently destroyed before we moved

13   in.   So we had to stage all of our equipment and

14   furniture and supplies, and that took four months.   I

15   lost my business.   It was a business interruption.

16     Q.   When you were operational, was there a certain

17   kind of client that you were printing for?

18     A.   Yes.   We did work for the NBA, for Coca-Cola, for

19   Disney, for Pfaltzgraff, for UPS, and supermarkets.

20     Q.   Okay.   So your work product, was it safe to say

21   it was like -- I don't want to say like paper, but it

22   was like on paper or --

23     A.   It was large format.   So think about the trucks

24   and the -- the trucks and vans that are wrapped in

25   graphics, we did that.   We did huge murals inside of



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                    14

1   stores; we did banners; we printed posters, floor

2   graphics.  We -- basically, if it was big and it was

3   visible, that's a product that we made.

4       **Q.  Was that company your first experience with**

5   **printing?**

6       A.  Yes.

7       **Q.  Okay.  How did you learn how to do the stuff you**

8   **were doing at the company?**

9       A.  I started with a 36-inch wide ink-jet printer.

10   So I was -- I was doing my consulting work and some of

11   my clients wanted print product.  I got a 36-inch

12   printer.  There's a long story associated with that, but

13   I'm giving you the condensed version.  I got a 36-inch

14   printer and started doing some work for ad agencies and

15   for various types of clients, and -- and it just grew

16   from there.  One 36-inch printer turned into two 36-inch

17   printers, and then we moved into the color electrostatic

18   printing.  We got trained by 3M.  It was my wife and I;

19   we had one employee.  We went up to Minnesota and got

20   trained by 3M and built our business that way.

21       **Q.  How was it that you came to be trained by 3M?**

22       A.  They had a program known as the 3M Scotch

23   Program.  It's a particular mix of their materials,

24   their materials and certain equipment.  We wanted to be

25   in that club because you could command a higher price



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1  point for the product.  And they offered -- 3M offered,

2  if you use their supplies, their training, their

3  materials, their processes, that they put a guarantee on

4  the product.

5      So think about it, if your company's buying a --

6  big graphics that are going to go outdoors and you're

7  going to spend $5,000, you want as much life out of that

8  product as possible.  What 3M would say is that we're

9  going to guarantee that that product is going to be as

10 long as their guarantee would go if this company uses

11 these combination of goods.  So we wanted to have a

12 superior product backed by a guarantee and we signed up

13 for that program.

14 **Q.  Okay.  And the company -- and you said it was**

15 **Promo Printing?**

16 A.  Promo Point.

17 **Q.  Oh, Promo Point, I'm sorry.  And you said it**

18 **basically stopped doing business in 2002, right?**

19 A.  2002.

20 **Q.  When did it start doing business?**

21 A.  1996.

22 **Q.  Okay.**

23 A.  Around that time.  It's been a while.

24 **Q.  Okay.  Did you start in Pennsylvania --**

25 A.  Yes.



```
 1      Q.  -- also?  Okay.  Did you go to college?

 2      A.  Yes.

 3      Q.  Where did you go?

 4      A.  I went to couple of small schools, Hesston

 5   College in Kansas; I went to a small school in Indiana,

 6   it's a sister school, Goshen College.

 7      Q.  Did you graduate from one of those colleges?

 8      A.  No.

 9      Q.  Okay.

10      A.  I got restless and went on.

11      Q.  I understand.

12      A.  I did -- I did a Bill Gates.

13      Q.  Do you have any degrees other than a high school

14   diploma?

15      A.  No.

16      Q.  Okay.  Do you have any -- other than the 3M

17   training you just told me about, do you have any

18   training in printing, in the printing industry that you

19   were formerly --

20      A.  Formal training, like in college or --

21      Q.  Any certifications, any type credential that you

22   might be --

23      A.  No.  Over the years, we got trained by ink

24   manufacturers and suppliers, workshop type of things.  A

25   lot of it was self-education, but no certifications, to
```



1    answer your question more specifically.

2        Q.  At Promo Point, did you ever print t-shirts?

3        A.  No.

4        Q.  Did you ever print any clothing?

5        A.  No.

6        Q.  Any apparel?

7        A.  No.

8        Q.  Pens?

9        A.  No.

10       Q.  Hats?

11       A.  No.

12       Q.  Okay.  After 2002, when Promo Point was

13   dissolved, I guess, right, did you dissolve in 2002?

14       A.  Yes.

15       Q.  Okay.  So at that point, were you only a business

16   consultant?

17       A.  Yes.

18       Q.  Okay.  So take me forward from 2002 until you

19   were doing something other than business consulting,

20   what year was that?

21       A.  Until I was doing -- I'm not sure I understand

22   your question.

23       Q.  Yeah.  Maybe it -- let me sharpen the question.

24   So 2002, you were just a business consultant as we

25   discussed earlier?



1    A.  Yes.

2    Q.  **I want to know how long you're a business**

3    **consultant before you started doing something else, or**

4    **maybe you never did, maybe you're just a business**

5    **consultant even now today?**

6    A.  I'm still doing business consulting.

7    Q.  **Okay.  So let's do this then.  From 2002, tell me**

8    **about your -- I guess the manner in which you would get**

9    **clients for your business consulting.**

10   A.  So I would attend networking, business networking

11   events.

12   Q.  **Okay.**

13   A.  But a majority of my clients for consulting

14   were -- came either through existing long-term

15   relationships, where clients had used me before and had

16   me come back, or referrals where people would say, hey,

17   you know, Acosta can help you with that.

18   Q.  **Now, when a company would hire you, would you go**

19   **in and just assess it and give them verbal**

20   **recommendations or would you create reports or --**

21   A.  All of the above.

22   Q.  **Okay.  When did you come to learn about FloGrown?**

23   A.  We have -- FloGrown, the owner of FloGrown,

24   Jesse, and my nephew -- let's say it this way:  My

25   nephew -- my nephew had an employee that was friends



1  with Jesse Welch and that's how I came to learn about

2  FloGrown; it was his mutual acquaintance.

3      Q.   Okay.  And what year was that when you learned

4  about him, or the company?

5      A.   I want to say it was 2014.

6      Q.   Okay.  And what's your nephew's name?

7      A.   His name is Daniel Santiago.

8      Q.   And you said he had a friend who was Jesse's

9  employee?

10     A.   He was an -- he was an -- he had an employee.

11     Q.   Daniel had an employee?

12     A.   Yes, had an employee.  He had a -- he had a

13  business here in Florida.  He's no longer here, but he

14  had a business in Florida and he employed a fellow that

15  we -- we called Kick, his last name is Kicklighter,

16  Aaron Kicklighter.  And Aaron Kicklighter was the common

17  connection to learn about FloGrown.

18     Q.   Okay.  And just so I'm clear here, are you saying

19  Mr. Kicklighter knew an employee of Jesse's or he knew

20  Jesse?

21     A.   No, he knew Jesse.

22     Q.   Okay.  And so who made the introduction for you

23  and Jesse; was it Mr. Santiago, was it Mr. Kicklighter?

24     A.   I don't recall the specifics, but I think it may

25  have been Aaron.  At the time -- around the time that I



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1   met Jesse, I was doing some consulting work for my

2   nephew's company, so I would go in and do some training.

3   Aaron would sit in on some of those sessions.  We would

4   do troubleshooting for things that were going on at

5   his -- at my nephew's company.  And so I think the way

6   this came about was somehow my name came up in a

7   conversation -- this is speculation -- came up in a

8   conversation with Jesse.

9       Q.  What kind of company did your nephew,

10   Mr. Santiago, have?

11       A.  He had a baseball youth training and event

12   business, so he would put on baseball tournaments and

13   that sort of thing, but he would do player development,

14   training.  He was a former pro ball baseball player.

15       Q.  What do you consider the business FloGrown to be,

16   like what kind of business are they?

17       A.  FloGrown is a lifestyle brand marketing company,

18   and they produce wearables to expand that brand.

19       Q.  Okay.  Based on the definition you just gave me,

20   is there any other company besides FloGrown that you've

21   worked with that do lifestyle and brand marketing, that

22   kind of stuff you just told me?

23       A.  No.

24       Q.  Okay.  Are there any companies you ever consulted

25   with who sell t-shirts?



**Orange Legal**
**800-275-7991**

```
 1      A.  No.
 2      Q.  Okay.  Have you ever consulted with any company
 3   that does screen printing other than FloGrown?
 4      A.  No, I can't recall.
 5      Q.  Okay.  Have you ever consulted with any company
 6   that does heat pressing?
 7      A.  Have I ever consulted -- have I ever provided --
 8   why don't you clarify?
 9      Q.  Yeah.  Have you ever provided consulting services
10   as a business consultant to any company that does heat
11   pressing of any logos or things like that on t-shirts or
12   any other products?
13      A.  No.
14      Q.  Okay.  So going back to FloGrown --
15      A.  Well, hold on.  Let me clarify that question.
16      Q.  Okay.
17      A.  I want to be as transparent with you as possible.
18   That's what this whole purpose is.
19      Q.  Yeah, absolutely, and that's what I want you to
20   do.
21      A.  So we currently, my wife and I have a small
22   business now where we -- where we do this type of work,
23   okay, so we are doing heat pressing.  We're doing
24   dye-sublimation, and we have customers that buy our
25   product.  For example, we -- we have a rhinestone
```



1    transfer business, we -- we create rhinestone transfers

2    that -- that are applied to garments or caps.  Those

3    customers periodically would ask about how to best

4    approach, you know, their particular project.  So when

5    you -- when you say have I consulted, not in a formal

6    consulting capacity, but in my talking with my own

7    customers about their heat pressing, yes.

8        **Q.  Okay.**

9        A.  In that context, yes.

10       **Q.  Okay.  What is the name of the company that you**

11   **and your wife have?**

12       A.  It's called Hands On Color, LLC.

13       **Q.  Is it a Florida LLC?**

14       A.  Yes.

15       **Q.  Is your wife also a member of the LLC?**

16       A.  Yes.

17       **Q.  Are there any other members of the LLC?**

18       A.  No.

19       **Q.  Do you and your wife own 100 percent of the LLC?**

20       A.  That's correct.

21       **Q.  Are there any employees of the LLC?**

22       A.  No.  It's just -- it's just my wife and I.

23       **Q.  What is your wife's name?**

24       A.  Elizabeth.

25       **Q.  Is it Acosta?**



```
 1    A.  Acosta, yes.  Sorry.
 2    Q.  I always have to clarify because my wife kept her
 3    maiden name, so I don't assume that anymore.
 4         Going back to FloGrown, in 2014, approximately, I
 5    think is when you said you think you first were
 6    introduced to FloGrown and Mr. Welch.  I'd like you to,
 7    you know, to the best of your memory take me back to
 8    that initial meeting and tell me what happened, who was
 9    there, what did you say.
10    A.  My initial meeting with FloGrown was -- was a
11    conversation with Jesse Welch.  He wanted to know if
12    there was anything that I could do to help him with his
13    business.  He made reference to the fact that I was
14    helping my nephew with his company.
15    Q.  Why -- I'm sorry.  Were you -- I didn't mean to
16    cut you off.  Go ahead.
17    A.  In -- in that conversation, we talked about -- as
18    I -- as I would do with any prospective client, I would
19    ask about, you know, what are your goals?  What are you
20    trying to accomplish here?  What have you done so far?
21    What are the challenges that you're having?  And those
22    are kind of preliminary questions to better get a sense
23    of context.  And it was just a conversation; there was
24    no sales pitch, there was no agreement, there was no
25    follow-on steps.  It was just really, that's how I got
```



1   started with -- with -- with FloGrown.

2      **Q.  Was that initial meeting on the phone or in**

3   **person?**

4      A.  It was in person.

5      **Q.  Was there anyone else present at the meeting?**

6      A.  No.

7      **Q.  Where was the meeting at?**

8      A.  It's at -- at FloGrown offices.

9      **Q.  Why did Mr. Welch seek your help, and by that I**

10  **mean, was the business not doing well at that point, or**

11  **what was the purpose of him contacting you?**

12     A.  I think he was just looking for ways to -- I -- I

13  don't know what was in his head, but what we discussed

14  was that he was looking for ways to -- to better build

15  his company.

16     **Q.  And what was your initial assessment of the**

17  **company when you met with Mr. Welch?  Was it that you**

18  **felt the company was doing well or could do much better**

19  **or --**

20     A.  That the company was doing well at the time.

21  This was -- to the best of my recollection, this was his

22  first venture, and as a new entrepreneur, you know, with

23  your first venture, there's a lot of opportunities for

24  failure.  So what I saw was someone who had either

25  overcome a lot of the early obstacles -- well, not or,



1    but had overcome a lot of those early obstacles, and was

2    dealing with typical growing pains.

3        **Q.   Okay.   And you mentioned three things that your**

4    **initial assessment of him probably entailed, and that**

5    **was goals, finding out about his accomplishments, and**

6    **challenges.   Can you tell me what his goals were when he**

7    **met with you?**

8        A.   No.   I --

9        **Q.   Don't remember?**

10   A.   Yeah.   To be -- to be honest with you, I -- I

11   wouldn't be able to pinpoint it.   He wanted to -- what I

12   recall from the substance of that conversation was that

13   he wanted to build a business that was adopting best

14   practices.   That's the -- that's the best way that I

15   could put it.   You know, what are the -- what are the

16   things that I should be doing to better build my

17   business.

18       **Q.   And when you say best practices, does that mean**

19   **like internally in the company, or best practices for,**

20   **you know, customers, I guess?**

21   A.   All -- all of the above.

22       **Q.   All of the above?**

23       **Did he tell you what his challenges were at**

24   **FloGrown when he first met with you?**

25   A.   I'm sure we discussed some of those.   I can't



1   recall the specifics right now.

2       **Q.   Okay.  After that first meeting, what did you do**

3   **to follow up with Mr. Welch or FloGrown?**

4       A.  We talked over the course of a few months, and

5   then he formally asked me to give him a proposal to do

6   some consulting work.

7       **Q.  And did you do that?**

8       A.  Yes.

9       **Q.  Was it a written proposal?**

10      A.  No.

11      **Q.  Okay.  Was that proposal in 2014 still?**

12      A.  I believe it was in 2014, the end of 2014.

13      **Q.  And what was the proposal that you provided to**

14  **him?**

15      A.  So the proposal consisted largely of helping him

16  to better identify and profile his customers.  So you've

17  got selling product to all these people, but they're not

18  all the same, so ideally helping him to understand, you

19  know, this customer's different than this customer.

20  They have different age, age brackets; they have

21  different socioeconomic, they have different lifestyle

22  interests, so we call those marketing personas.  So that

23  was part of my work to help him better understand this

24  market.

25          Connected to that was the messaging, you know,



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1  how he's actually communicating, engaging his market;

2  both online, offline, selling, distribution.  We talked

3  about at some point doing some forecasting for the

4  company.  And that was -- that was mainly the gist of

5  that initial engagement.

6      Q.  Did you ask for any money?

7      A.  Yes.

8      Q.  Okay.  How much did you ask for?

9      A.  For 5,000.

10     Q.  Okay.  Was there a certain timeline when you

11  would have the marketing personas messaging and

12  forecasting done by?

13     A.  We didn't bracket a time period.

14     Q.  Okay.  Was it just you who would be doing the

15  consulting for that?

16     A.  Correct.

17     Q.  Did you produce any written materials for him,

18  like recommendations, any recommendations?

19     A.  I don't remember doing formal reports with him.

20  A lot of our work together was meetings going over our

21  various items.

22     Q.  Okay.  What did you do to help him better

23  understand his market?

24     A.  We -- we studied some of the -- the audiences

25  that he was already selling product to.  And it became



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA
28

1   apparent that, you know, there were -- there were finite

2   marketing personas that could be identified from -- from

3   looking at those patterns online, and the people that

4   were buying the product, where they were buying the

5   product.

6   **Q.  Were there certain markets that he was not**

7   **tapping into that you recommended that he should?**

8   A.  No.  My focus really was to develop, to develop

9   what he was already strong in.

10  **Q.  And what was his biggest strength, if you recall?**

11  A.  His biggest strength was that his marketing --

12  FloGrown appealed to a Florida lifestyle, whether it was

13  hunters, surfers, campers, beachgoers.

14  **Q.  Did he have a website when you first met him?**

15  A.  Yes.

16  **Q.  Did you make any recommendations on the website?**

17  A.  Yes.

18  **Q.  What were those?**

19  A.  I told him he needed a better website.

20  **Q.  And why would you say that?  What was -- what was**

21  **it about the prior website that made you say that?**

22  A.  If -- if I tried to guess at -- at what it was

23  right this moment, I would not be able to tell you, but

24  generally, it wasn't -- it wasn't optimized for speed.

25  It didn't have a good presentation generally.  And I



```
 1    encouraged him to fix that.
 2        Q.  And did he do that?
 3        A.  Yes.
 4        Q.  Did you make a recommendation to him for someone
 5    to -- to use for that work?
 6        A.  No.
 7        Q.  Okay.  What did you do for messaging for
 8    FloGrown, or what were your recommendations, rather, for
 9    messaging?
10        A.  We -- we actually never got to that part.
11        Q.  And you said forecasting earlier, what do you
12    mean by that?
13        A.  Sales forecasting.
14        Q.  What does sales forecasting mean?
15        A.  Sales forecasting is just as it sounds, you know,
16    looking into the future to see what you anticipate your
17    sales could be, and it's a best guess, say, for a given
18    year, we intend to do this much sales overall and then
19    you break it down by month, by quarter.
20        Q.  What were FloGrown's gross sales when you first
21    started giving recommendations, when you first looked
22    into the company?
23        A.  I couldn't tell you off the top of my head.
24        Q.  Okay.  What were some of the forecasting, sales
25    forecasting you gave to try to get to a different goal?
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1    A.  You're asking me -- are you asking me specific

2    forecasting numbers?

3        **Q.  If you recall them.**

4    A.  I don't recall them.

5        **Q.  Okay.  So after you were paid the $5,000 -- was**

6    **it retainer or just a flat fee or --**

7    A.  It was a -- it was a flat fee for a collection of

8    services.

9        **Q.  Okay.  After you completed all the services under**

10   **that $5,000, did FloGrown retain you for any other**

11   **services?**

12   A.  Yes.

13       **Q.  What were those?**

14   A.  Well, the way -- the way these consulting

15   relationships work, they oftentimes follow a specific

16   pattern.  You start with a specific set of things that

17   you're going to do for the client, and then because

18   there's a relationship of trust and you're working

19   through things, oftentimes, the work morphs into doing

20   other things.

21       **Q.  Okay.**

22   A.  So after -- after the initial $5,000, we began to

23   look at other aspects of the business.  And -- and then

24   he would just periodically ask me to help him with some

25   specific things and he would pay me for the -- for the



**Orange Legal**
**800-275-7991**

 1   time.

 2      Q.   Okay.   So did he always treat you as an

 3   independent contractor?

 4      A.   Until -- until a point where we began talking

 5   about partnering, yes.   The answer is yes, until that

 6   point.

 7      Q.   Okay.   And what point did you talk about

 8   partnering, what year is that?

 9      A.   I believe that we started that conversation

10   sometime in 2015.

11      Q.   Okay.   So I want to just jump back for a second.

12   From the period of time between after your initial

13   series of recommendations, the $5,000, I want to know

14   what happened after that, up to the point where we're in

15   2015, you're talking about partnering, and what I mean

16   by that is, I want to know what other services you

17   provided to FloGrown during that time to the extent

18   they're different than what you just told me, that was

19   under the initial recommendations.

20      A.   To the extent that they're different, they

21   weren't different.   They were generally the same

22   business development type of conversations.

23      Q.   Okay.   Up until the point where you started

24   talking about partnering in 2015, how much money would

25   you say FloGrown had paid you for your consulting



```
 1    services in addition to the 5,000?

 2        A.  I can't recall.

 3        Q.  All right.  So then in 2015, describe for me the

 4    nature of how the partnership proposal came up that you

 5    referenced.

 6        A.  So the conversation was -- I want to try and

 7    contextualize it -- so he's a young man who's got his

 8    first business doing, and he's being advised by somebody

 9    who's been doing business consulting for 25-plus years.

10    He saw value in that.  We had a -- we had a relationship

11    of trust, and so the conversation was, you know, would

12    it make sense for -- for us to work together to actually

13    be partners in this business to build it up.  I'm not

14    sure whether the -- the impetus came from his side or my

15    side, but that's -- that's where we ended up in a

16    conversation like that.

17        And I'm not sure I could tell you much more than

18    that, but that's -- it was generally, we started to say,

19    hey, you know, maybe we could just build this company

20    together.

21        Q.  Okay.  So why don't you tell me what it means to

22    be partners under what happened.

23        A.  Partners meant co-ownership.

24        Q.  Okay.  Did that happen here; did you become

25    co-owners of FloGrown?
```



1    A.  For a short period of time, there was -- there

2  was -- there was a period of time where we -- we had an

3  informal relationship of co-ownership.  I had like one

4  percent of the company.

5    **Q.  Okay.  So what was that period of time?  And I**

6  **know you said it started in 2015 when a proposal came**

7  **up, but was --**

8    A.  Yeah.  I think that -- that aspect of it started,

9  I want to say, in 2016.

10    **Q.  Okay.  Was there a written agreement that**

11  **transferred one percent of the company to you?**

12    A.  No.

13    **Q.  So how did you know you had one percent?**

14    A.  Because we agreed to it verbally.

15    **Q.  Okay.**

16    A.  It was a -- it was an informal way for us to

17  actually start working together.  I got a title so that

18  I could start interfacing with the company's customers,

19  vendors, and being involved day to day, and that's how

20  we got started.

21    **Q.  What was your title that he gave you?**

22    A.  It was vice president.

23    **Q.  Okay.  Did you get, like, business cards, things**

24  **like that?**

25    A.  Yes.



```
1       Q.   Okay.  Did you have an office at the company?

2       A.   No.

3       Q.   What were your job duties as vice president?

4       A.   We didn't -- we didn't bracket those in any kind

5    of writing.  So I was -- I was looking at -- at that

6    period of time, I was looking at his -- at FloGrown's

7    sales, at FloGrown's customers.  I remember one -- one

8    customer, we went out to Missouri to go visit, a company

9    called Bass Pro, we travelled out there to see one of

10   our customers.  And those are the kind of things that we

11   did together.

12      Q.   When you became vice president, were you an

13   employee of the company?

14      A.   In -- in formal context as a -- as a payroll

15   employee?

16      Q.   Yeah.  Were you a W-2 employee?

17      A.   No.

18      Q.   Okay.  Did you -- well, how long were you in the

19   role of vice president at FloGrown?

20      A.   I don't recall.

21      Q.   Okay.  How long did you have the -- well, do you

22   still have the one percent ownership in FloGrown?

23      A.   No, I don't.

24      Q.   When did that stop?

25      A.   That stopped -- let's see, we're in 2018.  I want
```



1  to say that stopped sometime in 2017.  I just couldn't

2  give you a date.

3      **Q.  So approximately a year, is that right -- about**

4  **right, 2016; sometime in 2017, you had about one**

5  **percent?**

6      A.  Yeah.  I -- I couldn't bracket the time period.

7      **Q.  Okay.  But is it fair to say it was about a year,**

8  **whenever it was?**

9      A.  I'm -- I'm just going to go by what I said.  It

10  started sometime in 2016, I believe it stopped in 2017.

11      **Q.  Okay.  Why did it stop?**

12      A.  It became apparent that the partnership wasn't

13  going to work long-term, and I thought that Jesse Welch

14  would better be -- would be better served by either

15  running alone or running with a different type of

16  partner.

17      **Q.  Why did you think it would be better served**

18  **without your involvement?**

19      A.  Because I developed other business interests.

20      **Q.  So the relationship stopped because --**

21      A.  My wife and I started this -- this business that

22  I described to you earlier and my interests went in that

23  direction.

24      **Q.  Did --**

25      A.  So I had a different priority.



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA
                                                                      36

```
 1      Q.  Got it.  Did you start that business with your
 2   wife in 2017?
 3      A.  2016.
 4      Q.  2016.  Do you know when in 2016?
 5      A.  Yes.  It was March.
 6      Q.  Did you tell Mr. Welch you started another
 7   business in March of 2016?
 8      A.  Yes.
 9      Q.  Did he have any problem with you having
10   involvement with another business --
11      A.  No.
12      Q.  Other than your business in March of 2016 and
13   FloGrown, were there other companies you did business
14   consulting with during the time you were consulting with
15   FloGrown?
16      A.  Yes.
17      Q.  Okay.
18      A.  I had a -- you want -- you want to know which
19   one?
20      Q.  Sure.
21      A.  Okay.  It's a company in Pennsylvania that I had
22   been doing consulting work since about 1999.  It's a
23   financial services company known as Community First.
24   They are -- they are a nonprofit lender for small
25   businesses in their community in Lancaster County,
```



1    Pennsylvania.  They make loans to small businesses for

2    purposes of economic development.  And I had taken that

3    company through a couple of strategic plans.  I had

4    interviewed and coached their executive staff.

5        I had done a lot of work over the years, lot of

6    consulting engagements.  They had asked me -- over this

7    period of time, they had asked me to come in and help

8    them with their new website and online marketing.  So

9    that was a project that was happening around the same

10   time.

11   **Q.  Any other companies you were providing consulting**

12   **services for during the time you were providing -- I'm**

13   **sorry, during the time you were vice president for**

14   **FloGrown?**

15   A.  Business consulting, no.

16   **Q.  Other than First -- First Financial Services,**

17   **that was called --**

18   A.  It's Community First Fund.

19   **Q.  Community First Fund, yes.  I also want to make**

20   **sure we're on the same page when we used the word stop**

21   **before, because you said it stopped in 2017.  And by**

22   **stop, are you just saying you no longer had the one**

23   **percent and the relationship was over after that or what**

24   **does stop mean?**

25   A.  Correct.  I -- stop means I no longer had the one



1  percent.

2      **Q.  Does it also mean you're no longer doing business**

3  **consulting for FloGrown?**

4      A.  No.  I can't recall whether he used me for

5  anything else, because periodically, he would contact me

6  for -- for help on -- on certain business things.

7      **Q.  And what happened to that one percent when you**

8  **stopped in 2017?**

9      A.  It was -- it was an informal agreement between

10  us.  It was -- it went back to him.

11      **Q.  So you never paid for the one percent?**

12      A.  I did.  I think it was a symbolic $100 that I

13  gave him.

14      **Q.  No.  I mean, were you paid out at the end?**

15      A.  Was I given the $100 back?

16      **Q.  Or whatever value it had at that point?**

17      A.  Actually, now that you say that, I have to go

18  back and get my $100.  It was -- it was that kind of

19  informal arrangement.

20      **Q.  But when it stopped, was there a former**

21  **conversation where you said, hey, Jesse, I'm giving you**

22  **back the one percent and I'll shake your hand or**

23  **something like that?**

24      A.  Yes.

25      **Q.  It was something like that?**



1    A.  Yes.

2    Q.  Okay.  And what was Jesse's reaction to that?

3    A.  He was okay with it.

4    Q.  So if you started the company with your wife in

5    March 2016 -- but it was March 2016, right?

6    A.  March 2016, yes.

7    Q.  I just want to understand a little bit more about

8    the termination, because if you were there March 2016, I

9    mean, what happened all those months that made you come

10   to the realization that the partnership with FloGrown

11   wasn't right, because you worked for him for seven,

12   eight months at that point, right, when you gave the one

13   percent back?

14   A.  I'm not sure what you're asking.

15   Q.  At March 2016 when you started the company with

16   your wife, you were already doing consulting for

17   FloGrown?

18   A.  Yes.

19   Q.  You already had the one percent for FloGrown?

20   A.  Yes.

21   Q.  But you said in 2017 sometime when it stopped,

22   with FloGrown, when you gave the one percent back and

23   you were no longer doing consulting, I just want to know

24   why, whatever happened in 2017, it took so long for that

25   to build up for those seven, eight months, because you



1    were already doing that same work for FloGrown, what led

2    to it?

3        A.   I'm still not following your question.  You're

4    saying I was still doing that work for FloGrown.

5    What --

6        Q.   Well, you were vice president?

7        A.   Can you break your questions down?

8        Q.   Yeah, sure.  Yeah, let's do it like that.

9             So you were vice president for FloGrown?

10       A.   Yes.

11       Q.   You had one percent of the company?

12       A.   Yes.

13       Q.   You were Jesse's partner.  You were giving him

14   recommendations?

15       A.   Yes.

16       Q.   It was going well?

17       A.   Yes.

18       Q.   March 2016, you and your wife decided to start

19   your own company, right?

20       A.   Correct.

21       Q.   You tell Jesse about the company?

22       A.   Yes.

23       Q.   He has no problem with you working with this

24   other company, your own company, in fact, at the same

25   time, right?



```
 1      A.  Correct.
 2      Q.  From March 2016 to the beginning of 2017, things
 3   are going well both with your company and with you
 4   working with FloGrown, right?
 5      A.  I'm not sure I said that, but --
 6      Q.  Okay.  Well, what happened -- was there any --
 7   was there anything that happened while you were working
 8   for FloGrown as vice president and while you were
 9   starting the business with your wife that caused you
10   conflict or some angst between --
11      A.  No.
12      Q.  -- your two roles?
13      A.  The short answer is no.
14      Q.  Okay.  Is there a long answer?
15      A.  No.
16      Q.  Okay.  So in 2017, when I think you said you
17   decided that -- or you and Jesse had some conversation
18   that the partnership with you -- or it would be better
19   for him to partner with someone else with FloGrown, is
20   that accurate?  Is that what you said earlier?
21      A.  Yes.
22      Q.  Okay.  And you said one of the reasons was -- for
23   that was because you found a different partner, your own
24   wife, you started a business with her, right?
25      A.  Correct.
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1    Q.  Okay.  So all I'm asking here is, if you had been

2    doing that same partnership with your wife for seven,

3    eight months by that point, what was it in early 2017

4    that made you then say, Jesse, I can't do this because

5    I'm going to partner with my wife in this business or it

6    was going well with her or whatever you said?

7    A.  Okay.  So I understand your question now.  It's

8    all about focus.

9    Q.  Okay.

10   A.  So Jesse's business was very different than the

11   business that I was developing with my wife.

12   Q.  Okay.  Tell me how they were different.  How was

13   your wife's different than what Jesse's does, the focus?

14   A.  Well, Jesse's -- FloGrown is in -- is in the

15   business that we described earlier, they're a lifestyle

16   brand marketing company.  They print t-shirts and sell

17   caps, and their -- their audience is a geographic

18   specific targeted market.  The business that my wife and

19   I were starting was very different; we were not in the

20   lifestyle brand business.  It's a completely different

21   focus.  We -- we bought a local -- we bought out a small

22   local company that had this rhinestone transfer

23   equipment, they had a little business, online presence,

24   doing these rhinestone transfers that look absolutely

25   gorgeous, completely different audience.  The people



1    that buy the FloGrown product would have no interest in

2    rhinestone anything, so we had two completely different

3    focuses.  So if I'm in the middle, I'm staying, helping

4    Jesse, and I want to do this thing with my wife, it

5    didn't make sense for me to have -- to be riding two

6    different horses.

7        Q.   Okay.  Were you unhappy with your vice president

8    role at FloGrown when you left?

9        A.   I was not.

10       Q.   Were you unhappy with the amount of hours you

11   were putting in at FloGrown?

12       A.   No.

13       Q.   Is there any employees you were unhappy with?

14       A.   No.

15       Q.   So it was an amicable split?

16       A.   Amicable, yes.

17       Q.   Okay.  Are you still friends with Jesse today?

18       A.   Absolutely.

19       Q.   When you and your wife started in March 2016, did

20   you have like an office for your business?

21       A.   We worked out of our home.

22       Q.   Okay.  And that was in Longwood?

23       A.   Yes.

24       Q.   Still in Longwood?

25            Were you paid as a vice president at FloGrown or



```
 1    were you just still compensated as you were as a

 2    consultant with a salary --

 3        A.  I was -- so once we -- once -- once the

 4    relationship transitioned into ownership, there was no

 5    longer a focus on fee for service.  I was earning my way

 6    as -- as a co-owner, so a lot of the work that I did was

 7    as if I were an owner.  And sometimes you take a draw;

 8    sometimes you take, you know, a salary.  In this

 9    particular case, I -- I took neither.  I was earning my

10    way into the business.

11        Q.  So it was just like split equity for the one

12    percent?

13        A.  Yes.

14        Q.  So you were never paid anything after you were

15    vice president of FloGrown?

16        A.  No, I'm not saying that.  I'm saying that we

17    didn't have a formal arrangement like -- like a set

18    salary.

19        Q.  But at times you did take a draw, like

20    compensation-wise?

21        A.  No.  At -- at times, I was compensated for -- for

22    specific -- I was reimbursed, for example, you know, if

23    I had some expenses, but yeah, it was not a wage or

24    salary.

25        Q.  I may have asked you this earlier, but maybe I
```



1    did not, but when you were vice president, did you have

2    an office inside the -- inside FloGrown's office?

3        A.   You did ask me that.  No, I did not have an

4    office there.

5        Q.   Okay.  How often did you go to FloGrown's

6    facility as vice president?

7        A.   Maybe once every couple of weeks.

8        Q.   And when you went --

9        A.   Most of my work was virtual, online, phone.

10       Q.   Sure.  When you went, did you just go to meet

11   Jesse and do updates, or what did you do when you went

12   to the actual office at FloGrown?

13       A.   Well, I talked with the employees; I talked with

14   Jesse.  We did normal business stuff.

15       Q.   Did you ever help FloGrown buy equipment?

16       A.   No.

17       Q.   Did you ever give recommendations on which type

18   of equipment to buy?

19       A.   Yes, I did.

20       Q.   Okay.  How did you do that; how did you give

21   those recommendations?

22       A.   So I -- I would simply say, look, this is the

23   best piece of equipment I think could help.  He has a

24   large format digital printer, for example, I had a lot

25   of experience with those.



```
 1      Q.  Okay.  How did you do your recommendations?  Was

 2   it just based on your experience or did you do like

 3   Internet research and come up with --

 4      A.  Both.

 5      Q.  Okay.  Other than the print -- I'm sorry, other

 6   than the equipment that you just mentioned, the digital

 7   printer, was there other equipment that you recommended

 8   that FloGrown purchase?

 9      A.  For production purposes, no, but for -- for their

10   trade show and display participation, I did recommend

11   that they pick up some display materials.

12      Q.  Did you ever recommend to FloGrown where they

13   should buy their -- I don't know the best way to say

14   this, but like the naked products before their logos run

15   them, like blank products?  You know what I mean,

16   like --

17      A.  Shirt blanks?

18      Q.  Shirt blanks, or like pens that don't have

19   anything on it.  They don't have to be pens, but just

20   giving you an example; hats with no logo on it?

21      A.  No.

22      Q.  Did you tell them where to buy those?

23      A.  No.

24      Q.  Did you -- did they ever ask you where to buy

25   those?
```



1    A.   No.

2    Q.   **Do you know where he bought those blank products?**

3    A.   I did at the time.  I don't recall at this

4    moment, but yes.

5    Q.   **Okay.  I want to understand a little bit about**

6    **how the facility was laid out at FloGrown.  I assume**

7    **there was a production part of the company where things**

8    **were printed; is that right?**

9    A.   Yes.

10   Q.   **And was -- are there offices inside the office,**

11   **too?**

12   A.   Offices inside?

13   Q.   **Yeah, like the FloGrown office, is it internal**

14   **offices?**

15   A.   So they had a -- there's a -- there's a

16   production area, I'd say about two-thirds of the

17   building is production, and then there's a section at

18   kind of a showroom, and then there's -- there's an

19   office where -- where Jesse is.

20   Q.   **Where he's usually sitting?**

21   A.   Yes.

22   Q.   **Okay.  When you would go to FloGrown, did you**

23   **mostly go to the production area, to Jesse's office, or**

24   **somewhere else in the business?**

25   A.   All over the building.



1      Q.  Okay.  Did you ever hear about any maintenance

2   issues with any of the equipment at the facility?

3      A.  Maintenance issues?

4      Q.  Yeah.

5      A.  No.  Jesse took care of that.

6      Q.  So is -- I want to make sure I'm clear on this

7   answer.  Jesse took care of it, so you don't know, or

8   you don't -- or you know there was never any maintenance

9   issues, which are you saying?

10     A.  I'm saying if there were maintenance issues,

11  Jesse would have known and taken care of those.

12     Q.  Okay.

13     A.  And I didn't have a need to know.

14     Q.  Okay.  So then you don't know if there were

15  maintenance issues on any of the screen printing

16  machines?

17     A.  I don't know.

18     Q.  All right.  Did Jesse ever -- or I'm sorry, let

19  me take that back.

20         Did you ever tell Jesse any process by which the

21  company should use to sell goods that were misprinted or

22  wrongly printed or -- or how should he dispose of them,

23  or what would you do if something was misprinted?

24     A.  You have to rephrase that for me.

25     Q.  Yeah.  If a t-shirt comes out and it should say



1    FloGrown, like, you know, right across it, but it's at a

2    wrong angle, and you have 100 t-shirts and they're

3    effectively trash, would you recommend to Jesse, hey, we

4    should sell these at a discounted price, or we should

5    throw these out, or did you have any involvement with

6    that?

7        A.   I did not have any involvement with that.

8        Q.   Okay.  Do you have any knowledge of any shirts

9    being misprinted?

10       A.   I do not.

11       Q.   Any other products being misprinted?

12       A.   I do not.

13       Q.   Okay.  Do you have any knowledge of any employees

14   who were fired while you were the vice president,

15   FloGrown employees?

16       A.   No, I do not.

17       Q.   Did you have supervisory control over the

18   employees there at FloGrown?

19       A.   No.

20       Q.   Was that all Jesse?

21       A.   Yes.

22       Q.   Did you ever see any customers give Jesse or

23   FloGrown their own products for him to print FloGrown

24   logos on them?

25       A.   No.



1    Q.  Do you have any knowledge if Jesse ever did that?

2    I know you said you didn't see it, but just generally,

3    do you have any knowledge about whether clients did

4    that?

5    A.  If -- if I -- if I didn't see it, I'm not sure

6    I'm qualified to comment on it.

7    Q.  Okay.  That's fair.  All right.  Let's go more

8    specifically to this case.  What do you understand this

9    case to be about, that you're sitting here for today

10   giving a deposition on?

11   A.  I -- I'm not involved with this case.

12   Q.  Okay.  You certainly know about a case, right?

13   A.  I know about the case.  I believe it has

14   something to do with use -- improper use of the FloGrown

15   brand, but I'm not involved with this case.

16   Q.  When's the last time you spoke to Jesse?

17   A.  Yesterday.

18   Q.  What did he say to you?

19   A.  He wanted me to know that his lawyers will --

20   will not be attending the deposition.

21   Q.  Was that all he said to you?

22   A.  No.  No.  I'm trying to remember what else he

23   said to me.  But that was -- that was the main gist of

24   the conversation.  I was surprised by that, but that's

25   what he told me.



```
 1      Q.  Okay.  If that was the main gist of the
 2   conversation, was there any other gist of the
 3   conversation, because when you give me a qualifying
 4   answer, I need to know the rest.
 5      A.  Yes.  Sure.  He said -- he gave me some context.
 6   He said, you know, your -- he said that your clients
 7   will be here, and he said the deposition shouldn't take
 8   more than maybe a couple of hours.
 9      Q.  Did he tell you he was deposed?
10      A.  Yes.
11      Q.  Did he tell you anything to say today?
12      A.  No.
13      Q.  Did you speak to his lawyers?
14      A.  Yes.
15      Q.  What did you say to them?
16      A.  I said -- what did I say to them?
17      Q.  Yeah.
18      A.  I said that I'm coming to the deposition today; I
19   was -- I was going to follow through with your subpoena.
20      Q.  Did his lawyers tell you anything to say today?
21      A.  No.
22      Q.  Okay.  Has anyone else told you what to say
23   today?
24      A.  No.
25      Q.  Have you spoken to anyone about this case, other
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

```
 1    than Mr. Welch and the lawyers that we just discussed?

 2        A.  I told my wife I was having my deposition taken.

 3    She doesn't know anything about this case, but I told

 4    her.

 5        Q.  Okay.  Okay.  So why don't we go back to while

 6    you were at FloGrown, either as the vice president or

 7    before that just as a consultant, and I want to know if

 8    you were a consultant or the vice president when you

 9    first learned about my clients, Dixie Heritage?

10        A.  If I was a consultant or vice president?

11        Q.  If you were just --

12        A.  When I first -- when I first heard about Dixie

13    Heritage?

14        Q.  Yeah.  Were you at that point the vice president

15    of FloGrown or were you -- or was it before, when you

16    were just consulting?

17        A.  I -- I can't recall at this moment.

18        Q.  Okay.  Do you recall when it was when you first

19    learned about Dixie Heritage, what year?

20        A.  Yes.  The first time that I learned about Dixie

21    Heritage was in a conversation with Jesse about sales.

22    Apparently, Dixie Heritage was buying a bunch of product

23    from FloGrown and we were talking about customers, and

24    that's when the name first came up.

25        Q.  Did FloGrown consider Dixie to be a big customer,
```



```
 1   based on the amount of sales?

 2      A.  I'm not sure that it was characterized that way,

 3   but I recognized that they were buying -- they were

 4   buying a good volume from FloGrown.

 5      Q.  Now, in your capacity as vice president, was it

 6   one of your duties to be a little more hands-on with

 7   certain customers who are buying more?

 8      A.  No.

 9      Q.  Okay.  If there was such a role, would that be

10   Jesse or someone else?

11      A.  Jesse had handled the relationship to that point

12   and I -- I was too new into the company and its

13   operations to jump in and get involved in those

14   conversations.  The relationships take a long time to

15   establish and he was handling that.

16      Q.  When you initially found out about or learned

17   about Dixie, did Jesse ask you to do anything

18   specifically with Dixie from a client relationship

19   perspective?

20      A.  In other words, what?  I mean, I'm --

21      Q.  I don't know.  Anything he might have asked you,

22   or did he ask you anything to do with Dixie when he

23   first -- when you first learned about them?

24      A.  As a customer, as a FloGrown customer?

25      Q.  Right.
```



1    A.  No.

2    **Q.  Okay.  So after you learned about Dixie and after**

3    **you learned that they were placing, you know, somewhat**

4    **large sale orders, take me forward in time to when you**

5    **first heard about a dispute between FloGrown and Dixie.**

6    A.  I got a call from Jesse one day saying that he

7    believed that -- that there was FloGrown product in the

8    Dixie store in Sanford that he hadn't sold.  And he

9    wanted me to go in and to -- to verify that and to --

10   and to buy it if -- if it was in there, and I did that.

11   **Q.  And you did what, you went to buy it?**

12   A.  I went into the store and bought some product.

13   **Q.  Okay.  When you went into the store to buy some**

14   **product, did you see anything that alarmed you?**

15   A.  Well, I -- you know, I saw -- I bought -- I

16   bought a couple of products, one that Jesse had

17   described to me was not one of his products.  It was

18   a -- it was a woman's tank top.  I think it was a tank

19   top.  He said, you know, we don't make that product.

20   And at that point, I didn't know whether we did or we

21   didn't.  I simply went in, bought the product.

22   **Q.  How do you know you bought the tank top that he**

23   **was describing to you on the phone?**

24   A.  Because I bought a product that matched

25   the description.



1    Q.  Well, I mean, what did he say about description;

2    let me go back and ask that?

3    A.  Well, I don't remember the specifics, but he

4    said, you know, this is the type of shirt, here's what

5    it looks like, and I went in the store and bought it.

6    Q.  How many of those were available to buy at the

7    time?  And what I'm asking here, like, for example, if

8    there are 20 shirts sitting there, how do you know you

9    bought the one that he was telling you to buy?

10   A.  Well, I was looking for -- for a particular

11   description.

12   Q.  Um-hmm.

13   A.  Okay.  And I went to a rack and I saw a whole

14   bunch of shirts with -- that matched that description.

15   Q.  So you just bought one of the shirts that matched

16   that description?

17   A.  Correct.

18   Q.  Okay.  And then what did you do with the shirt

19   after that?

20   A.  I kept it in my office for a while and then I

21   eventually gave it to Jesse.

22   Q.  How many did you buy, just one?

23   A.  I believe it was just one.

24   Q.  Okay.  And when was this, by the way,

25   approximately, what year or month?



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1    A.   I -- I don't recall right at this minute.

2    Q.   Okay.  But you do recall it was a Sanford store

3    of Dixie?

4    A.   Correct.

5    Q.   And you took it back to FloGrown; you put it in

6    your office -- or you said office, do you mean your home

7    office or --

8    A.   My -- no, the only office I had is at home, yes.

9    Q.   Home office, okay.  So why didn't you give it to

10   Jesse right away?

11   A.   Proximity.

12   Q.   What does that mean?

13   A.   That means, you know, I'm in -- I'm in Longwood,

14   he's in Orlando.

15   Q.   So Jesse wasn't concerned enough about the --

16   A.   I'm not sure what Jesse was concerned about.

17   Q.   But he didn't ask you if you'd bring it to him or

18   if he can come get it like right away?

19   A.   No.

20   Q.   So he just simply said, hey, Dave, I think

21   there's a shirt I don't sell there, go buy it, or

22   something like that?

23   A.   Yes.

24   Q.   Okay.  So when you took it home and put it in

25   your home office, how long did it stay there until you



Orange Legal
800-275-7991

1    gave it to Jesse?

2        A.  Can't tell you.

3        Q.  **Did he ever say, hey, Dave, did you buy that**

4    **shirt?  Did you buy that shirt that I asked you to go**

5    **buy; did he ever say something like that to you?**

6        A.  No.  He didn't get to it because I told him that

7    I bought the shirt.

8        Q.  **All right.  So I'm just trying to understand**

9    **here, after you bought the shirt, was that just it?  I**

10   **mean, it never came up again in conversation until you**

11   **gave it to him?**

12       A.  It came up in conversation.  He was very

13   concerned about this product, about his brand being used

14   without his permission.  We had conversations about

15   that.

16       Q.  **And what were your conversations?**

17       A.  It was about his brand being used without his

18   permission.

19       Q.  **And what was your part of the conversation; what**

20   **did you say back to him when he was saying that to you?**

21       A.  Oh, I -- I told him that, you know, in a

22   situation like that, he needs to -- he needs to get some

23   legal counsel to deal with that.

24       Q.  **And did he do that?**

25       A.  Yes.



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA
                                                                    58

1      Q.   Other than this one incident you're telling me

2    about, the woman's tank top, were there any other

3    incidents that you became aware of between FloGrown and

4    Dixie, that you would consider to be a dispute or an

5    adverse situation, kind of like the t-shirt?

6      A.   Kind of like the t-shirt?  No.

7      Q.   Yeah.  So other than the woman's tank top, you're

8    aware of nothing else between FloGrown and Dixie that --

9      A.   Regarding the t-shirt example?

10     Q.   No, not the t-shirt.  I'm speaking anything other

11   than the t-shirt now.

12     A.   Okay.  You said kind of like the t-shirt; I just

13   want to make sure we're in the same lane.

14     Q.   Yeah.  Well, a dispute, you know, like the

15   t-shirt, any dispute between FloGrown and Dixie?

16     A.   Any dispute?

17     Q.   Right.  Any dispute other than --

18     A.   There was another dispute beyond the t-shirt.

19     Q.   Okay.  So why don't you tell me about the next

20   dispute, other than the woman's tank top; we've -- in

21   agreement with that one.

22     A.   The next --

23     Q.   Tell me the next one.

24     A.   The next dispute had to do with Dixie not paying

25   invoices that FloGrown had sent.



**Orange Legal**
**800-275-7991**

1    Q.  Okay.  Tell me about that.

2    A.  What would you like to know?

3    Q.  How do you know that FloGrown didn't pay those

4  invoices?

5    A.  FloGrown sent the invoices.

6    Q.  I'm sorry.  How do you know Dixie didn't pay the

7  invoices?

8    A.  Well, none of our registers show that -- shows us

9  getting a receipt, any kind of check from Dixie as to

10  those particular invoices, and we had conversations

11  about that, Jesse and I.

12    Q.  Were you involved with the accounting in the

13  company?

14    A.  Not -- not in -- not the day-to-day accounting,

15  but when it came to the specific issue, yes, I was given

16  reports showing that there was invoices remained unpaid.

17    Q.  Who was involved on day -- day-to-day accounting?

18    A.  Jesse was.

19    Q.  Was there anyone else who did accounting support

20  for FloGrown?

21    A.  Accounting support?

22    Q.  Yeah.  Like a CPA, an outside accountant or

23  anyone else?

24    A.  Jesse had resource people before I got there, so

25  I can't possibly know the full range of advisors that



 1   had been providing services to FloGrown.

 2   **Q.  Okay.  So other than -- other than a second, what**

 3   **we both, I think, agree is a dispute about Dixie not**

 4   **paying invoices, allegedly, was there any other disputes**

 5   **other than the woman's tank top issue and Dixie not**

 6   **paying invoices?**

 7   A.  Other than this federal case, no.

 8   **Q.  Okay.  So with respect to this federal case, what**

 9   **is it you know about the facts that this case is based**

10   **on?**

11   A.  I have not been involved in this case when --

12   when FloGrown was faced with this dilemma that somebody

13   was using their brand without their permission.  My

14   advice to Jesse was to get -- get legal advice, to get

15   counsel involved.  And I recommended during our

16   relationship, meaning my relationship with Jesse, I had

17   recommended two attorneys to help him with intellectual

18   property matters.  And once the attorneys got involved,

19   they're the ones that were running with this.

20   **Q.  Before this -- well, before this lawsuit began,**

21   **were there ever times when Jesse came to you to discuss**

22   **with you certain companies that he felt were selling**

23   **counterfeit FloGrown merchandise?**

24   A.  Could you rephrase the question again?

25   **Q.  Yeah, sure.**



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                 61

```
 1      A.  Or help me clarify.
 2      Q.  Yes.  Were there times when Jesse came to you,
 3   called you, e-mailed you, made any kind of contact with
 4   you, to discuss with you that he thought certain
 5   companies were selling FloGrown counterfeit merchandise,
 6   I'm going to start with other than Dixie?
 7      A.  Other than Dixie, I can't recall.  I can't recall
 8   a time.  I'm not saying no definitively; I'm saying at
 9   this moment, I can't recall if there were other
10   companies.  The majority of our conversations revolved
11   around Dixie.
12      Q.  All right.  When you worked at FloGrown as a vice
13   president, did you have a company e-mail address?
14      A.  Yes.
15      Q.  What was it?
16      A.  I think it was David.acosta@flogrown.com.
17      Q.  Okay.  So then is it fair to say after you
18   stopped and gave back the one percent of the company,
19   you lost access to that e-mail address?
20      A.  I haven't used that e-mail address in a long
21   time.  I'm not sure if it's still alive, but I no longer
22   use it.  After that -- after that particular time, I --
23   I stopped using it.
24      Q.  Would your written communications with Jesse be
25   in that e-mail address or another e-mail address?
```



1    A.  It should have been with that e-mail address, and

2    during the pendency of this case, we provided a bunch

3    of -- I gave them a whole bunch of e-mails that I had

4    with FloGrown that was part of the production request.

5    **Q.  The e-mails that you had, though, were they from**

6    **your Dixie e-mail address or a different e-mail address?**

7    A.  Dixie, I've never had a Dixie-- you mean

8    FloGrown?

9    **Q.  Oh, I'm sorry.  FloGrown.**

10   A.  FloGrown.

11   **Q.  So they were from your FloGrown e-mail address?**

12   A.  Yes.

13   **Q.  Okay.  Do you have a personal e-mail address?**

14   A.  Yes.  Yes.

15   **Q.  Okay.  What is it?**

16   A.  It's David@caseclarity.com.

17   **Q.  At Case, C-A-S-E, Clarity?**

18   A.  Yes.

19   **Q.  Is Case Clarity a company?**

20   A.  It's a name that I use to trade under.

21   **Q.  What do you trade?**

22   A.  Litigation, litigation consulting.

23   **Q.  Oh, okay.**

24       **Did Jesse ever tell you of any other locations of**

25   **Dixie that he thought was selling counterfeit**



```
 1   merchandise, other than Sanford?

 2      A.  He mentioned the Oviedo store and Lakeland.

 3      Q.  What did he tell you about the Oviedo store that

 4   he thought was counterfeit there?

 5      A.  I don't recall the specifics, but he did -- he

 6   did describe to me that there was -- there was product

 7   that was being sold with the FloGrown brand out of that

 8   store, product that FloGrown had not sold to Dixie.

 9      Q.  Did you do anything to confirm whether FloGrown

10   had, in fact, sold Dixie products to that location?

11      A.  At the Oviedo store, I did -- I did travel to

12   that store, walked in the store, looked around, left.  I

13   didn't see any product on my visit.

14      Q.  You didn't see any FloGrown product?

15      A.  I didn't see any FloGrown product the way Jesse

16   was describing it to me.

17      Q.  Okay.  How did he describe it to you?

18      A.  I can't tell you the specifics off the top of my

19   head right now.  But at the time, he said, you know,

20   here are the things that I believe are being sold in

21   there that's counterfeit, and I went in, looked for

22   that, and I didn't see it at Oviedo store.

23      Q.  Why did he say he felt it was counterfeit?

24      A.  I don't know.  You'd have to ask him.

25      Q.  Okay.  Lakeland store, what did he -- what did
```



1    you do with the Lakeland store?

2       A.  I've never been in the Lakeland store.

3       Q.  All right.  What did Jesse tell you about the

4    Lakeland store that he felt was counterfeit?

5       A.  Again, he was telling me that there was FloGrown

6    counterfeit product being sold out of that store.  I

7    can't recall the specifics right now.

8       Q.  And you don't recall why Jesse said he felt like

9    there were counterfeit products at these two locations?

10      A.  Why?

11      Q.  Yeah.  Why he thought they were counterfeit.

12      A.  Like I said, I think that's something you want to

13   ask him.

14      Q.  No, I'm asking you, did he tell you why -- why he

15   thought they were counterfeit?  I know what he said, but

16   I'm asking you, what did he tell you?

17      A.  Well, the gist of the conversation was that, you

18   know, this is -- this type of product wasn't something

19   that FloGrown either authorized or sold, is -- is what I

20   recall at this moment.

21      Q.  Did he ever tell you that he felt like certain

22   product was counterfeit because it was heat pressed?

23      A.  Yeah.  We did talk about heat-press product, yes.

24      Q.  When you went in the Oviedo store, did you see

25   any products that were heat pressed, FloGrown products?



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

65

1    A.  Yes.  I saw product in there that was heat

2    pressed.

3    **Q.  So does FloGrown do heat-pressed product?**

4    A.  No.

5    **Q.  Okay.**

6    A.  Well, hold on a second.  Can you define heat

7    press?  Heat pressing covers a lot of range of type of

8    products.

9    **Q.  Okay.  Well, let me ask you a few questions first**

10   **just to get on the same page with you, because I want to**

11   **make sure you give the testimony, not me.  First of all,**

12   **can you tell me what screen printing is with relation to**

13   **t-shirts?**

14   A.  I think I told you earlier that screen printing

15   really has not been -- I could describe generally what

16   it is.  But screen printing, I'm not an expert on screen

17   printing.  Screen printing is a process by which you put

18   ink on a substrate, whether it's a hard substrate, a

19   textile, some other material.

20   **Q.  Right.**

21   A.  After the ink goes through a screen that's been

22   burned based on a film, and the film is created based on

23   art.  So it's those -- with the art, create the film,

24   film burns the screen, screen goes onto the product, the

25   ink goes through the screen.  Everywhere where there's



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                    66

1   an opening, that's where the ink goes and hits the

2   substrate.   That's screen printing.

3       **Q.   Okay.   So heat pressing, then, when I use that**

4   **term, I'm basically referring to not screen printing,**

5   **based on what you just told me?**

6       A.   That's too broad.   I'm just being candid with

7   you.   It's just really, if you're saying everything

8   that's not screen printing is heat pressed --

9       **Q.   Okay.   So why don't you tell me what your**

10  **definition of heat pressing is, then.**

11      A.   There's like a dozen of them.   There's a lot of

12  different ways to heat press, and I want to get in the

13  same lane with you as far as answering your question.

14      **Q.   No, and I want to make sure we're very clear,**

15  **because --**

16      A.   What type of -- what type of heat pressing would

17  you -- should I be taking your questions to mean?

18      **Q.   Well, why don't you do this; you said there were**

19  **definitely products in the Oviedo store that were heat**

20  **pressed, I think, right?   How did you know they were**

21  **heat pressed by looking at them?**

22      A.   So a screen-printed product, first of all, has a

23  certain feel to the product because of the -- because of

24  the way the ink coalesces and sets into the material, so

25  you could tell by feeling the product the difference



**Orange Legal**
**800-275-7991**

1   between the texture of the fabric, and then the texture

2   of the image that's been screen-printed.

3         The heat press -- heat pressing, there's a lot of

4   different ways to do heat pressing.  One method would be

5   using a film, a film that actually gets cut out of a

6   solid sheet of material.  So let's say you have the

7   letter, this letter W here, you would take a heat

8   pressed film and you cut that W out, and now what you

9   have is a -- is a -- some sort of transfer carrier that

10  then has this W on it.  You take the piece, put it onto

11  the target substrate that you're going to print on and

12  you apply heat and pressure.  You remove -- once that

13  time and temperature is met, heat press comes open, you

14  remove the carrier and all that's left is the material

15  with the W on the substrate that you're printing on.

16  That's one form of heat pressing.

17       **Q.  Okay.  The day you went to the Oviedo store, did**

18  **you pick up any of the shirts, touch them?**

19       A.  I did.

20       **Q.  Okay.  So if you knew FloGrown didn't do heat**

21  **pressing, and you're also telling me that you know the**

22  **Oviedo store had heat-pressed products, why didn't you**

23  **buy them?**

24       A.  The Oviedo store?

25       **Q.  Yeah.  You said in the Oviedo store, you didn't**



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

68

```
 1    buy any product when you went in, right?

 2        A.   Correct.

 3        Q.   But you told me a second ago that you saw -- you

 4    definitely saw heat-pressed items there?

 5        A.   I misunderstood your question.  I didn't -- I

 6    didn't spend much time in the Oviedo store because I

 7    went in looking for something specific.

 8        Q.   Okay.

 9        A.   I saw heat-pressed product at the Sanford

10    store --

11        Q.   So you --

12        A.   -- the Seminole Town Center.  I actually had a

13    conversation with the clerk there.  She had heat presses

14    behind the counter and I asked her about that, so I knew

15    that they did heat pressing in that store.

16        Q.   All right.  So let's go back, just to make sure

17    we're talking the same language here.  Oviedo store, you

18    walked in briefly but you didn't see any heat-pressed

19    FloGrown products, right?

20        A.   I didn't -- no, that's not what I said.

21        Q.   Okay.  Tell me what you said.

22        A.   I went into the store and I was looking for

23    something specific that Jesse had described to me.

24        Q.   Okay.

25        A.   I didn't see it.
```



1      Q.  All right.

2      A.  So I left.

3      Q.  Okay.

4      A.  That's it.  That's all -- that's the only

5  interaction that I had with the Oviedo store.

6      Q.  Okay.

7      A.  And my wife and I went out to -- to the food

8  court and had -- had a bite to bite and then we went

9  home.

10     Q.  All right.  But while you were in the Oviedo

11  store, you certainly saw FloGrown products, right?

12     A.  In the Oviedo store?

13     Q.  Right.

14     A.  I believe I did, yes.

15     Q.  Okay.  And any of the products you saw, were they

16  heat pressed?

17     A.  I wasn't looking closely at those; I was looking

18  for something specific.

19     Q.  Okay.  So the answer is no, right, you didn't --

20  you didn't see any heat-pressed products?

21     A.  What I'm telling you is that I wasn't looking for

22  anything else; I was looking for something specific.

23  You're trying to say that I didn't see -- what I didn't

24  see.  I was looking for something specific; I wasn't

25  focused on anything else.



1    Q.   I understand that, but if you weren't focused on

2    it, then you didn't see any heat-pressed products,

3    right?  You couldn't have because you weren't focused on

4    it, right?

5    A.   Fair enough.

6    Q.   So yes, you didn't see any heat-pressed

7    products --

8    A.   No.

9    Q.   -- in the Oviedo store?

10   A.   Correct.

11   Q.   Okay.  Sanford store, you said you talked to a

12   clerk; who was that clerk you talked to?

13   A.   I don't remember her name.  I went into the store

14   and I was looking at one of their camo pieces that had

15   this orange -- orange graphics on it.  We had a brief

16   conversation about it, and I asked, I said, you know, do

17   you -- do you heat press, said, this is heat pressed,

18   she said, yes.  I said, do you heat press all of these

19   things, and I pointed around and she said no, so -- you

20   know, this stuff is all copyrighted so we can't do

21   those.  But I don't remember her name.

22   Q.   Okay.  Now, in your answer, you kind of

23   indicated -- you pointed up, I guess, kind of pointed to

24   some shirts when she was having that conversation with

25   you?



1     A.  Yeah.  There were a lot of different brands that

2    were represented on the walls of this -- in the store.

3        **Q.  Okay.  When she pointed up like that, did she**

4    **point to a FloGrown shirt when she indicated she did**

5    **heat pressing?**

6        A.  I don't recall her pointing to a specific

7    FloGrown shirt.

8        **Q.  Did you see a FloGrown shirt hanging above her**

9    **head?**

10       A.  I believe there was a FloGrown shirt up there.

11       **Q.  Did you ask her, hey, do you do heat pressing at**

12   **FloGrown?**

13       A.  No, I did not.

14       **Q.  Did she say, we do heat pressing on FloGrown**

15   **shirts?**

16       A.  I don't remember her saying that, no.  What she

17   said was that we can't -- we can't print all of those

18   because those are all copyrighted.

19       **Q.  Did she say one of them was FloGrown that she**

20   **could not print during heat press?**

21       A.  No, she didn't say that.

22       **Q.  Did you ask her?**

23       A.  She was pointing up to all the shirts that were

24   up there, including the FloGrown.

25       **Q.  Okay.  Did you ever specifically ask her, hey,**



1    can you do heat pressed FloGrown for me?

2        A.   No, I did not.

3        Q.   Why not?

4        A.   What do you mean, why I didn't ask her that?

5        Q.   Yeah.  Why not, why didn't you ask her?

6        A.   I don't know.

7        Q.   Was this conversation before or after you bought

8    the shirt that you felt was heat pressed?

9        A.   It was before.

10       Q.   Okay.  After you bought the shirt that -- or when

11   you were at the counter, even, with the shirt that you

12   felt was heat pressed, did you ask her if she heat

13   pressed it?

14       A.   Well, first of all, I'm not sure that the shirt

15   that I bought at that store was heat pressed.

16       Q.   All right.

17       A.   Okay.  Just want to clarify.

18       Q.   Okay.

19       A.   At that point, I picked up a shirt that was

20   described to me by Jesse.  I said, look, this is the

21   product that I believe is being produced without our

22   permission.

23       Q.   Okay.

24       A.   And I bought that product, and that was it.  I'm

25   not sure whether it was heat pressed or screen-printed,



1   but I bought the shirt that Jesse described to me.

2       Q.   Okay.  Did you ever touch the logo on the shirt

3   after you bought it?

4       A.   I did.

5       Q.   And earlier you described to me how you could

6   tell the difference in texture between screen printing

7   and heat pressed, right?

8       A.   Okay.

9       Q.   And you never thought it was heat pressed even

10  after you bought it and touched it?

11      A.   To tell you which -- which method of imaging

12  here -- right here, right now, I -- I couldn't tell you.

13      Q.   Well, it certainly didn't --

14      A.   If you had the shirt here, I could tell you.

15      Q.   Okay.  Well, I mean, is it fair to say it

16  certainly didn't concern you enough to think it was heat

17  pressed, because you didn't call Jesse right away and

18  say, hey, this is heat pressed, right?  Did you do that?

19      A.   No.  Because the focus was -- the focus was that

20  there was a product that bore the FloGrown brand that

21  was not sold by FloGrown.  That was the focus.  How it

22  was -- how it was produced was secondary.  Honestly, I

23  mean, that was -- that was really -- that was the focus.

24      Q.   Okay.  So I just want to make sure I'm clear

25  here.  The issue with this shirt, and I'll just use an



1   example, let's say it was a teal-colored shirt and Jesse

2   says, hey, we don't print on teal-colored shirts, so go

3   buy that teal-colored shirt, was that the reason why he

4   was so concerned with the shirt?  So it wasn't about the

5   printing method; it was the fact that it was on

6   something, some color, some cut or whatever, however you

7   describe it, that he didn't actually have for sale, was

8   that the issue?

9        A.   No.  The issue was that there was a shirt that

10   bore the FloGrown logo.

11        Q.   Right.

12        A.   That FloGrown never -- that FloGrown had not sold

13   to Dixie, that FloGrown did not produce, that FloGrown

14   did not authorize anybody else to produce.  That was the

15   focus, go in there and buy that shirt, he'd asked me,

16   and I went in there, got the shirt and that was it.

17        Q.   Do you have any knowledge about what Jesse did

18   with respect to the Sanford location for those shirts

19   after you bought the one?  In other words, did he call

20   Mr. Torgeman and say, hey, I had my vice president,

21   David, stop by and buy a shirt; I'm concerned about

22   this, so what's going on with these shirts?  Do you know

23   anything about that?

24        A.   Yeah.  I think there were -- I have just kind of

25   cursory knowledge.  There was some texting going back



1  and forth and some phone calls between the two of them.

2  I was not involved in those conversations.

3  **Q.  And when you say texting, were you on the text**

4  **messages?**

5  A.  No.

6  **Q.  So how do you know there were text messages?**

7  A.  Jesse told me there were.

8  **Q.  Did he show them to you?**

9  A.  Yes.

10  **Q.  Okay.  Was he showing you, like, the response**

11  **what was --**

12  A.  Yes.

13  **Q.  Okay.  Do you recall what the response was?**

14  A.  It was -- it was -- it was all over the place.

15  And it was not just one exchange, it was a lot of

16  exchanges, so I couldn't recall all of that.

17  **Q.  Who is Joey Camacho?**

18  A.  Joey's a production guy at FloGrown.

19  **Q.  And what is -- let's just make sure again we're**

20  **clear here.  When you say production guy, you mean like**

21  **working on the production line with all the products?**

22  A.  Right.

23  **Q.  Okay.**

24  A.  He supervises the production.  From what I

25  remember -- I don't know if he's still there, but from



1  what I remember, he pretty much ran the screen printing

2  operation together with other guys there.

3      Q.   In your capacity as vice president, did you

4  interact with Mr. Camacho?

5      A.   Yes.

6      Q.   What was the nature of your interactions; why did

7  you interact with him?

8      A.   Well, I mean, I was there; we talked about

9  different aspects of production.  We talked about the

10  large-format printer; we talked about decals.  FloGrown

11  sells decals.  So, I mean, our interactions really just

12  straddled a range of things.

13      Q.   Other than Mr. Welch, is there anyone else at

14  FloGrown that you've ever had conversations with about

15  alleged counterfeit products?

16      A.   Say that again.

17      Q.   Other than with Mr. Welch, is there anyone else

18  at FloGrown, employees, that you've ever had

19  conversations with about alleged counterfeit products?

20      A.   At FloGrown, employees?

21      Q.   Yes.

22      A.   No.

23      Q.   Okay.  Now I want to go back to, earlier you said

24  the third store was the Lakeland store, Dixie store, but

25  you never went into that store?



1     A.   Never went into that store.

2     Q.   **Okay.  So you could never, then, have seen any**

3   **heat-pressed item there, right, because you never went**

4   **in?**

5     A.   Absolutely not.

6     Q.   **All right.  Did you ever hear about any**

7   **counterfeit merchandise allegedly at the Lakeland store?**

8     A.   Yes.

9     Q.   **Okay.  And what was that?**

10    A.   Well, I learned that there was a -- a Dixie

11  employee there that came forward and said, hey, you

12  know, that we've -- we've got FloGrown product in the

13  store that's counterfeit, and apparently, there was some

14  sort of police action, and that's what I heard.

15    Q.   **Okay.  What did she say was being counterfeit**

16  **there; what did this employee say?**

17    A.   I never talked to the employee.

18    Q.   **But you said you heard it, though, right?**

19    A.   I heard that, yes.

20    Q.   **So what did you hear that was being counterfeit**

21  **there?**

22    A.   Well, I read -- I read materials that were

23  produced by the police, so that's the extent of my

24  knowledge about that.

25    Q.   **Okay.  So you just read the police report?**



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

```
 1      A.  Well, and talked -- had conversations with Jesse
 2   about it.
 3      Q.  Did you ever talk to the police yourself?
 4      A.  No.
 5      Q.  Did they ever ask to speak with you and you
 6   declined?
 7      A.  No.  No and no.
 8      Q.  All right.  What were your conversations with
 9   Jesse about the Lakeland store merchandise?
10      A.  I couldn't tell you specifics, but generally, he
11   had the same concern, and I shared that concern, that
12   FloGrown product was being counterfeit and sold out of
13   that store.
14      Q.  Okay.  What do you know about what Jesse did with
15   the merchandise that he thought was counterfeit from
16   that store?
17      A.  What I do know is that he went into the store and
18   bought a bunch of material that -- that he said was
19   counterfeit.  He went in the store with his aunt, I
20   guess on his way down to Fort Myers, and -- that's at
21   least what he told me.  I wasn't there.
22      Q.  Okay.  Did you ever see the materials or things
23   that he bought from the store?
24      A.  No.
25      Q.  Never did?  Did he ever bring them back to the
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA
79

```
 1    office or do you know what happened to them?
 2        A.  I believe he brought them back to the office, but
 3    I -- I didn't -- I didn't see them.
 4        Q.  Okay.
 5        A.  I saw them in pictures.  I should -- I should
 6    qualify that, I didn't see them physically, but I did
 7    see photographs.
 8        Q.  In the photographs, could you tell if they were
 9    heat pressed?
10        A.  You can't tell from the photographs.
11        Q.  Why not?  Why can't you tell that from the
12    photograph?
13        A.  If the photograph is fuzzy, it's almost
14    impossible to tell the printing method.
15        Q.  Well, if the photo is not fuzzy, can you tell if
16    it's heat pressed from looking at the photo?
17        A.  If you -- if you have a good enough photograph,
18    generally, you can -- you can exclude certain type of
19    heat-applied printing methods, for example, with
20    dye-sublimation, dye-sublimation is a form of heat
21    pressing.  When you look up close to a product that's
22    been imaged with dye-sublimation, there is no edge to
23    the product.  Because there's no film, the ink actually
24    permeates the fibers of the fabric and become part of
25    the synthetic fibers of -- of the shirt, so when you
```



**Orange Legal**
**800-275-7991**

1    look closely, you don't see -- the same as in my earlier

2    example with the W, the W would be a piece of film that

3    would have an edge that would be discernible, so

4    depending on the photograph, you could see those types

5    of differences.

6         **Q.  But again, the photographs you saw, you couldn't**

7    **do that, right, because they were too fuzzy, you said?**

8         A.  Yeah.  And, you know, my role was not to -- to

9    examine those closely.  I mean, I wasn't just -- but

10   yes, I saw photographs; I did not see the physical

11   product.

12        **Q.  How do you have knowledge of what heat-pressed**

13   **items look like or feel like?  How do you have that**

14   **knowledge?**

15        A.  So we do Hands On Color; we do -- we do heat

16   pressing, and we use films.  Right, and we use films,

17   and we also do dye-sublimation.  So over the years, we

18   can become a -- you know, before we started our Hands On

19   Color business, I had familiarity with those methods; we

20   just never did it.  We had a heat press back in the

21   '90s, and we used that heat press primarily to do color

22   swatches for color calibration, so we know about

23   sublimating a printed piece onto fabric.

24        Even though we didn't do wearable garments, we

25   printed on fabric.  We did -- we printed on fabric for



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                81

1    vertical banners, horizontal banners, big backdrops for

2    trade show displays, multicast broadcast backdrops, so

3    we're familiar with printing on fabric.

4        And then over the years, we learned about some of

5    the other heat transfer methods.  And -- and there are a

6    lot of different types of methods.  You can actually

7    screen print -- start with a screen-printed transfer,

8    which -- which I believe at the Dixie store they had

9    those as well.  So the transfer is, instead of being

10   digitally printed, screen-printed, and then that also

11   can be imaged onto a shirt.  So again, there's a wide

12   range, and over the years, we've just learned how to do

13   this stuff.

14   **Q.  All right.  Did Mr. Welch know about your**

15   **knowledge of heat printing -- I'm sorry, heat pressing**

16   **before?**

17   A.  Yes.

18   **Q.  So he bought those items, so he didn't ask you,**

19   **hey, Dave, can you come down and tell me if these are**

20   **heat pressed?  None of that ever happened?**

21   A.  The -- the focus -- just to be candid with you,

22   to answer your question more completely, the focus was

23   not the printing method.  The focus was that the product

24   was not sold by FloGrown, was not authorized to be

25   produced by anybody else.  That was the focus.  The



**Orange Legal**
**800-275-7991**

1    method of printing was -- was the secondary.

2        Q.  Okay.  And I think I asked you this earlier, but

3    I just want to make sure again.  You don't have any

4    knowledge about whether clients of FloGrown would give

5    FloGrown blank products to print FloGrown logo on and

6    then give those products back to them, right?

7        A.  I do not.

8        Q.  Okay.

9        A.  I'm aware that that was something that was

10   discussed, but I -- I don't have any knowledge of that.

11       Q.  Do you know what kind of screen printing machines

12   FloGrown had?

13       A.  I think they're HIX.  I was not involved in the

14   production.

15       Q.  Do you know or can you tell me, in the screen

16   printing process, at least as I understand it from

17   learning from this case, after the logo is

18   screen-printed on the shirt, it goes into a dryer of

19   some sort; is that right?

20       A.  Correct.

21       Q.  And the dryer has to be about 350 degrees, I

22   think I've learned --

23       A.  I'm not sure about the temperature, but that

24   sounds about right.

25       Q.  Has to be hot.  Have you ever heard of a process



1    when the blowing is going on or the heating or whatever

2    the terminology is going to be, where there's a defect

3    in the logo because of the drying or heating process?

4        A.  Can you restate the question?

5        Q.  Restate it?  Sure.  With respect to screen

6    printing, that final step for blowing or drying, which I

7    think is the same thing, right, is that the same thing?

8        A.  Blowing or drying, you're -- what you're doing

9    is, you're curing the ink.

10       Q.  Right, and I've heard that term, also.

11       A.  The heat cures the ink.

12       Q.  Okay.  So whether we're talking about curing or

13   blowing or drying, I'm kind of using those

14   interchangeably for now.

15       A.  Okay.

16       Q.  For that last step.  Based on your experience

17   with FloGrown or just the industry in general, have you

18   ever heard of a situation where during that last final

19   step, because of the heat or the blowing or the curing,

20   the logo is somehow affected by that process and made

21   it, you know --

22       A.  Honestly, I -- I'm not qualified to answer that.

23   I could guess, but I -- I'm not here to guess.

24       Q.  No, I understand that, and I'm not asking you for

25   an expert opinion on it.  I'm just asking simply, have



1    you ever heard about it?  Have you ever seen it?

2        A.  Of defects occurring in the curing process?

3        Q.  Right.

4        A.  Honestly, no.  I just -- I've not -- I've just

5    never been part of that.

6        Q.  Yeah.  Have you ever worked on an assembly line,

7    like, printing shirts?

8        A.  No.

9        Q.  Did you ever do that at FloGrown?

10       A.  No.

11       Q.  Did you ever see shirts come out of the screen

12   printer?

13       A.  Yes.

14       Q.  Did you have any participation in putting the

15   shirts in boxes to ship them out?

16       A.  No.

17       Q.  Did you ever have any involvement in counting the

18   shirts or making sure the orders for the customers match

19   the invoices?

20       A.  At FloGrown?

21       Q.  Yes.

22       A.  No.

23       Q.  Okay.  Do you have any knowledge about whether

24   certain customers did, in fact, buy misprinted FloGrown

25   shirts?



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1     A.  No, I don't have knowledge of that.

2     **Q.  All right.  Do you have any knowledge if FloGrown**

3     **ever tried to get a kiosk location to sell merchandise**

4     **in any mall in Florida?**

5     A.  Can you be more specific?

6     **Q.  Yeah.**

7     A.  Knowledge of what?

8     **Q.  Of trying to get a kiosk, like a lease for a**

9     **kiosk inside of a mall so they could sell their own**

10    **shirts, like their own kind of storefront, you know, if**

11    **you will, location?**

12    A.  In?

13    **Q.  Any mall, I'm asking first.**

14    A.  In any mall?

15    **Q.  Yeah.**

16    A.  So I'll answer the question this way.  That was

17    an idea that -- that Jesse and I talked about.

18    Whether -- whether FloGrown actually tried to get kiosk

19    space, that's a different kind of question, and that's

20    something I think you probably need to ask him.

21    **Q.  Okay.  And I did ask him that.  I'm just asking**

22    **you now, though, do you have any knowledge about whether**

23    **FloGrown ever tried to get a kiosk somewhere else?  No?**

24    A.  (Shakes head.)  I don't -- I don't recall if

25    there -- if there was an active effort to get a kiosk.



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1     Q.   Okay.

2     A.   I could tell you that we did talk about that.

3     Q.   Okay.  And why -- why did you want to do that, to

4     get a kiosk or any other location?

5     A.   It's like -- like anything else in selling, the

6     more visibility you have, the more likely it is that you

7     could sell your product.

8     Q.   Did you ever ask Jesse if he tried to get the

9     kiosk anywhere?

10    A.   I don't recall.

11    Q.   And did he ever get a kiosk anywhere?  Do you

12    know that?

13    A.   I don't -- I don't believe that he did.

14    Q.   Do you know if FloGrown ever got a storefront

15    location anywhere to start selling their merchandise --

16    A.   A storefront?

17    Q.   Yeah, a storefront or, you know, just a place to

18    sell directly to a consumer?

19    A.   No.

20    Q.   So other than their facility where they do

21    printing, they don't have their own store where they

22    sell anywhere, right?

23    A.   I don't know of any stores.

24    Q.   Well --

25    A.   They sell their product through retail stores,



**Orange Legal**
**800-275-7991**

1    but are you saying a FloGrown store, a FloGrown-owned

2    storefront?

3       Q.  Correct, that's what I'm -- that's what I'm

4    asking.

5       A.  Not that I know of.

6       Q.  Not that you know of now, right?  Are you saying

7    now or like when you were vice president?

8       A.  Not at any time.

9       Q.  Okay.  I'm going to show you a couple pictures

10   I'm going to mark as Exhibit 1, Defendants' Exhibit 1,

11   and ask you, have you ever seen that picture before?

12          (Defendants' Exhibit No. 1 was marked for

13      identification.)

14          THE WITNESS:  This does look familiar.

15   BY MR. WATSON:

16      Q.  Do you know what it is?

17      A.  No.

18      Q.  So, then, you didn't take the picture?

19      A.  I did not take this picture, no.

20      Q.  Okay.

21      A.  If that's a different question, no, I did not

22   take this picture.

23      Q.  All right.  Let me show you Exhibit 2, and

24   really, same two questions.  First, does that look

25   familiar to you?



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

```
 1          (Defendants' Exhibit No. 2 was marked for

 2      identification.)

 3          THE WITNESS:  I -- I can't say for certain.

 4   BY MR. WATSON:

 5      Q.  Okay.  So you didn't take this picture, then,

 6   also, right?

 7      A.  I -- I don't -- I don't believe so.

 8      Q.  Okay.  This piece of equipment here, the middle

 9   picture, do you know what that is?

10      A.  Yes.  That's a -- that's a heat press.

11      Q.  Have you ever used this particular type of heat

12   press?

13      A.  Type?  Yes.

14      Q.  Okay.

15      A.  That heat -- that specific heat press, no, that

16   looks like a -- like an Insta, Insta brand heat press.

17      Q.  Now, in your answer when you said type of heat

18   press, can you give me some of the different types of

19   heat presses?  And when you say type, you're referring

20   to like model numbers or brands, or what do you mean by

21   types?

22      A.  So you have heat presses that press different

23   types of materials.  So a hat press will have a

24   curvature to account for the concave, convex parts of

25   the hat.  You have -- you have heat presses that are
```



1    long and narrow.  If you're going to heat press, for

2    example, a tie, this is a standard -- this looks like a

3    standard t-shirt type of heat press.  You can press a

4    lot of different types of things with this.

5        Q.  Why don't we take a five-minute break and let me

6    go through my notes and I think I can finish up with

7    you.

8        A.  Okay.

9            THE VIDEOGRAPHER:  We are going off the record.

10   The time is 11:49 a.m.

11           (A brief recess was taken.)

12           THE VIDEOGRAPHER:  We are back on the record at

13   12:00 p.m.

14   BY MR. WATSON:

15       Q.  Okay.  Mr. Acosta, I just want to jump back to a

16   few questions to clean them up and then I just have a

17   few more questions, and I think in about 30 minutes,

18   like I said, we'll probably be done.

19           First, I want to go back to something you said

20   earlier about a camouflage jacket.  What did -- what did

21   you say about a camouflage jacket earlier, because I --

22       A.  I'm not sure if it was a jacket.  I --

23       Q.  Or a sweatshirt?

24       A.  I think it was a sweatshirt, maybe.

25       Q.  Was your testimony that you thought that was a



**Orange Legal**
**800-275-7991**

1   counterfeit?

2       A.   No.  My testimony was simply a conversation I had

3   with the clerk.  I asked her whether they produced this

4   at the store, she said yes.

5       Q.   And that was the Sanford store you're referring

6   to?

7       A.   Yes.

8       Q.   Did Jesse ever tell you he thought there was a

9   camouflage jacket or sweatshirt that was counterfeit

10  there?

11      A.   No.  This was -- this was a casual observation.

12  It was my first time in that store.

13      Q.   All right.  The Sanford store is the store where

14  you found the woman's tank top we discussed earlier,

15  right?

16      A.   I think it was a tank top, I'm not sure, but yes,

17  whatever -- whatever that shirt was.

18      Q.   Okay.  So you -- what I want to understand with

19  you here is, I know we had a conversation before about

20  why Jesse said we don't sell that item, but was it

21  because it was a tank top that he said we don't sell

22  that item or was it because it was some other kind of

23  shirt?

24      A.   I don't remember the context.

25      Q.   All right.  When you were at the Sanford store



1    talking to a clerk the day you were there, you didn't

2    see her use the heat press to create a FloGrown product,

3    did you?

4        A.  I did not.

5        Q.  Okay.  I want to show you -- I know you've

6    already seen this, but I want to show you again Exhibit

7    2, which is -- and you can just use my copy.  I just

8    want you to see that piece of equipment there.  And we

9    kind of agreed, I think, I wrote standard here, it's

10   kind of like a standard heat press, you can use it for

11   many different things?

12       A.  Yes.

13       Q.  Okay.  So what I want to do is, I want to know

14   basically your knowledge.  If I walk into the store and

15   you're standing behind the counter here now and I say,

16   hey, I want a FloGrown shirt and I want you to heat

17   press it, how do you do that with this?  Walk me through

18   the process.

19       A.  How would I do it?

20       Q.  Yeah.

21       A.  I don't know their process, so you're asking me

22   my opinion on how I would do it?

23       Q.  I'm asking you, if you were the person in the

24   store and I walked in and I pointed and I said, I want

25   that FloGrown shirt and I want it on this t-shirt and I



1    want you to heat press it, can you do it for me, and you

2    say yes, and I want to know the steps that you do to do

3    it.

4        A.   Okay.  Typically, customers don't ask them to

5    heat press.  They'll just say I want--

6        Q.   Okay.

7        A.   -- I want a shirt with that graphic on it.

8        Q.   I'm a very specific customer.

9        A.   How they do it.

10           So a customer comes in, if I were -- if I were in

11   this situation, customer just says, I want that blank, I

12   want this jacket or shirt with this logo, the process is

13   actually fairly straightforward if you have the transfer

14   already made; in other words, you have a garment, in

15   this case, a jacket, a shirt, a hoodie, a cap, and then

16   you also have the -- transfer the -- the art that's

17   going to go onto that product, you need one of each.  So

18   you grab -- let's just say for this example, the jacket,

19   you'll grab the jacket, and you will grab the transfer.

20           Now, the next process is actually fairly

21   straightforward.  You put -- you would thread the jacket

22   onto the heat press, put the jacket on there, exposing

23   to the top part which is the heater, exposing the part

24   that's actually going to require heat for pressing.  You

25   put your transfer on top, and then you -- assuming that



**Orange Legal**
**800-275-7991**

```
 1   the heat press is up to temperature, you would lower

 2   the -- the top heater for the appropriate time,

 3   temperature, and pressure.  And when the time is up,

 4   depending on the type of transfer, you're done.  Once

 5   you lift that top heater, the image is applied to the

 6   garment, you would peel off any kind of transfer that

 7   held the art, pull off the jacket, and the product is

 8   pretty much done.

 9      Q.  Okay.  So I've been writing down some steps as

10   you've been talking; I want to see if you think they're

11   accurate.  Number one, I need a garment that I'm going

12   to heat press, right?

13      A.  Yes.

14      Q.  That's the first step.  Second step is, I need to

15   identify some art that I want to transfer onto the

16   garment.  Do you agree that's the second step?

17      A.  Yes.

18      Q.  Okay.  So let's stop there.  Where does this art

19   come from?  Is it already at the store or do you say,

20   hey, I want a FloGrown shirt; they say, what about the

21   art?

22      A.  It -- it depends on the provider.  It depends on

23   the store; it depends on who's making the product.  And

24   let me qualify that.

25      Q.  Okay.
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                            94

1      A.  If I'm making the product -- depending on the

2    type of product, again, there's a lot of different types

3    of heat transfer products, so we're just talking just

4    generally.

5      **Q.  Right.**

6      A.  Sometimes there's sublimation; sometimes it's

7    film, screen-printed transfers.  There's all these

8    different types of products; foils, for example, films.

9    Some of these products -- some of these transfers

10   would -- would need to be made ahead of time.  So, for

11   example, a screen-printed transfer, you can't really

12   just make that on the spot and transfer it to the

13   garment.  There's just not enough time to do that.  You

14   would need a lot of resources, versus a film-based

15   transfer, that could be made on the spot.  You could

16   take a piece of art, cut it out of the film, like in my

17   earlier example with this W, you could cut that on

18   location and press it, all right?  So depending on what

19   the transfer is would -- would drive what -- whether you

20   have the material there or whether -- whether you need

21   to have it ahead of time or you make it on -- on demand.

22     **Q.  One of the transfers you said was a film-based**

23   **transfer?**

24     A.  Film-based transfer, yes.

25     **Q.  The first one you were talking about, what did**



**Orange Legal**
**800-275-7991**

Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1    you call that one?

2        A.  A screen-printed.

3        Q.  **A screen-printed transfer?**

4        A.  Yes.

5        Q.  **Okay.  And you said screen-printed would take**

6    **basically too long to be set up?**

7        A.  Screen-printed transfers, you're going to have --

8    most shops are going to have those in a drawer or in a

9    box, they'll have those already.  The same thing would

10   be true for dye-sublimated transfers; those are

11   typically made in advance, although if you're -- if

12   you're equipped, sublimated transfers, you can have --

13   you can make those on demand as well.

14       Q.  **Okay.  So let's go back to these three different**

15   **types of transfers, those being film-based transfer,**

16   **screen-printed transfer, and dye-sublimated transfer.**

17   **For a film-based transfer, what do you need to create**

18   **the film, like the things going on the shirt?**

19       A.  You need -- again, there's a lot of variables.

20       Q.  **Okay.**

21       A.  But generally speaking, if you -- if you have the

22   right equipment, you could make it on demand by using --

23   let's say one method would be to cut vinyl, so you have

24   a logo that has -- for example, you start with a blank

25   sheet of film, and out of this blank sheet of film,



1   you -- you knife cut through a machine, knife cut the

2   shape of the logo or the art, the text, and then that is

3   the piece that you actually apply to the -- to the

4   garment.  And that could be made locally or it could be

5   made ahead of time.

6        Q.  Okay.

7        A.  I'm not sure if I'm answering your question, but

8   these are -- these are methods.

9        Q.  No, you are.  Now, you said you need the right

10  equipment; what equipment is the right equipment to

11  create a film-based transfer?

12       A.  If you're making it on location, you'd need a

13  vinyl cutter.

14       Q.  Okay.

15       A.  Or a laser color printer.  If you're making them

16  ahead of time, then you could simply buy that product.

17       Q.  Buy the film-based transfer?

18       A.  Yes.

19       Q.  Okay.

20       A.  The same way you would buy a transfer that's

21  screen printed or sublimated, these are -- you know, so

22  you have a company somewhere or someone somewhere would

23  make this transfer, you end up with a bunch of them and

24  then you'd have them ready to go.

25            So I'm trying to just -- trying to answer your



**Orange Legal**
**800-275-7991**

 1   question in two contexts; one context where you're

 2   making it on demand at the store, customer says, I want

 3   this and you make it.  The other context is where you

 4   have an inventory of transfers ready to print -- or

 5   ready to press, I'm sorry.

 6      **Q.  Okay.  The day you were at the Seminole store**

 7   **when the clerk pointed up and said, you know, some of**

 8   **these we could do, I don't know if she said on the spot**

 9   **or whatever her language was, did she tell you whether**

10   **they had heat -- or sorry, film-based transfers on the**

11   **spot or whether she needed to --**

12      A.  No, we didn't get into any of the types of

13   transfers.

14      **Q.  Okay.  Did you see any laying there, film-based**

15   **transfers, laying just on the counter or anything?**

16      A.  I don't recall seeing transfers of any type.

17      **Q.  Did you see a vinyl cutter in that facility?**

18      A.  No.

19      **Q.  Did you see a laser color printer?**

20      A.  Not specifically, no.  I -- no.

21      **Q.  Okay.  Did you --**

22      A.  I did see a heat press, but I didn't see any

23   other -- any other -- these other devices.

24      **Q.  Okay.  Does FloGrown sell its logo in a**

25   **film-based transfer available anywhere for consumers to**



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                98

 1   **buy?**

 2       A.   Yeah.   They sell a decal.

 3       **Q.   All right.**

 4       A.   Not -- not a decal that can be pressed to shirts;

 5   this is a decal that you would see on the back of a

 6   pickup truck.

 7       **Q.   Right.**

 8       A.   On a window, on different -- you know, where

 9   people put bumper stickers, essentially.

10       **Q.   Right.   So as it relates to garments, though,**

11   **FloGrown doesn't sell any?**

12       A.   Not to the best of my knowledge, I don't think

13   they've ever done that.

14       **Q.   Okay.   Now, if you were going -- if you were**

15   **going to do a screen-printed transfer in the**

16   **heat-pressing process, how would you get that**

17   **screen-printed transfer available to put on the garment?**

18       A.   You could buy that from any company that provides

19   screen-printed transfers.

20       **Q.   Okay.**

21       A.   You provide them the art, they send you

22   transfers.

23       **Q.   Does -- again, same question as to FloGrown, does**

24   **FloGrown sell any screen-printed transfers of its logo**

25   **to the general public?**



1    A.  Not -- never, not that I know of.

2    Q.  **All right.  The day you were at the Sanford**

3    **store, did you see any screen-printed transfers kind of**

4    **laying on the counter or anything else available to be**

5    **used?**

6    A.  I don't recall seeing transfers of any kind.

7    Q.  **What kind of equipment would you need to yourself**

8    **create a screen-printed transfer if you were -- if you**

9    **were going to do that yourself?  Would you, like, need a**

10   **screen printing machine or how does that --**

11   A.  Yes, you would need a screen-printing machine.

12   Q.  **All right.  Did you see a screen-printing machine**

13   **at the Sanford store the day you were there?**

14   A.  No.

15   Q.  **All right.  And a dye-sublimated transfer, how**

16   **would you create the artwork for that?**

17   A.  How would you create the artwork?

18   Q.  **Or how would you create the -- I don't know if**

19   **you say the film or --**

20   A.  The transfer.

21   Q.  **-- the art that's going to go on the shirt, I**

22   **don't know what that's called?**

23   A.  So for a dye-sublimated transfer, you would start

24   with art, whatever that art is, that's someone's name, a

25   brand.



1    Q.   And that's the part I'm interested in, just the

2    art.

3    A.   That art could be a digital file with the logo on

4    it.  And then if you -- if you're going to ask me as a

5    follow-up question, how would you turn that into a

6    transfer, it's -- there's a number of ways to do it, but

7    the most -- the most common way is that you hit the

8    print button having the right type of printer, and that

9    art goes from its digital form.  It's like printing on

10   paper, but it's printing with certain inks onto the

11   transfer material, and then that's what gets used to put

12   onto the garment.

13   Q.   Okay.  And what type of printer would you need

14   for that, when you say the right type of printer?

15   A.   You need a printer that can take water-based

16   sublimation inks or a toner-based system, so either a

17   laser printer or an ink-jet printer with sublimation ink

18   or toner.

19   Q.   Okay.  Did you see a printer that had those

20   capabilities at the Sanford store?

21   A.   I wasn't looking for printers that day, so the

22   answer is no.

23   Q.   All right.  So going back to our general

24   heat-pressed processes, I'm trying to understand here.

25   Number one, I think we can agree, we've got to find a



1    garment that we want to heat press, right?

2        Number two, we need some art to transfer on the

3    garment is -- I understand our second step to be.  But

4    the art -- I'm sorry, the transfer based on what we've

5    been discussing, is there a film-based transfer,

6    screen-printed transfer, or a dye-sublimated transfer?

7    A.  Those are the only three that we talked about,

8    there are other types of transfers.

9    Q.  All right.  Are these the three most common?

10   A.  Those are common.  You have transfers that

11   involve foils.  Again, I mean, just a wide range, those

12   are -- those are probably the three most common in

13   retail environments.

14   Q.  Is there another one in the retail environment

15   context kind of like film-based transfer that's very

16   quick to do on the spot?

17   A.  All of these are quick in terms of transfer.  Do

18   you mean to make the transfer?

19   Q.  Well, when I'm saying transfer, I'm really just

20   talking about taking art and putting it on the shirt.

21   A.  Okay.

22   Q.  So --

23   A.  All of -- all of them are quick, because all

24   you're doing is heat pressing them.

25   Q.  But the prior step, that getting the art printed



```
 1   on whatever material --

 2       A.  On the transfer.

 3       Q.  Right.  The screen-printing process to do the

 4   transfer, I understand it's going to be a lengthy

 5   process to create that art that goes on the transfer,

 6   right?

 7       A.  Do you -- do you need help with the -- what a

 8   transfer is?

 9       Q.  Yeah.  Maybe -- that would be fantastic.

10       A.  Okay, because I think that may help you.

11       Q.  That would be fantastic.

12       A.  Yeah, that may help you out with your

13   questioning.

14           So if you think of like a temporary tattoo.

15       Q.  Right.

16       A.  The temporary tattoo has a piece of paper and

17   then there's some art on there that you're going to

18   press onto your skin and you -- and when you peel it

19   off, you end up with a tattoo.

20       Q.  Right.

21       A.  Okay.  That's a transfer.

22       Q.  Okay.

23       A.  In other words, you have a carrier that has some

24   sort of image on it, okay, and the -- the image that's

25   on that carrier comes from some method, some printing
```



1    method.

2        **Q.  Right.**

3        A.  So all transfers are pretty much the same way.

4    You have a carrier that has something on it that's going

5    to be transferred to something else.

6        **Q.  Got it.**

7        A.  Does that help?

8        **Q.  It does help.  And I'm glad we're on the same**

9    **page with this, because my questions are about what's on**

10   **the transfer, not just the process of having the**

11   **transfer available, but the artwork, because you called**

12   **it a carrier, and what's on there?**

13       A.  Right.

14       **Q.  All right.  So what I'm asking is, if I'm going**

15   **to create some artwork on the spot on a transfer, on a**

16   **carrier, other than a film-based transfer, is there**

17   **another process that I would use to create it on the**

18   **spot when a customer walks in and wants it?**

19       A.  If you're going to print -- if you're going to

20   transfer something onto a garment on the spot, it's

21   either going to be with a cut vinyl, that film-based

22   that I described earlier, it's either going to be that.

23   That's on -- you can do that on the spot, or you're

24   going to print it either on an ink-jet printer or a

25   laser printer and then press it.  There aren't any other



1  methods that are practical.

2      Q.  Right.

3      A.  With the exception of a Direct To Garment

4  printer.

5      Q.  But those things you just told me about, the

6  vinyl cutter and the laser printer, refers to the

7  film-based transfer?

8      A.  The film-based, correct.

9      Q.  Right.  And so if you were looking at this

10 picture again in Exhibit 2, and I just want to refocus

11 us to make sure that we're still on our same

12 hypothetical.  I walk in, I see you're Mr. Acosta behind

13 the counter, I want a very quick process.  And if I just

14 say, hey, I want a logo, any logo on a shirt, the

15 film-based transfer, as I understand it, would be the

16 quickest way to do that?

17     A.  Not necessarily the quickest, no.

18     Q.  Okay.  Then what would be the quickest way other

19 than that?

20     A.  The quickest way would be to use a printer-based

21 transfer, because at that point, you're taking a piece

22 of -- a piece of art that's given to you by the customer

23 or that you have on your computer and you go print, hit

24 the print button, it comes out and then you press it;

25 that's the fastest.



1      Q.  **All right.**

2      A.  The film-based, you have a mechanical process

3   that actually cuts out the shape of the film, all right,

4   and that takes a little -- then you have to do weeding,

5   and it's a -- there's a few more -- a few more steps, so

6   it's not the fastest.

7      Q.  **Okay.  But printing is -- the print-based is the**

8   **fastest?**

9      A.  The print-based is going to be the fastest.

10      Q.  **But the customer needs to have the artwork with**

11   **them or you need to have the art available at the store**

12   **to do that, right?**

13      A.  Yes.

14      Q.  **Okay.  Does the image quality have to be a**

15   **certain, you know, size or type for a print-based**

16   **transfer to work, like 300 GPI or 500, a thousand?**

17      A.  They're -- they're all going to work.  I think

18   the -- maybe the focus of your question is, does it need

19   to be a certain resolution in order to be a quality

20   product.  If you're asking that --

21      Q.  **Yes.**

22      A.  -- then, yes, you do need to start with decent

23   quality.

24      Q.  **Is there a recommended decent quality to start**

25   **with?**



1    A.  Yes.  All of these -- all of these printer makers

2    and film makers have standards.

3        **Q.  But I'm asking, do you know the standard**

4    **resolution that you would advise people to use if they**

5    **were doing this?**

6        A.  If I'm on the other side of this counter and

7    somebody's bringing me artwork, yes, I would have

8    specifications; I would say it needs to be a certain

9    size, certain resolution.

10       **Q.  Okay.  What would you say, though, what would**

11   **that resolution be?**

12       A.  If they're sending me a file, I need three to

13   four megabytes of data per finished square foot size of

14   print.

15       **Q.  All right.**

16       A.  So if you look at the file size, somebody comes

17   in with a file that's 43K and I need something that's

18   two megabytes, that's not going to look good in its

19   final form.

20       **Q.  Okay.  When you do screen-based transfers, do you**

21   **also need -- as in you could use a vinyl cutter with**

22   **that also, or do you only do that with the printer?  Or**

23   **let me go back and ask you, what is a vinyl cutter; is**

24   **that just like literally to cut it out of the --**

25       A.  Right.  So we take this sheet, for example, if



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

1    this was a -- if this was a vinyl, a cuttable vinyl, it

2    will consist of two parts.  You've got a vinyl that's on

3    top and then you have a carrier.  So think of the vinyl

4    part as the part that goes onto your shirt.  The vinyl

5    cutter goes through and says, let's just take this

6    letter W, go through and it'll cut out this W.  And then

7    you peel away the excess, you're left with the W.  You

8    take that W and you go like this and you apply it to the

9    garment.

10       **Q.  Okay.  Got it.  Okay.  So going back to our**

11   **process again, for step two, we said, need art to**

12   **transfer the garment, and I have under that film-based,**

13   **print-based, screen-printed or dye-sublimated transfers,**

14   **but if you're using print-based or film-based, you**

15   **definitely need a printer, right, some kind of printer?**

16       A.  Well, again, just want to qualify all of this,

17   that you can get these transfers ahead of time --

18       **Q.  Right.**

19       A.  -- from some source.

20       **Q.  Right.**

21       A.  If you're doing it on demand, then you do need

22   these pieces of equipment, but you can get all of these

23   transfers ahead of time.

24       **Q.  Right.  So I'm going to put here, need printer,**

25   **unless have them ahead of time.**



1    A.   Right.  And that's what most shops do, because

2    it's too -- it's too burdensome to actually make these

3    on demand.  Most retail environments that I'm familiar

4    with would order these in advance or make them in

5    advance and bring them to the store and have them ready

6    to press.  It's more practical, you get instant

7    gratification for the customer.

8    **Q.   Right.  Okay, so for the third step, I was**

9    **writing down as you talked earlier, I just put, put**

10   **garment on heat press.  Sounds pretty elementary, but**

11   **that's the next step, right?**

12   A.   Yes.

13   **Q.   All right.  And then I have, lower the heat press**

14   **on the garment after it's at the appropriate**

15   **temperature.  Would that -- you're agreeing that that's**

16   **the next step?**

17   A.   Yes.  You want to protect the -- the garment, but

18   generally, yes.

19   **Q.   How are you -- are you sure the -- the transfer**

20   **stays in a certain spot when you lower the -- the top**

21   **down?  Is there a way to keep that logo or the transfer**

22   **on the spot?**

23   A.   For the most part, your -- your transfer's not

24   going to move.  If you need to tape it down, you can use

25   heat tape, but for garments, most of the time, it stays.



1    Our rhinestone transfer product, for example, has -- has

2    some stickiness to it.  So you take this clear sheet

3    that's got this beautiful rhinestone design in it, but

4    the exterior where there aren't rhinestones, it's --

5    it's got a little bit of adhesive, so you put it onto

6    the blouse or jeans or whatever and it sticks on there,

7    so you don't need anything else.

8        Q.   Okay.  Is there a recommended temperature that

9    the heat press has to heat up to before you can use it?

10       A.   Yes.

11       Q.   And what is that?

12       A.   It depends on the material.  It's literally

13   material dependent.  Both the garment and the transfer

14   will have requirements.

15       Q.   At the time that you leave the -- I guess the --

16       A.   The heater down?

17       Q.   The heater down.  Is that dependent also,

18   material type?

19       A.   Yes.  Time, temperature, and pressure is all --

20   is all really important in all of these steps.

21       Q.   The heat is material dependent; time is material

22   dependent, and pressure.  So is there like a switch on a

23   heat press where you can adjust the pressure for it, or

24   is pressure just how hard you manually lower down --

25       A.   Most -- most heat presses will have some sort of



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                                110

1    knob or some sort of control.  If it's a

2    pneumatic-controlled heat press, then you do it

3    digitally.  In this particular heat press here, I can't

4    tell from -- from this picture, but there would be some

5    way to control the pressure.

6       **Q.  All right.  So after you've had the heat press**

7    **down for a certain amount -- amount of time at a certain**

8    **heat and at a certain pressure, the next step has to be**

9    **that you lift the heat press, right?**

10      A.  Correct.  Some of these heat presses open

11   automatically based on a predefined time period, others,

12   you have to lift manually when -- when they beep, when

13   the time's up, the timer goes off.

14      **Q.  Okay.  And then do you have to let the garment**

15   **sit on there for a few minutes or you take it off, let**

16   **it cool off, or, I mean, how hot is it?**

17      A.  Yes.  Yeah.  Periodically, depending on the type

18   of film that you're using.  There's what's called hot

19   peel or cold peel.  A cold peel is where you let the

20   garment cool completely and then you peel off the

21   transfer, the -- the liner, if you will, because the

22   transfer's going to be attached to the garment.  A hot

23   peel, you open up the press and you peel off that liner

24   immediately.

25      **Q.  All right.  So I just want to show you, then,**



1   what I'm going to mark as Exhibit 3, and just to see if

2   you agree with me that I've accurately described the

3   heat press process that we've been discussing here.

4           (Defendants' Exhibit No. 3 was marked for

5       identification.)

6           THE WITNESS:  Well, you know, these are the

7       steps generally, and they're your notes.  If I were

8       doing a list, I'd probably do it a little bit

9       different because I tend to add more detail, but these

10      are generally the steps.

11  BY MR. WATSON:

12      Q.  Okay.  All right.  Did you ever hear Mr. Welch

13  talk about the time when he recorded a conversation

14  between him and Mr. Torgeman?

15      A.  Did I hear him talk about it?

16      Q.  Yeah.  Did he ever mention to you, hey, I

17  recorded, you know, me and Asher talking about something

18  the other day?  Do you have any knowledge of a voice

19  recording between --

20      A.  I don't -- I don't recall Jesse making a

21  recording.

22      Q.  Did anyone else at FloGrown tell you that there

23  is such a recording, other than Mr. Welch?

24      A.  A recording of --

25      Q.  A voice recording of anything?



```
1      A.  A voicemail or --
2      Q.  No.  A conversation like you and I would be
3  having now, but someone would be recording it, like that
4  kind of voice recording, not a voicemail?
5      A.  Like wearing a wire or something?
6      Q.  However people voice record.  Could be that or --
7      A.  No.  I never heard of anything like that, no.
8      Q.  How involved are you in the case -- or not the
9  case -- earlier today, we talked about a couple
10  disputes.  You said the second one was when Dixie didn't
11  pay any invoices.  How involved were you in that
12  dispute, the invoice dispute?
13     A.  I was -- I was directly involved in that case.
14     Q.  Okay.  How were you directly involved in it?
15  What did you do being directly involved?
16     A.  I handled trying to get the recovery of these
17  unpaid invoices.
18     Q.  And what does that mean, you contacted Dixie and
19  said, hey, pay these, or what does that mean?
20     A.  Well, you know, at the point that I got involved
21  in that particular dispute, it was pretty far along.
22  Dixie didn't want to pay, so I prepared a complaint and
23  filed it in small claims court, went to court.
24     Q.  And then you were the vice president at that time
25  when all this happened?
```



1     A.   Yes.

2     Q.   **Do you recall when that was, this whole process**

3     **of the invoices, do you know when that was?**

4     A.   You mean when they didn't pay?

5     Q.   **Time-wise, like when you filed the complaint and**

6     **that?**

7     A.   Off the top of my head, I mean, I know that's

8     memorialized somewhere, but to sit here and pick out a

9     specific date, I couldn't tell you.

10    Q.   **Do you know what year?  Was it 2016 or 2017?  I**

11    **know you don't know a specific date, I'm just asking for**

12    **year, if you remember it?  No, is that the answer?**

13    A.   Yeah.  I mean, at this moment for me to

14    cherry-pick a date.

15    Q.   **Right.  So currently, you're still doing business**

16    **consulting work -- well, no.  Currently, you are still**

17    **doing business consulting outside of the business for**

18    **you and your wife?**

19    A.   No.

20    Q.   **You're not doing that anymore?**

21    A.   I'm not pursuing business consulting work.

22    Q.   **Okay.**

23    A.   I do litigation consulting work but not business

24    consulting.

25    Q.   **What do you do for litigation consulting?**



1    A.  A lot, actually.  I work with attorneys who need

2    help with their cases just--

3    **Q.  But, I mean, what services are you providing to**

4    **attorneys; are you an expert witness or what do you do?**

5    A.  So on that side, I do a number of things.  I do

6    fact gathering, fact packaging, if you will, mine map

7    cases.  The more complex the case, the more likely it is

8    that I'm to be brought on.  I would do everything for

9    drafting -- drafting motions, briefs, I've handled

10   interlocutory and plenary appeals for counsel, in the --

11   in the research, doing the legal research, helping them

12   with brief writing.  I do trial exhibits.  Just a wide

13   range of things.

14   **Q.  That's under the CaseClarity business?**

15   A.  Yes.

16   **Q.  Okay.  Is CaseClarity the name -- is it like two**

17   **words, Case, Clarity?**

18   A.  It's all one word.

19   **Q.  One word.  But it's its own separate business?**

20   A.  It's just -- it's just me.  It's a -- it's a name

21   I trade under.

22   **Q.  Okay.  But it's just like a sole proprietorship?**

23   A.  Yes.

24   **Q.  All right.  Do you have a website or anything?**

25   A.  No.  Well, you could go to caseclarity.com, it's



1    a one-pager.

2       Q.   Right.   How do you find, like, clients or how do

3    attorneys find you?

4       A.   It's mostly referral, people find out about my

5    work, people that -- that -- I know a lot of attorneys,

6    and so one attorney might refer me to another attorney

7    or they might -- they might read a blog post that I've

8    put out on some -- on a law firm's blog, or someone has

9    read about a case that I've been involved in supporting.

10      Q.   Did you do any litigation support services on

11   this case doing any of the things you described, fact

12   gathering, motion writing, anything like that?

13      A.   Motion writing, no.

14      Q.   Did you do anything else?

15      A.   Now, I did get involved with trying to collect

16   the unpaid invoices, but that was in my capacity as vice

17   president, not as a consultant.

18      Q.   Okay.   But what about on this case, the federal

19   case that we're here on, did you do any of those things,

20   litigation support services that you described for this

21   case, fact gathering, motion writing, anything like

22   that?

23      A.   I was asked to help pull together some of the

24   discovery materials since I was familiar with some of

25   those.   But that was -- that was it.   I've not been



1    involved in this case except for that.

2        **Q.   Okay.  You don't have a law license, right?**

3        A.   I do not.  And I don't practice law in any

4    jurisdiction.  100 percent of my work is for counsel.

5        **Q.   But when you do motions, for example, like, you**

6    **just ghostwrite and the attorney puts their name on it;**

7    **is that how it happens?**

8        A.   I draft it; I submit it to the attorney; they

9    finish it up and send it in.  Same thing with the

10   briefs.

11       **Q.   You understand, I'm just asking -- but your name**

12   **is not on it, right?**

13       A.   No, my name is not on it.

14       **Q.   Okay.  When did you start CaseClarity?**

15       A.   As a formal name, I want to say maybe 2008.  I've

16   been doing this type of work since about 2003, 2004.

17       **Q.   Why did you decide to do litigation support in**

18   **addition to being a business consultant?**

19       A.   It's a long story, but the short version is that

20   my transition to Florida didn't go well and I had some

21   adversity that I had to deal with, so I got involved in

22   helping myself through that time period by helping the

23   attorneys in the case, and actually, applied some of the

24   consulting -- some of the skill sets that I used in a --

25   in a consulting space to -- for example, fact gathering,



```
 1    that's not -- that's not a skill set that's limited to

 2    the practice of law or in the legal context, so I had

 3    strong skills with that, writing, you know, arguments,

 4    so I started to work with a handful of attorneys on,

 5    first on my cases and then on other cases, and that

 6    just -- that led to working on all kinds of stuff.

 7         Q.  All right.  When we started today, when you said

 8    you had been deposed before and you had been involved in

 9    lawsuits before, can you tell me the lawsuits that you

10    have been personally involved in as a plaintiff or

11    defendant?

12         A.  All of them?  I -- I had some fallout from my

13    transition to Florida that did -- that spawned a few

14    lawsuits.  I had litigation involving the destruction of

15    my business.

16         Q.  The printing business?

17         A.  The printing business that we moved from

18    Pennsylvania to Florida, and from there, I had some debt

19    collection type of cases where I was deposed associated

20    with those.  Then I had a -- had a dispute with a

21    homeowner's association, my community.  Honestly, I'm

22    not sure if I could recall all of them, but I've -- I've

23    had my deposition taken.

24         Q.  But in those cases where your depositions were

25    taken, were you the plaintiff or defendant or was it
```



1    like this case?

2        A.  I was either plaintiff or the defendant, yes.

3        Q.  All right.  Were those cases all in Florida?

4        A.  Yes.

5        Q.  That you just mentioned to me?

6        A.  Yes.  There were cases that -- there were --

7    there were a few cases in Pennsylvania where I was

8    also -- I also gave depositions.

9        Q.  Were those cases in Orange or Seminole Counties,

10   like where -- where you live in Longwood or --

11       A.  All Seminole County.

12       Q.  All Seminole.  In your current business with your

13   wife, how is the business doing?

14       A.  It's not going as -- as fast as I'd like.  I

15   think all entrepreneurs feel that way.

16       Q.  Yeah?  How do you get your clients?

17       A.  We have a -- we have a website and we promote

18   through that website.  We also talk to artists who --

19   whose work goes on to different products that we can

20   make.  And then word of mouth, you know, people refer

21   others to us.

22       Q.  Okay.  Is FloGrown one of your clients?

23       A.  Yes.

24       Q.  Would you consider FloGrown to be a good client?

25       A.  Yes.  We -- I have to shift my thinking, because



1   in a professional context, they're clients, but in the

2   printing business, they're customers, so --

3       Q.  Right.

4       A.  -- FloGrown is a customer.

5       Q.  Right.

6       A.  I call them a customer, not a client.

7       Q.  Okay.  How much in sales would you say you get

8   from FloGrown, and when I say you, I mean, your Hands On

9   Color?

10      A.  Hands On Color?  Minimal.  It's less than -- less

11  than $5,000 a year.

12      Q.  All right.  Who would you consider your biggest

13  customer to be at Hands On Color?

14      A.  I'm not sure how that's relevant to your case,

15  but we're -- I'm actually not sure.  We have -- we've

16  done work for -- on the sublimation side, we've done

17  work for FloGrown; we've done work for a company called

18  Flying Fishermen.  I think it's between those two.  And

19  then we have we have -- we have a handful of other

20  customers that are sending us work.

21      Q.  Do you do -- do you have a screen printer at your

22  house?

23      A.  No.

24      Q.  So do you have a heat -- is that heat pressing,

25  is that the only other option?



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                           120

```
 1      A.  Yes.
 2      Q.  At your house?
 3      A.  Yes.
 4          (Sotto voce conversation between counsel.)
 5  BY MR. WATSON:
 6      Q.  Let me just review my notes real quick.  I think
 7  we're just about done.
 8          I think you did say before, but let me just ask
 9  you again, you said you didn't ever have any written
10  recommendations at FloGrown for any of the business
11  consulting work that you did for them?
12      A.  Written recommendations?  I mean, apart from
13  e-mails?
14      Q.  Right.  Like in a report-type format, like your
15  best practices?
16      A.  I don't -- I don't recall that I had formal
17  written -- that wasn't -- the relationship wasn't like
18  that.  We would go back, it was more realtime --
19      Q.  Okay.
20      A.  -- to hear the things that we were working on.
21  Unlike my relationship with Community First Fund in
22  Pennsylvania, very large -- larger organization, much
23  more structured, they expect certain things, in that
24  context, I would do a formal report, review it,
25  conversations.  With small -- with small business
```



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                          121

```
 1    owners, I have found that the relationship's a lot more
 2    fluid.  So my -- my feedback to them as a consultant
 3    would have been more verbal and would have been through
 4    e-mails.
 5        Q.  Okay.  Back when you were a vice president of
 6    FloGrown, when you would go into the production room, I
 7    guess it's called production area, did you ever see any
 8    vinyl cutters there that FloGrown owns?
 9        A.  Vinyl cutters?
10        Q.  Yeah.
11        A.  Yes.
12        Q.  Did you ever see any printers there?
13        A.  Yes.
14        Q.  Did you see the type of printer -- printers that
15    we were discussing earlier that could do film-based or
16    print-based transfers?
17        A.  Yes.  The short answer's yes.
18        Q.  Okay.  All right.  Mr. Acosta, I don't have any
19    further questions for you.  I do appreciate your time
20    today.  Thank you for coming in, spending some time with
21    me.
22        A.  Okay.
23            THE VIDEOGRAPHER:  This concludes the
24    videotaped deposition.  We're going off the video
25    record at 12:38 p.m.
```



1          MR. WATSON:  You probably know from prior

2     depositions, you have your opportunity to read or

3     waive.

4          THE WITNESS:  Honestly, I think this was as

5     transparent as I could be with you.  I'm not sure that

6     I need to read.  I don't remember anything that I need

7     to clarify.  You were good with your questions.  I'm

8     going to waive.

9          THE COURT REPORTER:  Are you ordering the

10    transcript at this time?

11         MR. WATSON:  Yes.  Can you do it in five

12    business days?

13         THE COURT REPORTER:  Yes.

14         (The deposition was concluded at 12:40 p.m.)

15

16

17

18

19

20

21

22

23

24

25



```
 1                    CERTIFICATE OF OATH

 2
     STATE OF FLORIDA)
 3   COUNTY OF ORANGE)

 4

 5          I, MAE FISHER, Registered Merit Reporter,

 6   Certified Realtime Reporter and Notary Public, State of

 7   Florida, certify that DAVID ACOSTA personally appeared

 8   before me on April 5, 2018, and was duly sworn/affirmed

 9   and produced a driver's license as identification.

10

11          WITNESS my hand and official seal this 11th day

12   of April, 2018.

13

14

15                    Mae Fisher

16                    MAE FISHER, RMR, CRR
                      Notary Public - State of Florida
17                    Commission # FF 943325
                      Expires:  January 8, 2020
18

19

20

21

22

23

24

25
```



```
 1                    TRANSCRIPT CERTIFICATE

 2   STATE OF FLORIDA)
     COUNTY OF ORANGE)
 3

 4         I, MAE FISHER, Registered Merit Reporter,
     Certified Realtime Reporter and Notary Public, State of
 5   Florida, certify that I was authorized to and did
     stenographically report the deposition of David Acosta;
 6   that a review of the transcript was not requested; and
     the foregoing transcript, pages 4 through 122, is a true
 7   record of my stenographic notes.

 8         I FURTHER CERTIFY that I am not a relative,
     employee, attorney, or counsel of any of the parties,
 9   nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
10   financially interested in the action.

11
           DATED this 11th day of April, 2018, at Orlando,
12   Orange County, Florida.

13

14

15

16                    _____
                      MAE FISHER, Notary Public
17                    State of Florida

18

19

20

21

22

23

24

25
```



**Exhibits**

040518_D.Acosta_
Exhibit 01

040518_D.Acosta_
Exhibit 02

040518_D.Acosta_
Exhibit 03

**$**

**$100** 38:12,15,18

**$5,000** 15:7 30:5,10, 22 31:13 119:11

**1**

**1** 87:10,12

**100** 22:19 49:2 116:4

**10:16** 5:13

**10:19** 4:10

**11:49** 89:10

**12:00** 89:13

**12:38** 121:25

**12:40** 122:14

**18** 8:14

**189** 4:8

**1996** 15:21

**1999** 36:22

**2**

**2** 87:23 88:1 91:7 104:10

**20** 55:8

**20-degree** 8:22

**2000** 8:18

**2002** 13:7 15:18,19 17:12,13,18,24 18:7

**2003** 116:16

**2004** 116:16

**2008** 116:15

**2014** 19:5 23:4 26:11,12

**2015** 31:10,15,24 32:3 33:6

**2016** 33:9 35:4,10 36:3,4,7,12 39:5,6,8, 15 40:18 41:2 43:19 113:10

**2017** 35:1,4,10 36:2 37:21 38:8 39:21,24 41:2,16 42:3 113:10

**2018** 4:10 34:25

**25-plus** 32:9

**3**

**3** 111:1,4

**30** 89:17

**300** 105:16

**32801** 4:9

**350** 82:21

**36-inch** 14:9,11,13, 16

**3M** 14:18,20,21,22 15:1,8 16:16

**4**

**43K** 106:17

**5**

**5** 4:9

**5,000** 27:9 32:1

**500** 105:16

**52** 11:15

**52-inch** 12:7

**6**

**6:17-cv-00983-gks-gjk** 4:4

**7**

**70s** 11:3

**8**

**8** 12:8

**8,400-square** 13:11

**80s** 9:16

**810** 4:9

**9**

**90s** 80:21

**954 951-0154** 5:13

**A**

**a.m.** 4:10 5:13 89:10

**Aaron** 19:16,25 20:3

**absence** 5:15

**absolutely** 21:19 42:24 43:18 77:5

**access** 61:19

**accomplish** 23:20

**accomplishments** 25:5

**account** 88:24

**accountant** 59:22

**accounting** 59:12, 14,17,19,21

**accurate** 41:20 93:11

**accurately** 111:2

**Acosta** 4:3,25 5:7,8 18:17 22:25 23:1 89:15 104:12 121:18

**acquaintance** 19:2

**acquaintances** 7:1

**acted** 9:21

**action** 77:14

**active** 13:6 85:25

**activities** 7:1

**actual** 45:12

**ad** 14:14

**add** 111:9

**addition** 32:1 116:18

**address** 61:13,19,20, 25 62:1,6,11,13

**adhesive** 109:5

**adjust** 109:23

**adopting** 25:13

**advance** 95:11 108:4,5

**adverse** 58:5

**adversity** 116:21

**advice** 9:25 60:14

**advise** 106:4

**advised** 32:8

**advising** 9:10

**advisors** 59:25

**affected** 83:20

**affirm** 4:20

**age** 26:20

**agencies** 14:14

**agree** 60:3 93:16 100:25 111:2

**agreed** 33:14 91:9

**agreeing** 108:15

**agreement** 23:24 33:10 38:9 58:21

**ahead** 23:16 94:10, 21 96:5,16 107:17, 23,25

**alarmed** 54:14

**alive** 61:21

**alleged** 76:15,19

**allegedly** 60:4 77:7

**amicable** 43:15,16

**amount** 43:10 53:1 110:7

**angle** 49:2

**angst** 41:10

**answer's** 121:17

**answering** 66:13 96:7

**anticipate** 29:16

**anymore** 11:3 23:3 113:20

**apparel** 17:6

**apparent** 28:1 35:12

**apparently** 52:22 77:13

**appealed** 28:12

**appeals** 114:10

**applied** 22:2 93:5 116:23

**apply** 6:9 67:12 96:3 107:8

**approach** 22:4

**approximately** 23:4 35:3 55:25

**April** 4:9

**area** 47:16,23 121:7

**areas** 10:17

**arguments** 117:3

**arrangement** 38:19 44:17

**art** 65:23 92:16 93:7, 15,18,21 94:16 96:2 98:21 99:21,24 100:2,3,9 101:2,4, 20,25 102:5,17 104:22 105:11 107:11

**artists** 118:18

**artwork** 99:16,17 103:11,15 105:10 106:7

**Asher** 111:17

**aspect** 33:8



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

**aspects** 30:23 76:9

**assembly** 84:6

**assess** 18:19

**assessment** 24:16 25:4

**association** 117:21

**assume** 6:17 23:3 47:6

**assuming** 92:25

**attached** 110:22

**attend** 18:10

**attending** 5:14 50:20

**attorney** 115:6 116:6,8

**attorneys** 5:10 60:17,18 114:1,4 115:3,5 116:23 117:4

**audible** 7:7

**audience** 42:17,25

**audiences** 27:24

**aunt** 78:19

**authorize** 74:14

**authorized** 64:19 81:24

**automatically** 110:11

**Avenue** 4:8

**aware** 58:3,8 82:9

**B**

**back** 5:16 11:6 18:16 21:14 23:4,7 31:11 38:10,15,18,22 39:13,22 48:19 52:5 55:2 56:5 57:20 61:18 68:16 74:25 76:23 78:25 79:2 80:20 82:6 89:12,15, 19 95:14 98:5 100:23 106:23 107:10 120:18 121:5

**backdrops** 81:1,2

**backed** 15:12

**background** 5:17 8:3

**ball** 20:14

**banner** 11:18

**banners** 14:1 81:1

**baseball** 20:11,12,14

**based** 20:19 46:2 53:1 60:9 65:22 66:5 83:16 101:4 110:11

**basically** 14:2 15:18 66:4 91:14 95:6

**Bass** 34:9

**bath** 11:11

**bathroom** 7:25

**beachgoers** 28:13

**beautiful** 109:3

**Bedrava** 5:12

**beep** 110:12

**began** 30:22 31:4 60:20

**begin** 8:8

**beginning** 8:10 10:16 41:2

**begins** 4:2

**behalf** 4:12,17

**believed** 54:7

**Benjamin** 5:12

**big** 12:6 14:2 15:6 52:25 81:1

**biggest** 28:10,11 119:12

**Bill** 16:12

**bit** 7:18 39:7 47:5 109:5 111:8

**bite** 69:8

**black** 11:10 12:11

**blank** 46:15 47:2 82:5 92:11 95:24,25

**blanks** 46:17,18

**blog** 115:7,8

**blouse** 109:6

**blowing** 83:1,6,8,13, 19

**bore** 73:20 74:10

**bought** 42:21 47:2 54:12,15,16,21,22,24 55:5,9,15 57:7,9 72:7,10,15,24 73:1, 3,10 74:19 78:18,23 81:18

**box** 95:9

**boxes** 84:15

**bracket** 27:13 34:4 35:6

**brackets** 26:20

**brand** 20:17,18,21 42:16,20 50:15 57:13,17 60:13 63:7 73:20 88:16 99:25

**brands** 71:1 88:20

**break** 7:24,25 29:19 40:7 89:5

**briefly** 68:18

**briefs** 114:9 116:10

**bring** 56:17 78:25 108:5

**bringing** 106:7

**broad** 66:6

**broadcast** 81:2

**brought** 79:2 114:8

**build** 9:10,11 24:14 25:13,16 32:13,19 39:25

**building** 47:17,25

**built** 14:20

**bumper** 98:9

**bunch** 52:22 55:14 62:2,3 78:18 96:23

**burdensome** 108:2

**burned** 65:22

**burns** 65:24

**business** 9:5,6,7,9, 11,12 10:6,7,9 12:17,19,25 13:15 14:20 15:18,20 17:15,19,24 18:2,4, 6,9,10 19:13,14 20:12,15,16 21:10, 22 22:1 23:13 24:10 25:13,17 30:23 31:22 32:8,9,13 33:23 35:19,21 36:1, 7,10,12,13 37:15 38:2,6 41:9,24 42:5, 10,11,15,18,20,23 43:20 44:10 45:14 47:24 80:19 113:15, 17,21,23 114:14,19 116:18 117:15,16,17 118:12,13 119:2 120:10,25 122:12

**businesses** 10:2 36:25 37:1

**button** 100:8 104:24

**buy** 21:24 43:1 45:15,18 46:13,22, 24 54:10,11,13 55:6, 9,22 56:21 57:3,4,5 67:23 68:1 74:3,15, 21 84:24 96:16,17, 20 98:1,18

**buying** 15:5 28:4 52:22 53:3,4,7

**C**

**C-A-S-E** 62:17

**calibration** 80:22

**call** 26:22 54:6 73:17 74:19 95:1 119:6

**called** 19:15 22:12 34:9 37:17 61:3 99:22 103:11 110:18 119:17 121:7

**calls** 75:1

**Camacho** 75:17 76:4

**camo** 70:14

**camouflage** 89:20, 21 90:9

**campers** 28:13

**candid** 66:6 81:21

**cap** 92:15

**capabilities** 100:20

**capacity** 22:6 53:5 76:3 115:16

**caps** 22:2 42:17

**cards** 33:23

**care** 48:5,7,11

**career** 9:3,16

**carrier** 67:9,14 102:23,25 103:4,12, 16 107:3

**case** 4:4 5:20 6:8 10:21 44:9 50:8,9, 11,12,13,15 51:25 52:3 60:7,8,9,11 62:2,17,19 82:17 92:15 112:8,9,13 114:7,17 115:9,11, 18,19,21 116:1,23 118:1 119:14

**Caseclarity** 114:14, 16 116:14

**caseclarity.com** 114:25

**cases** 5:22 114:2,7 117:5,19,24 118:3,6, 7,9

**casual** 90:11

**caused** 41:9

**causing** 7:13

**Center** 68:12

**certifications** 16:21,25

**chair** 7:19

**challenges** 23:21 25:6,23

**characterized** 53:2

**charge** 11:8

**charges** 11:8



**check** 59:9

**cherry-pick** 113:14

**claims** 112:23

**clarification** 6:17

**clarify** 6:13 10:23 21:8,15 23:2 61:1 72:17 122:7

**Clarity** 62:17,19 114:17

**clean** 7:5 89:16

**clear** 6:19,20,21 19:18 48:6 66:14 73:24 75:20 109:2

**clerk** 68:13 70:12 90:3 91:1 97:7

**client** 13:17 23:18 30:17 53:18 118:24 119:6

**clients** 14:11,15 18:9,13,15 50:3 51:6 52:9 82:4 115:2 118:16,22 119:1

**close** 79:21

**closely** 69:17 80:1,9

**clothing** 17:4

**club** 14:25

**co-owner** 44:6

**co-owners** 32:25

**co-ownership** 32:23 33:3

**coached** 37:4

**coalesces** 66:24

**Coca-cola** 13:18

**coffee** 7:25

**cold** 110:19

**Coleman** 4:16

**collect** 115:15

**collection** 30:7 117:19

**college** 16:1,5,6,20

**colleges** 16:7

**color** 10:11 11:1,13, 20,21 12:11 14:17 22:12 74:6 80:15,19, 21,22 96:15 97:19 119:9,10,13

**combination** 15:11

**command** 14:25

**comment** 50:6

**common** 19:16 100:7 101:9,10,12

**communicating** 27:1

**communications** 61:24

**community** 36:23, 25 37:18,19 117:21 120:21

**companies** 9:10,11, 22 20:24 36:13 37:11 60:22 61:5,10

**company** 9:17 13:6 14:4,8 15:10,14 18:18 19:4 20:2,5,9, 17,20 21:2,5,10 22:10 23:14 24:15, 17,18,20 25:19 27:4 29:22 32:19 33:4,11 34:1,8,13 36:21,23 37:3 39:4,15 40:11, 19,21,24 41:3 42:16, 22 47:7 48:21 53:12 59:13 61:13,18 62:19 96:22 98:18 119:17

**company's** 15:5 33:18

**compensated** 44:1, 21

**compensation-wise** 44:20

**complaint** 112:22 113:5

**completed** 30:9

**completely** 7:2,4 11:21 42:20,25 43:2 81:22 110:20

**complex** 114:7

**computer** 104:23

**concave** 88:24

**concern** 73:16 78:11

**concerned** 56:15,16 57:13 74:4,21

**concluded** 122:14

**concludes** 121:23

**condensed** 14:13

**confirm** 6:12 63:9

**conflict** 41:10

**Connected** 26:25

**connection** 19:17

**consist** 107:2

**consisted** 26:15

**consultant** 9:5,7,23 17:16,24 18:3,5 21:10 44:2 52:7,8,10 115:17 116:18 121:2

**consulted** 20:24 21:2,5,7 22:5

**consulting** 9:8,18 10:6 14:10 17:19 18:6,9,13 20:1 21:9 22:6 26:6 27:15 30:14 31:25 32:9 36:14,22 37:6,11,15 38:3 39:16,23 52:16 62:22 113:16,17,21, 23,24,25 116:24,25 120:11

**consumer** 86:18

**consumers** 97:25

**contact** 38:5 61:3

**contacted** 112:18

**contacting** 24:11

**contest** 6:7

**context** 22:9 23:23 34:14 51:5 90:24 97:1,3 101:15 117:2 119:1 120:24

**contexts** 97:1

**contextualize** 32:7

**contract** 5:22

**contractor** 9:22 31:3

**control** 49:17 110:1, 5

**conversation** 6:25 20:7,8 23:11,17,23 25:12 31:9 32:6,11, 16 38:21 41:17 50:24 51:2,3 52:21 57:10,12,19 64:17 68:13 70:16,24 72:7 90:2,19 111:13 112:2 120:4

**conversations** 31:22 53:14 57:14, 16 59:10 61:10 75:2 76:14,19 78:1,8 120:25

**convert** 13:3

**convex** 88:24

**cool** 110:16,20

**copy** 91:7

**copyrighted** 70:20 71:18

**correct** 10:1 22:20 27:16 37:25 40:20 41:1,25 55:17 56:4 68:2 70:10 82:20 87:3 104:8 110:10

**cost** 12:9,12

**counsel** 4:13 5:12 57:23 60:15 114:10 116:4 120:4

**counter** 68:14 72:11 91:15 97:15 99:4 104:13 106:6

**counterfeit** 60:23 61:5 62:25 63:4,21, 23 64:4,6,9,11,15,22 76:15,19 77:7,13,15, 20 78:12,15,19 90:1, 9

**Counties** 118:9

**counting** 84:17

**County** 36:25 118:11

**couple** 5:9 6:14 7:23 9:4 16:4 37:3 45:7 51:8 54:16 87:9 112:9

**court** 4:6,10,14,19 7:6 69:8 112:23 122:9,13

**covers** 65:7

**CPA** 59:22

**create** 18:20 22:1 65:23 91:2 95:17 96:11 99:8,16,17,18 102:5 103:15,17

**created** 65:22

**credential** 16:21

**cures** 83:11

**curing** 83:9,12,19 84:2

**current** 118:12

**cursory** 74:25

**curvature** 88:24

**customer** 26:19 34:8 52:25 53:24 92:8,10,11 97:2 103:18 104:22 105:10 108:7 119:4, 6,13

**customer's** 26:19

**customers** 21:24 22:3,7 25:20 26:16 33:18 34:7,10 49:22 52:23 53:7 84:18,24 92:4 119:2,20

**cut** 23:16 67:5,8 74:6 94:16,17 95:23 96:1 103:21 106:24 107:6

**cuts** 105:3

**cuttable** 107:1

**cutter** 96:13 97:17 104:6 106:21,23 107:5

**cutters** 121:8,9

**cyan** 11:10 12:11



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

**D**

**Daniel** 19:7,11

**data** 106:13

**date** 4:9 35:2 113:9, 11,14

**Dave** 56:20 57:3 81:19

**David** 4:3,25 5:7 74:21

**David.acosta@ flogrown.com.** 61:16

**David@ caseclarity.com.** 62:16

**day** 7:1 33:19 54:6 59:17 67:17 91:1 97:6 99:2,13 100:21 111:18

**day-to-day** 59:14,17

**days** 122:12

**deal** 57:23 116:21

**dealing** 25:2

**debt** 117:18

**decal** 98:2,4,5

**decals** 76:10,11

**decent** 105:22,24

**decide** 116:17

**decided** 40:18 41:17

**declined** 78:6

**defect** 83:2

**defects** 84:2

**defendant** 117:11, 25 118:2

**defendants** 4:16,18

**defendants'** 87:10, 12 88:1 111:4

**define** 65:6

**definition** 20:19 66:10

**definitively** 61:8

**degrees** 16:13 82:21

**demand** 94:21 95:13,22 97:2 107:21 108:3

**dependent** 109:13, 17,21,22

**depending** 80:4 93:4 94:1,18 110:17

**depends** 93:22,23 109:12

**deposed** 5:24 6:2 51:9 117:8,19

**deposition** 4:3,7 5:18,21 7:14 50:10, 20 51:7,18 52:2 117:23 121:24 122:14

**depositions** 6:5 117:24 118:8 122:2

**describe** 32:3 63:6, 17 65:15 74:7

**describing** 54:23 63:16

**description** 11:24 54:25 55:1,11,14,16

**design** 109:3

**destroyed** 13:12

**destruction** 117:14

**detail** 111:9

**develop** 28:8

**developed** 35:19

**developing** 42:11

**development** 9:9 20:13 31:22 37:2

**devices** 97:23

**diazo-coated** 11:7

**difference** 66:25 73:6

**differences** 80:5

**digital** 10:9 11:21 12:5,13,16 45:24 46:6 100:3,9

**digitally** 81:10 110:3

**dilemma** 60:12

**diploma** 16:14

**Direct** 5:3 104:3

**direction** 35:23

**directly** 86:18 112:13,14,15

**discernible** 80:3

**discounted** 49:4

**discovery** 115:24

**discuss** 60:21 61:4

**discussed** 17:25 24:13 25:25 52:1 82:10 90:14

**discussing** 101:5 111:3 121:15

**Disney** 13:19

**display** 46:10,11

**displays** 81:2

**dispose** 48:22

**dispute** 5:22 54:5 58:4,14,15,16,17,18, 20,24 60:3 112:12, 21 117:20

**disputes** 60:4 112:10

**dissolve** 17:13

**dissolved** 17:13

**distribution** 27:2

**District** 4:6

**Division** 4:7

**Dixie** 4:5 52:9,12,19, 20,22,25 53:17,18,22 54:2,5,8 56:3 58:4,8, 15,24 59:6,9 60:3,5 61:6,7,11 62:6,7,25 63:8,10 74:13 76:24 77:10 81:8 112:10, 18,22

**Dixie--** 62:7

**dot** 11:10

**dozen** 66:11

**draft** 116:8

**drafting** 114:9

**draw** 44:7,19

**drawer** 95:8

**drive** 94:19

**dryer** 82:18,21

**drying** 83:3,6,8,13

**duly** 5:1

**duties** 34:3 53:6

**dye-sublimated** 95:10,16 99:15,23 101:6 107:13

**dye-sublimation** 21:24 79:20,22 80:17

**E**

**e-mail** 61:13,19,20, 25 62:1,6,11,13

**e-mailed** 61:3

**e-mails** 62:3,5 120:13 121:4

**earlier** 17:25 29:11 35:22 41:20 42:15 44:25 65:14 73:5 76:23 80:1 82:2 89:20,21 90:14 94:17 103:22 108:9 112:9 121:15

**early** 24:25 25:1 42:3

**earning** 44:5,9

**economic** 37:2

**edge** 79:22 80:3

**effectively** 49:3

**efficient** 10:2

**effort** 85:25

**electric** 11:7

**electrical** 11:8

**electronics** 9:15

**electrostatic** 10:12, 24 11:1,21 14:17

**elementary** 108:10

**Elizabeth** 22:24

**employed** 19:14

**employee** 14:19 18:25 19:9,10,11,12, 19 34:13,15,16 77:11,16,17

**employees** 22:21 43:13 45:13 49:13, 15,18 76:18,20

**encouraged** 29:1

**encroaching** 12:6

**end** 11:24 26:12 38:14 96:23 102:19

**ended** 32:15

**endurance** 6:6

**engagement** 27:5

**engagements** 37:6

**engaging** 27:1

**entailed** 25:4

**entrepreneur** 24:22

**entrepreneurs** 118:15

**environment** 101:14

**environments** 101:13 108:3

**equipment** 13:13 14:24 42:23 45:15, 18,23 46:6,7 48:2 88:8 91:8 95:22 96:10 99:7 107:22

**equipped** 95:12

**equity** 44:11

**essentially** 98:9

**establish** 53:15

**et al** 4:5

**event** 20:11

**events** 18:11



**Orange Legal
800-275-7991**

eventually 55:21

**EXAMINATION** 5:3

examine 80:9

examined 5:2

exception 104:3

excess 107:7

exchange 75:15

exchanges 75:16

exclude 79:18

executive 37:4

exercise 6:7

**Exhibit** 87:10,12,23 88:1 91:6 104:10 111:1,4

exhibits 114:12

existing 18:14

expand 20:18

expect 120:23

expenses 44:23

experience 14:4 45:25 46:2 83:16

expert 65:16 83:25 114:4

explain 6:19

explanation 7:7

exposing 92:22,23

extent 31:17,20 77:23

exterior 109:4

**F**

fabric 67:1 79:24 80:23,25 81:3

faced 60:12

facility 13:10,12 45:6 47:6 48:2 86:20 97:17

fact 23:13 40:24 63:10 74:5 84:24 114:6 115:11,21

116:25

fact-gathering 6:7

facts 6:10,11 10:22 60:9

failure 24:24

fair 35:7 50:7 61:17 70:5 73:15

fairly 92:13,20

fallout 117:12

familiar 6:4 81:3 87:14,25 108:3 115:24

familiarity 80:19

fantastic 102:9,11

fast 118:14

fastest 104:25 105:6, 8,9

Februarys 8:22

federal 60:7,8 115:18

fee 30:6,7 44:5

feedback 121:2

feel 7:13,16 66:23 80:13 118:15

feeling 66:25

feet 12:8

fellow 19:14

felt 24:18 60:22 63:23 64:4,8,21 72:8,12

fibers 79:24,25

file 100:3 106:12,16, 17

filed 112:23 113:5

film 65:22,23,24 67:5,8 79:23 80:2 94:7,16 95:18,25 99:19 105:3 106:2 110:18

film-based 94:14, 22,24 95:15,17 96:11,17 97:10,14, 25 101:5,15 103:16,

21 104:7,8,15 105:2 107:12,14 121:15

films 12:9 80:16 94:8

final 83:6,18 106:19

financial 9:14 36:23 37:16

find 100:25 115:2,3, 4

finding 25:5

finish 89:6 116:9

finished 106:13

finite 28:1

fired 49:14

firm's 115:8

Fisher 4:11

Fishermen 119:18

five-minute 89:5

fix 29:1

flat 30:6,7

Flogrown 4:4 5:11 8:5,6 18:22,23 19:2, 17 20:15,17,20 21:3, 14 23:4,6,10 24:1,8 25:24 26:3 28:12 29:8 30:10 31:17,25 32:25 34:19,22 36:13,15 37:14 38:3 39:10,17,19,22 40:1, 4,9 41:4,8,19 42:14 43:1,8,11,25 44:15 45:12,15 46:8,12 47:6,13,22 49:1,15, 18,23 50:14 52:6,15, 23,25 53:4,24 54:5,7 56:5 58:3,8,15,25 59:3,5,20 60:1,12,23 61:5,12 62:4,8,9,10, 11 63:7,8,9,14,15 64:5,19,25 65:3 67:20 68:19 69:11 71:4,7,8,10,12,14,19, 24 72:1 73:20,21 74:10,12,13 75:18 76:10,14,18,20 77:12 78:12 81:24 82:4,5,12 83:17 84:9,20,24 85:2,18,

23 86:14 87:1 91:2, 16,25 93:20 97:24 98:11,23,24 111:22 118:22,24 119:4,8, 17 120:10 121:6,8

Flogrown's 29:20 34:6,7 45:2,5

Flogrown-owned 87:1

floor 14:1

Florida 4:7,9 8:15, 17,19 9:2 13:1,3,9 19:13,14 22:13 28:12 85:4 116:20 117:13,18 118:3

fluid 121:2

Flying 119:18

focus 28:8 42:8,13, 21 44:5 73:19,21,23 74:15 81:21,22,23, 25 105:18

focused 69:25 70:1,3

focuses 43:3

foils 94:8 101:11

follow 26:3 30:15 51:19

follow-on 23:25

follow-up 100:5

food 69:7

foot 13:11 106:13

forecasting 27:3,12 29:11,13,14,15,24,25 30:2

form 67:16 79:20 100:9 106:19

formal 16:20 22:5 27:19 34:14 44:17 116:15 120:16,24

formally 26:5

format 11:14 13:23 45:24 120:14

Fort 78:20

forward 17:18 54:4 77:11

found 41:23 53:16 90:14 121:1

friend 19:8

friends 18:25 43:17

full 5:6 7:16 11:13, 20 59:25

Fund 37:18,19 120:21

fundraising 9:10

furniture 13:14

future 29:16

fuzzy 79:13,15 80:7

**G**

garment 92:14 93:6, 11,16 94:13 96:4 98:17 100:12 101:1, 3 103:20 104:3 107:9,12 108:10,14, 17 109:13 110:14, 20,22

garments 22:2 80:24 98:10 108:25

Gates 16:12

gathering 114:6 115:12,21 116:25

gave 20:19 29:25 33:21 38:13 39:12, 22 51:5 55:21 57:1, 11 61:18 62:3 118:8

general 6:15 83:17 98:25 100:23

generally 9:10 28:24,25 31:21 32:18 50:2 65:15 78:10 79:18 94:4 95:21 108:18 111:7, 10

geographic 42:17

get all 107:22

ghostwrite 116:6

gist 27:4 50:23 51:1, 2 64:17

give 4:21 7:18,20



9:24 18:19 26:5 35:2 45:17,20 49:22 51:3 56:9 65:11 82:4,6 88:18

**giving** 14:13 29:21 38:21 40:13 46:20 50:10

**glad** 103:8

**goal** 29:25

**goals** 23:19 25:5,6

**good** 5:5 8:24 28:25 53:4 79:17 106:18 118:24 122:7

**goods** 15:11 48:21

**gorgeous** 42:25

**Goshen** 7:9,17 24:13 29:23 63:19 71:9 85:24 113:7

**GPI** 105:16

**grab** 92:18,19

**graduate** 16:7

**graphic** 92:7

**graphics** 13:25 14:2 15:6 70:15

**gratification** 108:7

**grew** 14:15

**gross** 29:20

**growing** 25:2

**guarantee** 15:3,9, 10,12

**guess** 17:13 18:8 25:20 28:22 29:17 70:23 78:20 83:23 109:15 121:7

**guy** 75:18,20

**guys** 76:2

**H**

**hand** 4:20 38:22

**handful** 117:4 119:19

**handled** 53:11 112:16 114:9

**handling** 53:15

**Hands** 22:12 80:15, 18 119:8,10,13

**hands-on** 53:6

**hanging** 71:8

**happen** 32:24

**happened** 23:8 31:14 32:22 38:7 39:9,24 41:6,7 79:1 81:20 112:25

**happening** 37:9

**hard** 65:18 109:24

**hat** 88:23,25

**hats** 17:10 46:20

**head** 7:9,17 24:13 29:23 63:19 71:9 85:24 113:7

**hear** 48:1 77:6,20 111:12,15 120:20

**heard** 4:5 52:12 54:5 77:14,18,19 82:25 83:10,18 84:1 112:7

**heat** 21:6,10,23 22:7 64:22,25 65:1,6,7 66:3,8,10,12,16,19, 21 67:3,4,7,12,13,16, 20 68:13,15 69:16 70:17,18 71:5,11,14, 20 72:1,8,12,15,25 73:7,9,16,18 79:9, 16,20 80:15,20,21 81:5,15,20 83:11,19 88:10,11,15,16,17, 19,22,25 89:1,3 91:2,10,16 92:1,5, 22,24 93:1,12 94:3 97:10,22 101:1,24 108:10,13,25 109:9, 21,23,25 110:2,3,6,8, 9,10 111:3 119:24

**heat-applied** 79:19

**heat-press** 64:23

**heat-pressed** 65:3 67:22 68:4,9,18 69:20 70:2,6 77:3 80:12 100:24

**heat-pressing** 98:16

**heater** 92:23 93:2,5 109:16,17

**heating** 83:1,3

**held** 4:8 93:7

**helping** 23:14 26:15, 18 43:3 114:11 116:22

**Heritage** 4:5 52:9, 13,19,21,22

**Hesston** 16:4

**hey** 18:16 32:19 38:21 49:3 56:20 57:3 71:11,25 73:18 74:2,20 77:11 81:19 91:16 93:20 104:14 111:16 112:19

**high** 12:8 16:13

**higher** 14:25

**hire** 9:24 18:18

**hit** 100:7 104:23

**hits** 66:1

**HIX** 82:13

**HOA** 5:22

**hold** 21:15 65:6

**home** 43:21 56:6,8,9, 24,25 69:9

**homeowner's** 117:21

**honest** 25:10

**Honestly** 73:22 83:22 84:4 117:21 122:4

**hoodie** 92:15

**horizontal** 9:14 81:1

**horses** 43:6

**hot** 82:25 110:16,18, 22

**hours** 7:23 43:10 51:8

**house** 119:22 120:2

**huge** 13:25

**human** 6:22 7:12

**hunters** 28:13

**hypothetical** 104:12

**I**

**idea** 85:17

**ideally** 26:18

**identification** 87:13 88:2 111:5

**identified** 28:2

**identify** 26:16 93:15

**image** 67:2 93:5 102:24 105:14

**imaged** 79:22 81:11

**imaging** 73:11

**immediately** 110:24

**impetus** 32:14

**important** 109:20

**impossible** 79:14

**improper** 50:14

**inadvertently** 13:12

**inches** 11:15

**incident** 58:1

**incidents** 58:3

**including** 71:24

**incorporated** 12:21

**independent** 9:21, 23 31:3

**Indiana** 16:5

**industry** 9:12 16:18 83:17

**informal** 33:3,16 38:9,19

**initial** 23:8,10 24:2, 16 25:4 27:5 30:22 31:12,19

**initially** 53:16

**ink** 11:11 12:10 16:23 65:18,21,25 66:1,24 79:23 83:9,

11 100:17

**ink's** 11:13

**ink-jet** 10:12 14:9 100:17 103:24

**inks** 100:10,16

**inroads** 12:6

**inside** 13:25 45:2 47:10,12 85:9

**Insta** 88:16

**instant** 108:6

**intellectual** 60:17

**intend** 29:18

**interact** 76:4,7

**interaction** 69:5

**interactions** 76:6,11

**interchangeably** 83:14

**interest** 43:1

**interested** 100:1

**interests** 26:22 83:16

**interfacing** 33:18

**interlocutory** 114:10

**internal** 47:13

**internally** 25:19

**Internet** 46:3

**interruption** 13:15

**interviewed** 37:4

**introduce** 4:13

**introduced** 23:6

**introduction** 19:22

**inventory** 97:4

**invoice** 112:12

**invoices** 58:25 59:4, 5,7,10,16 60:4,6 84:19 112:11,17 113:3 115:16

**involve** 101:11



**involved** 6:8 33:19 50:11,15 53:13 59:12,17 60:11,15, 18 75:2 82:13 112:8, 11,13,14,15,20 115:9,15 116:1,21 117:8,10

**involvement** 35:18 36:10 49:5,7 84:17

**involving** 117:14

**issue** 59:15 60:5 73:25 74:8,9

**issues** 48:2,3,9,10,15

**item** 77:3 90:20,22

**items** 27:21 68:4 80:13 81:18

—————————

**J**

**jacket** 89:20,21,22 90:9 92:12,15,18,19, 21,22 93:7

**jeans** 109:6

**Jesse** 18:24 19:1,20, 21,23 20:1,8 23:11 35:13 38:21 40:21 41:17 42:4 43:4,17 45:11,14 47:19 48:5, 7,11,18,20 49:3,20, 22 50:1,16 52:21 53:10,11,17 54:6,16 55:21 56:10,15,16 57:1 59:11,18,24 60:14,16,21 61:2,24 62:24 63:15 64:3,8 68:23 72:20 73:1,17 74:1,17 75:7 78:1,9, 14 85:17 86:8 90:8, 20 111:20

**Jesse's** 19:8,19 39:2 40:13 42:10,13,14 47:23

**job** 34:3

**Joey** 75:17

**Joey's** 75:18

**July** 8:18

**jump** 7:4 31:11 53:13 89:15

**jurisdiction** 116:4

**just--** 114:2

—————————

**K**

**Kansas** 16:5

**Kick** 19:15

**Kicklighter** 19:15, 16,19,23

**kids** 9:1

**kind** 5:20 8:2,3 10:10 13:17 20:9,16, 22 23:22 34:4,10 38:18 47:18 58:5,6, 12 59:9 61:3 70:22, 23 74:24 82:11 83:13 85:10,19 90:22 91:9,10 93:6 99:3,6,7 101:15 107:15 112:4

**kinds** 117:6

**kiosk** 85:3,8,9,18,23, 25 86:4,9,11

**knew** 19:19,21 67:20 68:14

**knife** 96:1

**knob** 110:1

**knowledge** 10:19 49:8,13 50:1,3 74:17,25 77:24 80:12,14 81:15 82:4, 10 84:23 85:1,2,7,22 91:14 98:12 111:18

—————————

**L**

**laid** 47:6

**Lakeland** 63:2,25 64:1,2,4 76:24 77:7 78:9

**Lancaster** 36:25

**lane** 58:13 66:13

**language** 68:17 97:9

**large** 11:14 13:23 45:24 54:4 120:22

**large-format** 10:9, 12 76:10

**largely** 26:15

**larger** 120:22

**laser** 96:15 97:19 100:17 103:25 104:6

**late** 11:2,3

**law** 115:8 116:2,3, 117:2

**laws** 6:9

**lawsuit** 60:20

**lawsuit's** 8:4

**lawsuits** 6:1 117:9, 14

**lawyer** 10:21

**lawyers** 6:8 50:19 51:13,20 52:1

**laying** 97:14,15 99:4

**learn** 6:11 14:7 18:22 19:1,17

**learned** 19:3 52:9, 19,20 53:16,23 54:2, 3 77:10 81:4,12 82:22

**learning** 82:17

**lease** 85:8

**leave** 109:15

**led** 40:1 117:6

**left** 43:8 63:12 67:14 69:2 107:7

**legal** 4:12 57:23 60:14 114:11 117:2

**Leia** 4:17

**Leitner** 4:17

**lender** 36:24

**lengthy** 102:4

**letter** 67:7 107:6

**license** 116:2

**life** 8:20 15:7

**lifestyle** 20:17,21 26:21 28:12 42:15,

20

**lift** 93:5 110:9,12

**limited** 117:1

**liner** 110:21,23

**liquid** 11:10

**liquid-based** 11:4

**list** 111:8

**literally** 106:24 109:12

**litigation** 62:22 113:23,25 115:10,20 116:17 117:14

**live** 8:11,12 118:10

**lived** 8:13

**LLC** 4:4,5 5:11 12:21,22,23 13:2,3 22:12,13,15,17,19,21

**LLP** 4:8

**loans** 37:1

**local** 42:21,22

**locally** 96:4

**location** 63:10 74:18 85:3,11 86:4,15 94:18 96:12

**locations** 62:24 64:9

**logo** 46:20 73:2 74:10 82:5,17 83:3, 20 92:12 95:24 96:2 97:24 98:24 100:3 104:14 108:21

**logos** 21:11 46:14 49:24

**long** 8:13 14:12 15:10 18:2 34:18,21 39:24 41:14 53:14 56:25 61:20 89:1 95:6 116:19

**long-term** 18:14 35:13

**longer** 19:13 37:22, 25 38:2 39:23 44:5 61:21

**Longwood** 8:12,13 43:22,24 56:13

118:10

**looked** 29:21 63:12, 21

**lost** 13:15 61:19

**lot** 10:16,17,18 16:25 24:23,25 25:1 27:20 37:5 44:6 45:24 65:7 66:11 67:3 71:1 75:15 81:6 89:4 94:2,14 95:19 114:1 115:5 121:1

**lower** 93:1 108:13, 20 109:24

—————————

**M**

**machine** 96:1 99:10, 11,12

**machines** 48:16 82:11

**made** 14:3 19:22 23:13 28:21 39:9 42:4 61:3 83:20 92:14 94:10,15 95:11 96:4,5

**Mae** 4:11

**magenta** 11:10 12:11

**maiden** 23:3

**main** 10:13 50:23 51:1

**maintenance** 48:1, 3,8,10,15

**majority** 18:13 61:10

**make** 10:2 28:16 29:4 32:12 37:1,19 43:5 48:6 54:19 58:13 65:11 66:14 68:16 73:24 75:19 82:3 94:12,21 95:13, 22 96:23 97:3 101:18 104:11 108:2,4 118:20

**makers** 106:1,2

**making** 12:6 84:18 93:23 94:1 96:12,15



97:2 111:20

**mall** 85:4,9,13,14

**man** 32:7

**manner** 18:8

**manually** 109:24 110:12

**manufacturers** 16:24

**manufacturing** 9:15

**map** 114:6

**March** 36:5,7,12 39:5,6,8,15 40:18 41:2 43:19

**mark** 87:10 111:1

**marked** 87:12 88:1 111:4

**market** 26:24 27:1, 23 42:18

**marketing** 9:9 20:17,21 26:22 27:11 28:2,11 37:8 42:16

**markets** 28:6

**match** 84:18

**matched** 54:24 55:14,15

**material** 11:18 65:19 66:24 67:6,14 78:18 94:20 100:11 102:1 109:12,13,18, 21

**materials** 11:18 14:23,24 15:3 27:17 46:11 77:22 78:22 88:23 115:24

**matter** 4:3

**matters** 60:18

**meaning** 60:16

**means** 32:21 37:25 56:13

**meant** 6:6 32:23

**mechanical** 6:23 105:2

**meet** 45:10

**meeting** 23:8,10 24:2,5,7 26:2

**meetings** 27:20

**megabytes** 106:13, 18

**member** 22:15

**members** 12:23 22:17

**memorialized** 113:8

**memory** 23:7

**mention** 111:16

**mentioned** 25:3 46:6 63:2 118:5

**merchandise** 60:23 61:5 63:1 77:7 78:9, 15 85:3 86:15

**messages** 75:4,6

**messaging** 26:25 27:11 29:7,9

**met** 20:1 24:17 25:7, 24 28:14 67:13

**method** 11:12 67:4 73:11 74:5 79:14 81:23 82:1 95:23 102:25 103:1

**methods** 79:19 80:19 81:5,6 96:8 104:1

**middle** 4:6 43:3 88:8

**mind** 6:20 7:16

**mine** 114:6

**Minimal** 119:10

**Minnesota** 14:19

**minute** 56:1

**minutes** 89:17 110:15

**misprinted** 48:21, 23 49:9,11 84:24

**Missouri** 34:8

**misunderstood** 68:5

**mix** 14:23

**model** 88:20

**moment** 28:23 47:4 52:17 61:9 64:20 113:13

**money** 27:6 31:24

**month** 29:19 55:25

**months** 13:14 26:4 39:9,12,25 42:3

**morning** 5:5

**morphs** 30:19

**motion** 115:12,13,21

**motions** 114:9 116:5

**mouth** 118:20

**move** 8:17,19,25 108:24

**moved** 9:2 13:1,4,12 14:17 117:17

**moving** 13:11

**multicast** 81:2

**multiple** 5:23

**Munk** 4:11

**murals** 13:25

**mutual** 19:2

**Myers** 78:20

---

### N

**naked** 46:14

**narrow** 89:1

**nature** 6:22 7:12 32:4 76:6

**NBA** 13:18

**necessarily** 6:9 104:17

**needed** 7:8 28:19 97:11

**nephew** 18:24,25 20:9 23:14

**nephew's** 19:6 20:2, 5

**networking** 18:10

**nice** 7:5

**nods** 7:17

**nonetheless** 6:5

**nonprofit** 36:24

**normal** 45:14

**note** 5:10

**notes** 89:6 111:7 120:6

**number** 4:4 93:11 100:6,25 101:2 114:5

**numbers** 30:2 88:20

---

### O

**objection** 5:15

**observation** 90:11

**obstacles** 24:25 25:1

**occurring** 84:2

**offered** 15:1

**office** 34:1 43:20 45:2,4,12 47:10,13, 19,23 55:20 56:6,7, 8,9,25 79:1,2

**offices** 24:8 47:10, 12,14

**offline** 27:2

**oftentimes** 30:15,19

**one-pager** 115:1

**online** 27:2 28:3 37:8 42:23 45:9

**open** 67:13 110:10, 23

**opening** 66:1

**operation** 76:2

**operational** 13:16

**operations** 53:13

**opinion** 83:25 91:22

**opportunities** 24:23

**opportunity** 122:2

**optimized** 28:24

**option** 119:25

**orange** 4:8,12 70:15 118:9

**order** 105:19 108:4

**ordering** 122:9

**orders** 54:4 84:18

**organization** 120:22

**originally** 8:15

**Orlando** 4:7,9 56:14

**outdoors** 15:6

**overcome** 24:25 25:1

**overview** 7:19

**Oviedo** 63:2,3,11,22 64:24 66:19 67:17, 22,24,25 68:6,17 69:5,10,12 70:9

**owner** 18:23 44:7

**owners** 9:11 121:1

**ownership** 34:22 44:4

**owns** 121:8

---

### P

**p.m.** 89:13 121:25 122:14

**packaging** 114:6

**paid** 30:5 31:25 38:11,14 43:25 44:14

**pains** 25:2

**palm** 8:22

**paper** 11:5,7,9,11, 12,13 12:2 13:21,22 100:10 102:16

**part** 26:23 29:10 47:7 57:19 62:4 79:24 84:5 92:23 100:1 107:4 108:23

**participation** 46:10



84:14

**partner** 35:16 40:13 41:19,23 42:5

**partnering** 31:5,8, 15,24

**partners** 32:13,22, 23

**partnership** 32:4 35:12 39:10 41:18 42:2

**parts** 8:6 88:24 107:2

**party** 6:1

**past** 5:24

**pattern** 30:16

**patterns** 28:3

**pay** 30:25 59:3,6 112:11,19,22 113:4

**paying** 58:24 60:4,6

**payroll** 34:14

**peel** 93:6 102:18 107:7 110:19,20,23

**pendency** 62:2

**Pennsylvania** 8:16 13:2 15:24 36:21 37:1 117:18 118:7 120:22

**pens** 17:8 46:18,19

**people** 18:16 26:17 28:3 42:25 59:24 98:9 106:4 112:6 115:4,5 118:20

**percent** 22:19 33:4, 11,13 34:22 35:5 37:23 38:1,7,11,22 39:13,19,22 40:11 44:12 61:18 116:4

**period** 27:13 31:12 33:1,2,5 34:6 35:6 37:7 110:11 116:22

**periodically** 22:3 30:24 38:5 110:17

**permeates** 79:24

**permission** 57:14,

18 60:13 72:22

**person** 24:3,4 91:23

**personal** 62:13

**personally** 117:10

**personas** 26:22 27:11 28:2

**perspective** 53:19

**Pfaltzgraff** 13:19

**pharmaceuticals** 9:15

**phone** 5:14 24:2 45:9 54:23 75:1

**photo** 79:15,16

**photograph** 79:12, 13,17 80:4

**photographs** 79:7, 8,10 80:6,10

**physical** 80:10

**physically** 79:6

**pick** 46:11 67:18 113:8

**picked** 72:19

**pickup** 98:6

**picture** 87:11,18,19, 22 88:5,9 104:10 110:4

**pictures** 79:5 87:9

**piece** 45:23 67:10 80:2,23 88:8 91:8 94:16 96:3 102:16 104:21,22

**pieces** 70:14 107:22

**pinpoint** 25:11

**pitch** 23:24

**pivot** 8:5

**place** 75:14 86:17

**placing** 54:3

**plaintiff** 5:11 117:10,25 118:2

**plans** 37:3

**player** 20:13,14

**plenary** 114:10

**pneumatic-controlled** 110:2

**point** 12:18,19,22 15:1,16,17 17:2,12, 15 24:10 27:3 31:4, 6,7,14,23 38:16 39:12 42:3 52:14 53:11 54:20 71:4 72:19 104:21 112:20

**pointed** 70:19,23 71:3 91:24 97:7

**pointing** 71:6,23

**police** 77:14,23,25 78:3

**possibly** 59:25

**post** 115:7

**posters** 14:1

**practical** 11:3 104:1 108:6

**practice** 116:3 117:2

**practices** 25:14,18, 19 120:15

**predefined** 110:11

**preliminary** 23:22

**prepared** 112:22

**presence** 42:23

**present** 5:11 24:5

**presentation** 28:25

**president** 33:22 34:3,12,19 37:13 40:6,9 41:8 43:7,25 44:15 45:1,6 49:14 52:6,8,10,14 53:5 61:13 74:20 76:3 87:7 112:24 115:17 121:5

**press** 65:7 66:12 67:3,13 70:17,18 71:20 80:20,21 88:10,12,15,16,18, 22,23 89:1,3 91:2, 10,17 92:1,5,22 93:1,12 94:18 97:5, 22 101:1 102:18 103:25 104:24

108:6,10,13 109:9, 23 110:2,3,6,9,23 111:3

**pressed** 64:22,25 65:2 66:8,20,21 67:8 69:16 70:17 72:1,8, 12,13,15,25 73:7,9, 17,18 79:9,16 81:20 98:4

**presses** 68:13 88:19, 22,25 109:25 110:10

**pressing** 21:6,11,23 22:7 65:7 66:3,10,16 67:3,4,16,21 68:15 71:5,11,14 79:21 80:16 81:15 92:24 101:24 119:24

**pressure** 67:12 93:3 109:19,22,23,24 110:5,8

**pretty** 76:1 93:8 103:3 108:10 112:21

**price** 14:25 49:4

**primarily** 80:21

**print** 11:4,5,14,17 12:8 14:11 17:2,4 42:16 46:5 49:23 67:11 71:17,20 74:2 81:7 82:5 97:4 100:8 103:19,24 104:23,24 106:14

**print-based** 105:7, 9,15 107:13,14 121:16

**printed** 14:1 47:8 48:22 80:23,25 81:10 96:21 101:25

**printer** 12:14 14:9, 12,14,16 45:24 46:7 76:10 84:12 96:15 97:19 100:8,13,14, 15,17,19 103:24,25 104:4,6 106:1,22 107:15,24 119:21 121:14

**printer-based** 104:20

**printers** 14:17 100:21 121:12,14

**printhead** 11:8

**printing** 9:6 10:7,9, 10,12,13,24 11:1,6, 12,20,22,23 12:1,3,7, 15 13:17 14:5,18 15:15 16:18 21:3 48:15 65:12,14,16, 17 66:2,4,8 67:15 73:6 74:5 76:1 79:14,19 81:3,15,23 82:1,11,16 83:6 84:7 86:21 99:10 100:9, 10 102:25 105:7 117:16,17 119:2

**prior** 28:21 101:25 122:1

**priority** 35:25

**pro** 20:14 34:9

**problem** 36:9 40:23

**proceeding** 5:15

**process** 6:23 11:21 48:20 65:17 82:16, 25 83:3,20 84:2 91:18,21 92:12,20 98:16 102:3,5 103:10,17 104:13 105:2 107:11 111:3 113:2

**processes** 15:3 100:24

**produce** 20:18 27:17 74:13,14

**produced** 72:21 73:22 77:23 81:25 90:3

**product** 13:20 14:3, 11 15:1,4,8,9,12 21:25 26:17 27:25 28:4,5 43:1 52:22 54:7,12,14,19,21,24 57:13 63:6,8,13,14, 15 64:6,18,22,23 65:1,3,24 66:22,23, 25 68:1,9 72:21,24 73:20 77:12 78:12 79:21,23 80:11 81:23 86:7,25 91:2 92:17 93:7,23 94:1,2 96:16 105:20 109:1



**production** 46:9
47:7,16,17,23 62:4
75:18,20,21,24 76:9
82:14 121:6,7

**productive** 10:3

**products** 21:12
46:14,15 47:2 49:11,
23 54:16,17 63:10
64:9,25 65:8 66:19
67:22 68:19 69:11,
15,20 70:2,7 75:21
76:15,19 82:5,6
94:3,8,9 118:19

**professional** 119:1

**profile** 26:16

**program** 14:22,23
15:13

**prohibitive** 12:9,12

**project** 22:4 37:9

**Promo** 12:18,19,22
15:15,16,17 17:2,12

**promote** 118:17

**property** 60:18

**proposal** 26:5,9,11,
13,15 32:4 33:6

**proprietorship**
9:19 114:22

**prospective** 23:18

**protect** 108:17

**provide** 98:21

**provided** 21:7,9
26:13 31:17 62:2

**provider** 93:22

**providing** 37:11,12
60:1 114:3

**Proximity** 56:11

**public** 98:25

**pull** 93:7 115:23

**purchase** 46:8

**purpose** 11:16 21:18
24:11

**purposes** 5:10 37:2
46:9

**pursuing** 113:21

**put** 11:17 12:10 15:3
20:12 25:15 56:5,24
65:17 67:10 92:21,
22,25 98:9,17
100:11 107:24 108:9
109:5 115:8

**puts** 116:6

**putting** 43:11 84:14
101:20

---

**Q**

**qualified** 50:6 83:22

**qualify** 79:6 93:24
107:16

**qualifying** 51:3

**quality** 8:20 105:14,
19,23,24

**quarter** 29:19

**question** 6:14,16,18
7:2,8 17:1,22,23
21:15 40:3 42:7
60:24 66:13 68:5
81:22 83:4 85:16,19
87:21 96:7 97:1
98:23 100:5 105:18

**questioning** 102:13

**questions** 5:17 8:7
23:22 40:7 65:9
66:17 87:24 89:16,
17 103:9 121:19
122:7

**quick** 101:16,17,23
104:13 120:6

**quickest** 104:16,17,
18,20

---

**R**

**rack** 55:13

**raise** 4:19

**ran** 76:1

**range** 59:25 65:7
76:12 81:12 101:11
114:13

**reaction** 39:2

**read** 77:22,25 115:7,
9 122:2,6

**ready** 7:16 96:24
97:4,5 108:5

**real** 120:6

**realization** 39:10

**realtime** 120:18

**reason** 8:24 74:3

**reasons** 41:22

**recall** 13:5 19:24
21:4 25:12 26:1
28:10 30:3,4 32:2
34:20 38:4 47:3
52:17,18 56:1,2
61:7,9 63:5 64:7,8,
20 71:6 75:13,16
85:24 86:10 97:16
99:6 111:20 113:2
117:22 120:16

**receipt** 59:9

**receive** 11:8

**recess** 89:11

**recognized** 53:3

**recollection** 24:21

**recommend** 46:10,
12 49:3

**recommendation**
29:4

**recommendations**
18:20 27:18 28:16
29:8,21 31:13,19
40:14 45:17,21 46:1
120:10,12

**recommended** 28:7
46:7 60:15,17
105:24 109:8

**record** 5:9 89:9,12
112:6 121:25

**record's** 7:5

**recorded** 111:13,17

**recording** 111:19,
21,23,24,25 112:3,4

**recovery** 112:16

**refer** 115:6 118:20

**reference** 23:13

**referenced** 32:5

**referral** 115:4

**referrals** 18:16

**referring** 12:1 66:4
88:19 90:5

**refers** 104:6

**refocus** 104:10

**registers** 59:8

**reimbursed** 44:22

**relates** 98:10

**relation** 65:12

**relationship** 30:18
32:10 33:3 35:20
37:23 44:4 53:11,18
60:16 120:17,21

**relationship's**
121:1

**relationships** 18:15
30:15 53:14

**relevant** 119:14

**remained** 59:16

**remember** 13:4
25:9 27:19 34:7
50:22 55:3 70:13,21
71:16 75:25 76:1
90:24 113:12 122:6

**remind** 6:5 7:11

**remove** 67:12,14

**rephrase** 6:19 48:24
60:24

**report** 77:25 120:24

**report-type** 120:14

**reporter** 4:10,14,19
7:6 122:9,13

**reports** 18:20 27:19
59:16

**represented** 71:2

**request** 62:4

**require** 92:24

**requirements**
109:14

**requires** 7:2

**research** 46:3
114:11

**resolution** 105:19
106:4,9,11

**resource** 59:24

**resources** 94:14

**respect** 60:8 74:18
83:5

**responding** 7:3

**response** 75:10,13

**rest** 51:4

**restate** 83:4,5

**restless** 16:10

**restroom** 7:25

**retail** 86:25 101:13,
14 108:3

**retain** 30:10

**retainer** 30:6

**review** 120:6,24

**revolved** 61:10

**rhinestone** 21:25
22:1 42:22,24 43:2
109:1,3

**rhinestones** 109:4

**riding** 43:5

**roadmap** 7:20

**roads** 12:6

**role** 8:5 34:19 43:8
53:9 80:8

**roles** 41:12

**room** 121:6

**rules** 6:4

**run** 46:14

**running** 35:15 60:19

---

**S**

**safe** 13:20



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA                                                                Index: salary..store

**salary** 44:2,8,18,24

**sale** 54:4 74:7

**sales** 23:24 29:13,14, 15,17,18,20,24 34:7 52:21 53:1 119:7

**Sanford** 54:8 56:2 63:1 68:9 70:11 74:18 90:5,13,25 99:2,13 100:20

**Santiago** 19:7,23 20:10

**sat** 5:18 7:19

**school** 16:5,6,13

**schools** 16:4

**Scotch** 14:22

**screen** 11:20,23 12:1,3,6,8,15 21:3 48:15 65:12,14,16, 17,21,24,25 66:2,4,8 73:6 76:1 81:7 82:11,15 83:5 84:11 96:21 99:10 119:21

**screen-based** 106:20

**screen-printed** 66:22 67:2 72:25 81:7,10 82:18 94:7, 11 95:2,3,5,7,16 98:15,17,19,24 99:3, 8 101:6 107:13

**screen-printing** 99:11,12 102:3

**screens** 12:10

**secondary** 73:22 82:1

**section** 47:17

**seek** 24:9

**self-education** 16:25

**sell** 20:25 42:16 48:21 49:4 56:21 85:3,9 86:7,18,22,25 90:20,21 97:24 98:2, 11,24

**selling** 26:17 27:2,25 60:22 61:5 62:25

86:5,15

**sells** 76:11

**Seminole** 68:12 97:6 118:9,11,12

**send** 98:21 116:9

**sending** 106:12 119:20

**sense** 23:22 32:12 43:5

**separate** 114:19

**series** 31:13

**served** 35:14,17

**service** 44:5

**services** 9:15 21:9 30:8,9,11 31:16 32:1 36:23 37:12,16 60:1 114:3 115:10,20

**sessions** 20:3

**set** 11:7 30:16 44:17 95:6 117:1

**sets** 66:24 116:24

**shake** 38:22

**shakes** 85:24

**shaking** 7:8

**shape** 96:2 105:3

**shared** 78:11

**sharpen** 17:23

**sheet** 12:7 67:6 95:25 106:25 109:2

**shift** 118:25

**ship** 84:15

**shirt** 46:17,18 55:4, 18 56:21 57:4,7,9 71:4,7,8,10 72:8,10, 11,14,19 73:1,2,14, 25 74:1,3,4,9,15,16, 21 79:25 81:11 82:18 90:17,23 91:16,25 92:7,12,15 93:20 95:18 99:21 101:20 104:14 107:4

**shirts** 49:8 55:8,14, 15 67:18 70:24

71:15,23 74:2,18,22 84:7,11,15,18,25 85:10 98:4

**shops** 95:8 108:1

**short** 33:1 41:13 116:19 121:17

**show** 46:10 59:8 75:8 81:2 87:9,23 91:5,6 110:25

**showing** 59:16 75:10

**showroom** 47:18

**shows** 59:8

**side** 12:15,16 32:14, 15 106:14 114:5 119:16

**signed** 15:12

**simply** 45:22 54:21 56:20 83:25 90:2 96:16

**sir** 5:5

**sister** 16:6

**sit** 5:20 7:14 20:3 110:15 113:8

**sitting** 47:20 50:9 55:8

**situation** 57:22 58:5 83:18 92:11

**size** 105:15 106:9,13, 16

**skill** 116:24 117:1

**skills** 117:3

**skin** 102:18

**small** 9:11 16:4,5 21:21 36:24 37:1 42:21 112:23 120:25

**socioeconomic** 26:21

**sold** 54:8 63:7,8,10, 20 64:6,19 73:21 74:12 78:12 81:24

**sole** 9:19 114:22

**solemnly** 4:20

**solid** 67:6

**somebody's** 106:7

**someone's** 99:24

**something's** 6:20

**sort** 20:13 67:9 77:14 82:19 102:24 109:25 110:1

**sotto** 120:4

**sounds** 29:15 82:24 108:10

**source** 107:19

**South** 4:8

**space** 85:19 116:25

**spawned** 117:13

**speak** 5:12 6:21 51:13 78:5

**speaking** 58:10 95:21

**specialist** 4:11

**specific** 30:1,15,16, 25 42:18 44:22 59:15 68:7,23 69:18, 22,24 71:6 85:5 88:15 92:8 113:9,11

**specifically** 17:1 50:8 53:18 71:25 97:20

**specifications** 106:8

**specifics** 19:24 26:1 55:3 63:5,18 64:7 78:10

**speculation** 20:7

**speed** 28:24

**spend** 15:7 68:6

**spending** 121:20

**split** 43:15 44:11

**spoke** 50:16

**spoken** 51:25

**spot** 94:12,15 97:8, 11 101:16 103:15, 18,20,23 108:20,22

**square** 106:13

**staff** 37:4

**stage** 13:13

**standard** 89:2,3 91:9,10 106:3

**standards** 106:2

**standing** 91:15

**Starbucks** 6:25

**start** 7:3 8:1,10 13:1 15:20,24 30:16 33:17,18 36:1 40:18 61:6 81:7 86:15 95:24 99:23 105:22, 24 116:14

**started** 5:8 9:16 11:2 12:25 14:9,14 18:3 24:1 29:21 31:9,23 32:18 33:6,8,20 35:10,21 36:6 39:4, 15 41:24 43:19 80:18 117:4,7

**starting** 41:9 42:19

**state** 5:5

**States** 4:6

**stay** 56:25

**staying** 43:3

**stays** 108:20,25

**step** 83:6,16,19 93:14,16 101:3,25 107:11 108:8,11,16 110:8

**steps** 23:25 92:2 93:9 105:5 109:20 111:7,10

**stickers** 98:9

**stickiness** 109:2

**sticks** 11:11 109:6

**stop** 34:24 35:11 37:20,22,24,25 74:21 93:18

**stopped** 15:18 34:25 35:1,10,20 37:21 38:8,20 39:21 61:18, 23

**store** 54:8,12,13 55:5 56:2 63:2,3,8,11,12,



22,25 64:1,2,4,6,24
66:19 67:17,22,24,
25 68:6,10,15,17,22
69:5,11,12 70:9,11,
13 71:2 72:15 76:24,
25 77:1,7,13 78:9,
13,16,17,19,23 81:8
86:21 87:1 90:4,5,
12,13,25 91:14,24
93:19,23 97:2,6
99:3,13 100:20
105:11 108:5

**storefront** 85:10
86:14,16,17 87:2

**stores** 14:1 86:23,25

**story** 14:12 116:19

**straddled** 76:12

**straightforward**
92:13,21

**strategic** 37:3

**strategy** 9:9

**strength** 28:10,11

**strong** 28:9 117:3

**structured** 120:23

**studied** 27:24

**stuff** 14:7 20:22
45:14 70:20 81:13
117:6

**sublimated** 95:12
96:21

**sublimating** 80:23

**sublimation** 94:6
100:16,17 119:16

**submit** 116:8

**subpoena** 51:19

**substance** 25:12

**substrate** 65:18
66:2 67:11,15

**Suite** 4:8

**superior** 15:12

**supermarkets**
13:19

**supervises** 75:24

**supervisory** 49:17

**suppliers** 16:24

**supplies** 13:14 15:2

**support** 59:19,21
115:10,20 116:17

**supporting** 115:9

**supposed** 11:9

**surfers** 28:13

**surprised** 50:24

**swatches** 80:22

**swear** 4:14,20

**sweatshirt** 89:23,24
90:9

**switch** 109:22

**sworn** 5:1

**symbolic** 38:12

**synthetic** 79:25

**system** 100:16

---

**T**

**t-shirt** 48:25 58:5,6,
9,10,11,12,15,18
89:3 91:25

**t-shirts** 17:2 20:25
21:11 42:16 49:2
65:13

**takes** 105:4

**taking** 66:17 101:20
104:21

**talk** 31:7 64:23 78:3
86:2 111:13,15
118:18

**talked** 23:17 26:4
27:2 45:13 70:11,12
76:8,9,10 77:17 78:1
85:17 101:7 108:9
112:9

**talking** 7:1 22:6
31:4,15,24 52:23
68:17 83:12 91:1
93:10 94:3,25
101:20 111:17

**tank** 54:18,22 58:2,
7,20 60:5 90:14,16,
21

**tap** 12:13

**tape** 108:24,25

**tapping** 28:7

**target** 67:11

**targeted** 42:18

**targeting** 9:13

**tattoo** 102:14,16,19

**teal-colored** 74:1,2,
3

**technologies** 10:14

**technology** 11:1,4,
16 12:5

**telling** 55:9 58:1
64:5 67:21 69:21

**temperature** 67:13
82:23 93:1,3 108:15
109:8,19

**temporary** 102:14,
16

**tend** 111:9

**term** 66:4 83:10

**termination** 39:8

**terminology** 83:2

**terms** 10:18 101:17

**test** 10:19

**testified** 5:2

**testimony** 4:21
65:11 89:25 90:2

**text** 75:3,6 96:2

**textile** 65:19

**texting** 74:25 75:3

**texture** 67:1 73:6

**thing** 7:6,12 8:1 10:5
12:14 20:13 43:4
83:7 95:9 116:9

**things** 5:9 6:15 9:4
10:3,15 16:24 20:4
21:11 25:3,16 30:16,
19,20,25 33:23

34:10 38:6 41:2 47:7
63:20 70:19 76:12
78:22 89:4 91:11
95:18 104:5 114:5,
13 115:11,19
120:20,23

**thinking** 118:25

**Thomas** 4:11

**thought** 35:13 61:4
62:25 63:4 64:11,15
73:9 78:15 89:25
90:8

**thousand** 105:16

**thread** 92:21

**throw** 49:5

**tie** 89:2

**time** 4:10 7:24 9:5
10:11,14 12:5 15:23
19:25 24:20 27:13
31:1,12,17 33:1,2,5
34:6 35:6 36:14
37:7,10,12,13 40:25
47:3 50:16 52:20
53:14 54:4 55:7
61:8,21,22 63:19
67:13 68:6 87:8
89:10 90:12 93:2,3
94:10,13,21 96:5,16
107:17,23,25 108:25
109:15,19,21 110:7,
11 111:13 112:24
116:22 121:19,20
122:10

**time's** 110:13

**Time-wise** 113:5

**timeline** 27:10

**timer** 110:13

**times** 5:23 44:19,21
60:21 61:2

**title** 33:17,21

**today** 5:8,11,14
6:10,14 7:11,14,21
8:6 10:16,18 13:6
18:5 43:17 50:9
51:11,18,20,23
112:9 117:7 121:20

**Today's** 4:9

**told** 16:17 20:22
28:19 31:18 50:25
51:22 52:2,3 57:6,21
65:14 66:5 68:3 75:7
78:21 104:5

**toner** 11:5,11 100:18

**toner-based** 100:16

**toners** 11:5

**top** 29:23 54:18,19,
22 58:2,7,20 60:5
63:18 90:14,16,21
92:23,25 93:2,5
107:3 108:20 113:7

**Torgeman** 74:20
111:14

**touch** 67:18 73:2

**touched** 73:10

**tournaments** 20:12

**Town** 68:12

**trade** 8:22 46:10
62:20,21 81:2
114:21

**trained** 14:18,20,21
16:23

**training** 15:2 16:17,
18,20 20:2,11,14

**transcribe** 7:9

**transcript** 122:10

**transfer** 22:1 42:22
67:9 81:5,7,9 92:13,
16,19,25 93:4,6,15
94:3,11,12,15,19,23,
24 95:3,15,16,17
96:11,17,20,23
97:25 98:15,17 99:8,
15,20,23 100:6,11
101:2,4,5,6,15,17,18,
19 102:2,4,5,8,21
103:10,11,15,16,20
104:7,15,21 105:16
107:12 108:19,21
109:1,13 110:21

**transfer's** 108:23
110:22

**transferred** 33:11
103:5



Flogrown LLC vs Dixie Heritage LLC
DAVID ACOSTA

**transfers** 22:1 42:24 94:7,9,22 95:7,10, 12,15 97:4,10,13,15, 16 98:19,22,24 99:3, 6 101:8,10 103:3 106:20 107:13,17,23 121:16

**transition** 13:9 116:20 117:13

**transitioned** 44:4

**transparent** 21:17 122:5

**trash** 49:3

**travel** 63:11

**travelled** 34:9

**treat** 31:2

**trees** 8:23

**trial** 114:12

**troubleshooting** 20:4

**truck** 98:6

**trucks** 13:23,24

**true** 95:10

**trust** 30:18 32:11

**truth** 4:22,23

**turn** 100:5

**turned** 14:16

**two-thirds** 47:16

**type** 9:12 16:21,24 21:22 31:22 35:15 45:17 55:4 64:18 65:7 66:16 79:18 88:11,13,17,19 89:3 93:4 94:2 97:16 100:8,13,14 105:15 109:18 110:17 116:16 117:19 121:14

**types** 14:15 80:4 81:6 88:18,21,23 89:4 94:2,8 95:15 97:12 101:8

**typical** 25:2

**typically** 92:4 95:11

---

**U**

**uh-huh** 7:10

**uh-uh** 7:10

**Um-hmm** 55:12

**understand** 16:11 17:21 26:18,23 27:23 39:7 42:7 47:5 50:8 57:8 70:1 82:16 83:24 90:18 100:24 101:3 102:4 104:15 116:11

**understanding** 6:15

**understood** 6:17

**unhappy** 43:7,10,13

**United** 4:6

**unlike** 6:24 120:21

**unpaid** 59:16 112:17 115:16

**unusual** 6:24

**updates** 45:11

**UPS** 13:19

---

**V**

**vans** 13:24

**variables** 95:19

**vendors** 33:19

**venture** 24:22,23

**verbal** 18:19 121:3

**verbally** 33:14

**verify** 54:9

**version** 14:13 116:19

**versus** 4:5 94:14

**vertical** 81:1

**vice** 33:22 34:3,12,19 37:13 40:6,9 41:8 43:7,25 44:15 45:1,6 49:14 52:6,8,10,14 53:5 61:12 74:20

---

76:3 87:7 112:24 115:16 121:5

**video** 4:11 121:24

**vinyl** 11:18,19 95:23 96:13 97:17 103:21 104:6 106:21,23 107:1,2,3,4 121:8,9

**virtual** 45:9

**visibility** 86:6

**visible** 14:3

**visit** 34:8 63:13

**voce** 120:4

**voice** 111:18,25 112:4,6

**voicemail** 112:1,4

**volume** 53:4

---

**W**

**W-2** 34:16

**wage** 44:23

**waive** 122:3,8

**walk** 91:14,17 104:12

**walked** 63:12 68:18 91:24

**walks** 103:18

**walls** 71:2

**want--** 92:5

**wanted** 8:22 14:11, 24 15:11 23:11 25:11,13 50:19 54:9

**water-based** 100:15

**Watson** 4:8,16 5:4 87:15 88:4 89:14 111:11 120:5 122:1, 11

**ways** 24:12,14 66:12 67:4 100:6

**wearable** 80:24

**wearables** 20:18

**wearing** 112:5

---

**website** 28:14,16,19, 21 37:8 114:24 118:17,18

**weeding** 105:4

**weeks** 45:7

**Welch** 19:1 23:6,11 24:9,17 26:3 35:13 36:6 52:1 76:13,17 81:14 111:12,23

**When's** 50:16

**wide** 12:7 14:9 81:11 101:11 114:12

**wife** 9:1 14:18 21:21 22:11,15,19,22 23:2 35:21 36:2 39:4,16 40:18 41:9,24 42:2, 5,11,18 43:4,19 52:2 69:7 113:18 118:13

**wife's** 22:23 42:13

**window** 98:8

**wire** 112:5

**woman's** 54:18 58:2,7,20 60:5 90:14

**word** 37:20 114:18, 19 118:20

**words** 53:20 74:19 92:14 102:23 114:17

**work** 13:18,20 14:10,14 20:1 21:22 26:6,23 27:20 29:5 30:15,19 32:12 35:13 36:22 37:5 40:1,4 44:6 45:9 105:16,17 113:16, 21,23 114:1 115:5 116:4,16 117:4 118:19 119:16,17,20 120:11

**worked** 20:21 39:11 43:21 61:12 84:6

**working** 30:18 33:17 40:23 41:4,7 75:21 117:6 120:20

**workshop** 16:24

**wrapped** 13:24

**writing** 34:5 93:9 108:9 114:12

---

115:12,13,21 117:3

**written** 26:9 27:17 33:10 61:24 120:9, 12,17

**wrong** 49:2

**wrongly** 48:22

**wrote** 91:9

---

**Y**

**year** 8:14 17:20 19:3 29:18 31:8 35:3,7 52:19 55:25 113:10, 12 119:11

**years** 8:14 16:23 32:9 37:5 80:17 81:4,12

**yellow** 11:9 12:11

**Yesterday** 50:17

**young** 32:7

**youth** 20:11





DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE: 4/5/18  RPTR: MG
PENGAD 800-631-6989





DEFENDANT'S
EXHIBIT NO. 2
FOR IDENTIFICATION
DATE: 4/5/18   RPTR: MF

# Heat Press Process

① Need a garmet

② Need art to transfer on garmet
  ⓐ Print based     ⟩ Need printer unless have them
  ⓑ Film-based      ⟩ ahead of time
  ⓒ screen printed
  ⓓ Dye sublimated

③ Put garmet on heat press

④ Lower heat press on garmet — heat is material
                                    dependent

                                 time is material
⑤ Lift heat press                  dependent

                                 pressure is material
                                    dependent

⑥ Remove product after it cools

**DEFENDANT'S**
EXHIBIT NO. 3
FOR IDENTIFICATION
DATE: 4/5/18  RPTR: MF
PENGAD 800-631-6989