UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FLOWGROWN, LLC,

      Plaintiff/Counterdefendant,

Case No.: 6:17-cv-983-Orl-18-GKS-GJK

v.

DIXIE HERITAGE, LLC,
ASHER TORGEMAN, and
ALBERT TOURGEMAN,

      Defendants/Counterplaintiffs.

## PLAINTIFF FLOGROWN'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DEFENDANTS' COUNTERCLAIMS

Plaintiff, Flogrown, LLC, moves, under Federal Rule of Civil Procedure 56, for partial summary judgment regarding Defendants' Counterclaims and as grounds therefor, states as follows:

Flogrown sued Defendants for trademark infringement, unfair competition, and unfair trade practices. Defendants responded by counterclaiming against Flogrown for (1) violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), §§ 501.201, et seq., Fla. Stat., and (2) defamation. Flogrown now moves for partial summary on Defendants' two counterclaims because Defendants have failed to provide admissible evidence in discovery that would support these claims.

The deadline for "dispositive motions" in this case is May 11, 2018. [DE 44, p. 2]. A "dispositive motion" is a motion seeking a ruling on the merits of a claim. A dispositive motion allows the court to dispose of an issue or a claim through an order in

response to the motion. A motion for summary judgment is an example of a dispositive motion. *Bouvier's Law Dictionary* (Lexis).

## ALLEGATIONS AND EVIDENCE

This section details Defendants' allegations against Flogrown in Defendants' Counterclaim and summarizes the relevant evidence that has been produced during discovery.

**Allegation:** (1) The first count of Defendants' Counterclaim alleges that Flogrown violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) by engaging in deceptive and unfair trade practices by contacting several of Dixie's vendors, including Bucked Up, DTF, Country Life, and Local Brand Only, and telling the vendors that Dixie sells counterfeit merchandise in its retail locations and that Flogrown did this to stifle and chill fair competition in the market. [DE 29, ¶ 31, 32].

(2) The second count of Defendants' Counterclaim alleges that Flogrown committed defamation against Defendants by making false and defamatory statements concerning Dixie and Asher Torgeman when it contacted Bucked Up, DTF, Country Life, and Local Brand Only and stated that Dixie and Asher Torgeman made counterfeit goods for re-sale at Dixie's retail locations. Defendants claim that this was an unprivileged publication to third parties made without reasonable care as to the truth or falsity of the statements and that Defendants suffered actual damages and reputational harm from the statements. [DE 29, ¶¶ 35-38].

**Evidence:** Defendants have presented no direct evidence from any vendors, including Bucked Up, DTF, Country Life, and Local Brand Only, or from anyone else, that Flogrown told them that Dixie sells counterfeit merchandise in its retail locations,

nor have they produced any testimony of any kind from witnesses to Flogrown's alleged statements to those vendors. Yeniset Torgeman of Dixie states in her deposition that Jesse Welch of Flogrown "was contacting John from Bucked Up, telling him we have counterfeit." She stated that she knew this because "John called Asher and told him." (Exh. 1, Y. Torgeman depo., pp. 102-03). Yeniset also stated that she thought that Jesse contacted some of his vendors and asked them to stop selling a competitor's product, but when asked if she had any proof of that, she replied, "I don't personally, no." (Exh. 1, pp. 105-06). Asher Torgeman of Dixie states in his deposition that Jesse Welch made derogatory statements about Dixie Heritage stores "many times" to people that Asher worked with, customers, and people that worked in the office of the malls. (Exh. 2, Asher Torgeman depo., pp. 67-68). He said that Jesse Welch told Dixie's employees "and a lot of customers" not to buy from Dixie because their goods were counterfeit. (Exh. 2, p. 70). Asher Torgeman did not state any specific examples of Flogrown making derogatory remarks to anyone from Bucked Up, DTF, Country Life, or Local Brand Only.

**Allegation:** Defendants' Counterclaim accuses Flogrown of approaching Simon Property Group, the landlord who owns the retail locations in which Dixie is a tenant, and requested that Simon Property Group lease space to Flogrown. [DE 29, ¶ 16].

**Evidence:** Defendants have presented no direct testimony or other evidence from owners or agents of Simon Property Group that Flogrown ever asked Simon Property Group to lease space to Flogrown, nor have any witnesses stated that they witnessed anyone from Flogrown make such a request of Simon Property Group. Yeniset Torgeman of Dixie stated in her deposition that Jesse Welch of Flogrown "contacted Crystal and TJ – the leasing managers for the – the malls that we were in . . . saying that he wanted to

3

open a kiosk with Flogrown." When asked how she knew that Welch reached out to Crystal at the mall, she replied, "Crystal told us. . . . She said, 'This guy, Jesse, called, he wants to open a kiosk of Flogrown.' And I flat-out told them, 'No, you can't compete with Asher. He already has Flogrown there.'" (Exh. 1, Y. Torgeman depo., pp. 103-04). Asher Torgeman of Dixie stated in his deposition that Crystal and TJ told him that Jesse Welch tried to lease space in their properties. He said that TJ sent him an email. (Exh. 2, Asher Torgeman depo., pp. 68-70). Defendants produced a Facebook exchange in which a "TJ Hoffmann" had an exchange, apparently with Asher, in which Asher asked, "Remember last year when Jesse from the Brand FloGrown contacted you about opening a location in Oviedo . . . do you remember if it was near Christmas and did he tell you we were selling counterfeit?" TJ replied, "I do no[t] think he said you were selling anything counterfeit." Asher asked: "So Jesse only contacted you to open a Flogrown store," to which TJ replied "yes." Asher commented: "Jesse had contacted Crystal at Sanford and told her that he wanted to open there; when she refused him, she asked him why he wants to . . . he said because all our stuff was counterfeit . . ." (Exh. 3).

**Allegation:** Defendants' Counterclaim accuses Jesse Welch of Flogrown of coming into one of Dixie's retail locations and purchasing over $800.00 in Flogrown merchandise which he told Dixie employee Rebecca Goodine was "counterfeit." [DE 29, ¶ 19].

**Evidence:** In her deposition, Rebecca Goodine never stated that Jesse Welch told her that the goods he purchased were either "fake" or "counterfeit." Instead, she said that her manager Patti Rumore told her that Defendants sold counterfeit goods and that when she called supervisor/owner Yeniset Tourgeman after Jesse Welch bought over $800 of

4

merchandise at Defendants' store, Yeniset told her to put the "fake" Flogrown products in the back. [DE 53, Goodine deposition, pp. 25-28, 39-40]. Goodine told police that she learned from her manager Patti that some of the clothes sold at the store were "fake." (Exh. 4, Police Report, p. 8).

**Allegation:** Defendants' Counterclaim alleges that Jesse Welch either knows or made contact with Dixie employee Rebecca Goodine, and requested that she file a police report with the Lakeland Police Department to report that Dixie was allegedly selling counterfeit merchandise. [DE 29, ¶ 26].

**Evidence:** Rebecca Goodine states in her deposition that she called the police because she believed that Defendants were selling counterfeit goods and that Jesse Welch never paid her or coerced her to call the police. [DE 53, Goodine depo., pp. 53-57]. She stated that she did not know Jesse Welch before he came to the store and bought over $800 worth of merchandise and that she had had no contact with him before or since that incident. [DE 53, Goodine depo., pp. 40-41, 45, 46, 50, 57]. Yeniset Torgeman admitted in her deposition that she had "no evidence" that Jesse Welch called the police or caused Rebecca Goodine to call the police. (Exh. 1, Y. Torgeman depo., p. 126). Asher Torgeman admitted in his deposition that he didn't know if Jesse Welch called the police and didn't have any proof whether Welch called the police or not. (Exh. 2, Asher Torgeman depo., pp. 85-87).

**Allegation:** Defendants' Counterclaim alleges that on December 9, 2016, Jesse Welch confronted one of Dixie's managers and stated that he was there to "verify" if Dixie was still selling Flogrown merchandise. When Jesse Welch discovered that Dixie

5

still had Flogrown goods for sale, he stated to the manager that she will "see what happens to her." [DE 29, ¶ 24].

**Allegation:** Defendants' Counterclaim alleges that on December 21, 2016, Jesse Welch spoke with the Lake County State Attorneys' Office and stated that Dixie was selling counterfeit merchandise, thus causing a false criminal complaint to be filed against Asher and Albert Torgeman, Dixie's owners. [DE 29, ¶ 27].

**Evidence:** Defendants have presented no evidence that Jesse Welch spoke with the Lake County State Attorney's office about Dixie's merchandise. They did provide a police report, which shows that Rebecca Goodine contacted the police, who then contacted Jesse. (Exh. 3).

## MEMORANDUM OF LAW

### 1. Summary Judgment Standard

Under Rule 56, a court must grant summary judgment if the moving party shows that there is no "genuine dispute" as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party makes such a showing, the burden shifts to the nonmoving party to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings. *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007). Evidence that is inadmissible at trial may not generally be considered

at summary judgment. *See* Fed. R. Civ. P. 56(c)(2) and (4); *Josendis v. Wall to Wall Residence Repairs Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011). Summary judgment is appropriate where there is a lack of evidence to support a claim. *See Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003) (affirming summary judgment where there was a lack of evidence against certain defendants); *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1317 (N.D. Ga. 2002) (granting summary judgment based on lack of evidence of general causation); *see also* Fed. R. Civ. P. 56(c)(1)(B) (assertion that a fact cannot be disputed may be supported by showing that adverse party cannot produce admissible evidence to support the fact).

**2. Defendants have produced no admissible evidence that Flogrown told any of Dixie's vendors that Dixie sold counterfeit merchandise.**

Defendants allege exactly the same behavior under each of the two counts in their counterclaim, namely that Flogrown told at least four of Dixie's vendors that Dixie was selling counterfeit merchandise. Yet Defendants have not produced a deposition, an affidavit, or a declaration of any kind from any owner or agent of any of Dixie's vendors that anyone from Flogrown made such statements to them. Nor have Defendants produced any such evidence from anyone who claimed to be a witness to such statements.

All that Defendants can produce to support these allegations are inadmissible hearsay statements. Yeniset Torgeman of Dixie states that Jesse Welch of Flogrown "was contacting John from Bucked Up, telling him we have counterfeit." She stated that she knew this because "John called Asher [Torgeman of Dixie] and told him." (Exh. 1, Y. Torgeman depo., pp. 102-03). This is "hearsay," defined as a statement not made while testifying at the current trial or hearing and offered to prove the truth of the matter

7

asserted. Fed. R. Evid. 801(c). John did not testify at the deposition and therefore his statement, offered to prove what Jesse said, is hearsay. Hearsay is inadmissible unless the statement is defined as not hearsay by Fed. R. Evid. 801(d) or falls into one of the hearsay exceptions. Fed. R. Evid. 802; *United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010). Additionally, testimony is inadmissible if it is not based on personal knowledge. Fed. R. Evid. 602; *Great Am. Ins. Co. v. Moye*, No. 8:10-CV-00330-EAK-TGW, 2010 U.S. Dist. LEXIS 83320, at *5-6 (M.D. Fla. July 19, 2010) (affidavit inadmissible where witness could not actually perceive or observe that to which they testified). Yeniset did not purport to have actually heard what Jesse said to John.

Furthermore, Yeniset's statement is hearsay upon hearsay: Yeniset saying what Asher told her that John said that Jesse said. Neither Yeniset nor Asher claimed to have witnessed what Jesse said to John. Hearsay within hearsay is admissible only if *each part* of the combined statement is subject to a hearsay exception. Fed. R. Evid. 805; *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280 (11th Cir. 2009). Thus, even if Jesse's statements might be admissible as an opposing party's statement under Fed. R. Evid. 801(d)(2), John's statement that he heard Jesse make certain statements is an out-of-court statement offered to prove that Jesse made those statements, and is still hearsay. Because some part of the combined statement is not subject to a hearsay exception, the statement as a whole is not admissible.

Although Yeniset, speaking as she was, as Defendants' corporate representative under Rule 30(b)(6), may speak on matters outside her personal knowledge at her deposition, she may not do so at trial. *Indus. Eng'g & Dev. v. Static Control Components, Inc.*, No. 8:12-cv-691-T-24-MAP, 2014 U.S. Dist. LEXIS 141823, at *8 (M.D. Fla. Oct.

8

6, 2014) (citing *Sovereign Military Hospitaller v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1295 (11th Cir. 2012)). Thus, her statement would not be admissible at trial.

Yeniset also admitted that she had no personal knowledge of Welch's allegedly contacting vendors and asking them to stop selling a competitor's (not Dixie's) product. (Exh. 1, Y. Torgeman depo., pp. 105-06).

Asher Torgeman of Dixie stated that Jesse Welch made derogatory statements about Dixie Heritage stores "many times" to people that Asher worked with, customers, and people that worked in the office of the malls. (Exh. 2, Asher Torgeman depo., pp. 67-68). He said that Jesse Welch told Dixie's employees "and a lot of customers" not to buy from Dixie because their goods were counterfeit. (Exh. 2, p. 70). Asher never specified that he actually heard Jesse make such statements with his own ears, and it seems implausible that Jesse Welch would say such things to customers in Asher's presence. Thus, it is not established that Asher was speaking from personal knowledge, and the statements must be taken as hearsay, not subject to a recognized exception. Fed. R. Evid. 602, 801(c), 802.

Because Defendants fail to produce a single first-hand account of anyone from Flogrown telling Dixie's vendors that Dixie had counterfeit products, counts 1 and 2 of Dixie's counterclaim fail for lack of admissible evidence.

**3. Defendants have produced no admissible evidence that Flogrown requested to lease retail locations from Simon Property Group, and even if Flogrown did this, such actions do not constitute a violation of FDUTPA nor defamation.**

Defendants also allege that Flogrown approached Simon Property Group about leasing space in retail locations where Dixie is a tenant. Even if these statements are true,

9

it is neither a deceptive and unfair trade practice nor defamation to inquire about leasing retail space. Thus, recitation of such allegations fails to state a claim on which relief may be granted.

A claim for damages under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) has three elements: (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. § 501.211, Fla. Stat.; *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009). A "deceptive act" occurs, within the meaning of FDUTPA where there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. § 501.204, Fla. Stat.; *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (citing *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). Generally, an "unfair practice," within the meaning of FDUTPA, is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. § 501.204, Fla. Stat.; *Samuels v. King Motor Co.*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001).

Jesse Welch's allegedly inquiring about leasing space in a mall cannot be a "deceptive act" because no consumer was misled by the act, particularly when one considers that Welch's inquiry did not result in any actual leasing of space. Similarly, there can be no "unfair practice" that offends public policy in merely asking about rental spaces. Finally, a FDUTPA claim requires actual damages. § 501.211(2), Fla. Stat. Defendants have produced no evidence as to how they were actually damaged by Jesse Welch's asking about rental space and being rejected.

To establish a *prima facie* case of defamation under Florida law, a party must show that: (1) the party against whom the claim is made published a false and defamatory statement of and concerning the party making the claim; (2) such statement was communicated to a third party without reasonable care as to whether the statement was true or false; and (3) the party making the claim suffered actual damages as a result of the publication. *Molenda v. Hoechst Celanese Corp.*, 60 F. Supp. 2d 1294, 1303 (S.D. Fla. 1999). It is difficult to see how inquiring about rental space and being rejected, by itself, is false and defamatory. And again, Defendants have produced no evidence identifying actual damages.

Even if Defendants allegations did state a claim for a FDUTPA violation or defamation, Defendants lack admissible evidence to support their claim. Defendants offer no statement from anyone who allegedly witnessed anyone from Flogrown making such an inquiry. Defendants do offer more hearsay from Yeniset Torgeman, who states in deposition that Jesse Welch of Flogrown "contacted Crystal and TJ – the leasing managers for the – the malls that we were in . . . saying that he wanted to open a kiosk with Flogrown." When asked how she knew that Welch reached out to Crystal at the mall, Yeniset replied, "Crystal told us. . . . She said, 'This guy, Jesse, called, he wants to open a kiosk of Flogrown.' And I flat-out told them, 'No, you can't compete with Asher. He already has Flogrown there.'" (Exh. 1, Y. Torgeman depo., pp. 103-04). All of this is hearsay, as Defendants produced no statement from Crystal herself, who was the person who allegedly heard Jesse make the statements in question.

Asher Torgeman stated that Crystal and TJ told him that Jesse Welch tried to lease space in their properties. (Exh. 2, Asher Torgeman depo., pp. 68-70). Defendants

11

produced a Facebook thread in which "TJ Hoffmann" had an exchange, apparently with Asher, in which Asher asked, "Remember last year when Jesse from the Brand FloGrown contacted you about opening a location in Oviedo . . . do you remember if it was near Christmas and did he tell you we were selling counterfeit?" TJ replied, "I do no[t] think he said you were selling anything counterfeit." Asher asked: "So Jesse only contacted you to open a Flogrown store," to which TJ replied "yes." Asher commented: "Jesse had contacted Crystal at Sanford and told her that he wanted to open there; when she refused him, she asked him why he wants to . . . he said because all our stuff was counterfeit . . ." (Exh. 3).

TJ's statement is no help to Defendants' defamation claim because TJ specifically denies that Jesse Welch said that Dixie was selling counterfeit goods. TJ's statement that Jesse contacted him about opening a Flogrown store is hearsay because it is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). It does not fall under any hearsay exception, such as the Business Records Exception, because making such a record was not a regular practice of the business, as issuing a receipt for a purchase would be. *See* Fed. R. Evid. 803(6)(C).

Thus, even if these allegations stated a colorable claim, Defendants have not established admissible evidence to support it, and it fails for lack of evidence.

**4. Defendants have produced no admissible evidence that Flogrown told Rebecca Goodine that Dixie sold counterfeit goods and even if he did, it would not have been defamation because it was not made to a third party.**

Defendants allege that Jesse Welch told Dixie employee Rebecca Goodine that Dixie sold counterfeit goods, but again, the record does not support this claim. In Rebecca Goodine's 59-page deposition, she never once states that Jesse Welch told her

12

that Dixie sold counterfeit or "fake" goods. She does state where she got that idea: from her manager, Patti Rumore, and from Yeniset Torgeman, one of Dixie's owners. She states that Patti told her that the Defendants sold counterfeit goods [DE 53, Goodine deposition, pp. 39-40]; this is consistent with a statement she made to the police. (Exh. 4, Police Report, p. 8). Additionally, when Goodine called Yeniset on the phone after Jesse Welch made an unusual $800+ purchase, Goodine states that Yeniset told her to put the "fake" goods in the back of the store. [DE 53, Goodine deposition, pp. 25-28].

While Jesse Welch may have triggered Goodine's concern that the goods were counterfeit when he said, while buying some baby "onesies" with the Flogrown logo on them, that he didn't know that Flogrown made baby onesies [DE 53, p. 45], Goodine never stated that Welch told her that the onesies, or any other goods, were counterfeit.

Even if Welch had told Goodine that the goods were counterfeit, that would not have been defamation because Goodine was acting at the time as an agent of Dixie, so telling her that the goods were counterfeit would be merely the equivalent of registering a complaint with a retailer about its products. A statement is not defamatory unless published to a third party. *See Molenda*, 60 F. Supp. 2d at 1303. As Goodine was not a third party to the transaction, such statements to her cannot be defamatory.

Thus, Defendants' allegation that Flogrown told Goodine that Dixie's goods were counterfeit fails on legal grounds and for lack of evidence.

**5. Defendants have produced no admissible evidence that Flogrown caused Rebecca Goodine to file a police report, false or otherwise.**

Defendants claim that Jesse Welch somehow caused Goodine to report to police that Dixie was selling counterfeit goods. Goodine did make such a report to police, but there is no evidence that Welch deliberately caused her to call the police. Goodine stated

13

in her deposition that she called the police because she believed that Defendants were selling counterfeit goods and that Jesse Welch never paid her or coerced her to call the police. [DE 53, Goodine depo., pp. 53-57]. As demonstrated in the previous section, Goodine's belief that the goods were counterfeit was not based on statements by Welch, but rather on statements by Dixie agents, Patti Rumore and Yeniset Torgeman.

Patti Rumore suspected that Welch and Goodine had conspired together to get Dixie in trouble [DE 53, Goodine depo., p. 37), and Asher Torgeman said that he suspected that Welch and Goodine were working together. (Exh. 2, Asher Torgeman depo., p. 79). But Goodine was questioned many times during her deposition about whether she knew Jesse Welch before or after the one incident at the Dixie Heritage store, and she consistently stated that she did not know him before the incident and had not seen him since. [DE 53, Goodine depo., pp. 40-41, 45, 46, 50, 57].

Yeniset Torgeman admitted that she had "no evidence" that Jesse Welch called the police or caused Rebecca Goodine to call the police. (Exh. 1, Y. Torgeman depo., p. 126). Asher Torgeman admitted that he didn't know if Jesse Welch called the police and didn't have any proof whether Welch called the police or not. (Exh. 2, Asher Torgeman depo., pp. 85-87).

Defendants have nothing but suspicions on this score, which is no substitute for evidence. This allegation also fails for lack of evidence.

### 6. Defendants' allegation that Jesse Welch told Dixie's manager that if Dixie still had Flogrown products for sale, she would "see what happened to her" fails to state a claim for either a FDUTPA violation or defamation.

Again, Defendants' allegation does not state a cause of action under the legal theories that Defendants allege. Jesse Welch's statement that the manager would "see

14

what happened to her" if she were selling Flogrown products could simply mean that Welch would sue her, which is his legal right where he has a good-faith claim. A person "is never liable . . . where he has done no more than to insist upon his legal rights in a permissible way." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985). This is not a FDUTPA violation because there is no deceptive act directed toward consumers. *See Zlotnick*, 480 F.3d at 1284. Neither is there an unfair practice implicated that offends public policy. *See Samuels*, 782 So. 2d at 499. If Jesse found that Dixie was using his trademark without authorization, he had a right to stop Dixie from doing so.

Similarly, this cannot be defamation because there is no false and defamatory statement published to a third party. *See Molenda*, 60 F. Supp. 2d at 1303. Additionally, defendants fail to provide any evidence as to how they were actually damaged by the incident, and actual damages are a necessary element for both FDUTPA and defamation claims.

**7. Defendants have produced no admissible evidence that Flogrown spoke with the Lake County State Attorney's office about Dixie's merchandise.**

Defendants have produced no evidence whatsoever to support this allegation, even indirectly. They did provide a police report, which shows that Rebecca Goodine contacted the police, who then contacted Jesse. (Exh. 4).

## **CONCLUSION**

Defendants have failed to produce admissible evidence that would support either of their counterclaims. Furthermore, several of their allegations, even if true, do not state a claim under FDUTPA or under common law defamation, the purported legal bases of their claims. The evidence does not support any colorable claim that Flogrown violated FDUTPA or committed defamation. Based on the lack of admissible evidence, there is no genuinely disputed issue of fact and Flogrown is entitled to judgment as a matter of law.

**WHEREFORE**, Plaintiff respectfully asks this Court to grant summary judgment in favor of Flogrown on both of Defendants' counterclaims.

Dated May 11, 2018.

        Respectfully submitted,

        By: /s/ Andrew S. Rapacke
        Attorney for Plaintiff
        THE RAPACKE LAW GROUP, P.A.
        Florida Bar No. 0116247
        1836 N. Pine Island Road
        Plantation, FL 33322
        Telephone: (954) 951-0154
        Facsimile: (954) 206-0484
        Email: andy@arapackelaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 11, 2018, under Federal Rule of Civil Procedure 5, the foregoing motion was filed with the Clerk of the Court by using the CM/ECF system, which will send an electronic notice to the following lead counsel of record in this proceeding:

<pre>
Coleman W. Watson
Watson LLP
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
</pre>

By: /s/ Andrew S. Rapacke
Florida Bar No. 0116247