# In The Matter Of:

*FLOGROWN, LLC v.*

*DIXIE HERITAGE, LLC*

---

*YENISET TORGEMAN*

*March 20, 2018*

*COPY*

---

*CourtScribes, Inc.*

*"Delivering More For Less"*

*(833) 727-4237*

*info@courtscribes.com*

*www.courtscribes.com*

Original File 106085 Yeniset TorgemanCOPY.txt

Min-U-Script® with Word Index

**COPY**

1

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF FLORIDA

3  ORLANDO DIVISION

4  CASE NO.: 6:17-CV-00983-GKS-GJK

5

6  FLOGROWN, LLC,

7  PLAINTIFF,

8

9  VS.

10

11  DIXIE HERITAGE, LLC,

12  ASHER TORGEMAN, AND ALBERT TORGEMAN,

13  DEFENDANTS.

14  _____/

15  VIDEOTAPED DEPOSITION DUCES TECUM OF YENISET TORGEMAN

16  DATE:          MARCH 20, 2018

17  REPORTER:      TREY SIDEBENDER

18  PLACE:         REGUS HERITAGE PARK

19                 941 WEST MORSE BOULEVARD

20                 SUITE 100

21                 WINTER PARK, FLORIDA 32789

22

23

24

25

**COPY**

2

APPEARANCES

ON BEHALF OF THE PLAINTIFF, FLOGROWN, LLC:

ANDREW S. RAPACKE, ESQUIRE

BENJAMIN L. BEDRAVA, ESQUIRE

THE RAPACKE LAW GROUP, P.A.

1836 NORTH PINE ISLAND ROAD

PLANTATION, FLORIDA 33322

TELEPHONE NO.: (954) 951-2242

FACSIMILE NO.: (954) 206-0484

E-MAIL: ANDY@ARAPACKELAW.COM

        BEN@ARAPACKELAW.COM


ON BEHALF OF THE DEFENDANTS, DIXIE HERITAGE, LLC, ASHER

TORGEMAN, AND ALBERT TORGEMAN:

LEIA V. LEITNER, ESQUIRE

WATSON, LLP

189 SOUTH ORANGE AVENUE

SUITE 810

ORLANDO, FLORIDA 32801

TELEPHONE NO.: (407) 377-6634

FACSIMILE NO.: (407) 377-6688

E-MAIL: LEIA@WATSONLLP.COM

**COPY**

INDEX

                                                        Page

PROCEEDINGS                                               5

DIRECT EXAMINATION BY MR. RAPACKE                         6


                        EXHIBITS

Exhibit                                                 Page

     1    NOTICE OF DEPOSITION DUCES TECUM                6

     2    INVOICE NUMBER 127                             44

     3    INVOICE NUMBER 280                             45

     4    INVOICE NUMBER 315                             45

     5    FLOGROWN ORDER SHEET                           47

     6    FOUR DIXIE HERITAGE LAKELAND                  108

          RECEIPTS DATED 12/3/16

     7    COMPOSITE - LAKELAND POLICE                   122

          DEPARTMENT REPORT

     8    REBECCA GOODINE STATEMENT                     136

     9    FLOGROWN LOGO                                 140

    10    TWO PHOTOGRAPHS                               140

    11    PHOTOGRAPH                                    140

**COPY**

4

1                              STIPULATION

2

3   THE VIDEOTAPED DEPOSITION OF YENISET TORGEMAN TAKEN AT

4   REGUS HERITAGE PARK, 941 WEST MORSE BOULEVARD, SUITE

5   100, WINTER PARK, FLORIDA 32789 ON TUESDAY THE 20TH DAY

6   OF MARCH 2018 AT APPROXIMATELY 9:19 A.M.; SAID

7   VIDEOTAPED DEPOSITION WAS TAKEN PURSUANT TO THE FEDERAL

8   RULES OF CIVIL PROCEDURE.

9

10  IT IS AGREED THAT TREY SIDEBENDER, BEING A NOTARY PUBLIC

11  AND COURT REPORTER FOR THE STATE OF FLORIDA, MAY SWEAR

12  THE WITNESS AND THAT THE READING AND SIGNING OF THE

13  COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

14

15

16

17

18

19

20

21

22

23

24

25

5

PROCEEDINGS

1  
2       MR. RAPACKE:  Good morning, Ms. Torgeman.  I'm

3    Andy Rapacke.  I'm the attorney for the plaintiff.

4    This is Ben Bedrava, he is my other attorney and my

5    right-hand man.  You know, we are from the Rapacke Law

6    Group and we represent Flogrown on this case.

7       MS. TORGEMAN:  Okay.

8       MS. LEITNER:  My name is Leia Leitner and I

9    represent Defendants, Dixie HerSitage, LLC.

10       COURT REPORTER:  Good morning.  My name is Trey

11    Sidebender from Court Scribes.  I'm the digital

12    court reporter.  As indicated in the notice, we will

13    be making a video recording.  We are here today,

14    March 20, 2018, at 941 West Morse Boulevard, Winter

15    Park, Florida for the purposes of recording the

16    deposition of

17  Yeniset Torgeman taken by Plaintiff in the matter of

18  Flogrown v. Dixie Heritage.  If both parties are ready

19  in agreement, we will continue with this proceeding.  I

20  will now swear in the witness.  Please raise your right

21  hand.  Do you, Yeniset Torgeman, swear or affirm to tell

22  the truth, the whole truth, and nothing but the truth,

23  so help you God?

24       THE WITNESS:  I do.

25       COURT REPORTER:  Counsel, you may begin.

COPY

6

```
1                    DIRECT EXAMINATION
2              BY MR. RAPACKE:
3        Q    All right.  Well, good morning, again --
4        A    Good morning.
5        Q    -- Ms. Torgeman.  We're going to just start
6   off with some background information.  Can you state
7   your name for the record and spell your --
8        A    Yeniset --
9        Q    -- spell your last name?
10       A    -- Yeniset Torgeman.
11       Q    Okay.
12       A    It's spelled T-O-R-G-E-M-A-N.
13       Q    All right.  And are you here to testify as a
14   30(b)(6) corporate representative for Dixie Heritage?
15       A    Yes.
16       Q    Okay.  And I'm going to show you now the
17   notice of deposition and the notice of deposition duces
18   tecum.  Are you here today because you received this?
19       A    Yes.
20       Q    Okay.  Can you please inspect it and make sure
21   that it is accurate?
22       A    Yes.
23            MR. RAPACKE:  Okay.  We're going to call this
24       Plaintiff's Exhibit number 1 and that's the notice
25       of deposition duces tecum.
```

COPY

7

1          MS. LEITNER:   Okay.

2          MR. RAPACKE:   Okay?   Excellent.

3          (EXHIBIT 1 MARKED FOR IDENTIFICATION)

4          MR. RAPACKE:   Is that entered into evidence?

5     Okay.

6          BY MR. RAPACKE:

7     Q     Before we get started, did you bring any

8     documents with you, any papers, notes?

9     A     No.

10    Q     You did not?   I saw a couple of notes here

11    earlier.   Was that from you or was that from --

12         MS. LEITNER:   Those are mine.

13         MR. RAPACKE:   Those are your notes?   Okay.

14         BY MR. RAPACKE:

15    Q     So you did not bring any notes.   Okay.   All

16    right.   So can you tell me what position you hold at

17    Dixie Heritage, LLC?

18    A     I am a manager --

19    Q     Okay.

20    A     -- at Dixie Heritage.

21    Q     Okay.   How long have you had that position?

22    A     Since 2015.

23    Q     2015.   Okay.   And can you tell me what your

24    responsibilities are, your just day-to-day --

25    A     Process payroll, do scheduling, work hand in

1    hand with employees.

2        Q    Okay.  And you've held that position since

3    2015?

4        A    That position was just in the past year.

5        Q    Okay.

6        A    Prior to that, I was just doing sales and

7    getting my hands into the business.  My --

8        Q    Okay.

9        A    -- husband is the owner.

10       Q    Okay.  Is your husband the only owner?

11       A    He is.

12       Q    Okay.  There's -- what is the relationship

13    with Albert Torgeman?

14       A    As his brother.

15       Q    And is he --

16       A    Albert is his brother.

17       Q    -- an owner, as well?

18       A    He's -- he has his own company, yes.

19       Q    Is he an owner of Dixie Heritage?

20       A    No.

21           MR. RAPACKE:  Okay.  Before I jump into the

22       questions, can I see Exhibit -- Plaintiff's Exhibit

23       number 1, please?

24           COURT REPORTER:  Uh-huh.

25            BY MR. RAPACKE:

COPY

9

1     Q     I'd like to ask you:  Have you read the duces

2 tecum?

3     A     No, just the questionings at the end, like,

4 the -- the things to bring in and all that.

5     Q     Okay.  You have read the duces tecum.  Okay.

6     A     Uh-huh.

7     Q     Can you read that for me?

8     A     Where?

9     Q     From here on.

10     A     "Under applicable law, the Defendant/Witness

11 is requested to gather and produce the following

12 materials at the time of the taking of these

13 depositions."

14     Q     Okay?

15     A     Yes.

16     Q     And can you tell me what those are?

17     A     Inventories and sales records of Dixie

18 Heritage's goods during the time of January 2015 to

19 present.  Number 2, Inventories of Dixie Heritage's

20 equipment during the time of January 2015 to present.

21 Number 3, Purchase records for any heat press owned,

22 leased, possessed, or controlled by Defendants.  Number

23 4, Employment records for all employees working at Dixie

24 Heritage from the time of January 2015 to present.

25 Number 5, Sales records for all sales of Flogrown

**COPY**

1   branded goods, including quantities, dates (to the

2   extent available), item's prices, gross sales dollar

3   amounts, profits, and type of goods.  And number 6,

4   Documents evidencing, identifying, or establishing any

5   licenses or authorizations granted to Defendants for the

6   purpose of reproducing designs, marks, names, or

7   copyrights of others.

8        Q    Okay.  And do you have any of these documents

9   with you?

10       A    Not at this time.

11            MS. LEITNER:  And just -- I just wanted to let

12       the record reflect that on March 16th, Defendant's

13       counsel served responses and objections to these

14       requests to counsel, as well.

15            BY MR. RAPACKE:

16       A    Yeah, it's -- I mean, we're -- you have to

17   understand, we're a small company.  It's just my

18   husband, and we don't have -- we have, like, four

19   employees --

20       Q    Uh-huh.

21       A    -- so for us to take, like, inventory in a

22   period of three days, it's just not feasible.

23       Q    Okay.  So are you objecting for the time

24   frame, or are you objecting for the relevance?

25       A    On which item?

11

```
 1          MS. LEITNER:  It's certain items she's
 2    objecting as to --
 3          THE WITNESS:  Right.
 4          MS. LEITNER:  -- the time frame and some of
 5    them she doesn't have any.
 6           BY MR. RAPACKE:
 7    A    I don't have any.
 8    Q    Okay.  And do you understand your
 9    responsibilities as a 30(b)(6) witness as a corporate
10    representative?
11          MS. LEITNER:  Yes.
12          MR. RAPACKE:  I'm asking her.
13    A    Yeah.
14    Q    Okay.  You do understand the responsibilities
15    that comes -- and the duties that come with your
16    testimony today as a corporate representative?
17    A    Yes.
18    Q    Okay.  Excellent.  All right.  Let me jump
19    into some ground work here before we get started.  I'm
20    not sure if you've had your deposition taken before, but
21    I'm just going to run through some ground rules
22    nonetheless.  As you can see, there's a court reporter
23    here who's going to take down everything you say, and I
24    say --
25    A    Uh-huh.
```

**COPY**

1    Q    -- okay?  It's much easier for the court

2  reporter to do this if one of us is talking at a time,

3  okay, so I'm not going to talk over you and I'd ask the

4  same courtesy.  Please verbally answer any questions

5  with a yes or no, don't nod your head.  I'd like to ask

6  you to wait until I've completed my questions before

7  answering them.  At any time today if you need to take a

8  break, just let me know.  You can take as many breaks as

9  you need.  If you do not understand a question, please

10  let me know, and I'll rephrase the question as best I

11  can.  If you do answer a question, I assume that you

12  understood the question that I asked you.

13    A    Okay.

14    Q    Okay?  Is there anything today from preventing

15  you from providing your best and truthful testimony?

16    A    No.

17    Q    Is this your attorney sitting next to you?

18    A    Yes.

19    Q    At no point today am I going to ask you any

20  questions that you've had between you and your attorney,

21  or your attorney and you, as that is privileged

22  information.  Have you prepared for today's deposition?

23    A    Yes.

24    Q    Okay.  Excellent.  All right.  So let's get

25  started.  What is your birthdate?

COPY

13

1       A       March 6, 1980.

2       Q       Okay.  And where were you born?

3       A       Havana, Cuba.

4       Q       Okay.  Where do you currently live?

5       A       Orlando, Florida.

6       Q       What's your current address in Orlando,

7   Florida?

8       A       4726 Riverton Drive, Orlando, Florida.

9       Q       And how long have you lived at this address?

10      A       15 years.

11      Q       Where did you live before that address?

12      A       Miami.

13      Q       Where in Miami?

14      A       Oh, I don't remember the address.

15      Q       Okay.

16      A       Do you need the -- like, a specific address or

17   --

18      Q       No, if Miami -- if it's Miami, it's Miami.

19      A       Yeah, Miami.

20      Q       That's all you can recall?

21      A       Uh-huh.

22      Q       Okay.  Do you own any other properties aside

23   from the address that you currently reside in?

24      A       No.

25      Q       Do you own any other properties outside of

**COPY**

1   Florida --

2        A     No.

3        Q     -- that anybody resides in?

4        A     No.

5        Q     Okay.  At the address you gave me, is there

6   anybody else who lives there?

7        A     Yes.

8        Q     And who is that?

9        A     My husband, Asher Torgeman, and our two

10  children.

11       Q     Okay.  You got two children, great.

12       A     Yes.

13       Q     How old are they?

14       A     I have Max --

15       Q     Okay.

16       A     -- he is 7 years old, and Shelli (phonetic) is

17  9.

18       Q     Okay.  Excellent.  And how long have you been

19  married?

20       A     Ten years.  I could probably answer other

21  questions better than that one.

22       Q     All right.  And then your spouse's full name,

23  is that Asher Torgeman?

24       A     Asher Torgeman.

25       Q     Okay.  Is that his full legal name?

**COPY**

1       A       Yes.

2       Q       And what does he do for a living?

3       A       He's the owner of Dixie Heritage, LLC.

4       Q       Okay.  Were you previously married before

5   Asher?

6       A       Yes.

7       Q       And what was his name?

8       A       Alex Brugger.

9       Q       Okay.  When did you get divorced?

10      A       Ten years ago.

11      Q       Okay.  Can you tell me where you were born?

12      A       What -- where I was born?  Havana, Cuba.

13      Q       Okay.  And is that where you grew up?

14      A       I lived there until I was 8 years old.

15      Q       Okay.  Where did you go to high school?

16      A       Barbara Goleman Senior High, first graduating

17  class.

18      Q       Excellent.  Congratulations.

19      A       Uh-huh.

20      Q       Did you attend college?

21      A       Yes.

22      Q       Okay.  And where did you go to college?

23      A       University of Miami and UCF.

24      Q       Okay.  Did you get a degree?

25      A       No.

**COPY**

1       Q     Okay.

2       A     I have a -- like, a -- like, your first two

3  years of college.

4       Q     Okay.  So you completed your first two years

5  of college?

6       A     Yeah.

7       Q     Okay.

8       A     On two -- two separate degrees.  I probably

9  have a bunch of minors.

10      Q     Okay.  What did you study in college?

11      A     University of Miami, I studied biology.

12      Q     Okay.

13      A     And at UCF, I studied accounting.

14      Q     Okay.  Did you take any other business-related

15  courses?

16      A     I mean, you have to take business courses

17  along with accounting --

18      Q     Okay.

19      A     -- so yes.

20      Q     Did you take any law courses?

21      A     Yes.

22      Q     Okay.  Which --

23      A     Yeah, like, real estate, I think it was.

24      Q     Okay.  Do you have any other licenses outside

25  of your college?

**COPY**

1        A     Currently?  No.

2        Q     Okay.  Did you serve in the military?

3        A     No.

4        Q     Okay.  All right.  Excellent.  I'm going to

5   ask you a few questions about your relationship with

6   Flogrown, our party that we're representing.  How did

7   you first get to know Flogrown, LLC?

8        A     Flogrown is a brand that we've been selling in

9   the store.

10       Q     Okay.

11       A     I believe we started selling his brand in

12   2015.

13       Q     Okay.

14       A     How the relationship came about, we had

15   customers asking for Flogrown.  At that time, we only

16   had one store in Sanford --

17       Q     Okay.

18       A     -- and we had a couple of people come in and

19   ask if we carried Flogrown just because of our -- our

20   merchandise, and we contacted -- Asher contacted Jesse

21   and Jesse right away replied via e-mail and he said he

22   was very interested to work with us.

23       Q     Okay.  Now, what store locations do you

24   currently have?

25       A     Dixie Heritage, LLC has Merritt Island and

**COPY**

18

1   Melbourne.

2        Q    Okay.  Is Dixie Heritage the only stores that

3   you have?  Do you have a Seminole Towne Center location?

4        A    That is the -- that -- that's owned by Albert

5   Torgeman.

6        Q    Okay.  How about the Sanford location?

7        A    That is the Sanford location.

8        Q    Okay.  How about the Oviedo location?

9        A    That store closed down.

10       Q    Okay.

11       A    It was moved to Merritt Island, so it was

12   owned by Dixie Heritage, LLC.

13       Q    Okay.  When did that close down?

14       A    Oh, we opened Merritt Island in September

15   of -- this was our first Christmas in 2017, so we opened

16   in September 2017, so we closed the month before, in

17   Oviedo.

18       Q    Okay.  So just so I understand --

19       A    Uh-huh.

20       Q    -- some stores are owned by Albert Torgeman?

21       A    Correct.

22       Q    So is he an owner of Dixie Heritage?

23       A    Who, Avi (phonetic)?

24       Q    Albert Torgeman.

25       A    Albert?  No.

**COPY**

1      Q    Okay.  So how are stores owned by him that are

2  operated by Dixie Heritage?

3      A    They're not operated by Dixie Heritage,

4  they're operated by him.  Asher is a buyer for him.

5      Q    Okay.  And what stores does he own?

6      A    So the relationship that -- that Flogrown had

7  with -- with Asher was -- like, Asher would buy from him

8  and then we had the four locations that he would buy

9  for.  Two of the stores were him, two of the stores were

10  Avi's -- Albert's.

11      Q    But they were not owned by Dixie Heritage,

12  LLC?

13      A    Correct.

14      Q    Okay.  So what stores are owned by Dixie

15  Heritage, LLC?

16      A    Currently, it's Merritt Island and Melbourne.

17      Q    Okay.

18      A    Those two locations.

19      Q    Okay.  Now, previously, what stores were owned

20  by Dixie Heritage, LLC?

21      A    So last -- last year --

22      Q    Yeah.

23      A    -- it was Sanford and Oviedo, which is now

24  Merritt Island and Melbourne.

25      Q    Were owned by Dixie Heritage?

COPY

1      A     Correct.

2      Q     Okay.  And then what stores were owned by --

3      A     Albert?

4      Q     -- Albert?

5      A     The Lakeland location.

6      Q     Okay.  When did you start having a

7  relationship with Flogrown?  So you heard about the

8  brand, you knew it was popular in the area, you reached

9  out to Jesse Welch, who's the owner of Flogrown, LLC.

10 When did that happen?

11     A     It was in -- I believe it was early 2015.

12     Q     Okay.

13     A     I'm not sure about the -- the date.  There is

14 an e-mail out there, though -- I think you guys have

15 it -- where Asher reached out to him and then Jesse

16 reached back out and said, "Yeah, I'm very interested."

17     Q     Okay.  How many different brands of goods

18 aside from Flogrown do you guys carry in your stores?

19     A     Many.

20     Q     Can you tell me which ones?

21     A     Yes.  Grunt Style.

22     Q     Okay.

23     A     Guy Harvey.

24     Q     Okay.

25     A     Simply Southern, Girlie Girl, Southern

COPY

21

1    Attitude.  We carry a lot of, like, Blue Line, you know,

2    for the police officers --

3         Q    Okay.

4         A    -- and Red Line.

5         Q    Okay.  What's the Red Line for?  Is it for --

6         A    For --

7         Q    -- firefighters?

8         A    -- firefighters.

9         Q    Okay.

10        A    Uh-huh.

11        Q    Okay.

12        A    And we carry a lot of, like, military, so

13   like, every single branch of the military, we carry

14   T-shirts and hats and all of that.  We carry Ruger --

15   the brand, not the -- not the gun.

16        Q    Uh-huh.

17        A    Montana West.

18        Q    Okay.  How do you establish these

19   relationships?

20        A    Same way we did with Flogrown.  You reach out

21   to them.  Some -- some vendors are a little bit --

22             more -- different than others.  Like, Guy

23   Harvey and Simply Southern, they're bigger brands so

24   they have, you know, sales personnel that -- it's

25   director of a certain region, so you have to go through

1   their corporate office, and then they send you that

2   person, they come over to the -- the store and they

3   approve it, and then we get the account and then we work

4   directly with a sales rep.

5       Q    Okay.

6       A    Some other brands, it's just like we did with

7   Flogrown, we reach out to them via e-mail that they have

8   on their website and they're a smaller company, so

9   they're, like, "Okay.  Yeah, we would love to work with

10  you."

11      Q    Uh-huh.  Are you the person that reaches out

12  to them, generally?

13      A    It's -- now, I've been doing that more.

14  Originally, no.  Obviously, I didn't -- you know, my

15  feet were not wet as far as, like, what to do.

16      Q    Okay.  Now, as the corporate representative,

17  are you one of the listed managers on the Florida

18  Department of State registration?

19      A    Not right now.

20      Q    Can you tell me about the registered --

21      A    It's just Asher Torgeman.

22      Q    Okay.  And who is the registered agent?

23      A    I think it's him, as well.

24      Q    Okay.  And so remind me, again, how long has

25  Dixie Heritage been in business?

COPY

1        A        It was December 2014 or 2015.  I'm sorry.  I

2   just can't remember right now.  It's one of those two.

3   It's on the registration, though.

4        Q        Okay.

5        A        Yeah.

6        Q        How did you guys come up with the concept of

7   selling shirts from -- how -- that's a very unique

8   business?

9        A        It is very unique --

10       Q        Right.

11       A        -- because -- especially in the malls, right?

12   Yeah.

13       Q        Right.  Well, I mean, how did you get into it?

14   What prompted you to say, Hey, I want to sell shirts, or

15   I want to sell that kind of merchandise?

16       A        Okay.  So Avi -- Albert and Asher, they're

17   brothers, they started off in the flea market in Flea

18   World.

19       Q        Okay.

20       A        And there they were selling just about

21   anything that you sell in a flea market, and then they

22   started -- people just started asking for those things.

23   And they started becoming familiarized with, like, the

24   different brands.  When the Flea World closed down,

25   Asher, I guess had the -- the vision to open in a mall

COPY

24

1  setting, and at that time, the only thing we carried

2  was, like, Bucked Up and some of the transfers that we

3  sell.  And little by little, people would just ask, "Oh,

4  you sell Bucked Up, do you sell Flogrown?  Oh, do you

5  sell" -- "You sell Flogrown, do you sell Loco?  Oh, you

6  sell Loco, do you have this?"  And it -- just little by

7  little, we just start contacting people and we just

8  grew.

9       Q     Okay.  So you basically started by selling

10  shirts with transfers and then you just grew --

11       A     Uh-huh.

12       Q     -- to more and more stores?  Okay.

13       A     Yeah.

14       Q     What was your first store?

15       A     The first store was in Sanford in the Seminole

16  Towne Center.

17       Q     Okay.  And then how long was it before you

18  guys opened up a second and third and --

19       A     It was about a year --

20       Q     Okay.

21       A     -- that we opened the second location.

22       Q     Okay.  And then you started out -- you said

23  you originally started out -- I'm sorry?

24       A     Can I go back?  It was about a year until we

25  moved there, because we started, like, in a -- in a

1    little store --

2         Q     Uh-huh.

3         A     -- on the second floor in Seminole Towne

4    Center, and then that first Christmas, we moved to a

5    bigger store --

6         Q     Uh-huh.

7         A     -- and then from there a year after, we

8    started opening stores.

9         Q     So you --

10        A     So it's probably a year and a half into it.

11        Q     Okay.

12        A     Yeah.

13        Q     And then what was your second and third store

14   that you guys opened?

15        A     The second store was -- I can't remember

16   because we've closed it down already.  I believe it was

17   in Ocala in the Paddock Mall.

18        Q     Okay.  And then what did you open up after

19   that?

20        A     We opened a store in Gainesville --

21        Q     Okay.

22        A     -- in the mall, in The Oaks Mall there, but

23   those were only seasonal stores.

24        Q     Okay.

25        A     Yeah.

**COPY**

26

1    Q    Okay.  And then you just -- as more and more

2  stores grew, is that when you started expanding your

3  line of products?  You know, you said you with, what --

4    A    I --

5    Q    -- Bucked Up?

6    A    -- we started with Bucked Up, correct.

7    Q    Okay.  Did you sign any agreements with Bucked

8  Up or any of these brands that you carried?

9    A    No, I don't believe.  I think the only

10  agreement that we currently have is for the -- like,

11  with two brands.  And it's, like, Simply Southern,

12  that's a bigger brand, and with Guy Harvey.

13    Q    Okay.

14    A    And I believe the -- the Grunt Style brand,

15  also, we have a contract with them.

16    Q    Okay.  Excellent.  Those are some big brands,

17  so --

18    A    Yeah.

19    Q    How many employees do you currently have

20  working at Dixie Heritage?

21    A    We have -- in Merritt Island, we have three

22  and --

23    Q    Okay.

24    A    -- in Melbourne, we have two, so a total of

25  five.

1      Q     Can you give me their names?

2      A     Yeah.   Jane.

3      Q     Does Jane have a last name?

4      A     Lohr (phonetic).   I love my employees, so I

5 hope I get this right.   Jane Lohr in Merritt Island.   I

6 have Savannah George and Lauren Hall is her last name.

7      Q     Okay.   How long have they worked for you?

8      A     Not -- not very long because we just opened in

9 September and I hired them in January.

10     Q     Okay.

11     A     Uh-huh.

12     Q     And you said you have two others?

13     A     And then in Melbourne --

14     Q     Uh-huh.

15     A     -- we've been open for a year, so we have

16 Heidi Perez that -- she's been working there for about a

17 year, and we have Candice -- I can't remember her last

18 name right now -- Candice.

19     Q     Okay.   You don't remember your employee's last

20 name?

21     A     I'm so sorry.   Candice -- I can -- I can check

22 it if --

23     Q     Could you do that --

24     A     -- you need me.

25     Q     -- for me, please?

**COPY**

1      A     Yeah, absolutely.

2           THE WITNESS:   Can I have my phone?

3           MS. LEITNER:   Uh-huh.

4           THE WITNESS:   It's right there in my purse.   I

5      have all their information in there.   Thank you.

6      All right.   I'm going to check on Lauren's, as well.

7           BY MR. RAPACKE:

8      Q     Thank you.

9      A     Yeah.   All right.   It's Candice (phonetic) Lee

10     Dabbs in Melbourne --

11     Q     Okay.

12     A     -- and Heidi Perez in Melbourne.   And then in

13     Merritt is Jane Lohr, Lauren Holly -- not Lauren Hall --

14     and Savannah George.

15     Q     Okay.   Now, do you handle payroll for the

16     company?

17     A     I do.

18     Q     Okay.   Excellent.   Are those all the employees

19     that you've ever had working for your company?

20     A     No.   When we had the other locations, those

21     other employees were our employees, but now they're

22     Albert Torgeman's.

23     Q     And who are they?

24     A     In -- in Sanford --

25     Q     Yeah.

**COPY**

1      A     -- Delaney Merrill (phonetic).

2      Q     Okay.

3      A     And -- okay.  The other girl's not there

4   anymore.  I haven't visited that location.  I don't do

5   payroll anymore, so I'm not sure if she's there in --

6      Q     So you don't do payroll anymore?

7      A     Uh-uh, not for -- no, it's not our company

8   anymore.

9      Q     Okay.

10     A     Uh-huh.

11     Q     Who's Patti (phonetic)?

12     A     Patti Rumore, she works in the Lakeland

13   location.

14     Q     Okay.  Who else works in the Lakeland

15   location?

16     A     Taylor Sims.

17     Q     Okay.

18     A     Yeah.

19     Q     And then the Lakeland location is owned by --

20     A     Albert Torgeman.

21     Q     Albert.  Okay.

22     A     Yes.

23     Q     And we're calling him Avi?

24     A     Avi.

25     Q     Okay.  How long have they worked for Avi?

COPY

30

1      A     Patti has been with Avi for -- well, with us

2  and with Avi for two years, over two years.

3      Q     So she is one of your employees then?

4      A     No.  We still run her payroll through Dixie,

5  but --

6      Q     Okay.  Let me ask you that -- that's a

7  different one, yeah.  This is a little confusing.  Can

8  you tell me --

9      A     Yeah.

10     Q     -- everybody on the payroll?

11     A     Right now, it's the people that I mentioned in

12  Melbourne and Merritt.

13     Q     Okay.  How about previously?  Let's say from

14  2015 --

15     A     Right.

16     Q     -- to now.

17     A     Right.  So --

18     Q     Can you give me their names?

19     A     -- from 20 -- I --

20          THE WITNESS:  Leia, do you -- do you -- we have

21     that list.  Do you want me to just -- like, the --

22          MS. LEITNER:  Do you recall it, do you remember

23     it?

24          THE WITNESS:  I don't recall it.

25          MS. LEITNER:  She's -- do you --

COPY

1          THE WITNESS:  I don't have it with me.

2          MS. LEITNER:  She doesn't have that exact

3     information.

4          THE WITNESS:  Right.

5          MS. LEITNER:  From 2015 to present, it's a lot

6     of employees.

7          MR. RAPACKE:  Can I get a list of that?

8          MS. LEITNER:  We can produce that --

9          MR. RAPACKE:  Can you send me over a list of

10    that?

11         MS. LEITNER:  -- to you --

12         THE WITNESS:  Yeah.

13         MR. RAPACKE:  Okay.

14         THE WITNESS:  Yeah, that's not a problem.

15         MS. LEITNER:  -- at a later time.

16         MR. RAPACKE:  Okay.  Excellent.  That's all

17    I -- all I'm looking for.

18         MS. LEITNER:  No problem.

19         THE WITNESS:  Yeah.

20          BY MR. RAPACKE:

21     Q    Okay.  So all the employees you have, you've

22    got quite a bit, and I'm trying to still put together

23    this relationship between Albert and Asher and Dixie and

24    Dixie payroll and --

25     A    Yes.

COPY

1      Q     How many employees do you have there that are

2  full-time?

3      A     Full-time?  None, just myself.

4      Q     Okay.

5      A     Uh-huh.

6      Q     The rest of them are part-time, then?

7      A     Correct.

8      Q     Okay.  How many hours a week would you say you

9  work?

10      A     Including right now?

11      Q     I mean, is this work?

12      A     Yeah, you guys are -- hopefully you're getting

13  paid for this, so -- I don't know.  I'd say about 40 or

14  more.

15      Q     Okay.  About 40.  And then how about your

16  part-time employees, how long do they work for?

17      A     In the -- in the store itself, I probably put

18  in about 26 hours, that's going in there and you know,

19  managing, fixing the store, doing everything that needs

20  to be done.  And then obviously after that, I have, you

21  know, payroll responsibilities, you know, the employees

22  calling me, helping with ordering, getting new accounts,

23  you know, everything that you have to do for a business.

24      Q     Now, you said earlier you weren't doing

25  payroll.  Are you doing payroll now?

COPY

33

1     A   I -- I said I was doing payroll.

2     Q   Okay.  All right.  How many -- so do you go

3 back and forth between stores, is that a big part of

4 your job?

5     A   Yeah, between Melbourne and Merritt.

6     Q   Okay.  Is there a manager in each one of those

7 stores?

8     A   In -- in Melbourne, we have an assistant

9 manager, but really the manager is me for both of those

10 stores.

11     Q   So you oversee the responsibilities in those

12 stores?

13     A   Correct, alongside Asher.  So it's not -- you

14 know, we're husband and wife, so I think employees

15 understand --

16     Q   Okay.

17     A   -- you know, there's pillow talk, I guess.

18     Q   Okay.  And do you train them on how to use the

19 POS system, the equipment, the --

20     A   That's all me, yes.

21     Q   Okay.  That's on you.  Okay.  So you're

22 responsible for training; is that correct?

23     A   Correct.

24     Q   Okay.  How much money does Dixie -- has Dixie

25 Heritage made since its inception in 2014,

**COPY**

34

1   approximately?

2       A    I don't have exact figures.  Last year's 1099

3   was, like, 400,000, but that's before expenses,

4   obviously.

5       Q    And that was for all three locations?

6       A    And that was for all three locations.

7       Q    Okay.  What's your most popular items?

8       A    Most popular items right now?

9       Q    Uh-huh.

10      A    Definitely Guy Harvey and definitely Simply

11  Southern and Grunt Style.  I would say those are the

12  three biggest.

13      Q    Those are the big brands?

14      A    Oh, yeah.

15      Q    Top sellers?

16      A    Absolutely.

17      Q    Okay.  Flogrown, was Flogrown ever a top

18  seller in 2015 or 2016?

19      A    Flogrown was a top seller in -- when we first

20  got them.

21      Q    Which was 20 --

22      A    2015.

23      Q    Okay.

24      A    Yeah.

25      Q    Do you know what percentage of sales was

COPY

1   Flogrown?

2        A    It was probably -- I mean, really at that

3   time, we -- we had -- it was Bucked Up and then we got

4   Flogrown, and we had a little store, so I would say

5   maybe a quarter of the sales.  I mean --

6        Q    Okay.

7        A    -- we only had two big brands and then

8   everything else was, like, either printed apparel or,

9   like, camo shirts, hunting.  Hunting was really big at

10  that time.  Oh, we had Buck Wear, too.  Buck Wear's a

11  really big brand.

12       Q    Okay.

13       A    So --

14       Q    Do you keep a --

15       A    But I remember we ordered from Flogrown, like,

16  a lot.  I mean, within two years, I think we order over

17  $100,000 in the two-year relationship that we had, so he

18  was definitely up there.

19       Q    Do you have an accounting system?  I mean, do

20  you keep track of how much you've ordered from Flogrown?

21       A    No.

22       Q    You don't maintain records of that kind of

23  thing?

24       A    No.  Invoices?

25       Q    Do you have invoices from what you've

1    purchased from Flogrown?

2         A    I'm sure he has them.

3         Q    Do you have invoices?

4         A    No.  I have some.  I've kept some records, you

5    know, some things get thrown away, you know.

6         Q    Right.  Well, and it's a couple years ago --

7         A    Yeah.

8         Q    -- right?  How do you keep track -- I guess as

9    a manager, how do you keep track of the top selling

10   products?  How do you say, "Hey, Flogrown is selling

11   great versus" --

12        A    According --

13        Q    -- "Bucked Up."  How do I know that I want to

14   reorder a certain amount of shirts?

15        A    First of all, because I'm there often --

16        Q    Uh-huh.

17        A    -- so I -- I'm -- I'm selling, as well.  I see

18   what people are coming in, asking for --

19        Q    Uh-huh.

20        A    -- and also, I know if I ordered 12 Grunt

21   Style shirts and now I have three, I know I need to

22   order, this is selling.

23        Q    Okay.  Was there a standard quantity that you

24   would reorder from Flogrown, or was it just --

25        A    Yes.

COPY

37

1      Q    -- you would look at the most popular items

2  and then just say, "I want a certain amount of those

3  T-shirts, I want a certain amount of those hats, or I

4  want a certain amount of those decals"?

5      A    Yeah, we typically ordered by the dozen.

6      Q    Okay.  So --

7      A    Yes.

8      Q    -- quantities of about 12?

9      A    Yes.

10      Q    Okay.  What was your highest selling items

11  from Flogrown?

12      A    I would definitely say T-shirts.

13      Q    Okay.  What was your -- what would you

14  typically order from Flogrown?

15      A    Me personally?  No, I never order from

16  Flogrown.  You say -- mean the company --

17      Q    Right.  You're --

18      A    -- or Asher?

19      Q    -- please keep it by you're --

20      A    Okay.

21      Q    -- you're testifying as the corporate

22  representative?

23      A    Correct.

24      Q    So what would the -- what would Dixie

25  Heritage, LLC typically order from Flogrown at any given

1    time?

2        A    Hats, T-shirts, sweatshirts.  We have -- I

3    have so many -- Flogrown has a big line of, like, things

4    that they sell.  They have lanyards, phone cases, kids'

5    apparel, ladies' tank tops, men's tank tops, women's

6    shirts, like, V-necks, like, fitted versus just, like, a

7    regular --

8        Q    Uh-huh.

9        A    -- crew neck shirt, a lot of hats.

10       Q    Okay.  But you said the most popular items

11   were --

12       A    Definitely T-shirts.

13       Q    -- T-shirts?

14       A    Men's -- men's shirts.

15       Q    Okay.  Men's T-shirts?

16       A    Yeah.

17       Q    Okay.  Did -- was there any particular color?

18       A    Black always sells the best.  Everybody

19   looks --

20       Q    How about size?

21       A    -- thinner in black.  Large, extra large.

22       Q    Large and extra large?

23       A    Yeah.

24       Q    Okay.  Do you know what percentage of your

25   sales were Flogrown?

COPY

1      A      I think I answered that question.  Maybe --

2             I -- I mean, at the beginning, maybe a quarter

3   --

4      Q      Okay.  But you don't have an --

5      A      -- or less.  I don't have, like, a --

6      Q      -- an accounting system ___

7      A      -- figure --

8      Q      -- or an inventory system or anything?

9      A      No.

10     Q      Do you guys use a POS system, or do you

11  guys --

12     A      We do.

13     Q      Okay.  How do you handle your payroll, do you

14  use QuickBooks?

15     A      No, we use SunTrust Payroll.

16     Q      Okay.  You just do it through your local bank?

17     A      Correct.

18     Q      Okay.  I understand.  So you don't really have

19  any sales records or inventory records or anything like

20  that?

21     A      Uh-uh.

22     Q      Okay.  And you've been doing business with

23  Flogrown for about -- since 2015; is that correct?

24     A      Correct.

25     Q      You said -- remind me, again.  How much in

COPY

1  merchandise did you purchase from Flogrown?

2      A    In the two-year span, over 100,000.

3      Q    How do you know that if you don't keep sales

4  records?

5      A    From -- just from the -- like, the invoices,

6  like, just -- just the -- the amount of sales that we've

7  had --

8      Q    Now, previously --

9      A    -- just a roundabout figure.  And I believe

10 also Asher went -- I think Jesse told him one time, he

11 said, "You know that you've ordered from me, like, over

12 $100,000 in the last two years?"  Like, he said it to

13 Asher --

14     Q    Okay.

15     A    -- one time.

16     Q    But let me be -- make sure that I'm clear.

17     A    But it's not off of figures, like, concrete

18 figures or anything.

19     Q    So you don't have invoices to show what you've

20 purchased from Flogrown?

21     A    We have some.

22     Q    You have some?

23     A    Yeah.

24     Q    But you don't have all of them?

25     A    Correct.

COPY

1          Q     Why is that?

2          A     Because some have gotten thrown away.  And

3     then also, he didn't invoice us for a lot of things.

4          Q     Okay.  You don't have any electronic records?

5          A     He did send us some of them via e-mail.

6          Q     Okay.

7          A     Yeah.  But a lot of them, he also just, like,

8     handed it over to us with -- with the packaging.

9          Q     Okay.  Do you know how many individual

10    purchases you had with Flogrown during your two-year

11    period?

12         A     Individual purchases?  What --

13         Q     How many different purchases -- you know, you

14    say -- you previously said you would order in about

15    quantities of 12.

16         A     Right.

17         Q     Do you know how many times you did that in

18    that two-year span?

19         A     We typically didn't order, like, just one

20    shirt.  We ordered, like -- like, several designs and

21    several different merchandise and -- like, at once.

22         Q     Can you tell me how many times you guys did

23    that in two years?

24         A     Wow.  I think we probably ordered from him,

25    like, every other month.

COPY

42

1    Q    Okay.  So about six times per year?

2    A    I would say.

3    Q    Okay.  Roughly, six times per year?

4    A    Yeah.

5    Q    So about 12 times in a two-year span?

6    A    More than that.

7    Q    More than that.  Okay.  Do you have any

8    idea -- can you -- in your opinion, do you know --

9    A    Just because --

10   Q    -- how many?

11   A    -- just because of the amount of invoices, I

12   would say it's a lot more.

13   Q    Okay.

14   A    So each invoice is representative of each time

15   that we've picked something up.

16   Q    So in the amount of --

17   A    There's other times --

18   Q    -- based on the amount of invoices --

19   A    -- that we didn't.

20   Q    -- you think that there's more than 12?

21   A    Yes.

22   Q    But we don't -- you don't have those invoices?

23   A    I don't -- I don't personally have them.

24   Q    Okay.  I'm going to show you a couple of

25   invoices that I've gotten --

COPY

43

1     A     Okay.

2     Q     -- from the request for production, and I just

3  want to make sure that there are true and accurate

4  copies of what you guys would handle.  This is one of

5  the invoices, and I'm going to ask you to authenticate

6  this when you take a look.  Tell me what number this

7  invoice is.

8     A     Invoice --

9          MS. LEITNER:  Can I have a copy?  I'm sorry.

10         MR. RAPACKE:  You can take a look at it first,

11    if you would like.

12         MS. LEITNER:  Thank you.

13         BY MR. RAPACKE:

14    Q     Can you tell me what invoice number that is?

15    A     Invoice 127.

16    Q     Okay.  And can you read the line items on

17  there?

18    A     Bold Tee FSU.  You want just the item code

19  or --

20    Q     Just the description of the goods, if you can.

21    A     Yeah.  Script Tee (men's); Bold Tee, blue;

22  Bold Tee, black; military, tan; scripted V-neck; Baby

23  Bold V-neck; UF, 13 inches; breast cancer, 13 inches;

24  scripted decal, 13 inches; scripted decal, 34 inches;

25  shipping and handling.  Now that I'm looking at this,

**COPY**

1  his decals are the best sellers, actually.

2       Q    Okay.

3       A    More than T-shirts, I would say.

4       Q    Okay.  Great.

5       A    Yes.

6       Q    What's the total on that -- the bottom of

7  that?

8       A    It is $936.39.

9       Q    Okay.  Thank you.

10           MR. RAPACKE:  I'm going to bring this in as

11      Exhibit number 2.

12               (EXHIBIT 2 MARKED FOR IDENTIFICATION)

13               BY MR. RAPACKE:

14      Q    I'm going to show you a second one here,

15  Ms. Torgeman.  Can you read me the invoice number at the

16  top of that, as well?

17      A    It's 280.

18      Q    Okay.  And then can you read me the line item

19  numbers?

20      A    It's Orange/black long-sleeve Bold tee; light

21  pink script sweater; camo decal, 13 inches; camos --

22  it's misspelled -- script decal, 13 inches; American

23  script, 13 inches; 1911 decal; Florida flag decal, 13

24  inches; Gainesville decal, 34 inches; camo decal, 34

25  inches; 72 sweaters in two-sided print; kids' black

**COPY**

1   bold, white standard; kids' blue bold; Flogrown bass

2   tee; girls' scripted black V-neck; camo koozie; Flogrown

3   flag; license plate, camo; orange with camo LS Bold;

4   American tee.

5        Q    Okay.  And what's the total on that?

6        A    It is $1,724.85.

7             MR. RAPACKE:  Okay.  Before I bring this into

8        evidence, Counsel, can you take a look?

9             MS. LEITNER:  No objection.

10            MR. RAPACKE:  No objection.  Okay.  We're going

11       to bring this in as Plaintiff's Exhibit number 3,

12       please.

13            (EXHIBIT 3 MARKED FOR IDENTIFICATION)

14            BY MR. RAPACKE:

15       Q    And I have one more, not going to ask you to

16   read the items, but just read me the invoice number.

17       A    Thank you.

18       Q    And the total.

19       A    Invoice number 315, and the total is $981.00.

20            MR. RAPACKE:  Okay.  Counsel, can you read

21       that?

22            MS. LEITNER:  Okay.  No objection.

23            MR. RAPACKE:  Excellent.  We're going to bring

24       this in as Exhibit number 3 [sic].

25            (EXHIBIT 4 MARKED FOR IDENTIFICATION)

1          MR. RAPACKE:   I'm going to show you -- oh, I'm

2      sorry, Exhibit number 4.   Correction to the record,

3      please.

4              BY MR. RAPACKE:

5      Q    I'm going to show you this document labeled,

6  Flogrown Order Sheet.   Can you tell me if you've seen

7  one of these before?

8      A    Yes.

9      Q    Okay.   And what is that?

10      A    It's the order sheet when Asher goes to the --

11  the warehouse -- I think it's in Forsythe.   He -- he

12  gives Asher sometimes this, like, when it's a lot of

13  merchandise --

14      Q    Okay.

15      A    -- and then Asher just writes down, like, what

16  he wants and that's it.

17      Q    Okay.

18      A    With his signature on there, obviously.

19      Q    Is that Asher's signature on there?

20      A    Looks like it, yes.

21      Q    Okay.   Would you receive one of these with

22  every invoice that you purchased, or --

23      A    No.

24      Q    -- just once in a while?

25      A    Once in a while.

COPY

47

1      Q      Just larger purchases?

2      A      Yes.

3             MR. RAPACKE:   Okay.   I'm going to bring this in

4      as Exhibit number 5 after Counsel's had a chance to

5      review.

6             MS. LEITNER:   No objection.

7             MR. RAPACKE:   All right.   Excellent.   Thank

8      you.   And this is Exhibit number 5.

9             (EXHIBIT 5 MARKED FOR IDENTIFICATION)

10            BY MR. RAPACKE:

11     Q      All right.   In total, do you know what that

12     came out to be, roughly, between those three invoices?

13     A      I -- I was -- you were testing me, my math?

14     Q      No, I'm just saying --

15     A      Okay.

16     Q      -- I'm just saying to you roughly, what --

17     A      Yeah.

18     Q      I'm going to have you take a look again.

19     A      Thank you.

20     Q      You don't have to give me an exact figure, I

21     just want to get a --

22     A      Yeah.

23     Q      -- get a ballpark.

24     A      Yeah.   Okay.   So it's 2,600 plus another

25     1,000.   3,600.

**COPY**

48

1      Q    Okay.  So we got about $3,600 worth of

2  invoices here.  You said that during your time, your

3  two-year time, you spent about $100,000 in purchases of

4  merchandise; is that correct?

5      A    Correct.

6      Q    Okay.  Do we know where the other 96,400 would

7  be?

8      A    Sure.  Jesse has them in his computer

9  somewhere.  He keeps tracks of his invoices.

10      Q    Okay.

11      A    Right?

12      Q    I believe so, but --

13      A    Yeah.

14      Q    -- does he sell -- does he send those to you

15  electronically?

16      A    Sometimes.

17      Q    Okay.

18      A    Some of them were just hard copies.

19      Q    How did you purchase these?  Did you use a

20  credit card, did you pay with cash, did you pay with a

21  check?

22      A    Cash and sometimes -- yes, sometimes checks

23  and sometimes credit card.

24      Q    Okay.  Do you have any bank records to account

25  for the other $96,000?

1      A     I'm sure we can produce it.  We can look at

2    our bank records.  A lot of it is cash, as well.

3      Q     Okay.  It's all cash --

4      A     Yeah.

5      Q     -- or a majority of it is cash?

6      A     Yeah.

7            MR. RAPACKE:  Okay.  Excellent.  Let's take a

8      break.

9            (OFF THE RECORD)

10            BY MR. RAPACKE:

11      Q     All right.  Welcome back.

12      A     Thank you.

13      Q     Let me ask you a couple questions, just

14    circling back.  What did you do to prepare for today's

15    deposition?

16      A     Went over the -- the items on the deposition

17    document that you showed me earlier.

18      Q     Okay.  So you're knowledgeable on all these

19    items?

20      A     Yes.

21      Q     Okay.

22      A     There were some questions that I had as far

23    as -- I didn't understand the way it was worded, but I

24    would answer to the best of my ability.

25      Q     Okay.  Excellent.  I appreciate it.  All

COPY

50

1    right.  Let me go back.  I'm still confused on the store

2    situation.

3         A    Okay.

4         Q    Avi owns some stores.  Can you tell me what

5    store -- all the stores that Avi has owned or currently

6    owns?

7         A    He has owned Lakeland and he currently owns

8    Lakeland and Sanford.

9         Q    Okay.  So he owns Lakeland and Sanford.  Okay.

10        A    Uh-huh.

11        Q    What stores -- and what is the name of his

12   business?

13        A    Southern Traditions, LLC.

14        Q    Okay.  Now, what stores have you owned or

15   currently own?

16        A    Dixie Heritage, LLC has owned Lakeland, has

17   owned --

18        Q    Same store?

19        A    -- Seminole.  Yeah, Dixie Heritage used to own

20   all four locations at one point --

21        Q    Okay.  And then you --

22        A    -- at the onset.

23        Q    -- and then you moved out and he --

24        A    Correct.  And Lakeland moved locations --

25        Q    Okay.

COPY

51

1       A      -- inside the mall.

2       Q      Okay.

3       A      And then Albert took over that.

4       Q      Okay.

5       A      It was just too much for Asher and myself to

6   deal with four stores, so it's a -- it's, like, a split

7   family business, almost.

8       Q      Okay.  But one payroll for --

9       A      One payroll --

10      Q      -- all companies?

11      A      Right.  So -- so I think you might be asking

12  about Patti.  So Patti used to be in our payroll because

13  she started with us when we owned Lakeland.  And then

14  the store moved to a different location and Patti stayed

15  onboard, but then that's, you know, Southern Traditions

16  now.  Has nothing to do with us.

17      Q      Okay.  So Patti is no longer employed at Dixie

18  Heritage?

19      A      Correct.

20      Q      Okay.  That makes sense.  Do you guys sell

21  anything online, do you have a website?

22      A      We do.

23      Q      Do you sell a lot through your website?

24      A      Let me -- let me circle back.

25      Q      Okay.

**COPY**

52

1     A    We don't have a website.

2     Q    You don't -- have you ever had --

3     A    As -- as the representative of Dixie Heritage,

4  LLC, no.  Dixie Heritage, LLC does not have a website.

5  The website's owned by me personally.

6     Q    Okay.  But it sells Dixie Heritage goods?

7     A    It sells some of the products that we sell in

8  the stores, yes.

9     Q    Okay.  So that's a yes, you sell Dixie

10  Heritage goods through your personal website?

11     A    Not Dixie Heritage goods.  It's separate --

12  separate entities, separate merchandise, but --

13     Q    What's --

14     A    -- like, goods --

15     Q    -- what's the --

16     A    -- I mean, like, goods.

17     Q    -- what's the website?  Could you give me

18  the --

19     A    Dixieheritagestore.com.

20     Q    So dixieheritagestore.com is not owned by

21  Dixie Heritage, LLC?

22     A    Correct, correct.

23     Q    It's your personal account?

24     A    Correct.

25     Q    Have you ever sold goods -- Dixie Heritage,

COPY

1    LLC goods through the dixieheritagestore.com?

2        A    No.

3        Q    Okay.  What is sold through the

4    dixieheritagestore.com website?

5        A    Mostly, we have Dixie products, like your

6    Confederate -- and we have some hunting and fishing.

7        Q    But those aren't Dixie Heritage goods?

8        A    They're -- they're -- I mean, I -- I buy them

9    from the same vendors, but I -- I can't put those two

10   businesses together, so I -- you know, the accounting,

11   everything is separate for that.  Does that make sense?

12   So I don't take -- I don't -- if I sell a shirt, I don't

13   take it from Dixie Heritage and sell it.

14       Q    So a minute ago, you said you sell Dixie

15   things through the Dixie Heritage website.

16       A    I sell --

17       Q    Is that --

18       A    -- Dixie Heritage -- it's -- it's the same --

19   it's like-products.  Does that make sense?  Okay.

20       Q    All right.  I'm -- you've got me totally

21   confused.  All right.  Let me ask --

22       A    Okay.  So I --

23       Q    -- let me ask again.

24       A    -- I -- I only have -- on the website --

25       Q    Okay.

COPY

1      A    -- there's -- there's a line of, like,

2   fisherman, which I sell -- I buy from Exist and I buy

3   those -- I sell those things for the fisherman

4   collection.  I have a Dixie collection and I buy from,

5   like, different companies.

6      Q    But you don't sell those Dixie items through

7   your website?

8      A    I sell those Dixie -- personally -- I'm

9   talking about personally, for the website.

10     Q    Okay.

11     A    Okay?

12     Q    Okay.  I am 100 percent confused, but that's

13  okay.

14     A    Okay.  What -- if you have questions --

15     Q    Yeah.

16     A    -- ask me.  I can answer.

17     Q    Okay.  Let's hit this.  Do you advertise Dixie

18  Heritage goods that are in Dixie Heritage's stores on

19  the dixieheritagestore.com website?

20     A    Not the goods themselves because, again, I buy

21  those for the website.  It's a different inventory

22  completely.

23     Q    So --

24     A    It would be --

25     Q    -- what is --

COPY

1        A     -- impossible for me to do -- like, if --

2    let's say I'm selling this shirt on -- online.  I can't

3    keep the same inventory for this shirt as I do for the

4    store.  First of all, we don't keep the inventory in the

5    store, so how do I know that if I put this shirt -- that

6    you buy it and I have it in the store?  So I have a box

7    separate of these shirts that I sell online.

8        Q     Just through the website?

9        A     Correct.

10       Q     Okay.  That makes sense.  How do you keep

11   track of that inventory?

12       A     For the website?

13       Q     Yeah.

14       A     I just -- I -- I have, like, boxes of them.

15       Q     And how do you keep track of the store --

16       A     It's not that --

17       Q     -- inventory?

18       A     -- many.  It's like -- a lot of them are,

19   like, prints, and then a lot of them are, like, just

20   T-shirts.

21       Q     How long has the website been active?

22       A     Well, I opened it last year in March 2017.

23       Q     Do you sell any other goods except Dixie

24   Heritage goods on that website?  Let me rephrase the --

25       A     Did you --

COPY

56

1     Q    -- question.

2     A    -- understand your question?

3     Q    Let me rephrase that question.

4     A    Okay.

5     Q    Aside from Dixie Heritage goods, what other

6 goods do you sell through that website?

7     A    My own, the -- the ones that are on the

8 website.

9     Q    Such as, what are your own?

10    A    So it's Dixie -- Dixie line --

11    Q    Okay.

12    A    -- so it's got, like, the -- the battle flag

13 from the Civil War, so all those apparel -- I have some

14 sweatshirts, some hats.  Then there's, like, a fisherman

15 line.

16    Q    Okay.

17    A    And then there's a hunting line, as well.

18    Q    And you carry those in the -- you carry those

19 same items in the store, as well, so I could buy them

20 online through your website, but those aren't Dixie

21 Heritage store goods --

22    A    Yeah, it's --

23    Q    -- those are just --

24    A    They -- that -- I have them on -- on -- in the

25 store, as well.

COPY

57

1      Q    Okay.  I think I get it.

2      A    Yeah.

3      Q    All right.  Excellent.  Let's see.  Do you

4   advertise the store on the website?

5      A    I do.

6      Q    Okay.  So you advertise the store on the

7   website --

8      A    That was --

9      Q    -- but you don't buy -- but you can't buy

10   something from the store through that website?

11      A    Okay.  So again, it's a family business.

12      Q    Okay.

13      A    So it's an avenue for me to put the stores out

14   there.  So there is -- you -- you order online and then

15   there's a tab where it has locations --

16      Q    Uh-huh.

17      A    -- and then I list all four stores, not only

18   Dixie Heritage, but I also put Avi's on there.

19      Q    Okay.  So Avi's stores are on there --

20      A    Uh-huh.

21      Q    -- as well?  So the -- Avi's stores are on the

22   dixieheritagestore.com --

23      A    Correct.

24      Q    -- but they're not Dixie Heritage stores?

25      A    Correct.  So like, if you buy a product

**COPY**

1   from -- from -- online -- go ahead.  I'm sorry.  I lost

2   of track of thought because my memory's shot.

3       Q    Okay.  Can I purchase a product from Avi's

4   stores online --

5       A    No.

6       Q    -- through the dixieheritagestore.com?

7       A    No.

8       Q    I can't.  Okay.  I have to go into Avi's

9   stores?

10      A    You have to go to Avi's store.

11      Q    Okay.  All right.  Let's circle back -- okay.

12  That makes sense.  I appreciate your --

13      A    And -- and it's a --

14      Q    -- clarifying that for me.

15      A    It's a separate entity as far as, like, if you

16  buy something online, you can't go to the store.  Like,

17  you can't go to Avi's store and return it --

18      Q    Right.

19      A    -- unless it's, like, a special circumstance

20  where I can call Avi and say, "Hey, do me a favor, I

21  just" -- "this lady coming, and" -- you know, it's --

22  where it's --

23      Q    So there are exceptions where you are --

24      A    It's our brother-in-law --

25      Q    Right.

COPY

1    A    -- it's my brother-in-law and absolutely --

2    Q    Right.

3    A    -- you know --

4    Q    I understand.  All right.  So let's go back to

5  Flogrown.  And I'm very impressed by the amount of

6  brands you've got.  You've got some really big brands.

7  How do you keep track of what brands you carry and what

8  are the most popular selling brands at the different

9  stores?

10    A    It's just pretty much standard across the

11  board --

12    Q    What do you mean?

13    A    -- as far as, like, what sells.

14    Q    Okay.

15    A    You know, the major brands are always going to

16  sell more.

17    Q    But there's no inventory system to say, these

18  are what's selling the most?

19    A    No.  We just -- we just -- Asher and I just go

20  to the store, we track, you know -- when we go there,

21  we -- you see -- you see the rack, and you're, like,

22  "Oh, it's" -- "something's selling here because it's not

23  as much as when we had it full," so we -- we start

24  counting and we order.

25    Q    Do you keep track --

COPY

60

1        A      Or every so --

2        Q      -- through, like --

3        A      -- often --

4        Q      -- a POS system?  I'm sorry.

5        A      No.

6        Q      Do you keep track through a POS system?

7        A      There's no inventory POS system, no.

8        Q      Does it -- the POS system track what sales

9   you've had?

10       A      We do custom items, that's the way that our --

11  the -- that's, like -- that's how we enter the sale --

12       Q      Right.  That's how the --

13       A      -- into the --

14       Q      -- receipt would show --

15       A      Yeah.

16       Q      Okay.  I understand.  When you would purchase

17  goods from Flogrown, right, whether it was hats or

18  decals, shirts -- you said shirts and decals were the

19  big sellers, right?  How would they get to your stores,

20  would you pick them up at Flogrown?

21       A      Yes.

22       Q      Would they be delivered to your stores?

23       A      At the very beginning, I -- when -- and I

24  remember when I was in Sanford because it's close to the

25  Flogrown warehouse, Jesse would sometimes drop off at

COPY

61

1    the store --

2        Q    Okay.

3        A    -- but I would say 99 percent of the time,

4    Asher went to the warehouse, he placed the order, and he

5    picked it up himself.

6        Q    Okay.  And would he receive a receipt of what

7    he purchased?

8        A    Sometimes, sometimes no, depending.

9        Q    Okay.

10       A    There were some things that Jesse, like, gave

11   him, so I can't tell you it was, like, 100 percent we

12   received invoices.

13       Q    So you didn't receive --

14       A    Some -- some --

15       Q    -- an invoice when he picked up those?

16       A    -- sometimes.

17       Q    Okay.  Are they invoices -- are they the only

18   invoices that we have here?

19       A    No, there's a lot more invoices.

20       Q    Okay.  And can you produce those for me?

21       A    I can go back on my records and -- yeah --

22       Q    Okay.

23       A    -- I guess.

24       Q    How long do you think it will take you to get

25   those?

COPY

1       A    I think seven days.  It's a decent amount.

2       Q    Seven days.  Okay.  Great.  So just to make

3  sure that I understand this -- and bear with me here --

4  every time an order was purchased, generally speaking,

5  your husband, Asher Torgeman, would go to the Flogrown

6  warehouse and pick it up?

7       A    Uh-huh.

8       Q    Okay.  And then there was an invoice that

9  would go with the goods that he purchased?

10      A    Most of the time.

11      Q    Would you inventory the goods there to make

12  sure everything matched the invoice?

13      A    No, there was that much trust.

14      Q    Okay.  There was that much trust.  Did Jesse

15  Welch ever deliver goods to your stores?

16      A    In Sanford, at the very beginning.

17      Q    Only to the Sanford location?

18      A    Yeah.  I remember I was there one time and he,

19  like, brought it and I --

20      Q    Okay.

21      A    -- I --

22      Q    Did he ever deliver goods to a personal

23  residence?

24      A    Yes, he did.  He did.

25      Q    Do you know how many times he delivered goods

**COPY**

1   to your personal residence?

2        A     Probably a handful of times, not that many.

3        Q     So 99 percent of the time --

4        A     Yeah.

5        Q     -- you picked it up, but a handful of times,

6   he would deliver it to your residence?

7        A     Yeah.

8        Q     So that must have been --

9        A     There was a -- there was a couple of times

10  that it was -- you know, like, we needed a certain

11  inventory by the following day, but he hadn't -- he

12  wasn't able to print everything by a certain time, so he

13  was, like, "Okay, I'm on my way home."  I think Jesse

14  lives very close to our house, so he would just drop it

15  off and then go.

16       Q     Okay.  Would Avi order separate goods from

17  Dixie Heritage for his stores?

18       A     Avi never made an order.

19       Q     How did Avi get shirts in his store, then?

20       A     Through Asher.  Asher was the buyer.

21       Q     So Avi owns stores --

22       A     Yes.

23       Q     -- carried Dixie Heritage, LLC products, was

24  advertised on the Dixie Heritage, LLC website, and all

25  inventory came from Dixie Heritage, LLC stores; is that

**COPY**

64

1    correct?

2         A    It came from -- it came from Asher's ordering.

3         Q    Right.  So Asher would --

4         A    Yeah.

5         Q    -- order for Avi?

6         A    Absolutely.

7         Q    There were no separate orders by Avi?

8         A    No.

9         Q    Okay.  Thank you.  All right.  I just wanted

10   to make sure that I understood that.

11        A    Yeah.

12        Q    Did -- now, would Asher make separate orders

13   for Dixie and then make a separate order for --

14        A    No.

15        Q    -- Albert's?

16        A    No.

17        Q    Or he would just kind of --

18        A    Yeah, all together.

19        Q    -- make one big order and then just decided --

20        A    Oh, yeah, absolutely.

21        Q    -- what would go to one store?

22        A    Yeah, we would decide -- we would just go to

23   every store, take inventory of what we needed and --

24        Q    So you did take an inventory?

25        A    No, accounts.  You need to do accounts.

1        Q    Okay.  I'm not sure I understand.  What's the

2   difference between accounts and inventory?

3        A    Inventory, you actually have to, like, write

4   it down and keep records of it, correct?  That, we did

5   not do.  What we did was --

6        Q    Now, how's that different from accounts?

7        A    So if -- if I need to order a dozen shirts

8   of -- I don't know -- camo T-shirts --

9        Q    Okay.

10       A    -- I would go to Flogrown and order that, but

11  I wouldn't necessarily keep an inventory.  But in -- in

12  retail, the -- that word is -- you know, you can just go

13  and take inventory, but there's no records of it.  Does

14  that make sense?

15       Q    Yes.

16       A    Okay.  Yeah, it's not confusing.

17       Q    Okay.  So internally, did you guys keep

18  records to know what goods Albert had and what goods

19  Asher had?

20       A    No.

21       Q    How would Albert know what the top selling

22  brands were?  Does he keep a separate inventory?

23       A    No.  Asher -- Asher would pretty much -- he

24  was the buyer, so Asher would pretty much go to the

25  stores and, again, count --

**COPY**

66

```
 1        Q      Uh-huh.
 2        A      -- so we don't confuse it with inventory -- he
 3   would take a count, and then he would just go to each
 4   different vendor and just order the amounts that we
 5   need --
 6        Q      Okay.
 7        A      -- and then split them up.
 8        Q      Okay.  Give me one sec.  Okay.  How would you
 9   divide up the orders?  How were they paid?  I mean,
10   would Albert pay separately, would Albert pay to Asher?
11        A      No.
12        Q      So Asher paid for all the goods that were
13   carried --
14        A      Oh, yeah.
15        Q      -- at Albert's --
16        A      Yes.
17        Q      -- stores?
18        A      No, no.  Yeah, Ash -- once it's split up, then
19   Avi will pay Asher.  So if he takes a dozen shirts and
20   it was $120, Avi gives Asher $120.
21        Q      But there was no inventory system to say,
22   "Avi, I'm giving you a dozen shirts, please pay me for
23   these dozen shirts?"
24        A      No, they're brothers.
25        Q      Brothers don't keep records?
```

COPY

1       A     They're very close.

2       Q     Okay.  Let's go --

3       A     This is -- this is, like, family business.

4       Q     Right.  I understand.

5       A     Yeah.

6       Q     Okay.  No, that's fine.  All right.  Let's get

7    going on this.  All right.  Electronic invoices -- all

8    right.  You would pick up goods from Flogrown and he

9    would hand you an invoice most of the time.  You

10   previously said that sometimes there would be electronic

11   invoices that were sent --

12      A     Correct.

13      Q     -- is that correct?

14      A     Correct.

15      Q     Do you know what e-mail those were sent to?

16      A     Ashertorgeman@hotmail.

17      Q     Okay.  They were sent to

18   ashertorgeman@hotmail?

19      A     Correct.

20      Q     Are those -- are there additional invoices

21   that were sent to ashertorgeman@hotmail.com that are

22   aside from the exhibits shown here?

23      A     Absolutely.

24      Q     Okay.  Can I get a copy of those records?

25      A     Yes.

**COPY**

68

1        Q     Can I get those within seven days?

2        A     Yes.

3        Q     Was it standard for Dixie Heritage to use

4    personal e-mails to communicate or to receive invoices

5    back and forth?

6        A     Wait.  Repeat the question.

7        Q     Was it standard practice --

8        A     Uh-huh.

9        Q     -- to use personal e-mail, such as

10   ashertorgeman@hotmail.com --

11       A     Uh-huh.

12       Q     -- to receive invoices back and forth --

13       A     Yeah.

14       Q     -- with companies?

15       A     That's the -- that's the only company e-mail

16   that we have, ashertorgeman@ --

17       Q     There's not a dixieheritagestore.com or

18   dixieheritagestore@gmail.com?

19       A     Again, that's a different entity, and that

20   just -- the -- it's -- it's sales@dixieheritagestore.com

21   for the website, and that's just to handle e-mails with

22   customers for website purchases.

23       Q     Can you repeat that e-mail address?

24       A     Sales@dixieheritagestore.com.

25       Q     Sales@ --

COPY

69

```
 1        A    Dixieheritagestore --

 2        Q    -- dixieheritagestore.com --

 3        A    Correct.

 4        Q    -- handles only online website purchases?

 5        A    Yeah, it's, like, the -- it's, like -- when

 6   you open a website, it comes with, you know, an

 7   e-mail --

 8        Q    Okay.

 9        A    -- server, so we just -- we just use it for

10   that.

11        Q    Okay.  But all electronic invoices, whether

12   from Flogrown or Bucked Up or all these brands --

13        A    Anything is handled with

14   ashertorgeman@hotmail.

15        Q    At ashertorgeman.com [sic]?

16        A    Correct.

17        Q    Okay.  Were invoices ever sent to any other

18   e-mails, that you know of?

19        A    No.

20        Q    Does -- is there an

21   alberttorgeman@hotmail.com?

22        A    There -- I don't know what Avi's e-mail is.  I

23   think it's avivtorgeman --

24        Q    Are electronic invoices sent --

25        A    -- @gmail.  No, no, Flogrown never dealt with
```

COPY

70

1    Avi.

2         Q    Flogrown never dealt with Avi because --

3         A    Yeah.

4         Q    -- Asher would buy goods for Avi?

5         A    Correct.

6         Q    Even though Avi wasn't part of Dixie Heritage?

7         A    Correct, because at the beginning, the

8    business was all under Dixie Heritage.

9         Q    Right.  Who administered the website, who

10   administered the e-mail accounts?

11        A    The e-mails accounts?  The website?

12        Q    Right.

13        A    Me.

14        Q    You are the administrator?

15        A    Yeah.

16        Q    Okay.  You would make changes, you would put

17   up new products, you would --

18        A    Yeah, it's all me.

19        Q    Okay.

20        A    Uh-huh.

21        Q    How about e-mails, who was responsible for

22   monitoring and checking e-mails?

23        A    For the website?

24        Q    For your e-mail address, for

25   ashertorgeman@hotmail.com.

COPY

71

1      A      Asher and myself.

2      Q      Okay.  Did Flogrown ever deliver merchandise

3  to any other location outside of a Dixie Heritage store?

4      A      Did Flogrown ever --

5      Q      Deliver any merchandise outside of your Dixie

6  Heritage stores?

7      A      Just the -- at my house.

8      Q      And that was just one time?

9      A      That was a -- maybe -- maybe once, twice.

10         I -- I can't remember.

11     Q      Okay.

12     A      Yeah.

13     Q      Okay.  Are you aware that we requested the

14  inventory records today?

15     A      Yes.

16     Q      But we don't have any inventory records; is

17  that correct?

18     A      Correct, no inventory records.

19     Q      Okay.  All right.  I understand.  All right.

20  So let's talk -- let's get into Flogrown.  Have you ever

21  placed a Flogrown mark on any garments, any merchandise,

22  any goods?

23     A      No.

24     Q      You never have?  Let me make sure that I

25  understand that.  You've never placed a Flogrown mark on

1  any garments?

2       A     Correct.

3       Q     Okay.  Have you ever caused another person,

4  trained another person, had an employee place a Flogrown

5  mark on any other goods?

6       A     No.

7       Q     Okay.  So the -- okay.  The reason I ask this

8  is Dixie Heritage claimed in its answer to the

9  interrogatories we sent --

10      A     Uh-huh.

11      Q     -- that it was routine for Flogrown to give

12  Dixie Heritage garments for Dixie Heritage to place the

13  Flogrown mark on and then give back to Flogrown.

14      A     No, that's the opposite.

15            MS. LEITNER:  Object to form.

16      Q     Okay.  I'll reask the question.  Your Answer

17  to Interrogatories stated it was routine for Flogrown to

18  give Dixie Heritage garments, and Dixie Heritage would

19  place a Flogrown mark on those garments and return them

20  to Flogrown; is this correct?

21            MS. LEITNER:  Object to form.

22      Q     Can you please answer the question?

23      A     No.

24      Q     You're refusing to answer my question?

25      A     No, it's not correct.

COPY

73

1       Q     Okay.

2       A     It's the opposite.  We gave the garments to

3   Flogrown, Flogrown printed them, we picked them up.

4       Q     Okay.

5       A     We have never printed the Flogrown mark on any

6   garments.

7       Q     Have you ever purchased Flogrown goods from

8   anywhere aside from Flogrown or Jesse Welch?

9       A     No.

10          MS. LEITNER:  Object to form.

11      Q     Can you answer the question, please?

12      A     Okay.  Repeat it.

13      Q     Have you ever purchased Flogrown goods outside

14  of a Flogrown warehouse or Jesse Welch?

15          MS. LEITNER:  Object to form.

16      Q     Can you answer the question, please?

17      A     Have we ever purchased Flogrown goods outside

18  of the warehouse --

19      Q     Correct.

20      A     -- or Jesse Welch?

21      Q     Yes.

22      A     There was one time that Jesse sold to one of

23  our friends and the inventory didn't sell in his store,

24  and we did contact Jesse and let him know that we're

25  buying it off -- from him, and we did get stuff from

1   him.

2          Q    Can you tell me when that was?

3          A    It was during the Christmas season, and we

4   were in Oviedo, so it was 2016.

5          Q    Do you remember what those goods were?

6          A    It was a lot of tank tops and T-shirts and

7   women's shirts.

8          Q    What did you do with those goods?

9          A    We still have most of it.  I think we got

10  stuck with it.

11         Q    You didn't -- you weren't able to sell them?

12         A    We -- we -- yeah, we have some.  I mean, we

13  sold some --

14         Q    Okay.

15         A    -- but --

16         Q    Okay.  In your day-to-day responsibilities as

17  manager, are you in charge of training and training new

18  employees?

19         A    Yes.

20         Q    Okay.  Do you own a heat press?

21         A    Yes.

22         Q    How many heat presses do you own?

23         A    Four.  Well, Dixie Heritage now owns just the

24  two and then Avi has the two, but yes, at one point, we

25  did purchase four, for each location.

**COPY**

75

1    Q    Okay.  And where are they located now?

2    A    In each store -- in the store.

3    Q    Okay.  Can you remind me of what stores they

4    are?

5    A    Yes.  Lakeland, Merritt Island, Melbourne,

6    and -- Merritt Island, Melbourne, and Sanford.  Sorry.

7    Our first store.

8    Q    Okay.  Do you own any other heat presses

9    except for those four?

10    A    No.

11    Q    Where did you buy those heat presses?

12    A    From, like, third-parties.  They were used.

13    Q    Do you have records of those purchases?

14    A    No.

15    Q    Do you own any of these heat presses at your

16    residence location?

17    A    No.

18    Q    Okay.  I'm going to show you a picture that

19    I'd like you to authenticate and tell me if this is what

20    a heat press is.

21        MR. RAPACKE:  Did you want to take a look?

22        MS. LEITNER:  Yes.  Thank you.

23    A    Yes.

24    Q    Is that a heat press?

25    A    Uh-huh.

COPY

1      Q    Okay.  Can you tell me how it works?

2      A    Yeah.

3      Q    I mean, I don't know.  I never worked at a T-

4   shirt shop, so how do you do it?

5      A    Just put the T-shirt underneath there with the

6   transfer --

7      Q    Okay.

8      A    -- and then you take down the lever.  Some of

9   them are on a compressor, so they're automatic and they

10  open up, and then some are manual where you -- after ten

11  seconds, it will lift up.

12     Q    So you put the shirt down, you close it --

13     A    Yeah.

14     Q    -- some open up after a time --

15     A    Put the shirt down with the transfer.

16     Q    Okay.

17     A    Sorry, I don't -- it's that -- with the sound,

18  I'm sorry -- the transfer, and then you pull down the

19  lever and it will automatically open after ten seconds,

20  I believe it is.

21     Q    And then the shirt's ready to be worn?

22     A    You peel out the transfer.

23     Q    Okay.

24     A    Uh-huh.

25     Q    Where would you buy your transfers?

**COPY**

1    A    We get all of our transfers from Charlie

2  Transfers [sic].

3    Q    Okay.  And --

4    A    He has a website.  It's charlietransfers.com

5  [sic].

6    Q    Okay.  What would be on the transfers when you

7  would purchase them?

8    A    The different designs.

9    Q    Can you tell me all the designs that you would

10  buy from Charlie Transfers [sic]?

11    A    Wow.  We have over 500 designs in the store

12  and we've been buying from Charlie since we were in the

13  flea market.

14    Q    Do you have any Flogrown transfers?

15    A    No, he doesn't sell that.  There's no custom

16  transfers there.  He works with, like, eight different

17  vendors, like, major companies, and he's -- he's, like,

18  the seller for those major companies.

19    Q    So of the 500 you have, there's no customized

20  ones; is that correct?

21    A    Correct.

22    Q    Okay.  Who operates the heat presses at your

23  locations?

24    A    All of us.

25    Q    Okay.  Do you --

**COPY**

78

1      A      All of the employees --

2      Q      -- train the new --

3      A      -- are trained.

4      Q      -- employees how to do it?

5      A      Absolutely, everybody.

6      Q      Is there a --

7      A      Safety and --

8      Q      -- training --

9      A      -- everything.

10     Q      Is there any sort of training record that you

11  show to the employees on how to do it safely, so they

12  don't burn themselves or injure themselves, or --

13     A      It's part of their training and they -- you

14  know, we do, like, a four-day training, and all four

15  days, we go over safety and we go over how to -- how to

16  print.

17     Q      And it's four days long?

18     A      It's a four -- like, four -- four separate

19  days.

20     Q      Four separate days.

21     A      Four -- four hours, but each day, it's -- I

22  mean --

23     Q      Do you have any --

24     A      -- it-s very --

25     Q      -- records of --

**COPY**

79

1      A     -- easy to use the press.

2      Q     Do you have any records of those trainings?

3  How do you know how to -- how do you know you're giving

4  a standard training to one employee versus another

5  employee?

6      A     I mean, you know how it is to train employees.

7  Some people get it right away and some people, you know,

8  you have to draw it out for them, you know.

9      Q     Is there any training material you use?

10     A     No, we just use what we have there in the

11  store.

12     Q     And what is it that you have there in the

13  store?

14     A     T-shirts, like, for garments for printing, we

15  have T-shirts, we have sweatshirts, we have kids'

16  apparel, other types of apparel, too, yeah.

17     Q     So you would just create one and then ask the

18  employees to create one, is that how you would train

19  them?

20     A     I would -- they -- they work with me during

21  the training --

22     Q     Uh-huh.

23     A     -- for that four-hour period, and if a

24  customer comes in and asks, you know, for a printed

25  garment, this is obviously a good opportunity for me to

COPY

80

1    train them, but then we also go -- like, we do, like,

2    one T-shirt, at least --

3         Q    Uh-huh.

4         A    -- if that's not the scenario.

5         Q    Okay.  That makes sense.  Do you have any

6    computer files with the Flogrown mark on it?

7         A    No.

8         Q    Okay.  Do you have the Flogrown mark anywhere

9    in your store except for the T-shirts?

10        A    I think he's given us, like, some banners and

11   stuff for marketing.

12        Q    Okay.  Of all the brands that you carry,

13   right, you said you've got some big major brands, right?

14        A    Uh-huh.

15        Q    We've established that.  How does your

16   employee know which marks are owned by which brands?

17        A    I don't think they know.

18        Q    They don't know?

19        A    What do you mean?

20        Q    So how would I know if that's a genuine

21   Flogrown mark or a genuine Bucked Up mark?  Do you train

22   them on what a trademark is?

23        A    No.

24        Q    No?  Okay.  So how do they know what -- if --

25             this Bucked Up shirt, if this is a real shirt

COPY

1   or if this

2   is a fake shirt?

3        A     I don't think they know.

4        Q     They don't know the different between a --

5        A     Yeah.  Why would they know?

6        Q     Okay.  Going back to the purchase of Flogrown.

7   When you would buy Flogrown goods, right, we said 99

8   percent of the time, you would pick them up?

9        A     Correct.

10       Q     A couple times, there were delivered?

11       A     Correct.

12       Q     At the time of purchase, were there hang tags

13  on them?

14       A     This was always, like, a battle with them

15  because they never produced, like, a complete product.

16  Sometimes they didn't have the tags back here, you know,

17  like, the --

18       Q     The hang -- or yeah, the --

19       A     He doesn't -- yeah --

20       Q     -- the tag --

21       A     -- he doesn't --

22       Q     -- on the shirt?

23       A     -- do the tag, but he -- he will do the

24  printing, you know, like, Flogrown.

25       Q     Uh-huh.

COPY

1    A    Sometimes he didn't have that, sometimes --

2         most of the time, it didn't have the tags, so

3    he would just give us, like, a stack of them --

4    Q    So you would have --

5    A    -- to -- to do it for him.

6    Q    So you would get the shirts --

7    A    Yes.

8    Q    -- and then you would get a stack of --

9    A    Of Flogrown --

10   Q    -- Flogrown --

11   A    -- hang tags.

12   Q    -- hang tags?

13   A    Yeah.

14   Q    And then you would put them on the shirt and

15   then put the shirt out for sale?

16   A    Right.

17   Q    Okay.  And was that routine?

18   A    Sometimes.  I mean, sometimes, he did --

19   Q    How do you know how many --

20   A    -- like I said --

21   Q    -- hang tags to get?

22   A    He would just -- he will give it to us.

23   Q    Okay.  Would he just give you a stack?

24   A    Just a stack.

25   Q    Okay.  There was no, "Hey, you're purchasing

1    12 shirts, here's 12 hangtags"?

2         A    Yeah.

3         Q    Okay.  Do you remember what you sold -- what's

4    your average sales price for a T-shirt?

5         A    19 -- for a Flogrown or --

6         Q    For any shirts.

7         A    I think it's 19.99 --

8         Q    So if I --

9         A    -- to say --

10        Q    -- went to one of the Dixie stores, a Bucked

11   Up shirt --

12        A    Yes.

13        Q    -- would cost me 19.99?

14        A    Yes.

15        Q    Okay.  How about Flogrown shirts?

16        A    19.99.

17        Q    Okay.  That makes sense.  What brands of

18   shirts do you get from each supplier, do you know?

19        A    Each supplier has their own brand.

20        Q    Right.

21        A    Right.

22        Q    So you -- I mean, so what I'm asking is:  If

23   you were going to get a Bucked Up shirt, would that

24   always come on a Hanes shirt, or a Fruit of the Loom

25   shirt, or a Gildan shirt?

1        A     It depends what they use, right?  I mean --

2        Q     Do you know what they use?

3        A     Yeah, sometimes.  You could tell by the

4    quality of the shirt, and sometimes it has the hang tag,

5    like, they don't remove it.

6        Q     Okay.

7        A     Like, Bucked Up shirts, for instance, since

8    you mentioned them, they mostly come in Gildan shirts.

9        Q     Do they always come in Gildan shirts or would

10   they come in different kinds of shirts?

11       A     There's other kinds of shirts.

12       Q     Do you know what brands that those are?

13       A     A lot of companies use Next Level --

14       Q     Okay.

15       A     -- I think, but his are -- Bucked Up

16   specifically, Gildan mostly.

17       Q     Who is he?  Is it --

18       A     Bucked Up.

19       Q     Okay.  Bucked Up usually uses Gildan?

20       A     Gildan, yeah.

21       Q     Okay.  And that's typical that they would just

22   use kind of, like, one brand for a T-shirt, maybe a

23   different brand for a hoodie or a long-sleeved shirt

24   or --

25       A     Sometimes, depends.

COPY

85

1      Q     Okay.

2      A     There's -- I mean, remember, there's, like,

3   different styles --

4      Q     Okay.

5      A     -- as well.

6      Q     How do you keep track of that?

7      A     Why would I keep track of them?  That's --

8   that's the supplier.

9      Q     Well, you wouldn't want to know that Bucked Up

10  is carrying Gildan or they have switched over to Next

11  Level, or anything like that?

12     A     No, it's irrelevant to our business.

13     Q     Okay.  Do you know what brands of garments you

14  receive from Flogrown?

15     A     He switches stuff quite a few times.  I think

16  he started with Gildan.  I have some older stuff that I

17  looked at before coming, like, when I was reviewing your

18  notes.

19     Q     Uh-huh.

20     A     He's got some stuff from Gildan, he's got some

21  stuff from Next Level.  Depends.  He -- he has some that

22  are, like, the dry fit --

23     Q     Uh-huh.

24     A     -- and then some stuff that I -- I don't even

25  know because he takes the tag off and then he puts his

1    own brand on it.

2         Q    Okay.

3         A    Yeah.

4         Q    Okay.  So you don't know all the brands that

5    you receive from Flogrown?

6         A    He's -- he has a lot.  He's used a lot of

7    different shirts and quality shirts.

8         Q    Okay.  I understand.  Can you tell me, again,

9    all the garment types that you receive from Flogrown?

10   The types of garments that you would purchase, regularly

11   purchase?

12        A    Sure.  Hats.

13        Q    Uh-huh.

14        A    I'm trying to start from, like, head to toe.

15   Hats, sunglasses, lanyards, men's shirts, women's

16   shirts.  He doesn't do bottoms.  He's got phone cases,

17   kids' shirts.  There's more, I'm sure.  He has a huge

18   line.

19        Q    Okay.  Just making sure that I understood

20   that.  Now, you mentioned that you guys provided

21   garments to Flogrown and then Flogrown would put their

22   logo on it and give it back to you?

23        A    Yeah.

24        Q    Okay.  How many times did that happen?

25        A    I know that it all happened between May --

1          because that's one of the things that I -- I
2    reviewed --
3          it was May 2016 through November 2016 where he
4    --
5      Q    So about six months?  All right.
6      A    Yeah.  He offered Asher -- he said he was
7    starting to do printing for other companies --
8      Q    Okay.
9      A    -- so he offered Asher if there was anything
10   and he -- and that's -- you know, we -- we provided some
11   of the stuff for him to print the Flogrown mark, because
12   he didn't have it and we knew it would sell, but he's,
13   like, "I just don't have that" -- "those garments right
14   now."
15     Q    Okay.  Do you remember what garments were
16   provided to Flogrown?
17     A    Yes.  We did some sweatshirts, black, pink,
18   and camo.
19     Q    Uh-huh.
20     A    And we did some onesies --
21     Q    Uh-huh.
22     A    -- and we did some ladies' T-shirts and kids'
23   shirts.
24     Q    Okay.  Do you know how many times you provided
25   goods to Flogrown for them to put the mark on?

**COPY**

88

1      A     Like, how many times we did that?  There was

2  one instance with the sweatshirts, there was another

3  instance with kids' shirts, and there was one instance

4  with the onesies, so probably three.

5      Q     Okay.  So it wasn't routine?

6      A     No.

7      Q     Okay.  And how would the -- you get the goods

8  over to Flogrown?  Would you just deliver them, would

9  Jesse come and pick them up?

10      A     Right.  No, we would deliver the goods to

11  Jesse at the warehouse.

12      Q     Okay.  Would Jesse give you an invoice?

13      A     He did not invoice us for any of the custom

14  stuff.  The only time he invoiced us was for the -- the

15  sweatshirts, and that was by mistake because his

16  employee was the one that gave us the merchandise and he

17  included it with the other order that we had made.

18      Q     Okay.  So when you would deliver those goods

19  to Jesse Welch --

20      A     Uh-huh.

21      Q     -- he only invoiced you one time; is that

22  correct?

23      A     Correct.

24      Q     Okay.  I'm going to pull Exhibit -- what is

25  it -- invoice 280 is Exhibit number 3, and I believe --

**COPY**

1   A    He invoiced -- he invoiced us -- it was the --

2   the sweatshirts.  I believe it might be in two different

3   invoices.

4   Q    It might be in two different invoices?

5   A    Yeah.

6   Q    Do you remember which invoices they were?

7   A    I don't remember the number.  I know, like,

8   one of them said printed camo, and then the other one

9   was, like, 72 printed sweatshirts, front and back.

10   Q    So he invoiced you more than once, then?

11   A    Twice, yeah, I think so.

12   Q    Okay.  So it was more than once?

13   A    Yeah.

14   Q    Okay.  Did you review any of the documents to

15   prepare to understand what these custom printing

16   invoices entailed?

17   A    Can you rephrase the question?  I don't

18   understand.

19   Q    Did you look at your records before this to

20   view how many times custom printing was done with Jesse

21   Welch or Flogrown?

22   A    No, I'm talking off of, like, memory and what

23   we have --

24   Q    Okay.

25   A    -- what we had.

**COPY**

90

1      Q    Was that part of the notice of deposition

2  duces tecum; do you recall?

3      A    I don't remember.  It mentioned, like, how

4  many times did you do that.

5      Q    Okay.  Aside from -- I'll strike that.

6           Aside from Exhibit 3, which is invoice 280,

7  are you stating that there's no other invoices that

8  would reflect custom printing by Flogrown?

9      A    Which one is 280?

10      Q    I'll show it to you right here.

11      A    All right.  This is the one that has the

12  sweatshirts --

13      Q    Uh-huh.

14      A    -- the two-sided sweatshirts.  And then I

15  remember seeing another invoice that said, camo printed

16  sweatshirts, something to that effect, I just don't have

17  this -- the invoice.  And I --

18      Q    Okay.

19      A    -- believe it was -- it must have been, like,

20  either the same day or like, a day after --

21      Q    Okay.

22      A    -- because we gave him all the sweatshirts at

23  once.

24      Q    Okay.  Thank you.

25           MR. RAPACKE:  Do you want to take ten?

COPY

1           MS. LEITNER:  Sure.

2           MR. RAPACKE:  Okay.

3            (OFF THE RECORD)

4           MR. BEDRAVA:  So I kick off some questions?

5           MR. RAPACKE:  Sure.

6           MS. LEITNER:  I'm sorry.  Are -- can you

7      establish who the lead is then, because I --

8           MR. RAPACKE:  Yeah --

9           MR. BEDRAVA:  Andy is.

10          MR. RAPACKE:  -- I mean, I can -- I could keep

11     asking if you would like?

12          MS. LEITNER:  Yes, that would be great, just

13     for purposes of record, having it flow better, I'd

14     appreciate just one is designated as lead.

15          MR. RAPACKE:  Yeah, I'll take it.

16          MS. LEITNER:  Okay.  Thank you.

17           BY MR. RAPACKE:

18     Q    I want to ask about August 2016.  Are you

19     aware of an incident in August 2016 where your husband,

20     Asher Torgeman, visited the Flogrown warehouse?

21     A    I'm sure he visited in August, yeah.

22     Q    Right.  Were you aware of an incident where

23     there was alleged counterfeit goods found in a -- in its

24     Oviedo and Seminole Towne Center location?

25          MS. LEITNER:  Object to form.

COPY

92

1      Q      Can you answer the question, please?

2      A      If -- if there was counterfeit what?

3      Q      That there was counterfeit goods found in the

4    Oviedo and Seminole Towne Center locations?

5      A      There was no counterfeit in either location.

6      Q      Okay.  Let's go back to the incident where you

7    mentioned that you purchased some goods from a different

8    location -- Flogrown goods from a different location.

9    Can you tell me when you did this?

10     A      From a different retailer?

11     Q      Correct.

12     A      It was -- it was in and around the Christmas

13   of 2016.

14     Q      Okay.  And what -- where was --

15     A      That's this -- in --

16     Q      -- that location?

17     A      Where the -- this -- the other retailer?

18     Q      What location did you purchase these goods

19   from?

20     A      It's a different -- it's -- it's a different

21   retailer.  He's -- he's got a store in Panama City.

22     Q      Okay.  What's his name?

23     A      I don't have it right now, but I can provide

24   it for you.

25            MS. LEITNER:  Sorry.

COPY

1      Q    Do you have any sales receipts for this

2    purchase?

3      A    No.

4      Q    You -- was there any other witnesses?

5      A    I'm sure the owner of that store can -- can

6    say that he -- he sold it to us.

7      Q    So the location of the store is Panama City,

8    we don't know the name of the store?

9      A    It's something with Palm -- something.  Sorry.

10   And I think his name is Yossi (phonetic).  Yeah.  Yossi

11   is the --

12     Q    So Yossi --

13     A    -- is the owner of the store in -- in Panama

14   City.

15     Q    Why did you purchase those goods at the Panama

16   City store?

17     A    He gave it to us for a discount.

18     Q    Okay.  What was the discount?

19     A    I'm not 100 percent, so if he would have

20   bought them from Jesse, say, $9.00, he gave it to us for

21   $3.00 off, or 50 percent off.

22     Q    Can you tell me what goods they were?

23     A    It was tank tops, T-shirts, stickers.  There

24   might have been some hats in there.  He -- he had

25   purchased from Jesse, like, $20,000 and he just couldn't

COPY

94

1    move the goods.

2        Q    Why did you buy them from Panama City instead

3    of just ordering them from Flogrown?

4        A    We originally gave the contact to Jesse

5    because Yossi is a friend of Asher's that owns that

6    store out in Panama City.

7        Q    Uh-huh.

8        A    He has, like, a swimwear and, like, beach --

9    it's, like, a beach store at the -- Panama City --

10       Q    Uh-huh.

11       A    -- and he told Asher -- Asher told him that,

12   you know, Flogrown might be a good product for him to

13   sell there.  And he -- he's -- like, he -- he makes a

14   lot of money there, so he bought, like, $20,000 worth of

15   Flogrown, but he just couldn't move it, nobody was

16   buying it.

17       Q    Sure.  And we don't remember the name of the

18   store?

19       A    I remember it has, like, a palm tree on it,

20   but I'm sorry.  I can give it to you, definitely.

21       Q    What did you do with these goods after you

22   purchased them?

23       A    We put it in the store.

24       Q    Okay.  Did you take inventory of those goods

25   before you put them in the store?

COPY

1      A      There -- there was an inventory of -- of what

2  we got from him, but it was, like, a count that I

3  remember I personally did when we got the boxes from him

4  just to make sure, you know, that he is delivering the

5  goods that -- that he -- that he delivered.

6      Q      So there was an accounting of what he

7  delivered.  I thought you purchased them at the store?

8      A      No.

9      Q      He delivered them to your store?

10     A      He -- he mailed them to us.

11     Q      Okay.  So he didn't deliver them to your

12 store?

13     A      He mailed them to us.

14     Q      Okay.  He mailed them to you.

15     A      Okay.

16     Q      Okay.  And there was an inventory of what you

17 received from him?

18     A      I took a count of it.

19     Q      Okay.

20     A      Yes.

21     Q      Was there sales receipts?

22     A      And -- and you know, I think it was really,

23 like, a -- like, a flat amount.  Like, let's say he told

24 Asher, "I'll give you everything for $8,000, $9,000."  I

25 can give you that figure, that's not a problem.  I'm

**COPY**

1    sure we --

2         Q    So you took an inventory of that, though,

3    correct?

4         A    We took a count of them.

5         Q    Okay.

6         A    Yeah.  I -- I want to make sure, yeah, because

7    you're sticking on that inventory.  We don't have

8    inventory.

9         Q    Okay.  You took an account on that --

10        A    A count of them.

11        Q    -- but you didn't regularly take an account on

12   stuff --

13        A    I did, of course.

14        Q    -- in the Dixie Heritage stores?

15        A    Of course, I counted the stuff we have.  How

16   else am I going to order?

17        Q    Okay.  But we're not counting -- calling that

18   an inventory?

19        A    Correct, because I don't have records of it.

20        Q    Okay.

21        A    Okay.

22        Q    Okay.  That's interesting.  Did he tell you

23   what you were buying and the amount that you were

24   buying?

25        A    Who?  The --

COPY

97

1     Q     The --

2     A     Yossi from --

3     Q     -- person we don't have a --

4     A     -- palm -- from Panama City?  Yeah, he told

5   us, "I'm going to send you a box with," this many

6   stickers, this many this.  And I remember after we

7   counted everything, like, some of the stickers were

8   damaged, so he gave us, like, another discount.

9     Q     Okay.  How would you know that those were

10  genuine Flogrown goods?

11    A     We told Jesse we're buying everything back

12  from him because he can't move it.

13    Q     Okay.  And Jesse gave you --

14    A     The okay.

15    Q     -- express permission?

16    A     Oh, yeah, absolutely.

17    Q     Do you have a record of that?

18    A     Asher just talked to Jesse on that.

19    Q     There's no e-mails?

20    A     No, I don't believe there is.

21    Q     Are there any phone records?

22    A     No, I don't -- I mean --

23    Q     No phone records?

24    A     No, I don't know if they talked in person, but

25  I -- I -- you know, because he -- he asked Asher, like,

**COPY**

98

1    how's -- how's the stuff moving over there with his

2    friend and Asher said, "He's not moving it and I'm

3    actually buying it from him."

4         Q    Do you remember what the total value of the

5    goods that you purchased were?

6         A    The -- I think the original value was $20,000.

7         Q    But there's no receipt?

8         A    There isn't any, unfortunately.

9         Q    But you remember that number?

10        A    That was -- that was the -- that's what he

11   got -- that's what he bought from Jesse, yeah.

12        Q    And you were -- and --

13        A    That's what Yossi got from Jesse, $20,000

14   worth of merchandise.

15        Q    How much did you purchase from Yossi in Panama

16   City?

17        A    As far as value --

18        Q    Yeah.

19        A    -- of, like, original value?

20        Q    Yes.

21        A    I -- I don't have, like, a figure.  Probably

22   between 15 to 20,000.

23        Q    But there's no sales records of that?

24        A    No.

25        Q    Is there any bank transaction history of that?

COPY

1    A    I'm not sure how we paid him.  I can go back

2  and look at that.  I'm sure it -- it would have probably

3  been a check or something, so I'll probably have some

4  sort of record.

5    Q    Okay.

6    A    I'll -- I'll double-check, though.

7    Q    Going back to purchases, when you would

8  purchase stuff from Yossi or Flogrown, would you pay for

9  it from the Dixie Heritage account?

10    A    Correct.

11    Q    Okay.  Now, when you bought stuff for Albert,

12  would you pay for it with the Dixie Heritage account?

13    A    Correct.  I think sometimes we -- we did pay

14  it out of the -- there's two accounts.  There's Dixie

15  Heritage, LLC, and Dixie Heritage Lakeland.  The

16  Lakeland account was Avi's, so Asher --

17    Q    Okay.  So there's a --

18    A    -- did have access --

19    Q    -- Dixie Heritage Lakeland, which is owned by

20  Avi --

21    A    Albert.

22    Q    -- Albert?

23    A    Correct, yes, a business account.

24    Q    But that's not owned by Dixie Heritage?

25    A    No.

1      Q    Okay.  Do you have access to that account?

2      A    To --

3      Q    The Dixie Heritage --

4      A    -- the Lakeland?

5      Q    -- Lakeland account.

6      A    Just checks.

7      Q    So you have access --

8      A    Like, we can write checks, but I don't have

9  access to view the account.  It's not my account, it's

10  Avi's account.

11     Q    You can write checks through there, you can

12  deposit checks --

13     A    Yeah.

14     Q    -- but you can't view the account?

15     A    Right.  It's a business account.

16     Q    I don't understand how you can't view a

17  business account.

18     A    Well, we need access to it.  Like, I would

19  need, like, a password and a login, which I don't have,

20  because it's Avi's account.

21     Q    So you can deposit checks, you can write

22  checks --

23     A    I can write checks.

24     Q    Okay.  But you can't view --

25     A    Ash -- right.

COPY

1       Q      -- anything else?

2       A      Right.

3       Q      Okay.  I understand.  Okay.  Excellent.  All

4    right.  Let's move up the time line to December 3, 2016,

5    okay?

6       A      Okay.

7       Q      And that was when Jesse Welch visited the

8    Dixie Heritage Lakeland store?

9       A      Yes.

10       Q      Can you tell me what happened that day?

11       A      I believe Jesse and his girlfriend went to the

12    store.  Our employee, Rebecca Goodine, was working that

13    day.  He made an excessive purchase of over $800 and

14    then she called -- Rebecca called Avi and -- she called

15    Patti first, who was her direct supervisor --

16       Q      Uh-huh.

17       A      -- and Patti redirected her to Avi.  And then

18    she said -- you know, she was concerned because it was,

19    like, so much money.  And Albert said, "It's okay.  We

20    -- "We have a problem with this guy, but" -- you know,

21    just "Everything's okay," and we reassured her and that

22    was the end of that.

23       Q      What kind of problem did you have with this

24    guy?

25       A      Asher and -- and Jesse had a fallout.

**COPY**

1    Q    Can you tell me about it?

2    A    Yeah.  Asher began to order Loco -- the Loco

3    brand --

4    Q    Uh-huh.

5    A    -- which it's the direct competitor for

6    Flogrown.  I know that Loco and Flogrown have had their

7    battles, and when he saw that we were carrying Loco, he

8    told Asher to take the stuff down, that he would replace

9    it with Flogrown merchandise for free, and that he --

10   you know, just -- just stop buying from Loco.  I'll give

11   you a discount, as well, on your -- on -- on our

12   product, so you can continue to carry Flogrown stronger

13   and you know, just get rid of Loco basically.  And Asher

14   said to him, "Okay.  Let me look into the situation."

15   Then he went -- I think it was him or one of his

16   employees -- went by the Oviedo location --

17   Q    Uh-huh.

18   A    -- we had just opened and saw that we were

19   still carrying Loco.  They had a mannequin with a Loco

20   hat on it.  And he called Asher and he, you know,

21   basically said, you know, "You're undermining my brand."

22   He just, like, you know, and this -- and Asher basically

23   told him, "I'm going to order from whoever I want to

24   order.  It's" --- you know, "You can't tell me what to

25   put in my store."  And that's when all, like, the

COPY

1    threats started happening and we even contacted the

2    Coleman law firm at that point and they sent him, like,

3    a cease and desist.  He was contacting John from Bucked

4    Up, telling him that we have counterfeit.  He even --

5    during that cease -- and he even contacted Crystal and

6    TJ, the -- the leasing managers for the -- the malls

7    that we were in --

8         Q    Uh-huh.

9         A    -- saying that he wanted to open a kiosk with

10   Flogrown.

11        Q    Uh-huh.

12        A    So you know, we -- we know that this case is

13   something personal.

14        Q    Okay.  How do you know he reached out to

15   Bucked Up?

16        A    John called Asher and told him.

17        Q    Okay.  Do you know -- remember what date that

18   was?

19        A    It was in December 2016.  I'm not sure exactly

20   the date.

21        Q    Okay.  When there was a phone call?

22        A    Uh-huh.

23        Q    Do you have a phone record of that?

24        A    Probably.  That's not my --

25        Q    Okay.  Do you -- how do you know that he

**COPY**

1    reached out to Crystal at the mall?

2        A    Crystal told us.

3        Q    Okay.

4        A    She said, "This guy, Jesse, called, he wants

5    to open a kiosk of Flogrown."  And I flat-out told them,

6    "No, you can't compete with Asher.  He already has

7    Flogrown there."

8        Q    Do you remember what day that was?

9        A    It was right around the same -- it was the

10   same -- everything happened in the same week.

11       Q    Do you remember what week that was?

12       A    Somewhere in December in 2016.  I'm sorry.

13       Q    Okay.

14       A    I don't remember.  I can -- I can try to look

15   for it.

16       Q    And that's --

17       A    TJ, as well.

18       Q    Okay.

19       A    TJ, as well.

20       Q    Was that before the incident on December

21   13th -- or on December 3, 2016 or was that after?

22       A    It was after.

23       Q    It was after that incident?

24       A    Uh-huh.

25       Q    Okay.  In your opinion, why was there problems

1    with Jesse Welch?

2            MS. LEITNER:  Object to form.  Go ahead.

3        A    Well, what do you mean by problems?  Like,

4    why -- why were there --

5        Q    Previously --

6        A    -- problems?

7        Q    -- you mentioned there was problems with this

8    guy when he came in, you said.

9        A    With Jesse?

10       Q    Correct.

11       A    Yeah, because of the Loco incident and, you

12   know, just -- he -- he was very adamant about us

13   removing the Loco brand.  And I think Frank Ciceri

14   (phonetic), he was the sales of Loco --

15       Q    Uh-huh.

16       A    -- I think he can -- he can add on to that, as

17   well, that he -- Jesse contacted some of his other

18   vendors, his other retailers, telling them the same

19   thing.

20       Q    Do you have any proof of that?

21       A    I don't personally, no.

22       Q    Do you know when he contacted them?

23       A    The other vendors?

24       Q    Correct.

25       A    No.

**COPY**

1    Q    Do you know what he said to them?

2    A    Pretty much what he told us, "Take the stuff

3  down.  I'll replace it with mine," or "I'll buy out your

4  stuff from Loco."

5    Q    I don't understand how that's a threat.  You

6  said he made threatening remarks?

7    A    To -- I said threats?

8    Q    To Crystal and Bucked Up.

9    A    He didn't make threats to them.

10    Q    Okay.  He -- you -- so he's never made any

11  threats; is that correct?

12    A    He made a threat to me personally.

13    Q    Okay.  So Jesse comes in on December 3rd?

14    A    Yes.

15    Q    Buys over $800 worth of goods.  Do you

16  remember how many transactions that was?

17    A    It was under three receipts.

18    Q    Okay.  Are you sure it was three?  I'm going

19  to show you --

20    A    Yeah.

21    Q    -- a document here --

22    A    Yeah, if you can --

23    Q    -- that will refresh your --

24    A    -- show me, that'd be great.

25    Q    -- recollections.  See if these look familiar.

**COPY**

1       A     Maybe four.  How many --

2       Q     Are these the receipts?

3       A     -- do you have?  Two, three -- yeah, four.

4       Q     Okay.

5       A     Yeah.  Thank you.

6       Q     Are those true and accurate copies of --

7       A     Yeah.

8       Q     -- of his purchases?

9       A     Custom item, 12 custom, 5 custom -- yeah.  On

10  our side -- because I went back and looked at it, on our

11  side, it's, like, broken down, like, by -- like, the

12  custom -- like, it says, 4 custom item, and then -- but

13  ours will just have, like, each custom item, like,

14  listed, but it could just be the -- the system, how it,

15  like, changes it or groups it on a receipt versus on our

16  records.

17      Q     Okay.

18      A     Yeah, but that looks accurate, I mean --

19          MR. RAPACKE:  We're going to enter it.  We're

20      going to call that Plaintiff's Exhibit number 6.

21          (EXHIBIT 6 MARKED FOR IDENTIFICATION)

22          BY MR. RAPACKE:

23      Q     Okay.  Can you tell me if that's a true and

24  accurate printout of what you would see from a purchase

25  at a Dixie Heritage store?

COPY

1        A     Yes.

2              MR. RAPACKE:   Okay.   I'm just going to have

3    him take a look at that real quick.   Can you give that

4    back?

5              MR. BEDRAVA:   Uh-huh.

6              BY MR. RAPACKE:

7        Q     Can you tell me the time of that purchase from

8    that receipt?

9        A     They are all in different times.

10       Q     Okay.

11       A     There's one at 6:42 p.m., there's one at 6:49

12   p.m., one at 6:44 p.m., and one at 6:39 p.m.

13       Q     Okay.   And who's the listed cashier for those?

14       A     Rebecca.

15       Q     Okay.   Who else was working that night?

16       A     Just Rebecca.

17       Q     So Rebecca was by herself?

18       A     Uh-huh.

19       Q     Okay.   Was that standard for most stores for

20   just one employee to be working at a time?

21       A     On Saturdays, we always had an overlap,

22   sometimes it would be, like, between 12:00 and 6:00 or

23   12:00 and 5:30, depending on how busy it is.

24       Q     Okay.   How did you hear of this incident on

25   December 3rd?

COPY

1     A    I can't remember if she called me or I called

2  her after Avi contacted me.

3     Q    Okay.  Do you remember making a phone call to

4  Ms. Rebecca Goodine at -- that evening?

5     A    Yes, I do.

6     Q    Could you tell me what entailed in that

7  conversation?

8     A    It's -- Avi called -- I think Avi did call me

9  and tell me, like, "Rebecca just called me, and she said

10  that somebody came in and" --

11     Q    Uh-huh.

12     A    -- and because I have access to the records, I

13  can see, like, who bought it, so I can --

14     Q    So there are records?

15     A    -- I can go back to the receipt --

16     Q    Okay.

17     A    -- in our system and I can see, like, who

18  purchased it on the credit card.

19     Q    Okay.

20     A    Okay.  And then I did talk to -- I did talk to

21  Rebecca and just basically -- she just told me what

22  happened.

23     Q    Did you call Rebecca?

24     A    I think I did call Rebecca --

25     Q    And you --

**COPY**

110

1    A    -- at the store.

2    Q    -- called her at the -- on the store phone?

3    A    The store or maybe her cell phone.

4    Q    Okay.

5    A    I'm sorry.  I don't remember.

6    Q    Was it normal for you to call employees like

7    that?

8    A    On the cell phones or on -- normally?

9    Q    Yeah, normally.

10   A    Yeah.  Oh, yeah.

11   Q    Okay.

12   A    Absolutely.

13   Q    What did you tell Rebecca that night?

14   A    Nothing.  I just told her, "Okay.  Let me look

15   over the receipt and" -- "and see what's going on."  But

16   I -- I mean, I know the background of what was going on.

17   Q    Okay.  Let's take a look at -- can you take a

18   look at those receipts one more time?

19   A    Yeah.

20   Q    I'm going to show you a picture of a couple of

21   shirts.

22   A    Yeah.

23        MS. LEITNER:  Thank you.

24   A    Is it the same picture?

25        MR. BEDRAVA:  Uh-huh.

1          MS. LEITNER:  Yes.

2      Q    Can you tell me if those are the same products

3  that were purchased on that -- on the receipts shown in

4  front of you, listed as Exhibit 6?

5      A    So there is -- I've seen this picture before.

6      Q    Okay.

7      A    Is there another one as well, with, like,

8  sweatshirts on it?  Is there another picture?

9      Q    We could you take a look.  Yeah, here's one

10  with a sweatshirt, I believe.

11          MR. RAPACKE:  Can you show Leia?

12          MS. LEITNER:  Thank you.

13      A    It's hard to -- here's -- here's the thing

14  about this order.  First of all, we don't understand why

15  Rebecca did it in four different orders.

16      Q    Okay.

17      A    We don't understand why because this is enough

18  information to go on one receipt.

19      Q    But they're at four separate times and those

20  times are how many minutes apart?

21      A    They are -- looks very shady.  I can tell you

22  that --

23      Q    Okay.

24      A    -- because I can tell the moment she opened

25  the order -- this is when she completed the order, but I

**COPY**

1    can tell you when she opened the order.

2         Q    How can you tell?

3         A    In the system, the system tells me when the

4    order was opened and then when it was cashed out.

5         Q    Can you send me those records?

6         A    Yeah.

7         Q    Okay.

8         A    I think in our interrogatories, in our

9    responses, I put in those times, as well.

10        Q    Okay.  We haven't received those yet, but

11   we'll take a look.

12        A    Okay.

13             MS. LEITNER:  Yeah, those are due on the 2nd.

14             THE WITNESS:  Oh.

15        Q    Okay.  Can you tell me if those pictures are

16   what were purchased that evening?

17        A    It looks like it.  I mean, I don't have the --

18   I can tell you the onesies, that's the brand that we --

19   that we gave him so that he can print them, the WF.

20        Q    Which one?

21        A    This one, WFC I think it is.

22        Q    Uh-huh.

23        A    Yeah.  That's -- we -- yeah, WFC --

24        Q    Uh-huh.

25        A    -- that's from Color Touch.  We get all our

COPY

1    onesies from him.

2          Q    You get all your onesies from Color Touch?

3          A    Uh-huh.

4          Q    Okay.  Where do you get your transfers again?

5          A    From Charlie's Transfers.

6          Q    Okay.  And how do you keep track of which

7    transfers you've purchased?

8          A    So the way that we have our transfers in the

9    store, we have them all displayed around the store.

10          Q    Okay.

11          A    And then you can just pick -- like, every

12    transfer has a number, and then from the number that you

13    pick out, we have a file behind the register that keeps,

14    like, all the transfers.  Once we use it up, we put sold

15    out --

16          Q    Uh-huh.

17          A    -- and we take that -- that out and then we

18    order that transfer again --

19          Q    Okay.

20          A    -- to replenish it.

21          Q    Okay.

22          A    So again, no inventory, just counts.

23          Q    Okay.  Can we -- can you tell me if those are

24    accurate pictures?

25          A    This -- this, we get from Exist --

**COPY**

114

1    Q    Okay.

2    A    -- these sweatshirts --

3    Q    Okay.

4    A    -- so we -- we did order those from Exist and

5  we gave those to -- to Jesse, as well, to -- for

6  printing.

7    Q    Okay.

8    A    Yeah.  And it looks like these are the ones

9  that he --

10    Q    Do you have --

11    A    -- that you have in that --

12    Q    -- receipts that you gave those?

13    A    -- inventory.

14    Q    I'm sorry.

15    A    I have receipts of when we buy them.  I'm sure

16  I can get them from -- from our vendor.

17    Q    Do you have receipts of when you gave those to

18  Jesse to be printed?

19    A    No, I have -- I have an invoice for these

20  because he put them on that invoice by mistake.

21    Q    Okay.  And is these the only ones that have

22  ever been custom printed?

23    A    The -- the sweatshirts and the onesies, it

24  looks like the stuff that he has custom printed for us.

25    Q    Is that all the stuff that he's custom printed

COPY

115

1   for you?

2       A    Yeah, the onesies were, like, a dozen onesies.

3   We couldn't move those.

4       Q    So would you say it's routine for Jesse to

5   custom print for you?

6       A    Jesse offered to start custom printing for

7   us --

8       Q    Okay.  Is that a --

9       A    -- again, in May.

10      Q    Is that a yes or a no?

11      A    Okay.  Yes.  Ask me the question again.

12      Q    Okay.  Was that routine for Jesse to custom

13  print for you?

14      A    Since we started our relationship --

15      Q    Right.

16      A    -- or -- no, he didn't -- he didn't start

17  doing that until May 2016.

18      Q    Is that -- would you say it was routine or not

19  routine?

20      A    Not routine.

21      Q    Okay.

22      A    Because, like, I mean, routine would be, like,

23  if it happened all the time, right?

24      Q    Right.

25      A    No.

**COPY**

116

1      Q      So it just happened once?

2      A      No, it happened more than once.

3      Q      But we only have receipts for one time?

4      A      We have -- we should have receipts for two

5  times.

6      Q      Okay.

7      A      The -- the camo and the sweatshirts.

8      Q      Okay.  So the camo and the sweatshirts were

9  printed by Jesse Welch?

10      A      Correct.

11      Q      Okay.

12      A      And everything else on here.  We -- we don't

13  have ability to print the Flogrown -- the Flogrown mark.

14  You have to have a special machine for that.  We don't

15  have that machine.

16      Q      Right.  I'm not asking you that.

17      A      Okay.

18      Q      Okay.

19      A      I'm just --

20      Q      Okay.  So let's go back to December 3rd.  So

21  December 3rd, you hear about this incident, Jesse comes

22  in, he buys goods in four different transactions, right?

23  We've established that --

24      A      Yes.

25      Q      -- through Exhibit number 6 --

COPY

1      A    6.

2      Q    -- right?

3      A    Uh-huh.

4      Q    Okay.  You called Rebecca Goodine.  What did

5   you tell Rebecca Goodine that evening?

6      A    I just -- I just called her for information so

7   I can see who bought the stuff.

8      Q    Is that routine when somebody purchases

9   something, you want to know who bought it?

10     A    You don't think it's weird that somebody comes

11  to your store and buys $800 worth of Flogrown goods?

12  And she asked him -- she asked Jesse, "Why are you

13  buying so many things?"  And he told her, "Oh, we have a

14  big family."  It was, like, right before Christmas.

15     Q    Okay.

16     A    But she just thought it was weird.

17     Q    So what did you tell her after you talked to

18  her?

19     A    Who?

20     Q    Rebecca Goodine.

21     A    Rebecca?

22     Q    Yeah.

23     A    What did I tell her?

24     Q    Yeah.

25     A    Nothing.

**COPY**

118

1    Q    So you called her --

2    A    What did I tell her?

3    Q    -- and you didn't tell her anything?

4    A    I told her just to -- to find out, like,

5    what -- you know, what happened and then she said, "This

6    guy came in with his girlfriend."  And I said, "What was

7    he doing?"  And she's, like, Oh, he was, like, looking

8    around and then him and his girlfriend were just

9    grabbing stuff.  She said she was helping another

10   customer and then I told her, "Why did you do it in four

11   different transactions?"

12   Q    Uh-huh.

13   A    And she's, like, I don't know.  I couldn't get

14   it to work.  So I said, "Okay.  Don't worry about it."

15   You know, "There's something going on right now with

16   Flogrown," and you know, just -- it's -- "Everything's

17   okay."

18   Q    Okay.  And that was it, that was the extent of

19   your conversation?

20   A    Yeah.

21   Q    Okay.  And you don't know what brands Flogrown

22   regularly uses for their garments; is that correct?

23   A    He uses several.

24   Q    Do you know which ones?

25   A    He's got Hanes, he has -- like, the ones from

1  here?  I can tell you he has -- he's printed on Gildan,

2  on Next Level, on Hanes, but he has other ones.  Like,

3  he has some Dreyfus that he used.

4      Q  Uh-huh.

5      A  I sent -- I sent her the pictures, as well,

6  of, like, other brands.

7      Q  Do you -- but do you know which ones he

8  regularly used?

9      A  I think he pretty much stuck to Next Level,

10  like, towards the end of our -- like, our relationship.

11  Like, it was pretty much Next Level on T-shirts, but

12  again, he has hats, he has, like --

13      Q  Uh-huh.

14      A  -- three or four different brands and things

15  that he uses for hats.  And he has long-sleeves, he has

16  sweatshirts, he has, you know --

17      Q  Okay.  How about Pacific & Co?  Has Flogrown

18  ever printed on Pacific & Co?

19      A  For us.

20      Q  He has?

21      A  For us, yes.

22      Q  Okay.  Do you remember when?

23      A  It was -- it's on that invoice.  That's one --

24  those are the ones.

25      Q  Okay.  It's on that invoice?

**COPY**

120

| | | |
|---|---|---|
| 1 | A | Yeah, the invoice you showed me with the 72. |
| 2 | Q | And that's the only time he's done it? |
| 3 | A | For the sweatshirts. |
| 4 | Q | Okay. |
| 5 | A | Uh-huh. |
| 6 | Q | How about WFC?  Has -- |
| 7 | A | Those are the -- |
| 8 | Q | -- Flogrown used WFC brand? |
| 9 | A | I don't think he does because he doesn't carry |
| 10 | | onesies. |

11    MR. RAPACKE:  Okay.  Excellent.  I'm going to

12    take a five-minute break.

13    (OFF THE RECORD)

14    BY MR. RAPACKE:

15    Q    All right.  Ms. Torgeman, I am going to show

16    you a copy of the Lakeland Police Department --

17    A    Okay.

18    Q    -- dated 1-27-2017.  Can you please look

19    through this document and tell me if this is a true and

20    accurate copy of the police report?

21    A    Okay.  Yeah, that looks accurate.

22    MS. LEITNER:  Let me look at it, please.

23    A    Should we clarify about the dates now or --

24    Q    Yeah, we'll do it --

25    A    -- after this?

**COPY**

1      Q    -- as soon as we get this through.

2      A    Okay.

3           MS. LEITNER:  Okay.  No objection.

4           MR. RAPACKE:  All right.  Excellent.  Go

5    ahead -- I'm going to bring this in as Plaintiff's

6    Exhibit number 7, and then if you want to go ahead and

7    clarify on the dates for the record?

8           (EXHIBIT 7 MARKED FOR IDENTIFICATION)

9           BY MR. RAPACKE:

10     A    So if I can see the exhibit where the 72

11   sweatshirts are because I can't remember if it was 2016

12   or 2015.  So -- because I know the onesies, we did in

13   May --

14     Q    Uh-huh.

15     A    -- of that same year, so I want to -- I think

16   all I have here is your pictures.

17     Q    Okay.

18          MR. BEDRAVA:  Thank you.

19          MS. LEITNER:  Can we call that last exhibit

20     Composite Exhibit 7?

21          MR. RAPACKE:  We did.

22          MS. LEITNER:  Oh.

23          MR. BEDRAVA:  Oh, the --

24          MS. LEITNER:  The police report?

25          MR. BEDRAVA:  The police report itself.

**COPY**

122

1          MR. RAPACKE:  The police report itself.

2          MS. LEITNER:  Okay.  I just wanted to make

3     sure.

4          THE WITNESS:  Do you want these?

5           BY MR. RAPACKE:

6     Q    Okay.

7     A    Are these -- do you want me to keep them here?

8          MR. BEDRAVA:  You can hold onto them if you

9     want.

10    A    Okay.

11    Q    Sure.

12         MR. BEDRAVA:  Do you have --

13         MR. RAPACKE:  What's that?

14         MR. BEDRAVA:  Do you have the invoice?

15          BY MR. RAPACKE:

16    Q    Oh, which invoice are we talking about?  Are

17    we talking about --

18    A    The one with the 72 jackets on it.  I just

19    want to see the year --

20    Q    I think that was 2.

21    A    -- so that way we can get that correct if --

22    Q    Absolutely.

23    A    It might still be 2016.  I just can't

24    remember --

25    Q    Okay.

**COPY**

123

1       A       -- the year.

2       Q       280, I believe it's this one.  Check if that's

3   the one.

4       A       Yeah.

5       Q       Exhibit number 3?

6       A       Yeah, so it's 2 -- 2015 instead of 2016.

7       Q       Okay.

8       A       All right.  Yeah, I'm sorry.  Just so many

9   years.

10      Q       Oh, yeah.  I understand.

11      A       Thank you.

12      Q       All right.  So we have authenticated the

13  Lakeland Police Department as Plaintiff Exhibit number

14  7.  I'm going to have you read the statement taken by

15  Heather Benthal.

16      A       Uh-huh.

17      Q       If you could, could you please read to me the

18  second and third paragraphs here?

19      A       Which one?

20      Q       The second and third paragraphs?

21      A       Okay.  So Goodine advised that shortly before

22  Christmas (later determined to be December 3, 2016, at

23  6:42 p.m., by the register receipts) she was working the

24  register when a couple she described as being in their

25  20s, came into the store.  Goodine advised the couple

124

1   (later determined to be Flogrown owner Jesse Welch and

2   his girlfriend Rachel Wright) purchased over $800 worth

3   of "fake" clothes which seemed strange to her.  After

4   the couple left, Goodine called her manager Patti to

5   tell her about the strange purchase.  Patti told Goodine

6   to call the owner and tell them about the sale.  Goodine

7   called Avi, who is Asher's brother.  Avi told Goodine he

8   would call her back shortly.  When Avi called Goodine

9   back, Avi advised her that people were trying to say

10  that the business was printing fake merchandise.

11  Shortly after hanging up with Avi, Asher's wife, Yeniset

12  Torgeman, (aka Yeni), called Goodine back and advised

13  her to take all the fake merchandise off the shelf and

14  put it in the back, which she did.  Goodine was then off

15  for a couple of days.  When she returned back to work,

16  all of the fake merchandise she removed from the shelves

17  or racks during her last shift, were back on the sales

18  floor.  When Goodine asked Patti why the merchandise was

19  back on the floor, Patti advised her "I just do what I'm

20  told."  Goodine stated she quit her job voluntarily

21  around 12-08-2016.  Do you want me to read the second --

22        Q    No, that's fine.

23        A    -- the other one?

24        Q    That's fine.

25        A    Okay.

**COPY**

125

1      Q     Do you recall if that information on 12/3 is

2    accurate in your conversation with Rebecca?

3      A     I did talk to Rebecca, however I did not tell

4    Rebecca anything about fake merchandise.

5      Q     Okay.  Do you know who called the Lakeland

6    Police Department that evening?

7      A     To file this report?

8      Q     Correct.

9      A     I believe the report stated it was filed by

10   Rebecca Goodine.

11     Q     Okay.  Do you believe that to be accurate?

12     A     Yes.

13     Q     Okay.  Do you have any information to show

14   that Jesse Welch caused a police report to be filed?

15     A     To what extent?

16     Q     Do you have any information --

17     A     Because if he -- if he -- if somebody goes to

18   your store and, you know, buys $800 worth of

19   merchandise, the owners are telling you, you know,

20   "There's some friction between these two people," he

21   shows up the following day to the store, threatens me --

22     Q     And we'll get to that.  Let's --

23     A     Yeah.

24     Q     -- let's stick with the question.

25     A     Yeah.

**COPY**

126

1    Q    Do you have any evidence to show that

2  Jesse Welch called the police?

3    A    I don't have any evidence.

4    Q    Do you have any evidence to show that

5  Jesse Welch caused somebody else to call the police?

6    A    I don't --

7        MS. LEITNER:  Object to form.

8    A    Yeah, because it's -- you know, it's the way

9  that -- it's the way that he did it that caused her

10  paranoia to do that, because nobody has ever told her

11  there's any fake merchandise in the store.

12    Q    Do you have any evidence to show that

13  Jesse Welch caused Rebecca to contact the Lakeland

14  Police Department?

15        MS. LEITNER:  Object to form.

16    A    No evidence.

17    Q    No evidence.  Okay.  Can you tell me about the

18  events that happened when Jesse Welch came back in and

19  threatened you that day?

20    A    He came into the store, it looked like he was

21  looking for somebody else, and --

22    Q    Okay.

23    A    -- he was startled when he saw me because I

24  said, "Jesse, what are you doing here?"

25    Q    Uh-huh.

**COPY**

1  A    And he said -- he said, "Oh, you're going to

2  see what's going to happen to you.  I'm going to wait

3  for you in the parking lot."  I said, you know, "What's

4  going on with you?"

5  Q    Uh-huh.

6  A    Like, why are you doing all of this?  And then

7  he said, you know, "Asher is undermining my brand."  And

8  I said, "How is Asher undermining your brand when all

9  he's done is help you?"  He got him that guy to order

10  $20,000, he told him about the Surf Expo, he's gotten

11  him in contact with some of the -- some of the brands

12  that he sells, some of the garments he sells, Asher got

13  him in touch with them.  He's -- Asher's ordered over

14  $100,000 in merchandise from him, so what -- what are --

15  well, how are we undermining your brand?  And he said,

16  "He's selling Loco."  And I -- you know, and Asher had

17  already broken up the relationship, obviously.

18  Q    Okay.  Do you keep cameras in your store?

19  A    We have cameras in all of our stores.

20  Q    Okay.  Do you have a recording of that

21  incident?

22  A    We don't record.  We have access to the

23  cameras on our phones and it's basically just to watch

24  for employee theft or, you know, theft in the store,

25  basically.

**COPY**

1        Q      Okay.

2        A      And it's to deter theft, obviously.

3        Q      Okay.  Was there anybody else in the store

4     that day?

5        A      On the day that -- Asher was -- Asher was in

6     the mall.  He had just stepped out when Jesse came in,

7     and I was there.

8        Q      Was there anybody else in the store that day?

9        A      There was another lady there and I was, like,

10    really shaken up when he left.  And she's, like, "Oh, my

11    God.  What was that about?"  Like, why is he -- and I

12    said, "No, it" -- "everything's okay," you know -- then

13    when Asher got back, I was crying.  And then he decided

14    to call the police because this guy's, like, out of

15    control.

16       Q      Do you remember that lady's name?

17       A      No, she was just a customer that was there.

18       Q      But she was a witness?

19       A      Yes, she -- there -- there was a lady there.

20       Q      Okay.

21       A      I couldn't even tell you what --

22       Q      But you don't remember her name?

23       A      -- she looks like.        No, nothing.

24       Q      You didn't want to keep her there for when you

25    called the police?

**COPY**

129

1      A      No, because when -- when Jesse left, she left,

2  as well.

3      Q      Okay.  Did that lady make any purchases that

4  day?

5      A      No.

6      Q      Okay.  I'm going to wrap up here, make sure

7  that I've got all my questions asked and we're before

8  noon.

9      A      You're doing good.

10      Q      I want to go back to the items that Flogrown

11  printed for you and gave back to you for sale.

12      A      Okay.

13      Q      Do you have any evidence to show what those

14  items were?

15      A      The only thing I can provide is, like, when we

16  bought it from the vendor -- so like, the color -- I

17  think we submitted that into evidence, right, the Color

18  Touch for the onesies?  We bought it, like, the same

19  week that we gave it to him.

20      Q      So you have evidence to show that you bought

21  it from Color, Inc.?

22      A      Color Touch, right.

23      Q      Color Touch?

24      A      Correct.

25      Q      Yes?

COPY

1          A      Yes.

2          Q      Do you have any evidence to show that you gave

3    it to Flogrown for printing?

4          A      We just hand-delivered them to the store -- to

5    his --

6          Q      Is that a no?

7          A      -- to his warehouse.   No.

8          Q      Okay.   Do you remember what day that was?

9          A      That was the -- the onesies were in May of

10   2015 and then the -- the sweatshirts were, I think in,

11   like, October or whatever that -- that says on that

12   invoice.

13         Q      Do you remember what day in May?

14         A      It was -- I think it was during the first or

15   second week of May --

16         Q      Okay.

17         A      -- but I'm not 100 percent sure.   If I go to

18   the invoice, I can tell you.

19         Q      So you have records of that?

20         A      There's an invoice for the purchase of the

21   onesies, and I know that that -- we bought them to give

22   them to Flogrown, so within that week, we gave it to

23   Flogrown.

24         Q      Okay.

25         A      Does that make sense?   There we go.

1      Q    I am going to show you a -- what looks to

2   appear to be a receipt from Color Touch, Inc.  Can you

3   please take a look and tell me if this is a true and

4   authentic copy?

5      A    Yeah, I'm familiar with this.

6           MR. RAPACKE:  Okay.  Do you want to take a

7      look, Counsel?

8           MS. LEITNER:  Yes.  Thank you.

9      A    It was on May -- May 5, 2015.

10          MS. LEITNER:  Okay.

11     Q    So May 5, 2015 is when you gave the onesies --

12     A    We --

13     Q    -- to --

14     A    -- purchased the onesies from Color Touch and

15   I think it's safe to say, maybe May -- May 12th,

16   something in that area, we gave it to Flogrown and then

17   we got it back another week after that.

18     Q    Who --

19     A    The turnaround time was, like, a week.

20     Q    Who delivered it to Flogrown?

21     A    Asher.

22     Q    Was there anybody else?

23     A    No.

24     Q    And there was no invoice?

25     A    No invoice.  He never invoiced us for custom

COPY

1    stuff except for those that you have there --

2        Q    Flogrown --

3        A    -- that, again --

4        Q    I'm sorry.  Flogrown never charged you for

5    custom printing?

6        A    Yeah, of course.

7        Q    Okay.  There was -- was there an invoice?

8        A    No.

9        Q    How did you pay it?

10       A    Cash.

11       Q    Always cash?

12       A    A lot of the stuff, we paid for cash.

13       Q    A lot of it, or always?

14       A    A lot of it.

15       Q    Okay.  What about the other stuff --

16       A    When --

17       Q    -- the other times?

18       A    The -- the sweatshirts, I'm not sure if we

19   paid for it with check or cash.  I -- I would have to

20   look back in the records, or maybe Jesse has that, how

21   we paid for it.  Those he -- those are in the invoice,

22   those are clear.

23       Q    Okay.  Do you remember what day in October

24   they were delivered to Jesse?

25       A    To Jesse?  Probably a week before that

**COPY**

133

1    invoice.

2         Q    This is for -- this is the invoice for May.

3              Do you remember in October when you delivered

4    the

5    sweatshirts to Flogrown --

6         A    A week -- a week before that invoice that you

7    have there, that we were looking at earlier.

8         Q    And who delivered it?

9         A    Asher, again.

10        Q    And was there a receipt?

11        A    For the sweatshirts?

12        Q    Correct.

13        A    Yes.

14        Q    Do you have that receipt?

15        A    You have it.  It's right there.  It's -- the

16   72 sweatshirts --

17        Q    Okay.

18        A    -- is the invoice.

19        Q    Okay.  Let me take a look at my last bit of

20   notes.  Let me ask you just one more time.  How do you

21   think you prepared for today?

22             MS. LEITNER:  Object to form.

23        Q    Did you prepare for today's deposition?

24        A    Yes.

25        Q    How did you prepare for today's deposition?

COPY

1          MS. LEITNER:  Object to form.  You can answer.

2      A    Oh.  Just went -- just went over the -- the

3  questions there that you had.

4      Q    Did you go over any records?  We're not going

5  to use the word inventory --

6      A    Yeah.

7      Q    -- or accounts.

8      A    We don't have --

9      Q    Bank transactions, did you review any of them?

10     A    No.  I don't think there was anything

11  pertinent to, like, just specific dates.

12     Q    Do you feel you're prepared today?

13     A    Yes.

14     Q    Okay.  I want to ask about Rebecca Goodine and

15  then we'll wrap it up.

16     A    Okay.

17     Q    Rebecca Goodine's -- according to the police

18  report, Rebecca Goodine's last day was on December 8th;

19  is that correct?

20     A    Last day?  I believe it was -- I think it's

21  December 7th or 8th, but it's -- it's right around that

22  area.

23     Q    In your opinion, why did Ms. Goodine quit?

24          MS. LEITNER:  Object to form.

25     A    She told us it was -- she -- for personal

1    reasons.  That's what she told us.

2        Q    On the day that Rebecca Goodine came into

3    collect her last paycheck, was she given a statement to

4    sign?

5        A    Yes.

6        Q    I'm going to show you this -- what appears to

7    be a statement and tell me if this is a true and

8    authentic copy of what was handed to Ms. Goodine for

9    signature.

10        A    Yes.

11        Q    Okay.

12        A    Uh-huh, yeah, it was on -- 12/12 --

13        Q    Okay.

14        A    -- was her last day, then.

15        Q    12/12?

16        A    Yeah.

17        Q    So 12/12 is her last day or 12/12 was the day

18    she came in to get her paycheck?

19        A    12-12, well, that's -- that's when I took her

20    off the -- the payroll.

21        Q    Okay.

22        A    But she did -- she did contact Asher before

23    that, too, to quit.  And then I believe over the

24    weekend, she couldn't come in to drop off her key

25    because all of our employees are key holders.  So on the

**COPY**

1   weekend, she didn't -- she couldn't because it was her

2   son's birthday or her daughter's birthday --

3        Q    Okay.

4        A    -- so then she came in soon after that.

5             MR. RAPACKE:  Okay.  Let's call this

6        Plaintiff's Exhibit number 8.

7             (EXHIBIT 8 MARKED FOR IDENTIFICATION)

8             BY MR. RAPACKE:

9        Q    Ms. Torgeman, I'm going to ask you to read the

10   statement --

11       A    Yes.

12       Q    -- that was provided to Rebecca Goodine on

13   12/12/2016, please.

14       A    Yes.  I -- and she typed -- she writes in her

15   name -- Rebecca Goodine, throughout my employment with

16   Dixie Heritage Lakeland and/or Dixie Heritage, LLC, (the

17   Companies):  Number 1, have not personally printed,

18   pressed, or in any manner reproduced the Flogrown brand,

19   including but not limited to its trademark, logo(s),

20   and/or design(s).  Number 2, have never witnessed or

21   known of any staff, manager, or owner of the Companies

22   print, press, or in any manner reproduce the Flogrown

23   brand, including but not limited to its trademark,

24   logo(s), or design(s).  And number 3, the best -- to the

25   best of my knowledge, have only sold authentic trademark

1    merchandise, including Flogrown's apparel and

2    accessories.  I hereby certify the statements above are

3    true and correct.  And then she signs and dates and

4    prints her name.

5          Q     Okay.  Who prepared that statement?

6          A     I did.

7          Q     Okay.  Was it normal to prepare that statement

8    for employees that were leaving employment?

9          A     No.

10         Q     Okay.

11         A     Absolutely not.

12         Q     Then why did you prepare that statement?

13         A     I prepared this statement for Rebecca because

14   of the threats that Jesse had made towards Asher that he

15   was basically putting a case together against him.

16         Q     Why would you have -- why would you put

17   together those exact statements?

18         A     To protect our employees.

19         Q     Did counsel advise you to create that

20   statement?

21         A     No.

22         Q     You created that on your own?

23         A     Uh-huh.

24         Q     Okay.  Do you notice that she didn't initial

25   that anywhere?

**COPY**

138

1    A    Yeah.

2    Q    So did she initial that anywhere?

3    A    No.

4    Q    Okay.

5    A    She just signed it.

6    Q    Was she required to sign that?

7    A    She wasn't required to sign this at all.

8    Q    She wasn't required to sign that statement

9    before she received her last paycheck?

10   A    No.  And I can tell you what happened on that

11   day if you want.

12   Q    Did she sign before she received her paycheck

13   that day?

14   A    She signed after she received her paycheck.

15   Q    Okay.

16   A    And she also signed another document, which

17   was her resignation letter, which is something that we

18   do have all our employees sign before leaving.

19   Q    But you don't have any other employees, except

20   for Rebecca Goodine, sign that statement right there?

21   A    Patti, as well.

22   Q    Patti signed that statement, as well?

23   A    Yeah.

24   Q    Okay.  In your opinion, why do you think

25   Rebecca filed a police report?

1          MS. LEITNER:  Object to form.

2     A    Why did Rebecca file a police report?

3     Q    In your opinion.

4     A    I don't know.  I think either she -- I have no

5  idea.  I would love to ask her that question, but I

6  think she was either paid off by Jesse because him

7  wanting to put a whole case together against us or --

8  you know, it's -- the series of events of how this all

9  came about, it's very unlike our procedures normally, or

10  even in the way that Rebecca did things.

11     Q    Do you have any records of your procedures, on

12  how you normally do things?

13     A    No.

14     Q    No?  You don't keep records of --

15     A    Of procedures?

16     Q    -- of day-to-day operations?

17     A    No.

18     Q    You don't keep a record of the store's

19  supposed to open at 9:00 and close at 5:00?

20     A    No.  We -- I mean, we have a schedule.

21     Q    Okay.

22     A    We definitely have a schedule.

23          MR. RAPACKE:  Okay.  I don't have anything

24     else.  Do you have any questions for her?

25          MS. LEITNER:  I don't have any questions.

**COPY**

1           MR. RAPACKE:  Okay.  That's it for me.  We're

2      off the record.

3           COURT REPORTER:  Okay.  And counsel would you

4      like the transcripts and video?

5           MS. LEITNER:  Yes.  Ms. Torgeman will read

6      before she finalizes everything.  And do you happen

7      to have the format for the transcript in TXT format?

8           COURT REPORTER:  I can double-check for you.

9           MS. LEITNER:  Okay.  If you can, we would like

10     a copy in that format.

11          COURT REPORTER:  Okay.

12          MS. LEITNER:  Thank you.

13          (EXHIBIT 9 MARKED FOR IDENTIFICATION)

14          (EXHIBIT 10 MARKED FOR IDENTIFICATION)

15          (EXHIBIT 11 MARKED FOR IDENTIFICATION)

16          (DEPOSITION CONCLUDED AT 12:02 P.M.)

17

18

19

20

21

22

23

24

25

**COPY**

141

1            CERTIFICATE OF TRANSCRIPTIONIST

2

3   STATE OF FLORIDA

4   COUNTY OF ORANGE

5

6       I, the undersigned, certify that I was authorized

7   to and did transcribe to the best of my ability the

8   foregoing audio provided to me by the Offices of

9   Milestone Reporting Company, Inc., and that the

10  transcript is a true and accurate representation of the

11  recording as heard by me.

12

13      I further certify that I am not a relative,

14  employee, attorney or counsel of any of the parties nor

15  am I a relative or counsel connected with the parties'

16  attorneys or counsel associated with the action, nor am

17  I financially interested in the outcome of the action.

18

19  Submitted on: March 30, 2018.

20

21

22

23  _____

24            KATIE O'MALLEY

25

## $

**$1,724.85 (1)**
45:6
**$100,000 (4)**
35:17;40:12;48:3;
127:14
**$120 (2)**
66:20,20
**$20,000 (5)**
93:25;94:14;98:6,
13;127:10
**$3,600 (1)**
48:1
**$3.00 (1)**
93:21
**$8,000 (1)**
95:24
**$800 (5)**
101:13;106:15;
117:11;124:2;125:18
**$9,000 (1)**
95:24
**$9.00 (1)**
93:20
**$936.39 (1)**
44:8
**$96,000 (1)**
48:25
**$981.00 (1)**
45:19

## @

**@gmail (1)**
69:25

## [

**[sic] (5)**
45:24;69:15;77:2,5,
10

## A

**ability (3)**
49:24;116:13;141:7
**able (2)**
63:12;74:11
**above (1)**
137:2
**absolutely (11)**
28:1;34:16;59:1;
64:6,20;67:23;78:5;
97:16;110:12;122:22;
137:11
**access (7)**
99:18;100:1,7,9,18;
109:12;127:22
**accessories (1)**
137:2
**According (2)**

36:12;134:17
**account (18)**
22:3;48:24;52:23;
96:9,11;99:9,12,16,
23;100:1,5,9,9,10,14,
15,17,20
**accounting (6)**
16:13,17;35:19;
39:6;53:10;95:6
**accounts (9)**
32:22;64:25,25;
65:2,6;70:10,11;
99:14;134:7
**accurate (11)**
6:21;43:3;107:6,18,
24;113:24;120:20,21;
125:2,11;141:10
**across (1)**
59:10
**action (2)**
141:16,17
**active (1)**
55:21
**actually (3)**
44:1;65:3;98:3
**adamant (1)**
105:12
**add (1)**
105:16
**additional (1)**
67:20
**address (9)**
13:6,9,11,14,16,23;
14:5;68:23;70:24
**administered (2)**
70:9,10
**administrator (1)**
70:14
**advertise (3)**
54:17;57:4,6
**advertised (1)**
63:24
**advise (1)**
137:19
**advised (5)**
123:21,25;124:9,
12,19
**affirm (1)**
5:21
**again (18)**
6:3;22:24;39:25;
47:18;53:23;54:20;
57:11;65:25;68:19;
86:8;113:4,18,22;
115:9,11;119:12;
132:3;133:9
**against (2)**
137:15;139:7
**agent (1)**
22:22
**ago (3)**
15:10;36:6;53:14
**agreement (2)**

5:19;26:10
**agreements (1)**
26:7
**ahead (4)**
58:1;105:2;121:5,6
**aka (1)**
124:12
**Albert (22)**
8:13,16;18:4,20,24,
25;20:3,4;23:16;
28:22;29:20,21;
31:23;51:3;65:18,21;
66:10,10;99:11,21,22;
101:19
**Albert's (3)**
19:10;64:15;66:15
**alberttorgeman@hotmailcom (1)**
69:21
**Alex (1)**
15:8
**alleged (1)**
91:23
**almost (1)**
51:7
**along (1)**
16:17
**alongside (1)**
33:13
**always (8)**
38:18;59:15;81:14;
83:24;84:9;108:21;
132:11,13
**American (2)**
44:22;45:4
**amount (12)**
36:14;37:2,3,4;
40:6;42:11,16,18;
59:5;62:1;95:23;
96:23
**amounts (2)**
10:3;66:4
**and/or (2)**
136:16,20
**Andy (2)**
5:3;91:9
**answered (1)**
39:1
**anymore (4)**
29:4,5,6,8
**apart (1)**
111:20
**apparel (6)**
35:8;38:5;56:13;
79:16,16;137:1
**appear (1)**
131:2
**appears (1)**
135:6
**applicable (1)**
9:10
**appreciate (3)**
49:25;58:12;91:14
**approve (1)**

22:3
**approximately (1)**
34:1
**area (3)**
20:8;131:16;134:22
**around (6)**
92:12;104:9;113:9;
118:8;124:21;134:21
**Ash (2)**
66:18;100:25
**Asher (67)**
14:9,23,24;15:5;
17:20;19:4,7,7;20:15;
22:21;23:16,25;
31:23;33:13;37:18;
40:10,13;46:10,12,15;
51:5;59:19;61:4;62:5;
63:20,20;64:3,12;
65:19,23,23,24;66:10,
12,19,20;70:4;71:1;
87:6,9;91:20;94:11,
11;95:24;97:18,25;
98:2;99:16;101:25;
102:2,8,13,20,22;
103:16;104:6;127:7,
8,12,16;128:5,5,13;
131:21;133:9;135:22;
137:14
**Asher's (6)**
46:19;64:2;94:5;
124:7,11;127:13
**ashertorgeman@ (1)**
68:16
**Ashertorgeman@hotmail (3)**
67:16,18;69:14
**ashertorgeman@hotmailcom (3)**
67:21;68:10;70:25
**ashertorgemancom (1)**
69:15
**aside (7)**
13:22;20:18;56:5;
67:22;73:8;90:5,6
**assistant (1)**
33:8
**associated (1)**
141:16
**assume (1)**
12:11
**attend (1)**
15:20
**Attitude (1)**
21:1
**attorney (6)**
5:3,4;12:17,20,21;
141:14
**attorneys (1)**
141:16
**audio (1)**
141:8
**August (3)**
91:18,19,21
**authentic (3)**
131:4;135:8;136:25

**authenticate (2)**
43:5;75:19
**authenticated (1)**
123:12
**authorizations (1)**
10:5
**authorized (1)**
141:6
**automatic (1)**
76:9
**automatically (1)**
76:19
**available (1)**
10:2
**avenue (1)**
57:13
**average (1)**
83:4
**Avi (35)**
18:23;23:16;29:23,
24,25;30:1,2;50:4,5;
58:20;63:16,18,19,21;
64:5,7;66:19,20,22;
70:1,2,4,6;74:24;
99:20;101:14,17;
109:2,8,8;124:7,7,8,9,
11
**Avi's (12)**
19:10;57:18,19,21;
58:3,8,10,17;69:22;
99:16;100:10,20
**avivtorgeman (1)**
69:23
**aware (3)**
71:13;91:19,22
**away (3)**
17:21;36:5;41:2;
79:7

## B

**Baby (1)**
43:22
**back (38)**
20:16;24:24;33:3;
49:11,14;50:1;51:24;
58:11;59:4;61:21;
68:5,12;72:13;81:6,
16;86:22;89:9;92:6;
97:11;99:1,7;107:10;
108:4;109:15;116:20;
124:8,9,12,14,15,17,
19;126:18;128:13;
129:10,11;131:17;
132:20
**background (2)**
6:6;110:16
**ballpark (1)**
47:23
**bank (5)**
39:16;48:24;49:2;
98:25;134:9
**banners (1)**

Case 6:17-cv-00983-GKS-GJK Document 57-1 Filed 05/11/18 Page 144 of 156 PageID 1477

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

YENISET TORGEMAN
March 20, 2018

80:10

**Barbara (1)**
15:16

**based (1)**
42:18

**basically (8)**
24:9;102:13,21,22;
109:21;127:23,25;
137:15

**bass (1)**
45:1

**battle (2)**
56:12;81:14

**battles (1)**
102:7

**beach (2)**
94:8,9

**bear (1)**
62:3

**becoming (1)**
23:23

**Bedrava (11)**
5:4;91:4,9;108:5;
110:25;121:18,23,25;
122:8,12,14

**began (1)**
102:2

**begin (1)**
5:25

**beginning (4)**
39:2;60:23;62:16;
70:7

**behind (1)**
113:13

**Ben (1)**
5:4

**Benthal (1)**
123:15

**best (8)**
12:10,15;38:18;
44:1;49:24;136:24,
25;141:7

**better (2)**
14:21;91:13

**big (12)**
26:16;33:3;34:13;
35:7,9,11;38:3;59:6;
60:19;64:19;80:13;
117:14

**bigger (3)**
21:23;25:5;26:12

**biggest (1)**
34:12

**biology (1)**
16:11

**birthdate (1)**
12:25

**birthday (2)**
136:2,2

**bit (3)**
21:21;31:22;133:19

**Black (6)**
38:18,21;43:22;

44:25;45:2;87:17

**Blue (3)**
21:1;43:21;45:1

**board (1)**
59:11

**Bold (8)**
43:18,21,22,23;
44:20;45:1,1,3

**born (3)**
13:2;15:11,12

**both (2)**
5:18;33:9

**bottom (1)**
44:6

**bottoms (1)**
86:16

**bought (11)**
93:20;94:14;98:11;
99:11;109:13;117:7,
9;129:16,18,20;
130:21

**Boulevard (1)**
5:14

**box (2)**
55:6;97:5

**boxes (2)**
55:14;95:3

**branch (1)**
21:13

**brand (21)**
17:8,11;20:8;21:15;
26:12,14;35:11;
83:19;84:22,23;86:1;
102:3,21;105:13;
112:18;120:8;127:7,
8,15;136:18,23

**branded (1)**
10:1

**brands (27)**
20:17;21:23;22:6;
23:24;26:8,11,16;
34:13;35:7;59:6,6,7,8,
15;65:22;69:12;
80:12,13,16;83:17;
84:12;85:13;86:4;
118:21;119:6,14;
127:11

**break (3)**
12:8;49:8;120:12

**breaks (1)**
12:8

**breast (1)**
43:23

**bring (9)**
7:7,15;9:4;44:10;
45:7,11,23;47:3;
121:5

**broken (2)**
107:11;127:17

**brother (3)**
8:14,16;124:7

**brother-in-law (2)**
58:24;59:1

**brothers (3)**
23:17;66:24,25

**brought (1)**
62:19

**Brugger (1)**
15:8

**Buck (2)**
35:10,10

**Bucked (20)**
24:2,4;26:5,6,7;
35:3;36:13;69:12;
80:21,25;83:10,23;
84:7,15,18,19;85:9;
103:3,15;106:8

**bunch (1)**
16:9

**burn (1)**
78:12

**business (16)**
8:7;16:16;22:25;
23:8;32:23;39:22;
50:12;51:7;57:11;
67:3;70:8;85:12;
99:23;100:15,17;
124:10

**businesses (1)**
53:10

**business-related (1)**
16:14

**busy (1)**
108:23

**buy (21)**
19:7,8;53:8;54:2,2,
4,20;55:6;56:19;57:9,
9,25;58:16;70:4;
75:11;76:25;77:10;
81:7;94:2;106:3;
114:15

**buyer (3)**
19:4;63:20;65:24

**buying (9)**
73:25;77:12;94:16;
96:23,24;97:11;98:3;
102:10;117:13

**Buys (4)**
106:15;116:22;
117:11;125:18

### C

**call (15)**
6:23;58:20;103:21;
107:20;109:3,8,23,24;
110:6;121:19;124:6,
8;126:5;128:14;136:5

**called (21)**
101:14,14,14;
102:20;103:16;104:4;
109:1,1,8,9;110:2;
117:4,6;118:1;124:4,
7,8,12;125:5;126:2;
128:25

**calling (3)**

**brothers (3)**
29:23;32:22;96:17

**came (16)**
17:14;47:12;63:25;
64:2,2;105:8;109:10;
118:6;123:25;126:18,
20;128:6;135:2,18;
136:4;139:9

**cameras (3)**
127:18,19,23

**camo (12)**
35:9;44:21,24;45:2,
3,3;65:8;87:18;89:8;
90:15;116:7,8

**camos (1)**
44:21

**Can (119)**
6:6,20;7:16,23;
8:22;9:7,16;11:22;
12:8,11;13:20;15:11;
20:20;22:20;24:24;
27:1,21,21;28:2;30:7,
18;31:7,8,9;41:22;
42:8;43:9,10,14,16,
20;44:15,18;45:8,20;
46:6;49:1,1;50:4;
54:16;58:3,20;61:20,
21;65:12;67:24;68:1,
23;72:22;73:11,16;
74:2;75:3;76:1;77:9;
86:8;89:17;91:6,10;
92:1,9,23;93:5,5,22;
94:20;95:25;99:1;
100:8,11,11,21,21,23;
101:10;102:1,1,2;
104:14,14;105:16,16;
106:22;107:23;108:3,
7;109:13,13,15,17;
110:17;111:2,11,21,
24;112:1,2,5,15,18,
19;113:11,23,23;
114:16;117:7;119:1;
120:18;121:10,19;
122:8,21;126:17;
129:15;130:18;131:2;
134:1;138:10;140:8,9

**cancer (1)**
43:23

**Candice (4)**
27:17,18,21;28:9

**card (3)**
48:20,23;109:18

**carried (5)**
17:19;24:1;26:8;
63:23;66:13

**carry (11)**
20:18;21:1,12,13,
14;56:18,18;59:7;
80:12;102:12;120:9

**carrying (3)**
85:10;102:7,19

**case (4)**
5:6;103:12;137:15;
139:7

**cases (2)**
38:4;86:16

**cash (9)**
48:20,22;49:2,3,5;
132:10,11,12,19

**cashed (1)**
112:4

**cashier (1)**
108:13

**caused (5)**
72:3;125:14;126:5,
9,13

**cease (1)**
103:3,5

**cell (2)**
110:3,8

**Center (5)**
18:3;24:16;25:4;
91:24;92:4

**certain (8)**
11:1;21:25;36:14;
37:2,3,4;63:10,12

**CERTIFICATE (1)**
141:1

**certify (3)**
137:2;141:6,13

**chance (1)**
47:4

**changes (2)**
70:16;107:15

**charge (1)**
74:17

**charged (1)**
132:4

**Charlie (3)**
77:1,10,12

**Charlie's (1)**
113:5

**charlietransferscom (1)**
77:4

**check (6)**
27:21;28:6;48:21;
99:3;123:2;132:19

**checking (1)**
70:22

**checks (8)**
48:22;100:6,8,11,
12,21,22,23

**children (2)**
14:10,11

**Christmas (6)**
18:15;25:4;74:3;
92:12;117:14;123:22

**Ciceri (1)**
105:13

**circle (2)**
51:24;58:11

**circling (1)**
49:14

**circumstance (1)**
58:19

**City (9)**
92:21;93:7,14,16;

94:2,6,9;97:4;98:16
**Civil (1)**
  56:13
**claimed (1)**
  72:8
**clarify (2)**
  120:23;121:7
**clarifying (1)**
  58:14
**class (1)**
  15:17
**clear (2)**
  40:16;132:22
**close (6)**
  18:13;60:24;63:14;
  67:1;76:12;139:19
**closed (4)**
  18:9,16;23:24;
  25:16
**clothes (1)**
  124:3
**Co (2)**
  119:17,18
**code (1)**
  43:18
**Coleman (1)**
  103:2
**collect (1)**
  135:3
**collection (2)**
  54:4,4
**college (6)**
  15:20,22;16:3,5,10,
  25
**color (10)**
  38:17;112:25;
  113:2;129:16,17,21,
  22,23;131:2,14
**coming (3)**
  36:18;58:21;85:17
**communicate (1)**
  68:4
**companies (9)**
  51:10;54:5;68:14;
  77:17,18;84:13;87:7;
  136:17,21
**company (9)**
  8:18;10:17;22:8;
  28:16,19;29:7;37:16;
  68:15;141:9
**compete (1)**
  104:6
**competitor (1)**
  102:5
**complete (1)**
  81:15
**completed (3)**
  12:6;16:4;111:25
**completely (1)**
  54:22
**Composite (1)**
  121:20
**compressor (1)**

76:9
**computer (2)**
  48:8;80:6
**concept (1)**
  23:6
**concerned (1)**
  101:18
**CONCLUDED (1)**
  140:16
**concrete (1)**
  40:17
**Confederate (1)**
  53:6
**confuse (1)**
  66:2
**confused (3)**
  50:1;53:21;54:12
**confusing (2)**
  30:7;65:16
**Congratulations (1)**
  15:18
**connected (1)**
  141:15
**contact (5)**
  73:24;94:4;126:13;
  127:11;135:22
**contacted (7)**
  17:20,20;103:1,5;
  105:17,22;109:2
**contacting (2)**
  24:7;103:3
**continue (2)**
  5:19;102:12
**contract (1)**
  26:15
**control (1)**
  128:15
**controlled (1)**
  9:22
**conversation (3)**
  109:7;118:19;125:2
**copies (3)**
  43:4;48:18;107:6
**copy (7)**
  43:9;67:24;120:16,
  20;131:4;135:8;
  140:10
**copyrights (1)**
  10:7
**corporate (6)**
  6:14;11:9,16;22:1,
  16;37:21
**Correction (1)**
  46:2
**cost (1)**
  83:13
**Counsel (11)**
  5:25;10:13,14;45:8,
  20;131:7;137:19;
  140:3;141:14,15,16
**Counsel's (1)**
  47:4
**count (6)**

65:25;66:3;95:2,18;
  96:4,10
**counted (2)**
  96:15;97:7
**counterfeit (5)**
  91:23;92:2,3,5;
  103:4
**counting (2)**
  59:24;96:17
**counts (1)**
  113:22
**COUNTY (1)**
  141:4
**couple (12)**
  7:10;17:18;36:6;
  42:24;49:13;63:9;
  81:10;110:20;123:24,
  25;124:4,15
**course (3)**
  96:13,15;132:6
**courses (3)**
  16:15,16,20
**COURT (10)**
  5:10,11,12,25;8:24;
  11:22;12:1;140:3,8,
  11
**courtesy (1)**
  12:4
**create (3)**
  79:17,18;137:19
**created (1)**
  137:22
**credit (3)**
  48:20,23;109:18
**crew (1)**
  38:9
**crying (1)**
  128:13
**Crystal (4)**
  103:5;104:1,2;
  106:8
**Cuba (2)**
  13:3;15:12
**current (1)**
  13:6
**currently (10)**
  13:4,23;17:1,24;
  19:16;26:10,19;50:5,
  7,15
**custom (20)**
  60:10;77:15;88:13;
  89:15,20;90:8;107:9,
  9,9,12,13;114:22,
  24,25;115:5,6,12;
  131:25;132:5
**customer (3)**
  79:24;118:10;
  128:17
**customers (2)**
  17:15;68:22
**customized (1)**
  77:19

                              **D**

**Dabbs (1)**
  28:10
**damaged (1)**
  97:8
**date (3)**
  20:13;103:17,20
**dated (1)**
  120:18
**dates (5)**
  10:1;120:23;121:7;
  134:11;137:3
**daughter's (1)**
  136:2
**day (24)**
  63:11;78:21;90:20,
  20;101:10,13;104:8;
  125:21;126:19;128:4,
  5,8;129:4;130:8,13;
  132:23;134:18,20;
  135:2,14,17,17;
  138:11,13
**days (9)**
  10:22;62:1,2;68:1;
  78:15,17,19,20;
  124:15
**day-to-day (3)**
  7:24;74:16;139:16
**deal (1)**
  51:6
**dealt (2)**
  69:25;70:2
**decal (8)**
  43:24,24;44:21,22,
  23,23,24,24
**decals (4)**
  37:4;44:1;60:18,18
**December (13)**
  23:1;101:4;103:19;
  104:12,20,21;106:13;
  108:25;116:20,21;
  123:22;134:18,21
**decent (1)**
  62:1
**decide (1)**
  64:22
**decided (2)**
  64:19;128:13
**Defendant/Witness (1)**
  9:10
**Defendants (3)**
  5:9;9:22;10:5
**Defendant's (1)**
  10:12
**definitely (7)**
  34:10,10;35:18;
  37:12;38:12;94:20;
  139:22
**degree (1)**
  15:24
**degrees (1)**

16:8
**Delaney (1)**
  29:1
**deliver (9)**
  62:15,22;63:6;71:2,
  5;88:8,10,18;95:11
**delivered (10)**
  60:22;62:25;81:10;
  95:5,7,9;131:20;
  132:24;133:3,8
**delivering (1)**
  95:4
**Department (5)**
  22:18;120:16;
  123:13;125:6;126:14
**depending (2)**
  61:8;108:23
**depends (3)**
  84:1,25;85:21
**deposit (2)**
  100:12,21
**deposition (12)**
  5:16;6:17,17,25;
  11:20;12:22;49:15,
  16;90:1;133:23,25;
  140:16
**depositions (1)**
  9:13
**described (1)**
  123:24
**description (1)**
  43:20
**designated (1)**
  91:14
**designs (7)**
  10:6;41:20;77:8,9,
  11;136:20,24
**desist (1)**
  103:3
**deter (1)**
  128:2
**determined (2)**
  123:22;124:1
**difference (1)**
  65:2
**different (32)**
  20:17;21:22;23:24;
  30:7;41:13,21;51:14;
  54:5,21;59:8;65:6;
  66:4;68:19;77:8,16;
  81:4;84:10,23;85:3;
  86:7;89:2,4;92:7,8,10,
  20,20;108:9;111:15;
  116:22;118:11;
  119:14
**digital (1)**
  5:11
**DIRECT (3)**
  6:1;101:15;102:5
**directly (1)**
  22:4
**director (1)**
  21:25

Case 6:17-cv-00983-GKS-GJK   Document 57-1   Filed 05/11/18   Page 146 of 156 PageID 1479

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

YENISET TORGEMAN
March 20, 2018

**discount (4)**
93:17,18;97:8;
102:11

**displayed (1)**
113:9

**divide (1)**
66:9

**divorced (1)**
15:9

**Dixie (85)**
5:9,18;6:14;7:17,
20;8:19;9:17,19,23;
15:3;17:25;18:2,12,
22;19:2,3,11,14,20,
25;22:25;26:20;30:4;
31:23,24;33:24,24;
37:24;50:16,19;
51:17;52:3,4,6,9,11,
21,25;53:5,7,13,14,
15,18;54:4,6,8,17,18;
55:23;56:5,10,10,20;
57:18,24;63:17,23,24,
25;64:13;68:3;70:6,8;
71:3,5;72:8,12,12,18,
18;74:23;83:10;
96:14;99:9,12,14,15,
19,24;100:3;101:8;
107:25;136:16,16

**Dixieheritagestore (1)**
69:1

**dixieheritagestore@gmailcom (1)**
68:18

**Dixieheritagestorecom (9)**
52:19,20;53:1,4;
54:19;57:22;58:6;
68:17;69:2

**document (5)**
46:5;49:17;106:21;
120:19;138:16

**documents (4)**
7:8;10:4,8;89:14

**dollar (1)**
10:2

**done (4)**
32:20;89:20;120:2;
127:9

**double-check (2)**
99:6;140:8

**down (14)**
11:23;18:9,13;
23:24;25:16;46:15;
65:4;76:8,12,15,18;
102:8;106:3;107:11

**dozen (6)**
37:5;65:7;66:19,22,
23;115:2

**draw (1)**
79:8

**Dreyfus (1)**
119:3

**Drive (1)**
13:8

**drop (3)**
60:25;63:14;135:24

**dry (1)**
85:22

**duces (5)**
6:17,25;9:1,5;90:2

**due (1)**
112:13

**during (9)**
9:18,20;41:10;48:2;
74:3;79:20;103:5;
124:17;130:14

**duties (1)**
11:15

## E

**earlier (4)**
7:11;32:24;49:17;
133:7

**early (1)**
20:11

**easier (1)**
12:1

**easy (1)**
79:1

**effect (1)**
90:16

**eight (1)**
77:16

**either (5)**
35:8;90:20;92:5;
139:4,6

**electronic (5)**
41:4;67:7,10;69:11,
24

**electronically (1)**
48:15

**else (13)**
14:6;29:14;35:8;
96:16;101:1;108:15;
116:12;126:5,21;
128:3,8;131:22;
139:24

**e-mail (12)**
17:21;20:14;22:7;
41:5;67:15;68:9,15,
23;69:7,22;70:10,24

**e-mails (7)**
68:4,21;69:18;
70:11,21,22;97:19

**employed (1)**
51:17

**employee (9)**
72:4;79:4,5;80:16;
88:16;101:12;108:20;
127:24;141:14

**employees (28)**
8:1;9:23;10:19;
26:19;27:4;28:18,21,
21;30:3;31:6,21;32:1,
16,21;33:14;74:18;
78:1,4,11;79:6,18;
102:16;110:6;135:25;
137:8,18;138:18,19

**employee's (1)**
27:19

**Employment (3)**
9:23;136:15;137:8

**end (3)**
9:3;101:22;119:10

**enough (1)**
111:17

**entailed (2)**
89:16;109:6

**enter (2)**
60:11;107:19

**entered (1)**
7:4

**entities (1)**
52:12

**entity (2)**
58:15;68:19

**equipment (2)**
9:20;33:19

**especially (1)**
23:11

**establish (2)**
21:18;91:7

**established (2)**
80:15;116:23

**establishing (1)**
10:4

**estate (1)**
16:23

**Even (7)**
70:6;85:24;103:1,4,
5;128:21;139:10

**evening (4)**
109:4;112:16;
117:5;125:6

**events (2)**
126:18;139:8

**everybody (3)**
30:10;38:18;78:5

**Everything's (3)**
101:21;118:16;
128:12

**evidence (12)**
7:4;45:8;126:1,3,4,
12,16,17;129:13,17,
20;130:2

**evidencing (1)**
10:4

**exact (4)**
31:2;34:2;47:20;
137:17

**exactly (1)**
103:19

**EXAMINATION (1)**
6:1

**Excellent (17)**
7:2;11:18;12:24;
14:18;15:18;17:4;
26:16;28:18;31:16;
45:23;47:7;49:7,25;
57:3;101:3;120:11;

121:4

**except (5)**
55:23;75:9;80:9;
132:1;138:19

**exceptions (1)**
58:23

**excessive (1)**
101:13

**Exhibit (33)**
6:24;7:3;8:22,22;
44:11,12;45:11,13,24,
25;46:2;47:4,8,9;
88:24,25;90:6;
107:20,21;111:4;
116:25;121:6,8,10,19,
20;123:5,13;136:6,7;
140:13,14,15

**exhibits (1)**
67:22

**Exist (3)**
54:2;113:25;114:4

**expanding (1)**
26:2

**expenses (1)**
34:3

**Expo (1)**
127:10

**express (1)**
97:15

**extent (3)**
10:2;118:18;125:15

**extra (2)**
38:21,22

## F

**fake (7)**
81:2;124:3,10,13,
16;125:4;126:11

**fallout (1)**
101:25

**familiar (2)**
106:25;131:5

**familiarized (1)**
23:23

**family (4)**
51:7;57:11;67:3;
117:14

**far (3)**
22:15;49:22;58:15;
59:13;98:17

**favor (1)**
58:20

**feasible (1)**
10:22

**feel (1)**
134:12

**feet (1)**
22:15

**few (2)**
17:5;85:15

**figure (5)**
39:7;40:9;47:20;

95:25;98:21

**figures (1)**
34:2;40:17,18

**file (3)**
113:13;125:7;139:2

**filed (3)**
125:9,14;138:25

**files (1)**
80:6

**finalizes (1)**
140:6

**financially (1)**
141:17

**find (1)**
118:4

**fine (3)**
67:6;124:22,24

**firefighters (2)**
21:7,8

**firm (1)**
103:2

**first (16)**
15:16;16:2,4;17:7;
18:15;24:14,15;25:4;
34:19;36:15;43:10;
55:4;75:7;101:15;
111:14;130:14

**fisherman (3)**
54:2,3;56:14

**fishing (1)**
53:6

**fit (1)**
85:22

**fitted (1)**
38:6

**five (1)**
26:25

**five-minute (1)**
120:12

**fixing (1)**
32:19

**flag (3)**
44:23;45:3;56:12

**flat (1)**
95:23

**flat-out (1)**
104:5

**Flea (5)**
23:17,17,21,24;
77:13

**Flogrown (124)**
5:6,18;9:25;17:6,7,
8,15,19;19:6;20:7,9,
18;21:20;22:7;24:4,5;
34:17,17,19;35:1,4,
15,20;36:1,10,24;
37:11,14,16,25;38:3,
25;39:23;40:1,20;
41:10;45:1,2;46:6;
59:5;60:17,20,25;
62:5;65:10;67:8;
69:12,25;70:2;71:2,4,
20,21,25;72:4,11,13,

Case 6:17-cv-00983-GKS-GJK   Document 57-1   Filed 05/11/18   Page 147 of 156 PageID 1480

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

YENISET TORGEMAN
March 20, 2018

13,17,19,20;73:3,3,5,
7,8,13,14,17;77:14;
80:6,8,21;81:6,7,24;
82:9,10;83:5,15;
85:14;86:5,9,21,21;
87:11,16,25;88:8;
89:21;90:8;91:20;
92:8;94:3,12,15;
97:10;99:8;102:6,6,9,
12;103:10;104:5,7;
116:13,13;117:11;
118:16,21;119:17;
120:8;124:1;129:10;
130:3,22,23;131:16,
20;132:2,4;133:5;
136:18,22

**Flogrown's (1)**
137:1
**floor (3)**
25:3;124:18,19
**Florida (8)**
5:15;13:5,7,8;14:1;
22:17;44:23;141:3
**flow (1)**
91:13
**following (3)**
9:11;63:11;125:21
**foregoing (1)**
141:8
**form (12)**
72:15,21;73:10,15;
91:25;105:2;126:7,
15;133:22;134:1,24;
139:1
**format (3)**
140:7,7,10
**Forsythe (1)**
46:11
**forth (3)**
33:3;68:5,12
**found (2)**
91:23;92:3
**four (23)**
10:18;19:8;50:20;
51:6;57:17;74:23,25;
75:9;78:14,17,18,18,
18,20,21,21;107:1,3;
111:15,19;116:22;
118:10;119:14
**four-day (1)**
78:14
**four-hour (1)**
79:23
**frame (2)**
10:24;11:4
**Frank (1)**
105:13
**free (1)**
102:9
**friction (1)**
125:20
**friend (2)**
94:5;98:2

**friends (1)**
73:23
**front (2)**
89:9;111:4
**Fruit (1)**
83:24
**FSU (1)**
43:18
**full (3)**
14:22,25;59:23
**full-time (2)**
32:2,3
**further (1)**
141:13

**G**

**Gainesville (2)**
25:20;44:24
**garment (2)**
79:25;86:9
**garments (15)**
71:21;72:1,12,18,
19;73:2,6;79:14;
85:13;86:10,21;
87:13,15;118:22;
127:12
**gather (1)**
9:11
**gave (20)**
14:5;61:10;73:2;
88:16;90:22;93:17,
20;94:4;97:8,13;
112:19;114:5,12,17;
129:11,19;130:2,22;
131:11,16
**generally (2)**
22:12;62:4
**genuine (3)**
80:20,21;97:10
**George (2)**
27:6;28:14
**Gildan (10)**
83:25;84:8,9,16,19,
20;85:10,16,20;119:1
**Girl (1)**
20:25
**girlfriend (4)**
101:11;118:6,8;
124:2
**Girlie (1)**
20:25
**girls' (1)**
45:2
**girl's (1)**
29:3
**given (3)**
37:25;80:10;135:3
**gives (2)**
46:12;66:20
**giving (2)**
66:22;79:3
**God (2)**

5:23;128:11
**goes (2)**
46:10;125:17
**Goleman (1)**
15:16
**Good (7)**
5:2,10;6:3,4;79:25;
94:12;129:9
**Goodine (24)**
101:12;109:4;
117:4,5,20;123:21,25;
124:4,5,6,7,8,12,14,
18,20;125:10;134:14,
23;135:2,8;136:12,
15;138:20
**Goodine's (2)**
134:17,18
**goods (60)**
9:18;10:1,3;20:17;
43:20;52:6,10,11,14,
16,25;53:1,7;54:18,
20;55:23,24;56:5,6,
21;60:17;62:9,11,15,
22,25;63:16;65:18,
18;66:12;67:8;70:4;
71:22;72:5;73:7,13,
17;74:5,8;81:7;87:25;
88:7,10,18;91:23;
92:3,7,8,18;93:15,22;
94:1,21,24;95:5;
97:10;98:5;106:15;
116:22;117:11
**grabbing (1)**
118:9
**graduating (1)**
15:16
**granted (1)**
10:5
**great (6)**
14:11;36:11;44:4;
62:2;91:12;106:24
**grew (4)**
15:13;24:8,10;26:2
**gross (1)**
10:2
**ground (2)**
11:19,21
**Group (1)**
5:6
**groups (1)**
107:15
**Grunt (4)**
20:21;26:14;34:11;
36:20
**guess (4)**
23:25;33:17;36:8;
61:23
**gun (1)**
21:15
**Guy (10)**
20:23;21:22;26:12;
34:10;101:20,24;
104:4;105:8;118:6;

127:9
**guys (13)**
20:14,18;23:6;
24:18;25:14;32:12;
39:10,11;41:22;43:4;
51:20;65:17;86:20
**guy's (1)**
128:14

**H**

**half (1)**
25:10
**Hall (2)**
27:6;28:13
**hand (4)**
5:21;7:25;8:1;67:9
**hand-delivered (1)**
130:4
**handed (2)**
41:8;135:8
**handful (2)**
63:2,5
**handle (4)**
28:15;39:13;43:4;
68:21
**handled (1)**
69:13
**handles (1)**
69:4
**handling (1)**
43:25
**hands (1)**
8:7
**Hanes (3)**
83:24;118:25;119:2
**hang (6)**
81:12,18;82:11,12,
21;84:4
**hanging (1)**
124:11
**hangtags (1)**
83:1
**happen (4)**
20:10;86:24;127:2;
140:6
**happened (10)**
86:25;101:10;
104:10;109:22;
115:23;116:1,2;
118:5;126:18;138:10
**happening (1)**
103:1
**hard (2)**
48:18;111:13
**Harvey (4)**
20:23;21:23;26:12;
34:10
**hat (1)**
102:20
**hats (11)**
21:14;37:3;38:2,9;
56:14;60:17;86:12,

15;93:24;119:12,15
**Havana (2)**
13:3;15:12
**head (2)**
12:5;86:14
**hear (2)**
108:24;116:21
**heard (2)**
20:7;141:11
**heat (9)**
9:21;74:20,22;75:8,
11,15,20,24;77:22
**Heather (2)**
123:15
**Heidi (2)**
27:16;28:12
**held (1)**
8:2
**help (2)**
5:23;127:9
**helping (2)**
32:22;118:9
**hereby (1)**
137:2
**here's (4)**
83:1;111:9,13,13
**Heritage (68)**
5:18;6:14;7:17,20;
8:19;9:24;15:3;17:25;
18:2,12,22;19:2,3,11,
15,20,25;22:25;
26:20;33:25;37:25;
50:16,19;51:18;52:3,
4,6,10,11,21,25;53:7,
13,15,18;54:18;
55:24;56:5,21;57:18,
24;63:17,23,24,25;
68:3;70:6,8;71:3,6;
72:8,12,12,18,18;
74:23;96:14;99:9,12,
15,15,19,24;100:3;
101:8;107:25;136:16,
16
**Heritage's (3)**
9:18,19;54:18
**herself (1)**
108:17
**HerSitage (1)**
5:9
**Hey (4)**
23:14;36:10;58:20;
82:25
**high (2)**
15:15,16
**highest (1)**
37:10
**himself (1)**
61:5
**hired (1)**
27:9
**history (1)**
98:25
**hit (1)**

54:17
**hold (2)**
7:16;122:8
**holders (1)**
135:25
**Holly (1)**
28:13
**home (1)**
63:13
**hoodie (1)**
84:23
**hope (1)**
27:5
**hopefully (1)**
32:12
**hours (3)**
32:8,18;78:21
**house (2)**
63:14;71:7
**how's (3)**
65:6;98:1,1
**huge (1)**
86:17
**hunting (4)**
35:9;53:6;56:17
**husband (7)**
8:9,10;10:18;14:9;
33:14;62:5;91:19

**I**

**idea (2)**
42:8;139:5
**IDENTIFICATION (11)**
7:3;44:12;45:13,25;
47:9;107:21;121:8;
136:7;140:13,14,15
**identifying (1)**
10:4
**impossible (1)**
55:1
**impressed (1)**
59:5
**Inc (3)**
129:21;131:2;141:9
**inception (1)**
33:25
**inches (10)**
43:23,23,24,24;
44:21,22,23,24,24,25
**incident (9)**
91:19,22;92:6;
104:20,23;105:11;
108:24;116:21;
127:21
**included (1)**
88:17
**including (5)**
10:1;32:10;136:19,
23;137:1
**indicated (1)**
5:12
**individual (2)**

41:9,12
**information (9)**
6:6;12:22;28:5;
31:3;111:18;117:6;
125:1,13,16
**initial (2)**
137:24;138:2
**injure (1)**
78:12
**inside (1)**
51:1
**inspect (1)**
6:20
**instance (4)**
84:7;88:2,3,3
**instead (2)**
94:2;123:6
**interested (3)**
17:22;20:16;141:17
**interesting (1)**
96:22
**internally (1)**
65:17
**interrogatories (3)**
72:9,17;112:8
**into (15)**
7:4;8:7,21;11:19;
23:13;25:10;45:7;
58:8;60:13;71:20;
102:14;123:25;
126:20;129:17;135:2
**Inventories (2)**
9:17,19
**inventory (36)**
10:21;39:8,19;
54:21;55:3,4,11,17;
59:17;60:7;62:11;
63:11,25;64:23,24;
65:2,3,11,13,22;66:2,
21;71:14,16,18;
73:23;94:24;95:1,16;
96:2,7,8,18;113:22;
114:13;134:5
**invoice (38)**
41:3;42:14;43:7,8,
14,15;44:15;45:16,
19;46:22;61:15;62:8,
12;67:9;88:12,13,25;
90:6,15,17;114:19,20;
119:23,25;120:1;
122:14,16;130:12,18,
20;131:24,25;132:7,
21;133:1,2,6,18
**invoiced (6)**
88:14,21;89:1,1,10;
131:25
**Invoices (30)**
35:24,25;36:3;40:5,
19;42:11,18,22,25;
43:5;47:12;48:2,9;
61:12,17,18,19;67:7,
11,20;68:4,12;69:11,
17,24;89:3,4,6,16;

90:7
**irrelevant (1)**
85:12
**Island (9)**
17:25;18:11,14;
19:16,24;26:21;27:5;
75:5,6
**item (6)**
10:25;43:18;44:18;
107:9,12,13
**items (15)**
11:1;34:7,8;37:1,
10;38:10;43:16;
45:16;49:16,19;54:6;
56:19;60:10;129:10,
14
**item's (1)**
10:2
**it-s (1)**
78:24

**J**

**jackets (1)**
122:18
**Jane (3)**
27:2,3,5;28:13
**January (4)**
9:18,20,24;27:9
**Jesse (58)**
17:20,21;20:9,15;
40:10;48:8;60:25;
61:10;62:14;63:13;
73:8,14,20,22,24;
88:9,11,12,19;89:20;
93:20,25;94:4;97:11,
13,18;98:11,13;101:7,
11,25;104:4;105:1,9,
17;106:13;114:5,18;
115:4,6,12;116:9,21;
117:12;124:1;125:14;
126:2,5,13,18,24;
128:6;129:1;132:20,
24,25;137:14;139:6
**job (2)**
33:4;124:20
**John (2)**
103:3,16
**jump (2)**
8:21;11:18

**K**

**KATIE (1)**
141:24
**keep (27)**
35:14,20;36:8,9;
37:19;40:3;55:3,4,10,
15;59:7,25;60:6;65:4,
11,17,22;66:25;85:6,
7;91:10;113:6;122:7;
127:18;128:24;
139:14,18

**keeps (2)**
48:9;113:13
**kept (1)**
36:4
**key (2)**
135:24,25
**kick (1)**
91:4
**kids' (7)**
38:4;44:25;45:1;
79:15;86:17;87:22;
88:3
**kind (5)**
23:15;35:22;64:17;
84:22;101:23
**kinds (2)**
84:10,11
**kiosk (2)**
103:9;104:5
**knew (2)**
20:8;87:12
**knowledge (1)**
136:25
**knowledgeable (1)**
49:18
**known (1)**
136:21
**koozie (1)**
45:2

**L**

**labeled (1)**
46:5
**ladies' (2)**
38:5;87:22
**lady (4)**
58:21;128:9,19;
129:3
**lady's (1)**
128:16
**Lakeland (22)**
20:5;29:12,14,19;
50:7,8,9,16,24;51:13;
75:5;99:15,16,19;
100:4,5;101:8;
120:16;123:13;125:5;
126:13;136:16
**lanyards (2)**
38:4;86:15
**large (4)**
38:21,21,22,22
**larger (1)**
47:1
**last (19)**
6:9;19:21,21;27:3,
6,17,19;34:2;40:12;
55:22;121:19;124:17;
133:19;134:18,20;
135:3,14,17;138:9
**later (3)**
31:15;123:22;124:1
**Lauren (3)**

27:6;28:13,13
**Lauren's (1)**
28:6
**Law (4)**
5:5;9:10;16:20;
103:2
**lead (2)**
91:7,14
**leased (1)**
9:22
**leasing (1)**
103:6
**least (1)**
80:2
**leaving (2)**
137:8;138:18
**Lee (1)**
28:9
**left (4)**
124:4;128:10;
129:1,1
**legal (1)**
14:25
**Leia (3)**
5:8;30:20;111:11
**Leitner (56)**
5:8,8;7:1,12;10:11;
11:1,4,11;28:3;30:22,
25;31:2,5,8,11,15,18;
43:9,12;45:9,22;47:6;
72:15,21;73:10,15;
75:22;91:1,6,12,16,
25;92:25;105:2;
110:23;111:1,12;
112:13;120:22;121:3,
19,22,24;122:2;126:7,
15;131:8,10;133:22;
134:1,24;139:1,25;
140:5,9,12
**less (1)**
39:5
**letter (1)**
138:17
**Level (6)**
84:13;85:11,21;
119:2,9,11
**lever (2)**
76:8,19
**license (1)**
45:3
**licenses (2)**
10:5;16:24
**lift (1)**
76:11
**light (2)**
44:20
**like-products (1)**
53:19
**limited (2)**
136:19,23
**Line (3)**
21:1,4,5;26:3;38:3;
43:16;44:18;54:1;

56:10,15,17;86:18;
101:4

**list (4)**
30:21;31:7,9;57:17
**listed (4)**
22:17;107:14;
108:13;111:4
**little (8)**
21:21;24:3,3,6,7;
25:1;30:7;35:4
**live (2)**
13:4,11
**lived (2)**
13:9;15:14
**lives (2)**
14:6;63:14
**living (1)**
15:2
**LLC (22)**
5:9;7:17;15:3;17:7,
25;18:12;19:12,15,
20;20:9;37:25;50:13,
16;52:4,4,21;53:1;
63:23,24,25;99:15;
136:16
**local (1)**
39:16
**located (1)**
75:1
**location (23)**
18:3,6,7,8;20:5;
24:21;29:4,13,15,19;
51:14;62:17;71:3;
74:25;75:16;91:24;
92:5,8,8,16,18;93:7;
102:16
**locations (11)**
17:23;19:8,18;
28:20;34:5,6;50:20,
24;57:15;77:23;92:4
**Loco (15)**
24:5,6;102:2,2,6,7,
10,13,19,19;105:11,
13,14;106:4;127:16
**login (1)**
100:19
**logo (1)**
86:22
**logos (2)**
136:19,24
**Lohr (3)**
27:4,5;28:13
**long (12)**
7:21;13:9;14:18;
22:24;24:17;27:7,8;
29:25;32:16;55:21;
61:24;78:17
**longer (1)**
51:17
**long-sleeve (1)**
44:20
**long-sleeved (1)**
84:23

**long-sleeves (1)**
119:15
**look (24)**
37:1;43:6,10;45:8;
47:18;49:1;75:21;
89:19;99:2;102:14;
104:14;106:25;108:3;
110:14,17,18;111:9;
112:11;120:18,22;
131:3,7;132:20;
133:19
**looked (3)**
85:17;107:10;
126:20
**looking (5)**
31:17;43:25;118:7;
126:21;133:7
**looks (10)**
38:19;46:20;
107:18;111:21;
112:17;114:8,24;
120:21;128:23;131:1
**Loom (1)**
83:24
**lost (1)**
58:1
**lot (23)**
21:1,12;31:5;35:16;
38:9;41:3,7;42:12;
46:12;49:2;51:23;
55:18,19;61:19;74:6;
84:13;86:6,6;94:14;
127:3;132:12,13,14
**love (3)**
22:9;27:4;139:5
**LS (1)**
45:3

## M

**machine (2)**
116:14,15
**mailed (1)**
95:10,13,14
**maintain (1)**
35:22
**major (4)**
59:15;77:17,18;
80:13
**majority (1)**
49:5
**makes (6)**
51:20;55:10;58:12;
80:5;83:17;94:13
**making (3)**
5:13;86:19;109:3
**mall (7)**
23:25;25:17,22,22;
51:1;104:1;128:6
**malls (2)**
23:11;103:6
**man (1)**
5:5

**manager (8)**
7:18;33:6,9,9;36:9;
74:17;124:4;136:21
**managers (2)**
22:17;103:6
**managing (1)**
32:19
**mannequin (1)**
102:19
**manner (2)**
136:18,22
**manual (1)**
76:10
**many (30)**
12:8;20:17,19;
26:19;32:1,8;33:2;
38:3;41:9,13,17,22;
42:10;55:18;62:25;
63:2;74:22;82:19;
86:24;87:24;88:1;
89:20;90:4;97:5,6;
106:16;107:1;111:20;
117:13;123:8
**March (5)**
5:14;10:12;13:1;
55:22;141:19
**mark (13)**
71:21,25;72:5,13,
19;73:5;80:6,8,21,21;
87:11,25;116:13
**MARKED (11)**
7:3;44:12;45:13,25;
47:9;107:21;121:8;
136:7;140:13,14,15
**market (3)**
23:17,21;77:13
**marketing (1)**
80:11
**marks (2)**
10:6;80:16
**married (2)**
14:19;15:4
**matched (1)**
62:12
**material (1)**
79:9
**materials (1)**
9:12
**math (1)**
47:13
**matter (1)**
5:17
**Max (1)**
14:14
**may (15)**
5:25;86:25;87:3;
115:9,17;121:13;
130:9,13,15;131:9,9,
11,15,15;133:2
**maybe (10)**
35:5;39:1,2;71:9,9;
84:22;107:1;110:3;
131:15;132:20

**mean (31)**
10:16;16:16;23:13;
32:11;35:2,5,16,19;
37:16;39:2;52:16;
53:8;59:12;66:9;
74:12;76:3;78:22;
79:6;80:19;82:18;
83:22;84:1;85:2;
91:10;97:22;105:3;
107:18;110:16;
112:17;115:22;
139:20
**Melbourne (12)**
18:1;19:16,24;
26:24;27:13;28:10,
12;30:12;33:5,8;75:5,
6
**memory (1)**
89:22
**memory's (1)**
58:2
**men's (6)**
38:5,14,14,15;
43:21;86:15
**mentioned (6)**
30:11;84:8;86:20;
90:3;92:7;105:7
**merchandise (22)**
17:20;23:15;40:1;
41:21;46:13;48:4;
52:12;71:2,5,21;
88:16;98:14;102:9;
124:10,13,16,18;
125:4,19;126:11;
127:14;137:1
**Merrill (1)**
29:1
**Merritt (12)**
17:25;18:11,14;
19:16,24;26:21;27:5;
28:13;30:12;33:5;
75:5,6
**Miami (8)**
13:12,13,18,18,18,
19;15:23;16:11
**might (6)**
51:11;89:2,4;93:24;
94:12;122:23
**Milestone (1)**
141:9
**military (4)**
17:2;21:12,13;
43:22
**mine (2)**
7:12;106:3
**minors (1)**
16:9
**minute (1)**
53:14
**minutes (1)**
111:20
**misspelled (1)**
44:22

**mistake (1)**
88:15;114:20
**moment (1)**
111:24
**money (3)**
33:24;94:14;101:19
**monitoring (1)**
70:22
**Montana (1)**
21:17
**month (2)**
18:16;41:25
**months (1)**
87:5
**more (21)**
21:22;22:13;24:12,
12;26:1,1;32:14;42:6,
7,12,20;44:3;45:15;
59:16;61:19;86:17;
89:10,12;110:18;
116:2;133:20
**morning (4)**
5:2,10;6:3,4
**Morse (1)**
5:14
**most (11)**
34:7,8;37:1;38:10;
59:8,18;62:10;67:9;
74:9;82:2;108:19
**Mostly (3)**
53:5;84:8,16
**move (5)**
94:1,15;97:12;
101:4;115:3
**moved (6)**
18:11;24:25;25:4;
50:23,24;51:14
**moving (2)**
98:1,2
**much (16)**
12:1;33:24;35:20;
39:25;51:5;59:10,23;
62:13,14;65:23,24;
98:15;101:19;106:2;
119:9,11
**must (2)**
63:8;90:19
**myself (3)**
32:3;51:5;71:1

## N

**name (20)**
5:8,10;6:7,9;14:22,
25;15:7;27:3,6,18,20;
50:11;92:22;93:8,10;
94:17;128:16,22;
136:15;137:4
**names (3)**
10:6;27:1;30:18
**necessarily (1)**
65:11
**neck (1)**

38:9
**need (10)**
12:7,9;13:16;27:24;
36:21;64:25;65:7;
66:5;100:18,19
**needed (2)**
63:10;64:23
**needs (1)**
32:19
**new (4)**
32:22;70:17;74:17;
78:2
**next (7)**
12:17;84:13;85:10,
21;119:2,9,11
**night (2)**
108:15;110:13
**nobody (2)**
94:15;126:10
**nod (1)**
12:5
**None (1)**
32:3
**nonetheless (1)**
11:22
**noon (1)**
129:8
**nor (2)**
141:14,16
**normal (2)**
110:6;137:7
**normally (4)**
110:8,9;139:9,12
**notes (6)**
7:8,10,13,15;85:18;
133:20
**notice (6)**
5:12;6:17,17,24;
90:1;137:24
**November (1)**
87:3
**number (32)**
6:24;8:23;9:19,21,
22,25;10:3;43:6,14;
44:11,15;45:11,16,19,
24;46:2;47:4,8;88:25;
89:7;98:9;107:20;
113:12,12;116:25;
121:6;123:5,13;
136:6,17,20,24
**numbers (1)**
44:19

---

## O

**Oaks (1)**
25:22
**Object (12)**
72:15,21;73:10,15;
91:25;105:2;126:7,
15;133:22;134:1,24;
139:1
**objecting (3)**

10:23,24;11:2
**objection (5)**
45:9,10,22;47:6;
121:3
**objections (1)**
10:13
**Obviously (7)**
22:14;32:20;34:4;
46:18;79:25;127:17;
128:2
**Ocala (1)**
25:17
**October (3)**
130:11;132:23;
133:3
**off (20)**
6:6;23:17;40:17;
49:9;60:25;63:15;
73:25;85:25;89:22;
91:3,4;93:21,21;
120:13;124:13,14;
135:20,24;139:6;
140:2
**offered (3)**
87:6,9;115:6
**office (1)**
22:1
**officers (1)**
21:2
**Offices (1)**
141:8
**often (2)**
36:15;60:3
**old (3)**
14:13,16;15:14
**older (1)**
85:16
**O'MALLEY (1)**
141:24
**onboard (1)**
51:15
**once (11)**
41:21;46:24,25;
66:18;71:9;89:10,12;
90:23;113:14;116:1,2
**one (63)**
12:2;14:21;17:16;
22:17;23:2;30:3,7;
33:6;40:10,15;41:19;
43:4;44:14;45:15;
46:7,21;50:20;51:8,9;
62:18;64:19,21;66:8;
71:8;73:22,22;74:24;
79:4,17,18;80:2;
83:10;84:22;87:1;
88:2,3,16,21;89:8,8;
90:9,11;91:14;
102:15;108:11,11,12,
12,20;110:18;111:7,9,
18;112:20,21;116:3;
119:23;122:18;123:2,
3,19;124:23;133:20
**ones (10)**

20:20;56:7;77:20;
114:8,21;118:24,25;
119:2,7,24
**onesies (15)**
87:20;88:4;112:18;
113:1,2;114:23;
115:2,2;120:10;
121:12;129:18;130:9,
21;131:11,14
**online (9)**
51:21;55:2,7;56:20;
57:14;58:1,4,16;69:4
**only (20)**
8:10;17:15;18:2;
24:1;25:23;26:9;35:7;
53:24;57:17;61:17;
62:17;68:15;69:4;
88:14,21;114:21;
116:3;120:2;129:15;
136:25
**onset (1)**
50:22
**onto (1)**
122:8
**open (10)**
23:25;25:18;27:15;
69:6;76:10,14,19;
103:9;104:5;139:19
**opened (12)**
18:14,15;24:18,21;
25:14,20;27:8;55:22;
102:18;111:24;112:1,
4
**opening (1)**
25:8
**operated (3)**
19:2,3,4
**operates (1)**
77:22
**operations (1)**
139:16
**opinion (5)**
42:8;104:25;
134:23;138:24;139:3
**opportunity (1)**
79:25
**opposite (2)**
72:14;73:2
**orange (2)**
45:3;141:4
**Orange/black (1)**
44:20
**order (34)**
35:16;36:22;37:14,
15,25;41:14,19;46:6,
10;57:14;59:24;61:4;
62:4;63:16,18;64:5,
13,19;65:7,10;66:4;
88:17;96:16;102:2,
23,24;111:14,25,25;
112:1,4;113:18;
114:4;127:9
**ordered (8)**

35:15,20;36:20;
37:5;40:11;41:20,24;
127:13
**ordering (3)**
32:22;64:2;94:3
**orders (4)**
64:7,12;66:9;
111:15
**original (2)**
98:6,19
**Originally (3)**
22:14;24:23;94:4
**Orlando (3)**
13:5,6,8
**others (3)**
10:7;21:22;27:12
**ours (1)**
107:13
**out (27)**
20:9,14,15,16;
21:20;22:7,11;24:22,
23;47:12;50:23;
57:13;76:22;79:8;
82:15;94:6;99:14;
103:14;104:1;106:3;
112:4;113:13,15,17;
118:4;128:6,14
**outcome (1)**
141:17
**outside (6)**
13:25;16:24;71:3,5;
73:13,17
**over (24)**
12:3;22:2;30:2;
31:9;35:16;40:2,11;
41:8;49:16;51:3;
77:11;78:15,15;
85:10;88:8;98:1;
101:13;106:15;
110:15;124:2;127:13;
134:2,4;135:23
**overlap (1)**
108:21
**oversee (1)**
33:11
**Oviedo (7)**
18:8,17;19:23;74:4;
91:24;92:4;102:16
**own (5)**
8:18;13:22,25;19:5;
50:15,19;56:7,9;
74:20,22;75:8,15;
83:19;86:1;137:22
**owned (12)**
9:21;18:4,12,20;
19:1,11,14,19,25;
20:2;29:19;50:5,7,14,
16,17;51:13;52:5,20;
80:16;99:19,24
**owner (12)**
8:9,10,17,19;15:3;
18:22;20:9;93:5,13;
124:1,6;136:21

**owners (1)**
125:19
**owns (7)**
50:4,6,7,9;63:21;
74:23;94:5

---

## P

**Pacific (2)**
119:17,18
**packaging (1)**
41:8
**Paddock (1)**
25:17
**paid (8)**
32:13;66:9,12;99:1;
132:12,19,21;139:6
**Palm (3)**
93:9;94:19;97:4
**Panama (9)**
92:21;93:7,13,15;
94:2,6,9;97:4;98:15
**papers (1)**
7:8
**paragraphs (2)**
123:18,20
**paranoia (1)**
126:10
**Park (1)**
5:15
**parking (1)**
127:3
**part (4)**
33:3;70:6;78:13;
90:1
**particular (1)**
38:17
**parties (2)**
5:18;141:14
**parties' (1)**
141:15
**part-time (2)**
32:6,16
**party (1)**
17:6
**password (1)**
100:19
**past (1)**
8:4
**Patti (15)**
29:11,12;30:1;
51:12,12,14,17;
101:15,17;124:4,5,18,
19;138:21,22
**pay (10)**
48:20,20;66:10,10,
19,22;99:8,12,13;
132:9
**paycheck (5)**
135:3,18;138:9,12,
14
**payroll (17)**
7:25;28:15;29:5,6,

30:4,10;31:24;32:21,
25,25;33:1;39:13,15;
51:8,9,12;135:20
**peel (1)**
76:22
**people (10)**
17:18;23:22;24:3,7;
30:11;36:18;79:7,7;
124:9;125:20
**per (2)**
42:1,3
**percent (8)**
54:12;61:3,11;63:3;
81:8;93:19,21;130:17
**percentage (2)**
34:25;38:24
**Perez (2)**
27:16;28:12
**period (3)**
10:22;41:11;79:23
**permission (1)**
97:15
**person (6)**
22:2,11;72:3,4;
97:3,24
**personal (8)**
52:10,23;62:22;
63:1;68:4,9;103:13;
134:25
**personally (9)**
37:15;42:23;52:5;
54:8,9;95:3;105:21;
106:12;136:17
**personnel (1)**
21:24
**pertinent (1)**
134:11
**phone (10)**
28:2;38:4;86:16;
97:21,23;103:21,23;
109:3;110:2,3
**phones (2)**
110:8;127:23
**phonetic (8)**
14:16;18:23;27:4;
28:9;29:1,11;93:10;
105:14
**pick (7)**
60:20;62:6;67:8;
81:8;88:9;113:11,13
**picked (5)**
42:15;61:5,15;63:5;
73:3
**picture (5)**
75:18;110:20,24;
111:5,8
**pictures (4)**
112:15;113:24;
119:5;121:16
**pillow (1)**
33:17
**pink (2)**
44:21;87:17

**place (3)**
72:4,12,19
**placed (3)**
61:4;71:21,25
**plaintiff (3)**
5:3,17;123:13
**Plaintiff's (6)**
6:24;8:22;45:11;
107:20;121:5;136:6
**plate (1)**
45:3
**Please (19)**
5:20;6:20;8:23;
12:4,9;27:25;37:19;
45:12;46:3;66:22;
72:22;73:11,16;92:1;
120:18,22;123:17;
131:3;136:13
**plus (1)**
47:24
**pm (6)**
108:11,12,12,12;
123:23;140:16
**point (4)**
12:19;50:20;74:24;
103:2
**police (17)**
21:2;120:16,20;
121:24,25;122:1;
123:13;125:6,14;
126:2,5,14;128:14,25;
134:17;138:25;139:2
**popular (6)**
20:8;34:7,8;37:1;
38:10;59:8
**POS (6)**
33:19;39:10;60:4,6,
7,8
**position (4)**
7:16,21;8:2,4
**possessed (1)**
9:22
**practice (1)**
68:7
**prepare (6)**
49:14;89:15;
133:23,25;137:7,12
**prepared (5)**
12:22;133:21;
134:12;137:5,13
**present (4)**
9:19,20,24;31:5
**press (6)**
9:21;74:20;75:20,
24;79:1;136:22
**pressed (1)**
136:18
**presses (5)**
74:22;75:8,11,15;
77:22
**pretty (6)**
59:10;65:23,24;
106:2;119:9,11

**preventing (1)**
12:14
**previously (7)**
15:4;19:19;30:13;
40:8;41:14;67:10;
105:5
**price (1)**
83:4
**prices (1)**
10:2
**print (9)**
44:25;63:12;78:16;
87:11;112:19;115:5,
13;116:13;136:22
**printed (16)**
35:8;73:3,5;79:24;
89:8,9;90:15;114:18,
22,24,25;116:9;119:1,
18;129:11;136:17
**printing (11)**
79:14;81:24;87:7;
89:15,20;90:8;114:6;
115:6;124:10;130:3;
132:5
**printout (1)**
107:24
**prints (2)**
55:19;137:4
**Prior (1)**
8:6
**privileged (1)**
12:21
**probably (13)**
14:20;16:8;25:10;
32:17;35:2;41:24;
63:2;88:4;98:21;99:2,
3;103:24;132:25
**problem (5)**
31:14,18;95:25;
101:20,23
**problems (4)**
104:25;105:3,6,7
**procedures (3)**
139:9,11,15
**proceeding (1)**
5:19
**PROCEEDINGS (1)**
5:1
**Process (1)**
7:25
**produce (4)**
9:11;31:8;49:1;
61:20
**produced (1)**
81:15
**product (5)**
57:25;58:3;81:15;
94:12;102:12
**production (1)**
43:2
**products (7)**
26:3;36:10;52:7;
53:5;63:23;70:17;

111:2
**profits (1)**
10:3
**prompted (1)**
23:14
**proof (1)**
105:20
**properties (2)**
13:22,25
**protect (1)**
137:18
**provide (2)**
92:23;129:15
**provided (6)**
86:20;87:10,16,24;
136:12;141:8
**providing (1)**
12:15
**pull (2)**
76:18;88:24
**Purchase (21)**
9:21;40:1;48:19;
58:3;60:16;74:25;
77:7;81:6,12;86:10,
11;92:18;93:2,15;
98:15;99:8;101:13;
107:24;108:7;124:5;
130:20
**purchased (20)**
36:1;40:20;46:22;
61:7;62:4,9;73:7,13,
17;92:7;93:25;94:22;
95:7;98:5;109:18;
111:3;112:16;113:7;
124:2;131:14
**purchases (12)**
41:10,12,13;47:1;
48:3;68:22;69:4;
75:13;99:7;107:8;
117:8;129:3
**purchasing (1)**
82:25
**purpose (1)**
10:6
**purposes (2)**
5:15;91:13
**purse (1)**
28:4
**put (23)**
31:22;32:17;53:9;
55:5;57:13,18;70:16;
76:5,12,15;82:14,15;
86:21;87:25;94:23,
25;102:25;112:9;
113:14;114:20;
124:14;137:16;139:7
**puts (1)**
85:25
**putting (1)**
137:15

**Q**

**quality (2)**
84:4;86:7
**quantities (3)**
10:1;37:8;41:15
**quantity (1)**
36:23
**quarter (2)**
35:5;39:2
**questionings (1)**
9:3
**quick (1)**
108:3
**QuickBooks (1)**
39:14
**quit (3)**
124:20;134:23;
135:23
**quite (2)**
31:22;85:15

**R**

**Rachel (1)**
124:2
**rack (1)**
59:21
**racks (1)**
124:17
**raise (1)**
5:20
**RAPACKE (64)**
5:2,3,5;6:2,23;7:2,
4,6,13,14;8:21,25;
10:15;11:6,12;28:7;
31:7,9,13,16,20;
43:10,13;44:10,13;
45:7,10,14,20,23;
46:1,4;47:3,7,10;49:7,
10;75:21;90:25;91:2,
5,8,10,15,17;107:19,
22;108:2,6;111:11;
120:11,14;121:4,9,21;
122:1,5,13,15;131:6;
136:5,8;139:23;140:1
**reach (2)**
21:20;22:7
**reached (5)**
20:8,15,16;103:14;
104:1
**reaches (1)**
22:11
**read (14)**
9:1,5,7;43:16;
44:15,18;45:16,16,20;
123:14,17;124:21;
136:9;140:5
**ready (2)**
5:18;76:21
**real (3)**
16:23;80:25;108:3
**really (8)**
33:9;35:2,9,11;
39:18;59:6;95:22;

128:10

reask (1)
72:16

reason (1)
72:7

reasons (1)
135:1

reassured (1)
101:21

Rebecca (32)
101:12,14;108:14,
16,17;109:4,9,21,23,
24;110:13;111:15;
117:4,5,20,21;125:2,
3,4,10;126:13;134:14,
17,18;135:2;136:12,
15;137:13;138:20,25;
139:2,10

recall (5)
13:20;30:22,24;
90:2;125:1

receipt (11)
60:14;61:6;98:7;
107:15;108:8;109:15;
110:15;111:18;131:2;
133:10,14

receipts (12)
93:1;95:21;106:17;
107:2;110:18;111:3;
114:12,15,17;116:3,4;
123:23

receive (8)
46:21;61:6,13;68:4,
12;85:14;86:5,9

received (7)
6:18;61:12;95:17;
112:10;138:9,12,14

recollections (1)
106:25

record (15)
6:7;10:12;46:2;
49:9;78:10;91:3,13;
97:17;99:4;103:23;
120:13;121:7;127:22;
139:18;140:2

recording (4)
5:13,15;127:20;
141:11

records (38)
9:17,21,23,25;
35:22;36:4;39:19,19;
40:4;41:4;48:24;49:2;
61:21;65:4,13,18;
66:25;67:24;71:14,
16,18;75:13;78:25;
79:2;89:19;96:19;
97:21,23;98:23;
107:16;109:12,14;
112:5;130:19;132:20;
134:4;139:11,14

Red (2)
21:4,5

redirected (1)

101:17

reflect (2)
10:12;90:8

refresh (1)
106:23

refusing (1)
72:24

region (1)
21:25

register (3)
113:13;123:23,24

registered (2)
22:20,22

registration (2)
22:18;23:3

regular (1)
38:7

regularly (4)
86:10;96:11;
118:22;119:8

relationship (10)
8:12;17:5,14;19:6;
20:7;31:23;35:17;
115:14;119:10;
127:17

relationships (1)
21:19

relative (2)
141:13,15

relevance (1)
10:24

remarks (1)
106:6

remember (41)
13:14;23:2;25:15;
27:17,19;30:22;
35:15;60:24;62:18;
71:10;74:5;83:3;85:2;
87:15;89:6,7;90:3,15;
94:17,19;95:3;97:6;
98:4,9;103:17;104:8,
11,14;106:16;109:1,
3;110:5;119:22;
121:11;122:24;
128:16,22;130:8,13;
132:23;133:3

remind (3)
22:24;39:25;75:3

remove (1)
84:5

removed (1)
124:16

removing (1)
105:13

reorder (2)
36:14,24

rep (1)
22:4

Repeat (3)
68:6,23;73:12

rephrase (3)
12:10;55:24;56:3;
89:17

replace (2)
102:8;106:3

replenish (1)
113:20

replied (1)
17:21

report (10)
120:20;121:24,25;
122:1;125:7,9,14;
134:18;138:25;139:2

REPORTER (9)
5:10,12,25;8:24;
11:22;12:2;140:3,8,
11

Reporting (1)
141:9

represent (2)
5:6,9

representation (1)
141:10

representative (7)
6:14;11:10,16;
22:16;37:22;42:14;
52:3

representing (1)
17:6

reproduce (1)
136:22

reproduced (1)
136:18

reproducing (1)
10:6

request (1)
43:2

requested (2)
9:11;71:13

requests (1)
10:14

required (3)
138:6,7,8

reside (1)
13:23

residence (4)
62:23;63:1,6;75:16

resides (1)
14:3

resignation (1)
138:17

responses (2)
10:13;112:9

responsibilities (6)
7:24;11:9,14;32:21;
33:11;74:16

responsible (2)
33:22;70:21

rest (1)
32:6

retail (1)
65:12

retailer (3)
92:10,17,21

retailers (1)
105:18

return (2)
58:17;72:19

returned (1)
124:15

review (3)
47:5;89:14;134:9

reviewed (1)
87:2

reviewing (1)
85:17

rid (1)
102:13

right (95)
5:20;6:3,13;7:16;
11:3,18;12:24;14:22;
17:4,21;22:19;23:2,
10,11,13;27:5,18;
28:4,6,9;30:11,15,17;
31:4;32:10;33:2;34:8;
36:6,8;37:17;41:16;
47:7,11;48:11;49:11;
50:1;51:11;53:20,21;
57:3;58:11,18,25;
59:2,4;60:12,17,19;
64:3,9;67:4,6,7,8;
70:9,12;71:19,19;
79:7;80:13,13;81:7;
82:16;83:20,21;84:1;
87:5,13;88:10;90:10,
11;91:22;92:23;
100:15,25;101:2,4;
104:9;115:15,23,24;
116:16,22;117:2,14;
118:15;120:15;121:4;
123:8,12;129:17,22;
133:15;134:21;
138:20

right-hand (1)
5:5

Riverton (1)
13:8

Roughly (3)
42:3;47:12,16

roundabout (1)
40:9

routine (11)
72:11,17;82:17;
88:5;115:4,12,18,19,
20,22;117:8

Ruger (1)
21:14

rules (1)
11:21

Rumore (1)
29:12

run (2)
11:21;30:4

## S

safe (1)
131:15

safely (1)

78:11

Safety (2)
78:7,15

sale (4)
60:11;82:15;124:6;
129:11

sales (20)
8:6,9;17,25,25;
10:2;21:24;22:4;
34:25;35:5;38:25;
39:19;40:3,6;60:8;
83:4;93:1;95:21;
98:23;105:14;124:17

Sales@ (1)
68:25

sales@dixieheritagestorecom (2)
68:20,24

same (16)
12:4;21:20;50:18;
53:9,18;55:3;56:19;
90:20;104:9,10,10;
105:18;110:24;111:2;
121:15;129:18

Sanford (12)
17:16;18:6,7;19:23;
24:15;28:24;50:8,9;
60:24;62:16,17;75:6

Saturdays (1)
108:21

Savannah (2)
27:6;28:14

saw (4)
7:10;102:7,18;
126:23

saying (3)
47:14,16;103:9

scenario (1)
80:4

schedule (2)
139:20,22

scheduling (1)
7:25

school (1)
15:15

Scribes (1)
5:11

Script (4)
43:21;44:21,22,23

scripted (4)
43:22,24,24;45:2

season (1)
74:3

seasonal (1)
25:23

sec (1)
66:8

second (10)
24:18,21;25:3,13,
15;44:14;123:18,20;
124:21;130:15

seconds (2)
76:11,19

seeing (1)

90:15

**seemed (1)**
124:3

**sell (33)**
23:14,15,21;24:3,4,
4,5,5,5,6;38:4;48:14;
51:20,23;52:7,9;
53:12,13,14,16;54:2,
3,6,8;55:7,23;56:6;
59:16;73:23;74:11;
77:15;87:12;94:13

**seller (3)**
34:18,19;77:18

**sellers (3)**
34:15;44:1;60:19

**selling (16)**
17:8,11;23:7,20;
24:9;36:9,10,17,22;
37:10;55:2;59:8,18,
22;65:21;127:16

**sells (6)**
38:18;52:6,7;59:13;
127:12,12

**Seminole (6)**
18:3;24:15;25:3;
50:19;91:24;92:4

**send (6)**
22:1;31:9;41:5;
48:14;97:5;112:5

**Senior (1)**
15:16

**sense (9)**
51:20;53:11,19;
55:10;58:12;65:14;
80:5;83:17;130:25

**sent (10)**
67:11,15,17,21;
69:17,24;72:9;103:2;
119:5,5

**separate (15)**
16:8;52:11,12,12;
53:11;55:7;58:15;
63:16;64:7,12,13;
65:22;78:18,20;
111:19

**separately (1)**
66:10

**September (3)**
18:14,16;27:9

**series (1)**
139:8

**serve (1)**
17:2

**served (1)**
10:13

**server (1)**
69:9

**setting (1)**
24:1

**seven (3)**
62:1,2;68:1

**several (3)**
41:20,21;118:23

**shady (1)**
111:21

**shaken (1)**
128:10

**Sheet (2)**
46:6,10

**shelf (1)**
124:13

**Shelli (1)**
14:16

**shelves (1)**
124:16

**shift (1)**
124:17

**shipping (1)**
43:25

**shirt (22)**
38:9;41:20;53:12;
55:2,3,5;76:4,12,15;
80:25,25;81:2,22;
82:14,15;83:11,23,24,
25,25;84:4,23

**shirts (35)**
23:7,14;24:10;35:9;
36:14,21;38:6,14;
55:7;60:18,18;63:19;
65:7;66:19,22,23;
74:7;82:6;83:1,6,15,
18;84:7,8,9,10,11;
86:7,7,15,16,17;
87:23;88:3;110:21

**shirt's (1)**
76:21

**shop (1)**
76:4

**shortly (3)**
123:21;124:8,11

**shot (1)**
58:2

**show (24)**
6:16;40:19;42:24;
44:14;46:1,5;60:14;
75:18;78:11;90:10;
106:19,24;110:20;
111:11;120:15;
125:13;126:1,4,12;
129:13,20;130:2;
131:1;135:6

**showed (2)**
49:17;120:1

**shown (2)**
67:22;111:3

**shows (1)**
125:21

**side (2)**
107:10,11

**Sidebender (1)**
5:11

**sign (8)**
26:7;135:4;138:6,7,
8,12,18,20

**signature (3)**
46:18,19;135:9

**signed (4)**
138:5,14,16,22

**signs (1)**
137:3

**Simply (4)**
20:25;21:23;26:11;
34:10

**Sims (1)**
29:16

**single (1)**
21:13

**sitting (1)**
12:17

**situation (2)**
50:2;102:14

**six (3)**
42:1,3;87:5

**size (1)**
38:20

**small (1)**
10:17

**smaller (1)**
22:8

**sold (8)**
52:25;53:3;73:22;
74:13;83:3;93:6;
113:14;136:25

**somebody (6)**
109:10;117:8,10;
125:17;126:5,21

**something's (1)**
59:22

**sometimes (20)**
46:12;48:16,22,22,
23;60:25;61:8,8,16;
67:10;81:16;82:1,1,
18,18;84:3,4,25;
99:13;108:22

**somewhere (1)**
48:9;104:12

**son's (1)**
136:2

**soon (2)**
121:1;136:4

**sorry (19)**
23:1;24:23;27:21;
43:9;46:2;58:1;60:4;
75:6;76:17,18;91:6;
92:25;93:9;94:20;
104:12;110:5;114:14;
123:8;132:4

**sort (2)**
78:10;99:4

**sound (1)**
76:17

**Southern (7)**
20:25,25;21:23;
26:11;34:11;50:13;
51:15

**span (3)**
40:2;41:18;42:5

**speaking (1)**
62:4

**special (2)**
58:19;116:14

**specific (2)**
13:16;134:11

**specifically (1)**
84:16

**spell (2)**
6:7,9

**spelled (1)**
6:12

**spent (1)**
48:3

**split (3)**
51:6;66:7,18

**spouse's (1)**
14:22

**stack (4)**
82:3,8,23,24

**staff (1)**
136:21

**standard (7)**
36:23;45:1;59:10;
68:3,7;79:4;108:19

**start (7)**
6:5;20:6;24:7;
59:23;86:14;115:6,16

**started (19)**
7:7;11:19;12:25;
17:11;23:17,22,22,23;
24:9,22,23,25;25:8;
26:2,6;51:13;85:16;
103:1;115:14

**starting (1)**
87:7

**startled (1)**
126:23

**state (3)**
6:6;22:18;141:3

**stated (3)**
72:17;124:20;125:9

**statement (12)**
123:14;135:3,7;
136:10;137:5,7,12,13,
20;138:8,20,22

**statements (2)**
137:2,17

**stating (1)**
90:7

**stayed (1)**
51:14

**stepped (1)**
128:6

**stick (1)**
125:24

**stickers (3)**
93:23;97:6,7

**sticking (1)**
96:7

**still (6)**
30:4;31:22;50:1;
74:9;102:19;122:23

**stop (1)**
102:10

**store (80)**
17:9,16,23;18:9;
22:2;24:14,15;25:1,5,
13,15,20;32:17,19;
35:4;50:1,5,18;51:14;
55:4,5,6,15;56:19,21,
25;57:4,6,10;58:10,
16,17;59:20;61:1;
63:19;64:21,23;71:3;
73:23;75:2,2,7;77:11;
79:11,13;80:9;92:21;
93:5,7,8,13,16;94:6,9,
18,23,25;95:7,9,12;
101:8,12;102:25;
107:25;110:1,2,3;
113:9,9;117:11;
123:25;125:18,21;
126:11,20;127:18,24;
128:3,8;130:4

**stores (47)**
18:2,20;19:1,5,9,9,
14,19;20:2,18;24:12;
25:8,23;26:2;33:3,7,
10,12;50:4,5,11,14;
51:6;52:8;54:18;
57:13,17,19,21,24;
58:4,9;59:9;60:19,22;
62:15;63:17,21,25;
65:25;66:17;71:6;
75:3;83:10;96:14;
109:19;127:19

**store's (1)**
139:18

**strange (2)**
124:3,5

**strike (1)**
90:5

**stronger (1)**
102:12

**stuck (2)**
74:10;119:9

**studied (2)**
16:11,13

**study (1)**
16:10

**stuff (24)**
73:25;80:11;85:15,
16,20,21,24;87:11;
88:14;96:12,15;98:1;
99:8,11;102:8;106:2,
4;114:24,25;117:7;
118:9;132:1,12,15

**Style (4)**
20:21;26:14;34:11;
36:21

**styles (1)**
85:3

**Submited (1)**
141:19

**submitted (1)**
129:17

**sunglasses (1)**
86:15

**SunTrust (1)**
39:15
**supervisor (1)**
101:15
**supplier (3)**
83:18,19;85:8
**supposed (1)**
139:19
**sure (35)**
6:20;11:20;20:13;
29:5;36:2;40:16;43:3;
48:8;49:1;62:3,12;
64:10;65:1;71:24;
86:12,17,19;91:1,5,
21;93:5;94:17;95:4;
96:1,6;99:1,2;103:19;
106:18;114:15;122:3,
11;129:6;130:17;
132:18
**Surf (1)**
127:10
**swear (2)**
5:20,21
**sweater (1)**
44:21
**sweaters (1)**
44:25
**sweatshirt (1)**
111:10
**sweatshirts (25)**
38:2;56:14;79:15;
87:17;88:2,15;89:2,9;
90:12,14,16,22;111:8;
114:2,23;116:7,8;
119:16;120:3;121:11;
130:10;132:18;133:5,
11,16
**swimwear (1)**
94:8
**switched (1)**
85:10
**switches (1)**
85:15
**system (15)**
33:19;35:19;39:6,8,
10;59:17;60:4,6,7,8;
66:21;107:14;109:17;
112:3,3

**T**

**T- (1)**
76:3
**tab (1)**
57:15
**tag (4)**
81:20,23;84:4;
85:25
**tags (6)**
81:12,16;82:2,11,
12,21
**talk (6)**
12:3;33:17;71:20;

**talked (3)**
97:18,24;117:17
**talking (5)**
12:2;54:9;89:22;
122:16,17
**tan (1)**
43:22
**tank (4)**
38:5,5;74:6;93:23
**Taylor (1)**
29:16
**tecum (5)**
6:18,25;9:2,5;90:2
**Tee (7)**
43:18,21,21,22;
44:20;45:2,4
**telling (3)**
103:4;105:18;
125:19
**tells (1)**
112:3
**Ten (5)**
14:20;15:10;76:10,
19;90:25
**testify (1)**
6:13
**testifying (1)**
37:21
**testimony (2)**
11:16;12:15
**testing (1)**
47:13
**that'd (1)**
106:24
**theft (3)**
127:24,24;128:2
**thinner (1)**
38:21
**third (4)**
24:18;25:13;
123:18,20
**third-parties (1)**
75:12
**though (5)**
20:14;23:3;70:6;
96:2;99:6
**thought (3)**
58:2;95:7;117:16
**threat (2)**
106:5,12
**threatened (1)**
126:19
**threatening (1)**
106:6
**threatens (1)**
125:21
**threats (5)**
103:1;106:7,9,11;
137:14
**three (12)**
10:22;26:21;34:5,6,
12;36:21;47:12;88:4;

**106:**17,18;107:3;
119:14
**throughout (1)**
136:15
**thrown (2)**
36:5;41:2
**times (23)**
41:17,22;42:1,3,5,
17;62:25;63:2,5,9;
81:10;85:15;86:24;
87:24;88:1;89:20;
90:4;108:9;111:19,
20;112:9;116:5;
132:17
**TJ (3)**
103:6;104:17,19
**today (9)**
5:13;6:18;11:16;
12:7,14,19;71:14;
133:21;134:12
**today's (4)**
12:22;49:14;
133:23,25
**toe (1)**
86:14
**together (6)**
31:22;53:10;64:18;
137:15,17;139:7
**told (24)**
40:10;94:11,11;
95:23;97:4,11;102:8,
23;103:16;104:2,5;
106:2;109:21;110:14;
117:13;118:4,10;
124:5,7,20;126:10;
130:17;134:25;135:1
**took (6)**
51:3;95:18;96:2,4,
9;135:19
**Top (6)**
34:15,17,19;36:9;
44:16;65:21
**tops (6)**
38:5,5;74:6;93:23
**Torgeman (22)**
5:2,7,17,21;6:5,10;
8:13;14:9,23,24;18:5,
20,24;22:21;29:20;
44:15;62:5;91:20;
120:15;124:12;136:9;
140:5
**T-O-R-G-E-M-A-N (1)**
6:12
**Torgeman's (1)**
28:22
**total (7)**
26:24;44:6;45:5,18,
19;47:11;98:4
**totally (1)**
53:20
**Touch (8)**
112:25;113:2;
127:13;129:18,22,23;

**131:**2,14
**towards (2)**
119:10;137:14
**Towne (5)**
18:3;24:16;25:3;
91:24;92:4
**track (14)**
35:20;36:8,9;55:11,
15;58:2;59:7,20,25;
60:6,8;85:6,7;113:6
**tracks (1)**
48:9
**trademark (4)**
80:22;136:19,23,25
**Traditions (2)**
50:13;51:15
**train (6)**
33:18;78:2;79:6,18;
80:1,21
**trained (2)**
72:4;78:3
**training (10)**
33:22;74:17,17;
78:8,10,13,14;79:4,9,
21
**trainings (1)**
79:2
**transaction (1)**
98:25
**transactions (4)**
106:16;116:22;
118:11;134:9
**transcribe (1)**
141:7
**transcript (2)**
140:7;141:10
**TRANSCRIPTIONIST (1)**
141:1
**transcripts (1)**
140:4
**transfer (6)**
76:6,15,18,22;
113:12,18
**transfers (14)**
24:2,10;76:25;77:1,
2,6,10,14,16;113:4,5,
7,8,14
**tree (1)**
94:19
**Trey (1)**
5:10
**true (8)**
43:3;107:6,23;
120:19;131:3;135:7;
137:3;141:10
**trust (2)**
62:13,14
**truth (3)**
5:22,22,22
**truthful (1)**
12:15
**try (1)**
104:14

**trying (3)**
31:22;86:14;124:9
**T-shirt (4)**
76:5;80:2;83:4;
84:22
**T-shirts (17)**
21:14;37:3,12;38:2,
12,13,15;44:3;55:20;
65:8;74:6;79:14,15;
80:9;87:22;93:23;
119:11
**turnaround (1)**
131:19
**twice (2)**
71:9;89:11
**two (28)**
14:9,11;16:2,4,8,8;
19:9,9,18;23:2;26:11,
24;27:12;30:2,2;35:7,
16;40:12;41:23;53:9;
74:24,24;89:2,4;
99:14;107:3;116:4;
125:20
**two-sided (2)**
44:25;90:14
**two-year (5)**
35:17;40:2;41:10,
18;42:5;48:3
**TXT (1)**
140:7
**type (1)**
10:3
**typed (1)**
136:14
**types (3)**
79:16;86:9,10
**typical (1)**
84:21
**typically (4)**
37:5,14,25;41:19

**U**

**UCF (2)**
15:23;16:13
**UF (1)**
43:23
**Uh-uh (2)**
29:7;39:21
**Under (3)**
9:10;70:8;106:17
**undermining (4)**
102:21;127:7,8,15
**underneath (1)**
76:5
**undersigned (1)**
141:6
**understood (3)**
12:12;64:10;86:19
**unfortunately (1)**
98:8
**unique (2)**
23:7,9

Case 6:17-cv-00983-GKS-GJK   Document 57-1   Filed 05/11/18   Page 155 of 156 PageID 1488

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

YENISET TORGEMAN
March 20, 2018

**University (2)**
15:23;16:11
**unless (1)**
58:19
**unlike (1)**
139:9
**up (50)**
15:13;23:6;24:2,4,
18;25:18;26:5,6,8;
35:3,18;36:13;42:15;
60:20;61:5,15;62:6;
63:5;66:7,9,18;67:8;
69:12;70:17;73:3;
76:10,11,14;80:21,25;
81:8;83:11,23;84:7,
15,18,19;85:9;88:9;
101:4;103:4,15;
106:8;113:14;124:11;
125:21;127:17;
128:10;129:6;134:15
**use (17)**
33:18;39:10,14,15;
48:19;68:3,9;69:9;
79:1,9,10;84:1,2,13,
22;113:14;134:5
**used (7)**
50:19;51:12;75:12;
86:6;119:3,8;120:8
**uses (4)**
84:19;118:22,23;
119:15
**usually (1)**
84:19

**V**

**value (4)**
98:4,6,17,19
**vendor (3)**
66:4;114:16;129:16
**vendors (5)**
21:21;53:9;77:17;
105:18,23
**verbally (1)**
12:4
**versus (4)**
36:11;38:6;79:4;
107:15
**via (3)**
17:21;22:7;41:5
**video (2)**
5:13;140:4
**view (5)**
89:20;100:9,14,16,
24
**vision (1)**
23:25
**visited (4)**
29:4;91:20,21;
101:7
**V-neck (3)**
43:22,23;45:2
**V-necks (1)**

**38:6**
**voluntarily (1)**
124:20

**W**

**wait (3)**
12:6;68:6;127:2
**wants (2)**
46:16;104:4
**War (1)**
56:13
**warehouse (9)**
46:11;60:25;61:4;
62:6;73:14,18;88:11;
91:20;130:7
**watch (1)**
127:23
**way (9)**
21:20;49:23;60:10;
63:13;113:8;122:21;
126:8,9;139:10
**Wear (1)**
35:10
**Wear's (1)**
35:10
**website (33)**
22:8;51:21,23;52:1,
4,10,17;53:4,15,24;
54:7,9,19,21;55:8,12,
21,24;56:6,8,20;57:4,
7,10;63:24;68:21,22;
69:4,6;70:9,11,23;
77:4
**website's (1)**
52:5
**week (11)**
32:8;104:10,11;
129:19;130:15,22;
131:17,19;132:25;
133:6,6
**weekend (2)**
135:24;136:1
**weird (2)**
117:10,16
**Welch (16)**
20:9;62:15;73:8,14,
20;88:19;89:21;
101:7;105:1;116:9;
124:1;125:14;126:2,
5,13,18
**Welcome (1)**
49:11
**weren't (2)**
32:24;74:11
**West (2)**
5:14;21:17
**wet (1)**
22:15
**WF (1)**
112:19
**WFC (4)**
112:21,23;120:6,8

**What's (16)**
13:6;21:5;34:7;
44:6;45:5;52:13,15,
17;59:18;65:1;83:3;
92:22;110:15;122:13;
127:2,3
**white (1)**
45:1
**whole (2)**
5:22;139:7
**who's (4)**
11:23;20:9;29:11;
108:13
**wife (2)**
33:14;124:11
**Winter (1)**
5:14
**within (3)**
35:16;68:1;130:22
**witness (16)**
5:20,24;11:3,9;
28:2,4;30:20,24;31:1,
4,12,14,19;112:14;
122:4;128:18
**witnessed (1)**
136:20
**witnesses (1)**
93:4
**women's (3)**
38:5;74:7;86:15
**word (2)**
65:12;134:5
**worded (1)**
49:23
**work (11)**
7:25;11:19;17:22;
22:3,9;32:9,11,16;
79:20;118:14;124:15
**worked (3)**
27:7;29:25;76:3
**working (8)**
9:23;26:20;27:16;
28:19;101:12;108:15,
20;123:23
**works (4)**
29:12,14;76:1;
77:16
**World (2)**
23:18,24
**worn (1)**
76:21
**worry (1)**
118:14
**worth (7)**
48:1;94:14;98:14;
106:15;117:11;124:2;
125:18
**Wow (2)**
41:24;77:11
**wrap (2)**
129:6;134:15
**Wright (1)**
124:2

**write (5)**
65:3;100:8,11,21,
23
**writes (2)**
46:15;136:14

**Y**

**year (14)**
8:4;19:21;24:19,24;
25:7,10;27:15,17;
42:1,3;55:22;121:15;
122:19;123:1
**years (14)**
13:10;14:16,20;
15:10,14;16:3,4;30:2,
2;35:16;36:6;40:12;
41:23;123:9
**year's (1)**
34:2
**Yeni (1)**
124:12
**Yeniset (5)**
5:17,21;6:8,10;
124:11
**Yossi (8)**
93:10,10,12;94:5;
97:2;98:13,15;99:8

**1**

**1 (4)**
6:24;7:3;8:23;
136:17
**1,000 (1)**
47:25
**10 (1)**
140:14
**100 (4)**
54:12;61:11;93:19;
130:17
**100,000 (1)**
40:2
**1099 (1)**
34:2
**11 (1)**
140:15
**12 (8)**
36:20;37:8;41:15;
42:5,20;83:1,1;107:9
**12/12 (4)**
135:12,15,17,17
**12/12/2016 (1)**
136:13
**12/3 (1)**
125:1
**12:00 (2)**
108:22,23
**12:02 (1)**
140:16
**12-08-2016 (1)**
124:21
**12-12 (1)**

**135:19**
**127 (1)**
43:15
**1-27-2017 (1)**
120:18
**12th (1)**
131:15
**13 (7)**
43:23,23,24;44:21,
22,23,23
**13th (1)**
104:21
**15 (2)**
13:10;98:22
**16th (1)**
10:12
**19 (1)**
83:5
**19.99 (3)**
83:7,13,16
**1911 (1)**
44:23
**1980 (1)**
13:1

**2**

**2 (6)**
9:19;44:11,12;
122:20;123:6;136:20
**2,600 (1)**
47:24
**20 (3)**
5:14;30:19;34:21
**20,000 (1)**
98:22
**2014 (2)**
23:1;33:25
**2015 (19)**
7:22,23;8:3;9:18,
20,24;17:12;20:11;
23:1;30:14;31:5;
34:18,22;39:23;
121:12;123:6;130:10;
131:9,11
**2016 (16)**
34:18;74:4;87:3,3;
91:18,19;92:13;
101:4;103:19;104:12,
21;115:17;121:11;
122:23;123:6,22
**2017 (3)**
18:15,16;55:22
**2018 (2)**
5:14;141:19
**20s (1)**
123:25
**26 (1)**
32:18
**280 (5)**
44:17;88:25;90:6,9;
123:2
**2nd (1)**

112:13

## 3

**3 (11)**
  9:21;45:11,13,24;
  88:25;90:6;101:4;
  104:21;123:5,22;
  136:24
**3,600 (1)**
  47:25
**30 (1)**
  141:19
**30b6 (2)**
  6:14;11:9
**315 (1)**
  45:19
**34 (3)**
  43:24;44:24,24
**3rd (4)**
  106:13;108:25;
  116:20,21

## 4

**4 (4)**
  9:23;45:25;46:2;
  107:12
**40 (2)**
  32:13,15
**400,000 (1)**
  34:3
**4726 (1)**
  13:8

## 5

**5 (7)**
  9:25;47:4,8,9;
  107:9;131:9,11
**5:00 (1)**
  139:19
**5:30 (1)**
  108:23
**50 (1)**
  93:21
**500 (2)**
  77:11,19

## 6

**6 (7)**
  10:3;13:1;107:20,
  21;111:4;116:25;
  117:1
**6:00 (1)**
  108:22
**6:39 (1)**
  108:12
**6:42 (2)**
  108:11;123:23
**6:44 (1)**
  108:12

**6:49 (1)**
  108:11

## 7

**7 (5)**
  14:16;121:6,8,20;
  123:14
**72 (6)**
  44:25;89:9;120:1;
  121:10;122:18;
  133:16
**7th (1)**
  134:21

## 8

**8 (3)**
  15:14;136:6,7
**8th (2)**
  134:18,21

## 9

**9 (2)**
  14:17;140:13
**9:00 (1)**
  139:19
**941 (1)**
  5:14
**96,400 (1)**
  48:6
**99 (3)**
  61:3;63:3;81:7