# In The Matter Of:

*FLOGROWN, LLC v.*

*DIXIE HERITAGE, LLC*

---

*ASHER TORGEMAN*

*March 20, 2018*

*COPY*

---

*CourtScribes, Inc.*

*"Delivering More For Less"*

*(833) 727-4237*

*info@courtscribes.com*

*www.courtscribes.com*

Original File 106085 Torgeman Ashercopy.txt

Min-U-Script® with Word Index

**COPY**

1

1   UNITED STATES DISTRICT COURT

2   MIDDLE DISTRICT OF FLORIDA

3   ORLANDO DIVISION

4   CASE NO.: 6:17-CV-00983-GKS-GJK

5

6   FLOGROWN, LLC,

7   PLAINTIFF,

8

9   VS.

10

11  DIXIE HERITAGE, LLC,

12  ASHER TORGEMAN, AND ALBERT TORGEMAN,

13  DEFENDANTS.

14  _____/

15  VIDEOTAPED DEPOSITION OF ASHER TORGEMAN

16  DATE:          MARCH 20, 2018

17  REPORTER:      TREY SIDEBENDER

18  PLACE:         REGUS HERITAGE PARK

19                 941 WEST MORSE BOULEVARD

20                 SUITE 100

21                 WINTER PARK, FLORIDA 32789

22

23

24

25

1                           APPEARANCES

2

3     ON BEHALF OF THE PLAINTIFF, FLOGROWN, LLC:

4     ANDREW S. RAPACKE, ESQUIRE

5     BENJAMIN L. BEDRAVA, ESQUIRE

6     THE RAPACKE LAW GROUP, P.A.

7     1836 NORTH PINE ISLAND ROAD

8     PLANTATION, FLORIDA, 33322

9     TELEPHONE NO.: (954) 951-2242

10    FACSIMILE NO.: (954) 206-0484

11    E-MAIL: ANDY@ARAPACKELAW.COM

12            BEN@ARAPCKELAW.COM

13

14    ON BEHALF OF THE DEFENDANTS, DIXIE HERITAGE, LLC, ASHER

15    TORGEMAN, AND ALBERT TORGEMAN:

16    LEIA V. LEITNER, ESQUIRE

17    WATSON, LLP

18    189 SOUTH ORANGE AVENUE

19    SUITE 810

20    ORLANDO, FLORIDA 32801

21    TELEPHONE NO.: (407) 377-6634

22    FACSIMILE NO.: (407) 377-6688

23    E-MAIL: LEIA@WATSONLLP.COM

24

25

**COPY**

3

1                              INDEX

2                                                    Page

3    PROCEEDINGS                                      5

4    DIRECT EXAMINATION BY MR. RAPACKE                5

5    CROSS EXAMINATION BY MS. LEITNER                 96

6    REDIRECT EXAMINATION BY MR. RAPACKE              98

7

8

9                            EXHIBITS

10   Exhibit                                          Page

11      8     REBECCA GOODINE STATEMENT               91

12      9     FLOGROWN LOGO                           17

13     10     TWO PHOTOGRAPHS                         30

14     11     PHOTOGRAPH                              31

15

16

17

18

19

20

21

22

23

24

25

**COPY**

4

1                          STIPULATION

2

3  THE VIDEOTAPED DEPOSITION OF ASHER TORGEMAN TAKEN AT

4  REGUS HERITAGE PARK, 941 WEST MORSE BOULEVARD, SUITE

5  100, WINTER PARK, FLORIDA 32789 ON TUESDAY THE 20TH DAY

6  OF MARCH 2018 AT APPROXIMATELY 1:19 P.M.; SAID

7  VIDEOTAPED DEPOSITION WAS TAKEN PURSUANT TO THE FEDERAL

8  RULES OF CIVIL PROCEDURE.

9

10  IT IS AGREED THAT TREY SIDEBENDER, BEING A NOTARY PUBLIC

11  AND COURT REPORTER FOR THE STATE OF FLORIDA, MAY SWEAR

12  THE WITNESS AND THAT THE READING AND SIGNING OF THE

13  COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

14

15

16

17

18

19

20

21

22

23

24

25

COPY

5

1      PROCEEDINGS

2          COURT REPORTER:  Good afternoon.  My name is

3      Trey Sidebender from Court Scribes.  I'm the digital

4      court reporter.  As indicated in the notice, we'll

5      be making a video recording.  We are here today,

6      March 20, 2018, at 941 West Morse Boulevard, Winter

7      Park, Florida, for the purposes of recording the

8      deposition of Asher Torgeman taken by Plaintiff in

9      the matter of Flogrown v. Dixie Heritage.  If both

10     parties are ready and in agreement, we will commence

11     proceeding.  Counsel will now state their

12     appearance.

13         MR. RAPACKE:  Andrew Rapacke, counsel for

14     Plaintiff, Flogrown, LLC.

15         MS. LEITNER:  Leia Leitner, counsel for the

16     defendants.

17         COURT REPORTER:  Thank you.  I'll now swear in

18     the witness.  Please raise your right hand.  Do you,

19     Asher Torgeman, swear or affirm to tell the truth,

20     the whole truth, and nothing but the truth, so help

21     you God?

22         THE WITNESS:  Yes.

23         COURT REPORTER:  Counsel, you may begin.

24             DIRECT EXAMINATION

25          BY MR. RAPACKE:

COPY

1    Q    All right.  Good afternoon, Mr. Torgeman.

2    A    Good afternoon.

3    Q    Thank you for coming in.  My name's Andrew

4  Rapacke.  I'm with the Rapacke Law Group, and I -- as

5  the court reporter just mentioned, I am the attorney for

6  Flogrown.  And -- now, you're here today because I would

7  like to ask you a couple of questions.  If you haven't

8  had your deposition before, essentially the ground rule

9  are that we have a court reporter here.  The court

10  reporter's going to record everything that I say and you

11  say.  I'd ask that -- I will not speak over you, and

12  I'll ask that you don't speak over me so that there's no

13  trouble transcribing what's being said.  When I ask a

14  question, please allow me to finish asking the question

15  before you answer.  Please don't anticipate what you

16  think I'm going to ask.  I'll do the same for you.

17  Please answer with a yes or a no and do not nod your

18  head.  If you don't understand a question, let me know,

19  and I'll rephrase the question.  If you answer a

20  question, I'm going to assume that you understood the

21  question.  Okay?

22    A    Okay.

23    Q    Have you prepared for this deposition?

24    A    Yes.

25    Q    Okay.  And is this your attorney sitting next

COPY

7

1    to you?

2         A    Yes.

3         Q    Okay.  Excellent.  Is there anything

4    preventing you from giving your best and truthful

5    testimony here today?

6         A    No.

7         Q    Okay.  And are you aware of what giving your

8    deposition means today?

9         A    Yes.

10        Q    Okay.  All right.  Can I get your full name

11   for the record?

12        A    Asher Torgeman.

13        Q    Can you spell your last name for me, please?

14        A    T-O-R-G-E-M-A-N.

15        Q    What's your date of birth, Mr. Torgeman?

16        A    January 29, 1970.

17        Q    What's your current address, Mr. Torgeman?

18        A    4726 Riverton Drive, Orlando, Florida, 32817.

19        Q    How long have you lived at that address?

20        A    Around ten years.

21        Q    Okay.  Do you own any other properties?  Do

22   you own any rental homes?

23        A    Yes.  I own one.

24        Q    Okay.  And who lives in that rental home?

25        A    My brother.

COPY

8

1       Q      I'm sorry.  Can you say that again?

2       A      My brother.

3       Q      Your brother.  Okay.  What's the address of

4   that rental home?

5       A      874 Charlotte Street, Longwood, Florida,

6   32750.

7       Q      And you are married, correct?

8       A      Yes.

9       Q      And what is your spouse's name?

10       A      Yeni Torgeman.

11       Q      Okay.  And what do you do for a living,

12   Mr. Torgeman?

13       A      I have stores, retail stores.

14       Q      Okay.  What's the name of your retail stores?

15       A      Dixie Heritage, LLC.

16       Q      Okay.  Are you the registered owner for Dixie

17   Heritage, LLC?

18       A      Yes.

19       Q      Are you the only owner for Dixie Heritage,

20   LLC?

21       A      Yes.

22       Q      Are you the registered agent for Dixie

23   Heritage, LLC?

24       A      Yes.

25       Q      Okay.  How long have you owned Dixie Heritage,

COPY

9

1    LLC?

2         A    Five years.

3         Q    Okay.  What are your responsibilities at Dixie

4    Heritage, LLC?

5         A    Everything.

6         Q    Can you tell me a little bit more?

7         A    I fix the stores, buy the stuff, everything

8    that I need to do for the stores.

9         Q    Okay.  Do you handle sales?

10        A    If I do sales?  Yes.

11        Q    Okay.  You do sales.

12        A    Yes.

13        Q    Okay.  Do you handle marketing?

14        A    We don't have any marketing --

15        Q    Okay.

16        A    -- so I don't handle marketing.

17        Q    Do you handle any advertising?

18        A    No.

19        Q    Okay.  Do you currently own a website for

20   Dixie Heritage, LLC?

21        A    I don't own one.  My wife own one, but it's

22   her website.

23        Q    Do you sell goods -- Dixie Heritage goods

24   through your wife's website?

25        A    Not from the stores.  She's buying the same --

**COPY**

1  similar stuff from the same companies, and she sell

2  them.  And the website opened after the lawsuit, so I

3  don't know what it's -- I have nothing to do with it.

4      Q  Do you advertise your stores on the Dixie

5  Heritage website?

6      A  Yes.

7      Q  Okay.  Do you handle employee records?

8      A  I think we have -- yes.

9      Q  Yes?  Okay.  Can you tell me how many stores

10  you own?

11      A  Right now, or in 2015?

12      Q  Right now.

13      A  Right now, I own two.

14      Q  What the location of the -- the two current

15  stores?

16      A  Melbourne, Florida, and Merritt Island,

17  Florida.

18      Q  Okay.  In 2015, how many stores did you own?

19      A  Three.

20      Q  Can you tell me the location of those stores?

21      A  At that time, it was Sanford, Oviedo, and

22  Melbourne.

23      Q  Okay.  Have you ever owned a Lakeland store?

24      A  I did in 2014.

25      Q  When did you sell the Lakeland store?

COPY

11

1       A     I didn't sell.  I closed down.

2       Q     Okay.  Do you -- does -- who operates the

3  Lakeland store now?

4       A     My brother is the owner and I'm the buyer.

5       Q     Okay.  Is your brother an owner of Dixie

6  Heritage, LLC?

7       A     No.

8       Q     Is your brother an employee of Dixie Heritage,

9  LLC?

10      A     No.

11      Q     Does your brother buy goods -- Dixie Heritage

12  goods through you?

13      A     Yes.  I'm buying for them -- for him.

14      Q     How many employees does your brother have at

15  his stores?

16      A     Usually, at least two.

17      Q     What stores does your brother currently own?

18      A     Right now, he own Lakeland and Sanford.

19      Q     Lakeland and Sanford.  How many employees does

20  he have?

21      A     Right now?  Four.

22      Q     Okay.  How many has he had since he bought the

23  Lakeland store?

24      A     How many employees he had?

25      Q     Has he had, correct.

COPY

12

1      A      I'm not sure of numbers.  I don't know.

2             Probably five, six.

3      Q      Okay.  Are your brother's employees paid

4   through Dixie Heritage, LLC?

5      A      I don't think so.

6      Q      Are they on the Dixie Heritage, LLC, payroll?

7      A      The employees, or him?

8      Q      Are they on the Dixie Heritage, LLC, payroll?

9   No?

10            MS. LEITNER:  Object to form.

11     A      It's now or 2015, that's a little bit

12  misunderstanding.

13     Q      Now.

14     A      No.

15     Q      Okay.  In 2015, were your brother's employees

16  paid through Dixie Heritage, LLC?

17     A      I believe yes.

18     Q      Okay.  And you're the buyer for your brother's

19  stores as well, correct?

20     A      Yes.

21     Q      Okay.  What brands does your brother carry at

22  his stores?

23     A      We have around 40 brands.

24     Q      Okay.  Can you tell me some of the brands?

25     A      Guy Harvey --

COPY

1    Q    Uh-huh.

2    A    Simply Southern, Southern Attitude, Country

3 Life, Browning, Exist.  We have a company that sell army

4 and navy shirts that's called Orbits.  We have -- I need

5 to remember -- we have Bucked Up, DTF.  We have -- I

6 don't remember right now, more, but we have, like, 40

7 different companies.  I can bring you a list if you

8 want.  I can do a list for you.

9    Q    Okay.  Who would have that information --

10    A    Me.

11    Q    -- of all the stores?

12    A    Me.

13    Q    Okay.  And you can provide me a list?

14    A    For all the brand names that we carry, yes.

15    Q    Excellent.  Thank you.  So do you operate with

16 your brother's stores or are they operated separately?

17    A    Operate as far as what?  Like, if I help him?

18    Q    Yes.

19    A    I have been -- I help him to operate the

20 store, yeah.

21    Q    So would you say he is a part of Dixie

22 Heritage, LLC?

23    A    No.

24        MS. LEITNER:  Object to form.

25        MR. RAPACKE:  What specifically do you object

**COPY**

1      to?

2          MS. LEITNER:  With respect to Dixie Heritage,

3      LLC, that was not -- that was kind of, like,

4      something that you offered.  That wasn't in -- in --

5      that wasn't his testimony.

6          BY MR. RAPACKE:

7      Q    Okay. Can you --

8      A    No.

9      Q    Okay.  Can you tell me where you were born?

10     A    Where what?

11     Q    Where were you born?

12     A    I was born in Israel.

13     Q    Okay.  Did you grow up in Israel?

14     A    Yes.

15     Q    Okay.  Did you go to high school in Israel?

16     A    Yes.

17     Q    Were you in the military?

18     A    Yes.

19     Q    What'd you do?

20     A    I was in the navy for four years.

21     Q    I was in the navy.  Did you go --

22     A    Actually --

23     Q    -- to college?

24     A    Yes.

25     Q    Okay.  What'd you study?

COPY

15

```
 1        A     Business.

 2        Q     Okay.  Did you go beyond undergraduate?

 3        A     No.

 4        Q     Okay.  All right.  How many years have you

 5   owned Flogrown, LLC?

 6        A     I don't own Flogrown.  Flogrown own Flogrown.

 7        Q     What do you own?

 8        A     I own Dixie Heritage, LLC.

 9        Q     I'm sorry.  Strike that.

10              How many years have you owned Dixie Heritage,

11   LLC?

12        A     Five years.

13        Q     Five years.  Okay.  It's getting late.

14              MS. LEITNER:  No worries.

15        Q     All right.  I'm going to jump right into your

16   relationship with Flogrown.  Can you tell me how you

17   started your relationship with Flogrown?

18        A     I -- I sent him an e-mail that I want to start

19   to carry stuff --

20        Q     Okay.

21        A     -- because I was thinking it's a cool name.

22   And he said, "Yeah, I'd be happy to work with you."  He

23   sent me an e-mail back.  "I'd be happy to work with you

24   and we can meet and talk," and we did, and we decided

25   we'd work together.  He -- in that time, he was -- have
```

**COPY**

1   no people, no customers, he was unknown, and I decide to

2   help him and carry stuff and put him in the front of the

3   stores and start to push his merchandise, so people

4   start to know him.

5        Q    Okay.  When was this?  What year was this?

6        A    I think it was in the end of -- maybe

7   beginning or in the middle of 2014.

8        Q    Okay.  Okay.  So the middle of 2014 --

9        A    Yeah.  I'm not sure exactly --

10       Q    -- approximately?

11       A    -- months.  But yeah, 2014, we started.

12       Q    Okay.  Okay.  I'm going to show you a picture,

13  and I want to see if you would tell me if this is the

14  Flogrown mark.

15       A    It is.

16       Q    That is the Flogrown mark?

17       A    And I help him to -- I told him to do this

18  colors and this -- I help him with that.

19       Q    Okay.

20            MR. RAPACKE:  Counsel, you want to look at that

21     before I put it in evidence?

22       Q    Would you agree that this is an authentic and

23  real mark of Flogrown?

24       A    Yes.

25       Q    Okay.  We're going to call this Plaintiff's

| | |
|---|---|
| 1 | Exhibit number 9.  What kind of agreement did you come |
| 2 | up with in 2014 with Flogrown? |
| 3 | (EXHIBIT 9 MARKED FOR IDENTIFICATION) |
| 4 | A    That he would sell me his merchandise and I |
| 5 | would sell them in the store. |
| 6 | Q    Okay.  Did you remember what the -- any other |
| 7 | terms of that? |
| 8 | A    No. |
| 9 | Q    How much would you resell the goods for? |
| 10 | A    First of all, it's up to me, and usually, we |
| 11 | was doing double.  So if he sell me for $10, I would |
| 12 | sell for $20. |
| 13 | Q    Okay.  Okay.  Was there a quantity that you |
| 14 | would purchase from him regularly? |
| 15 | A    No.  Every -- every time, it was different |
| 16 | quantity. |
| 17 | Q    Okay.  And how long did you buy and sell good |
| 18 | with Flogrown? |
| 19 | A    At least two and a half years. |
| 20 | Q    About two and a half years? |
| 21 | A    Yes. |
| 22 | Q    Yes.  Can you remember how many different |
| 23 | transactions that was? |
| 24 | A    No, but it was a lot. |
| 25 | Q    Okay.  How would you get the goods? |

**COPY**

18

1      A     I would order for -- with him.  Either way, I

2  called him or I text him.  I will go there, he will fill

3  a form with me, I signed.  Usually, 90 percent of the

4  time, I take the merchandise and put them into my

5  stores.

6      Q     Okay.  So you filled out a form.  What form

7  was it that you filled out?

8      A     He gave me a form -- a Flogrown form that said

9  the description of the shirts that I'm going to want,

10  and I will fill the size that I need.

11      Q     Okay.

12      A     So if I need medium and extra large, I will

13  fill it out.

14      Q     Okay.  I'm going to show you Exhibit number 5.

15  And tell me if this is the form that you would see.

16      A     This is the form.

17      Q     Okay.  Is this your signature at the bottom?

18      A     Yes.

19      Q     Okay.  Thank you.  Would you fill out a form

20  every time you purchase goods from Flogrown?

21      A     90 percent of the time, yes.

22      Q     Okay.  Would you receive an invoice for what

23  you purchased?

24      A     Yes.

25      Q     How would you pay your invoice?

COPY

19

1     A     Usually, by check or debit card, and it was

2  maybe a few times that I paid cash, too.

3     Q     Okay.  Okay.  So he would provide you an

4  invoice every time you went and picked up something?

5     A     His merchandise, yeah.

6     Q     Okay.  Do you remember, in your two and a half

7  years of working with Flogrown, how much merchandise

8  you've purchased?

9     A     Around $100,000.

10    Q     $100,000?  Okay.  Can I see the exhibits?

11 Okay.  I'm going to show you Exhibit number 2, which is

12 an invoice?

13    A     Yes.

14    Q     Would you agree that was an invoice that you

15 received from Flogrown?

16    A     I believe so, yes.

17    Q     Can you give me the -- can you tell me what

18 the total amount of money -- that is on the bottom?

19    A     936.39.

20    Q     Okay.  I'm going to show you Exhibit number 3.

21 Is this another invoice that you would receive from

22 Flogrown?

23    A     Yes.

24    Q     Okay.  And can you tell me the total at the

25 bottom?

**COPY**

20

1        A      1,724.

2        Q      Okay.  And here's Exhibit number 4.  Is that

3    another invoice?

4        A      Yes.

5        Q      Okay.  So when you regularly worked with

6    Flogrown, you would get an invoice, but you would also

7    get a order sheet?

8        A      Yes.

9        Q      Is that correct?

10       A      Yes.

11       Q      Okay.  If you total up these three invoices,

12   it's about $3,600, would you agree?

13       A      Yes.

14       Q      Okay.  These are the only invoices we've

15   received from you.  Are there more invoices than this?

16       A      Hundreds and hundreds.

17       Q      Okay.

18       A      Yeah.

19       Q      So how often would you say you ordered from

20   Flogrown?

21       A      Maybe once a month.  Twice a month, sometimes.

22       Q      Once a --

23       A      It's depend.  If we get close to Christmas, we

24   buy a little bit more.

25       Q      Okay.  So you would agree there's about

COPY

1    $97,000 of outstanding invoices?

2        A    Yes.

3        Q    Okay.  Let me take these.  Did Flogrown every

4    deliver goods to you, or did you always pick them up?

5        A    I believe they deliver -- deliver maybe one or

6    twice, in all these times.

7        Q    Where did they deliver them to?

8        A    To 874 Charlotte.

9        Q    So they delivered them to your house?

10       A    The house that I was -- lived before, yeah.

11       Q    Okay.

12       A    Long time.

13       Q    Was it -- was that a normal course of

14   business, that goods would get delivered to your home?

15       A    No.

16       Q    Did any of your other brands ever get

17   delivered to your home?

18       A    Sometimes, but usually, we get them in the

19   stores or to the house, too, sometimes.  Yeah.

20       Q    Okay.

21       A    He just call me and said, "I'm around, can I

22   drop the boxes?"  And I said, "Yes."

23       Q    How would you describe your relationship with

24   Flogrown in 2015 and 2016?

25       A    I describe it was very good.  I help him a

COPY

22

1   lot.  And I think when he start to get more customers,

2   he just become a little bit obsessed on his brand.

3       Q    Okay.  In our discovery production, we've

4   asked for a copy of invoices, and you said that there's

5   hundreds of invoices.  Do you have any idea why you sent

6   us three copies of invoice 127?

7       A    They just ask me for some invoices, they

8   didn't ask me for all the invoices.  In my opinion,

9   Flogrown can provide you all the invoices because he

10  have them, because a lot of the invoices, he just send

11  me an e-mail.

12      Q    So you don't feel --

13      A    So not -- so not all of them being in papers,

14  but we have all the invoices.

15      Q    You do have all the invoices; is that correct?

16      A    Some of the invoices in -- in paper, some

17  invoices in e-mails, yes.

18      Q    So do you have all the invoices, yes or no?

19      A    All the -- I can say maybe 80 percent, 90

20  percent.

21      Q    Is there any reason why you didn't give the

22  rest of the invoices in the discovery request?

23      A    They never asked me for all the invoices.

24      Q    Who never asked you for all the invoices?

25      A    You guys, or nobody.

**COPY**

23

1  Q Are you sure about that, Mr. Torgeman?

2  A Yes.

3  Q Okay.

4  A Do you -- it's okay.

5  Q I can show you our discovery request if you'd

6 like.

7  A Maybe I was thinking that he have the

8 invoices, that he can bring it to you.  So it's the same

9 thing.

10  Q Do you understand that when you receive the

11 discovery request, you have to respond to it?

12  A I understand.

13  Q Is there any reason why you didn't respond to

14 it?

15  A No.

16  Q Okay.  So you would pay for that Flogrown

17 merchandise with cash, check, credit card?

18  A Right.

19  Q Okay.  Do you have bank transaction history to

20 show that you paid with a credit card?

21  A I believe I have at the bank.  I don't know

22 how far I can go to bring them, but I believe, yes, we

23 have.

24  Q Is there any reason why you haven't discovered

25 that?

COPY

24

1      A     No.   I didn't see that they ask for a bank
2   statement or any bank receipts.
3      Q     Okay.   So you're saying that you do have
4   invoices.   Do you guys have an inventory system at Dixie
5   Heritage, LLC?
6      A     No.
7      Q     You don't keep an inventory?
8      A     No.
9      Q     How do you know what your top sellers are?
10     A     I'm there all the time so I know what I sell.
11     Q     So just whatever is kind of empty, you
12   realize --
13     A     Right.
14     Q     -- it's probably been selling a lot.   Okay.
15   Okay.   But you do keep invoices of everything you
16   purchased from other vendors; is that correct?
17     A     Yes.
18     Q     Okay.   And that's how you came up with that
19   $100,000 number?
20     A     It's -- it's -- approximately.   I
21   don't -- I'm not sure if it's 100 or 107 or 96, but it's
22   around this number.
23     Q     Where did Flogrown regularly send their
24   electronic invoices to --
25     A     My --

COPY

25

1     Q    -- when you would purchase --

2     A    My e-mails.

3     Q    Okay.   What is your e-mail address?

4     A    ashertorgeman@hotmail.com.

5     Q    Was there a Dixie Heritage e-mail address?

6     A    No.

7     Q    Why not?

8     A    I never had -- ever used --

9     Q    Was it regular practice for employees to use

10   their personal e-mail instead of a corporate e-mail?

11     A    Yes.   We don't have -- we don't have the

12   corporate e-mail and all these things.   It's a family

13   owned business.

14     Q    Uh-huh.

15     MS. LEITNER:   Do you mind if we take a break?

16     MR. RAPACKE:   Absolutely.

17     (OFF THE RECORD)

18     BY MR. RAPACKE:

19     Q    Let me circle back on a couple questions, then

20   we'll keep moving on Flogrown.

21     A    Okay.

22     Q    Tell me about how you help your brother,

23   Albert, run his stores.

24     A    I buy merchandise for him.

25     Q    Okay.

1      A    Me and my brother are like best friends, so we

2   hang out together.  Sometimes I go with him and help him

3   to, you know, fix the store nicer.  Sometime, I help him

4   to bring some merchandise when he can't.  That's it.

5      Q    Do you buy the merchandise through Dixie

6   Heritage, LLC, for your brother's stores?

7      A    No, I buy them through Dixie Heritage, like, I

8   have his checkbook.

9      Q    Okay.  So he buys separate goods from

10  Flogrown; is that correct?

11     A    No, I buy them.

12     Q    Okay.

13     A    And either way, he pay me back by cash or

14  check.  But if I buy just for him, I will buy by his

15  check -- by his account.

16     Q    Okay.  So normally, you would pay for it

17  through Dixie Heritage, LLC, and then he would reimburse

18  you for whatever you bought for his store.

19     A    Yeah.  So if I buy for half-half, the next

20  time, he buy half-half.

21     Q    Okay.  What merchandise would you regularly

22  purchase from Flogrown?

23     A    T-shirts, hats, stickers, koozies.  It was,

24  like, kids' T-shirts, sweatshirt, jackets, stuff like

25  this.

1       Q     What was your most popular-selling Flogrown

2  merchandise?

3       A     T-shirts.

4       Q     Okay.  A T-shirt with this logo on it as shown

5  in Exhibit 9?

6       A     Yes.

7       Q     Okay.  Did Flogrown make up a large part of

8  your sales in 2015?

9       A     No.

10      Q     Okay.  Did Flogrown make up a large part of

11  your sales in 2016?

12      A     No.

13      Q     Do you know what percentage of sales Flogrown

14  made up?

15      A     Probably, like, 5 percent.

16      Q     5 percent?  Okay.  Do you keep sales records?

17      A     No.

18      Q     You don't keep any sales records?

19      A     No.

20      Q     So how do you know 5 percent?

21      A     I have 40, 50 brands, and if I divide them by

22  what I make by 40 brands, that maybe 20 brands is better

23  than him, so his goes to the bottom.

24      Q     Okay.  Do you ever send any goods to Flogrown

25  to have the Flogrown mark put on?

**COPY**

28

1      A     Yes.

2      Q     Can you tell me what those goods were?

3      A     Was onesies, kids' T-shirts, few were ladies'

4   T-shirts, some jackets, some sweatshirts.

5      Q     Can you tell me how often you did that?

6      A     Not many often.  We did it between May 2015 to

7   December 2015.  He did it maybe five, six time for me,

8   and then he stopped.

9      Q     Okay.  Would you call it routine?

10     A     No.

11     Q     If you don't have sales records, how do you

12   know it was from May 2016 to December of 2016 [sic]?

13     A     I know when I give it to him and I know when

14   he was printing for me.

15     Q     Do you know how many times you did that?

16     A     All I can say, maybe four, five, six time.

17     Q     Did you receive a receipt when you would give

18   the goods to Flogrown?

19     A     Usually I -- he didn't give me receipt.  One

20   time that I went to pick up the goods, I order some more

21   things and he wasn't there, one of his employees was

22   there, and when they gave me a receipt, they put the

23   jackets on it, the sweatshirts.  But usually they would

24   not give me a receipt if he print them.

25     Q     When you would go to Flogrown to have them

COPY

29

1    printed, who would you give the goods to?

2         A    I would take them to the store.

3         Q    Who would you give them to at Flogrown?

4         A    To Jesse.  He's the owner.

5         Q    Only to Jesse?

6         A    Yeah, I believe so.

7         Q    Okay.  And you said that happened four or five

8    or six times.

9         A    Yes.

10        Q    Okay.

11             MR. RAPACKE:  Can you please show me Exhibit

12        number 5?

13             COURT REPORTER:  Uh-huh.

14             MR. RAPACKE:  Oh, I'm sorry, not 5.  Invoice

15        280, please.

16             BY MR. RAPACKE:

17        Q    Here's Exhibit number 3.  Is this an invoice

18   that you received from Flogrown to bring custom goods?

19        A    Yes.

20        Q    Okay.  How do you know that there was custom

21   goods on there, what does the line item say?

22        A    72 sweatshirts print.

23        Q    Does it say custom print?

24        A    I'm not sure what it said here.  It said, what

25   is this word here, cyclic print?  Sided print.

COPY

1      Q      Two-sided print, correct.

2      A      Yeah.

3      Q      Okay.

4      A      Two-sided print.

5      Q      Okay.  So this is a receipt for one of the

6   goods that you dropped off to get --

7      A      Yeah, this receipt I remember that receipt.  I

8   order some more stuff.

9      Q      Okay.

10      A      Jesse wasn't there.  I guess he wasn't involve

11   the employees with stuff that I give him.

12      Q      Okay.

13      A      So the guy that was there print for me an

14   invoice, and he did put the 72 sweatshirts, because I

15   picked them up.

16      Q      So it was 72 sweatshirts?

17      A      Yes.

18      Q      Okay.  I'm going to show you a picture.  Does

19   this look like one of the sweatshirts that you gave

20   Jesse in invoice 280?

21      A      Yes.

22      Q      Okay.  Can you take a look at that?  What do

23   we have here?  Plaintiff Exhibit 10.  We'll call this

24   Plaintiff's Exhibit 10.  Is this an example of other

25   clothes that you would give to Flogrown to have the mark

COPY

31

1    put on?

2              (EXHIBIT 10 MARKED FOR IDENTIFICATION)

3       A    Yes.

4       Q    Okay.  So we'll call this Exhibit 11.  Do you

5    know -- are these the same goods that Jesse is alleging

6    were counterfeit goods?

7              (EXHIBIT 11 MARKED FOR IDENTIFICATION)

8       A    I do not understand the question.

9       Q    Mr. Welsh (phonetic) has -- I'm sorry -- has

10   alleged counterfeit against Dixie Heritage, LLC,

11   correct?

12      A    Yes.

13           MS. LEITNER:  Object to form.

14      A    It's against Dix -- Dixie Heritage, yeah.

15      Q    Dixie Heritage, correct?

16      A    Yes.

17      Q    Yes.  Are these those goods that he claims are

18   counterfeit?

19      A    I believe so --

20           MS. LEITNER:  Object to form.

21      A    -- if he's showing it.  I -- I'm not sure.

22      Q    In your opinion, are these the goods that --

23      A    I believe so.

24      Q    Okay.  All right.  Does Dix -- Dixie Heritage

25   own any heat presses?

COPY

32

1      A    Yes.

2      Q    Can you tell me how many?

3      A    I own three stores.  At that time, I have

4   three, one at each store.  And Dixie Heritage Lakeland

5   have one.

6      Q    So that --

7      A    So each store have one.

8      Q    So that's four heat presses; is that correct?

9      A    Yes.

10     Q    Where did you purchase these heat presses?

11     A    It was long time ago, over, like, nine, ten

12   years ago.  So I'm not sure where, but probably like,

13   Craigslist and places, like, you can get them cheap.

14     Q    Do you have any purchase records of that?

15     A    No.

16     Q    Do you own any other heat presses except for

17   the four at the four Dixie Heritage locations?

18     A    No.

19     Q    Do you own a heat press at your residence?

20     A    No.

21     Q    I'm going to show you a picture of a

22   previously identified heat press, I want you to just

23   tell me if this is a heat press.

24     A    Okay.  It is.

25     Q    That is a heat press?

COPY

33

1        A       Yes.

2        Q       Is that in your store?

3        A       Yes.

4        Q       Is --

5        A       Yes.

6        Q       -- that a heat press?

7        A       Yes.

8        Q       Is that in your store?

9        A       Yes.

10       Q       Okay.

11       A       I believe it's the same one -- same store.

12       Q       Okay.  Do you train your employees how to use

13   the heat press?

14       A       We do show them how not -- like, safety --

15       Q       Uh-huh.

16       A       -- because it's very hot.

17       Q       Right.

18       A       And we show them how to print them on T-shirts

19   the designs we have.  And it's very easy -- very easy to

20   do.

21       Q       How do you keep track of all the brands you

22   have?

23       A       Just by e-mails that I get, by what I order

24   every day because I'm there every day, so I know what I

25   have.

COPY

34

1       Q     Have you looked at the marks enough to know

2    which ones are genuine and which ones would not be

3    genuine?

4       A     What do you mean "genuine"?

5       Q     A real authentic mark versus a mark that may

6    be a knock off?

7       A     If I know what is -- if I see it, I will know.

8       Q     Okay.

9       A     But I -- I only get original from the

10   companies.

11      Q     So you would know the difference if you'd saw

12   them?

13      A     Of course.

14      Q     Okay.  Because you've seen them hundreds or

15   thousands of times, correct?

16      A     I do fight against counterfeit.  I did fight

17   against counterfeit few times.  Counterfeit is not good

18   for my stores, and if I buy $100,000 merchandise, of

19   course, I will not put any counterfeit to hurt myself

20   from the original.  Who would do that?

21      Q     Right.  Can you tell me how you create a shirt

22   for the heat press?

23      A     How I do it?

24      Q     How a -- a shirt with a heat press is made.

25      A     We have them display in the stores.

**COPY**

1      Q      Okay.

2      A      They have numbers.

3      Q      Okay.

4      A      They go from one to 300, 400, whatever.

5      Q      Okay.

6      A      And if somebody said, "I want 200 on a small

7    white," so I take the file and put the design that's

8    come like paper like this.

9      Q      Uh-huh.

10      A      You take the design, we put it on the shirt,

11    we press it --

12      Q      What's that --

13      A      -- and we start --

14      Q      -- that paper called?

15      A      Transfers.

16      Q      Okay.  So -- so there's a transfer placed on

17    the shirt.

18      A      Yes.

19      Q      Okay.  Then what happens next?

20      A      You peel it.

21      Q      Okay.

22      A      And then you sell the shirt.

23      Q      So you put the transfer on, you press it, is

24    that correct?

25      A      Yes.  You press it -- you press the heat on

36

1    the shirt.

2         Q    Okay.  You open it.

3         A    You open it.

4         Q    You peel it back.

5         A    You peel back the paper and you have a shirt.

6         Q    Okay.  All right.  And all your employees are

7    trained on how to use the heat press?

8         A    Yes.

9         Q    Can you tell me all the employees you've had

10   since 2015?

11        A    All the employees in my stores?

12        Q    Yes.

13        A    Well, I don't know if I remember them all,

14   because sometimes in this kind of business, you have

15   employees that work one month, two months, and leave

16   because they're young, spring break, and all these

17   things.  But the ones that I have them for long times, I

18   can say the names.

19        Q    Can you say their names?

20        A    Yeah.  I have Patti (phonetic), Rebecca,

21   Robin, Heidi.  Let me think one second.  Jane, Lauren,

22   and one more I have.  I forgot the name.  And Candice

23   (phonetic).

24        Q    And Candice.  Okay.  And those are your

25   current employees?

COPY

1       A     Some of them left already --

2       Q     Okay.

3       A     -- and some of them, still.

4       Q     Who are your current employees?

5       A     Heidi, Candice, Patti.  I think it's Allian

6   (phonetic) in the other store, and Delaney (phonetic).

7   My brother work, me work, and my wife work.

8       Q     Okay.  Are any of those employees full-time?

9       A     Yeah.

10      Q     How many full-time employees do you have?

11      A     I believe four.

12      Q     You have --

13      A     There's one of each store, yeah.

14      Q     -- four full-time employees?

15      A     Yeah.

16      Q     How many part-time employees do you have?

17      A     Four.

18      Q     And so four full-time employees and four

19  part-time employees --

20      A     Right.

21      Q     -- is that correct?  Okay.  Do you have

22  payroll records of how you pay these employees?

23      A     Yes.

24      Q     Do you maintain those payroll records?

25      A     No.

1      Q      How do you pay your employees?  Do you pay

2   through QuickBooks, do you pay through a financial

3   institution like a bank, do you pay through -- how do

4   you pay your employees?

5      A      Yeah, we pay through a bank.

6      Q      Okay.

7      A      And my wife doing the payroll and I look.  I

8   don't really do that.

9      Q      Okay.  Do you keep records of that stuff?

10     A      No.

11     Q      Okay.  Does the bank keep records of that

12  stuff?

13     A      I'm not sure.

14     Q      Okay.  Do you know if we've asked you for that

15  stuff in discovery?

16     A      Yes.

17     Q      Okay.  Is there any reason why you haven't

18  given us that stuff in discovery?

19     A      We send it.  I'm not sure if you get it or

20  not, but we send a list of employees.

21     Q      Okay.  How about payroll?

22     A      The payroll.  This --

23     Q      Okay, you --

24     A      This is the people that work for us.

25     Q      I understand that -- what employees are,

COPY

39

1   right.  Now, you're telling me that -- do you -- so do

2   you have payroll --

3          A     I don't have any paper to show payroll --

4          Q     Okay.

5          A     -- or anything like that.

6          Q     Okay.  Okay.  Do you know that we've asked you

7   for that?

8          A     I'm not sure what you want.

9          Q     Have you been served our discovery request?

10         A     Yes.

11         Q     Okay.  Have you gone through those?

12         A     Yes.

13         Q     Have you been advised in what discovery is?

14         A     Yes.

15         Q     Okay.  Okay.  So four full-time employees,

16   four part-time --

17         A     Part-time --

18         Q     -- employees.

19         A     Yes.

20         Q     Okay.  Can you tell me what stores you

21   currently own?

22         A     Melbourne and Merritt Island.

23         Q     Melbourne and Merritt Island.  Okay.  And then

24   what stores does Albert own?

25         A     Sanford and Lakeland.

COPY

1      Q    Sanford and Lakeland.  Okay.  Okay.  Do you

2 have any records on how you train your employees to use

3 the heat press?

4      A    No, it's just talking.

5      Q    Okay.  Do you have any training records at all

6 on the employees?

7      A    No.

8      Q    Do you have a list of brands that you carry

9 that -- so the employees know what brands you have?

10      A    No.

11      Q    Where do you purchase your transfer paper

12 from?

13      A    There's a rep that he come to our stores and

14 he represent, like, ten companies.

15      Q    Uh-huh.

16      A    We order from him and he bring it to us.

17      Q    What's his name?

18      A    Charlie.

19      Q    Does Charlie have a last name?

20      A    No, I don't know what his last name -- I'm

21 sure he has one.

22      Q    How often does he come?

23      A    Probably once in two months.

24      Q    Once every other month?  Okay.

25      A    Yeah.

41

1      Q      Does he bring custom transfers?

2      A      No.

3      Q      Okay.  How do you know the difference between

4  a custom transfer and a non-custom transfer?

5      A      They have them on their website.

6      Q      Okay.

7      A      And I choose the picture that I want, and I

8  order from him.  If you do custom, they can't have them

9  on website.  You have to give them something to do, but

10  they don't do that.

11      Q      Okay.  Have you ever ordered a Flogrown

12  transfer --

13      A      No.

14      Q      -- from Charlie?

15      A      No.

16      Q      Have you ever ordered a Flogrown transfer from

17  anywhere?

18      A      Never.

19      Q      Who is in charge of ordering from Charlie?

20      A      Me.  Most of it, me.  Some of -- some, my

21  brother sometimes do, too.

22      Q      Sometimes your brother does as well.

23      A      Yes.

24      Q      Okay.  Okay.  Do any of your employees ever

25  order --

1     A     Never.

2     Q     -- transfers?

3     A     Never.

4     Q     No?  Okay.  And do you -- where do you carry

5  the transfers once you receive them from Charlie?

6     A     To the stores.

7     Q     To the stores?

8     A     Yes.

9     Q     Do you carry them behind the counter?

10    A     Yes.

11    Q     Okay.  Okay.  When you purchase goods from

12 Flogrown, you said you'd done it once or twice a month

13 for two years.

14    A     Yes.

15    Q     So that's about 24 times, 12 to 24 times.

16 Were there hang tags always attached to the shirts?

17    A     No.

18    Q     Now, how would you put hang tags on the

19 shirts?

20    A     Sometimes he give me some.  He said, "I didn't

21 have time to put so you can put them."

22    Q     Okay.

23    A     And sometimes they just didn't come with --

24    Q     Would you ask for extra hang tags?

25    A     No.

COPY

1     Q    You would never ask for extra hang tags?

2     A    No.

3     Q    Okay.  Did all Flogrown shirts have hang tags?

4     A    No.

5     Q    Okay.  That makes sense.  So you've never --

6 just to be clear, I want to be sure.  You've never

7 requested any additional hang tags.

8     A    No.

9     Q    So there would never be any hang tags behind

10 the counter or anything else?

11    A    No.

12    Q    Okay.

13    A    He give me -- a lot of times, he'd give me and

14 said, "Do it by yourself."  So I'd keep them -- usually,

15 I don't even put them.

16    Q    Okay.  How much are your shirts generally sold

17 for at Dixie Heritage stores?

18    A    $20.

19    Q    $20?

20    A    Yes.

21    Q    Is it $19.99?

22    A    Yes.

23    Q    Okay.  How much would you purchase them from

24 Flogrown for?

25    A    The price was $10, but he give me a ten

1    percent off, so I believe it's 9.

2         Q    Okay.  And you said in your agreement, you had

3    to sell up for double what you paid?

4         A    We didn't have agreement --

5         Q    Okay.

6         A    -- but usually I -- I sell double.

7         Q    Did you guys ever sign any agreements?

8         A    No.

9         Q    Did you ever sign any agreements with the

10   other 40 brands you have?

11        A    I did fill forms.

12        Q    Okay.

13        A    Let's said if I go with Guy Harvey that it's a

14   big brand.  They make me fill form, they approve me, and

15   then I start to buy from them.

16        Q    Do you remember what form that was?

17        A    No.  They just ask things about the company.

18        Q    Okay.  Did you ever sign an agreement that you

19   would agree to sell that product at a certain price?

20        A    No.

21        Q    Okay.  Do you know what brands -- what

22   manufacturing brands each vendor carries?  For example,

23   Guy Harvey may carry Fruit of the Loom or Hanes or

24   Gildan.  Do you know which ones they carry --

25        A    No.

COPY

1     Q    Your different brands?

2     A    No, they all mix them up.

3     Q    Okay.

4     A    You can get any shirts, any -- any brand --

5     Q    Okay.

6     A    -- of shirts.

7     Q    Okay.  How about with Flogrown?  Do you know

8 what brands Flogrown carried?

9     A    The same thing.  It was many brands.

10    Q    He used many brands?

11    A    Yes.

12    Q    Do you know if he used Gildan?

13    A    He did.

14    Q    Do you know if he used Pacific & Co?

15    A    Pacific?

16    Q    Pacific & Co?

17    A    No, this is something that I bring in.

18    Q    Okay.  So you -- so Flogrown never used

19 Pacific & Co?

20    A    No.

21    Q    Okay.  How about Next Level?

22    A    He did.

23    Q    Okay.  Now, what about -- whatever you want to

24 call -- blank shirts that you would put the transfer on,

25 what brands did you buy for that?  Did you buy one

**COPY**

46

1    standard brand, or did you just buy --

2         A    No, I buy random.  Anytimes the -- because

3    they go -- the prices go high and low --

4         Q    Okay.

5         A    -- and I believe all the companies do the

6    same.  If Gildan today is cheaper, then we buy Gildan.

7    If Hanes is better, cheaper, we buy Hanes.  If -- it can

8    be anything.

9         Q    Okay.  But you know for sure that Flogrown

10   carried Gildan?

11        A    Yes, I know.

12        Q    And you know for sure they did not carry

13   Pacific & Co?

14        A    I'm not sure if he carried Pacific & Co or

15   not, but I know -- I know for sure he carried Gildan.

16        Q    Okay.

17        A    I don't know who's Pacific -- Pacific & Co.  I

18   don't know what --

19        Q    Pacific & Co?  So it's a brand.  How about

20   Hanes?  Did Flogrown --

21        A    He did --

22        Q    -- carry --

23        A    He did use Hanes.  I know I have some shirts

24   from him.  Hanes, Gildan, I'm not sure any more.

25        Q    How about Next Level.

COPY

1      A    Next Level, yeah, too.

2      Q    Okay.  Okay.  Earlier on the record, you said

3  that you didn't know if they carried Pacific -- or you

4  knew they did not carry Pacific & Co.; Is that true?

5      A    I'm not sure what's Pacific & Co.  That's -- I

6  thought you talking about something else.

7      Q    It's a brand of shirts.

8      A    Yeah, I'm not sure if he buy them or not.

9      Q    How about WFC?  Do you remember him using WFC?

10     A    I'm not sure.  T-shirt?

11     Q    Correct.

12     A    I'm not sure.

13     Q    Okay.  But you said earlier you would know

14  what brands they carried.

15     A    No, I would not know.  They mix brand.

16     Q    Okay.

17     A    They can come with any brand the next day or

18  the next week.

19     Q    Okay.

20     A    They go by the prices.

21     Q    Okay.  Can we talk about -- I'd like to talk

22  about August 3, 2016.  Okay.  August 3, 2016 -- in early

23  August, there was an incident where you visited Flogrown

24  Warehouse; is that correct?

25     A    Yes.

**COPY**

1     Q    Okay.  Can you tell me what happened that day?

2     A    August 16?

3     Q    August 16th.

4     A    I pick up merchandise.

5     Q    Okay.

6     A    I ordered something.

7     Q    Was there any allegations of counterfeit goods

8 being sold by Dixie Heritage, LLC?

9     A    No.  I never sold any counterfeit.

10    Q    Was there ever -- were you ever accused of it?

11    A    If he accused me?

12    Q    Did Jesse Welsh ever accuse you prior to

13 December of 2016?

14    A    No.

15    Q    Okay.  Was there ever any allegations of

16 counterfeit Flogrown goods being sold in the Oviedo or

17 Seminole Towne Center?

18    A    Never.

19    Q    Never.  Have you ever purchased Flogrown goods

20 from anywhere except for the Flogrown Warehouse?

21    A    Never.

22    Q    Never.

23    A    We had one -- one incident --

24    Q    Okay.

25    A    -- that I called Flogrown.

**COPY**

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | And we can check it until today -- |
| 3 | Q | Okay. |
| 4 | A | -- that every mall have a kiosk. |
| 5 | Q | Uh-huh. |
| 6 | A | The kiosk make shirts. |
| 7 | Q | Okay. |

8   A   And one day I called him, and I said, "They
9   have six shirts hanging of Flogrown that I'm sure
10  they're doing it."  So he told me to buy them --

11  Q   Uh-huh.

12  A   -- for him so he can see them and maybe go
13  after them.  Until today, you can go to any of this mall
14  and ask for 50 Flogrown shirts, and they will make it
15  for you on the spot.

16  Q   Yeah.  Can you tell me what mall that was?

17  A   This one was in Gainesville.

18  Q   That was in the Gainesville mall.

19  A   Yeah.

20  Q   Do you remember when this was?

21  A   I think it was in 2015.

22  Q   Okay.  Do you remember when in 2015?

23  A   It was just -- before I closed the store, so
24  it was around May --

25  Q   Around May 2015.

**COPY**

50

1      A     -- that I called him.  Yeah.

2      Q     Okay.  In the Gainesville mall.

3      A     Yes.

4      Q     Okay.

5      A     And --

6      Q     And do you have a receipt from that

7    transaction?

8      A     No.

9      Q     Okay.  Do you remember how many shirts you

10   bought?

11     A     I think it was six.

12     Q     Okay.  What'd you do with those shirts after

13   you purchased them?

14     A     Just throw them in the -- in the back store.

15     Q     Okay.

16     A     Never used them.

17     Q     Were those shirts ever put out on the shelves

18   at Dixie Heritage?

19     A     No.

20     Q     Do you ever recall you mentioning that your

21   employees may have put those shirts out inadvertently?

22     A     No.

23     Q     What did you do with those shirts after you

24   took them back to your store?

25     A     Put them in the back room.

**COPY**

51

1       Q     Did you destroy those shirts?

2       A     What is it?

3       Q     Did you destroy those shirts?

4       A     No.

5       Q     Did you throw them away?

6       A     No.

7       Q     You still have those?

8       A     No, I believe I -- I give it to him.  I'm not

9    sure.  It was, like, three years ago.  But after I

10   bought them for him --

11      Q     Uh-huh.

12      A     -- I think I give it to him long time after.

13   I don't remember.

14      Q     Was there anybody with you when you gave them

15   those shirts?

16      A     No.

17      Q     Okay.  Do you remember who you purchased them

18   from?

19      A     No.

20      Q     Do you remember the name of the business that

21   you bought those from?

22      A     No.

23      Q     Was it a kiosk?

24      A     Yes.

25      Q     In Gainesville?

COPY

52

1      A    Yes.  And then I closed the store and I move
2  everything.
3      Q    Right.  Okay.  So just to -- just to make sure
4  I understand this.  You bought these.  You don't have a
5  receipt for them?
6      A    No.
7      Q    You don't remember the name of the store --
8      A    No.
9      Q    -- or the kiosk --
10     A    No.
11     Q    -- but you know it was a kiosk.
12     A    Yes.
13     Q    How do you know it was six shirts?
14     A    I bought them.
15     Q    Okay.  How do you remember it was six shirts?
16  You said it was three years ago.
17     A    I remember how many I bought.  I don't
18  remember the name of the business.  It didn't have a
19  name that exposed or anything.
20     Q    Okay.
21     A    And -- and this time, I send an e-mail to the
22  mall.
23     Q    Okay.
24     A    I think I can provide it --
25     Q    Okay.

1      A      -- that this kiosk selling counterfeit.  And I
2  did contact Jesse, told him, and he told me, "If you can
3  buy them, I would appreciate it," and I did.
4      Q      Are you aware of a discovery request where we
5  asked for all Flogrown March purchase from you?
6      A      Flogrown purchase from me?
7      Q      Correct.
8      A      He didn't never purchase from me.
9      Q      Any Flo --
10     A      What -- what did he purchase?
11     Q      Any Flogrown goods that you have purchased,
12 did you ask an -- did you remember in the discovery
13 request I was asking it -- for that?
14     A      No.
15     Q      Okay.  Is there any reason why you didn't
16 produce that e-mail that you sent to the Gainesville
17 mall?
18     A      I did send it to my attorney.
19     Q      Okay.  Then your attorney just hasn't sent it
20 to us.
21         MS. LEITNER:  Which e-mail?
22     A      I don't remember.  I have an e-mail that we
23 did fight against counterfeit, and we send it to the
24 office of the mall.  And I did send it -- I don't know.
25 It's not now.  I send to my attorney, like, four or five

1   months ago.

2        Q     Okay.

3        A     So I don't -- I don't know if you -- when you

4   get it or not.  But he have the e-mail.

5        Q     Okay.  Thank you.  And you don't remember if

6   you destroyed those goods?

7        A     I don't remember exactly.

8        Q     Okay.  All right.  Do you remember telling

9   Jesse that those goods were placed on the racks at a

10  Dixie Heritage location by accident?

11       A     No.

12       Q     Did you ever make that remark?

13       A     No.

14       Q     Okay.  All right.  Let me ask you -- we're

15  going to move up the timetable to December of 2016,

16  okay?  Can you tell me what happened on December 3,

17  2016?

18       A     This is the day Jesse purchased -- he went to

19  my store.

20       Q     Okay.

21       A     And he purchased merchandise that he knew that

22  I don't have the invoices because he make them for me,

23  and I think he planned it.  And he bought the

24  merchandise and that's it.  The employee called to the

25  manager, the manager called to my brother, my brother

**COPY**

1    called my wife, my wife called back to the store.

2    That's all I remember.

3         Q    Okay.  Do you remember who came into the store

4    on December 3rd?

5         A    December 3rd was the day -- it was the day --

6    what day, Saturday or Sunday?

7         Q    I'm not sure what day of the week that was.

8         A    It was the day that Jesse purchased the

9    things?

10        Q    Correct.

11        A    Who work?

12        Q    Who was working that day?

13        A    Yes.  Rebecca.

14        Q    Okay.  Was Rebecca the only employee working

15   that day?

16        A    No, she worked with Patti, but she request to

17   work evening shift.

18        Q    Okay.

19        A    So she came, like, Patti start -- the managers

20   start in the morning, and the manager left at 5:00, and

21   then Patti stay until the end -- or Rebecca stay until

22   the end.

23        Q    Okay.  So what time did Rebecca come in that?

24        A    I believe it was 12:00 to 9:00.  She -- she

25   request the shift -- the night shift.

COPY

56

1     Q    So from 12:00 to 5:00, Patti and Rebecca --

2     A    Rebecca.

3     Q    -- were working.

4     A    Yes.

5     Q    Okay.  Was it regular practice for a single

6  employee to work by themselves?

7     A    Yes.  On Saturday -- I think it was Saturday.

8     Q    Was there always a manager there?

9     A    On --

10    Q    Was there -- was there -- is there generally a

11  manager always working when the store is open?

12    A    Either were me, my brother, or a manager, or

13  employee.

14    Q    Okay.

15    A    It doesn't --

16    Q    Okay.

17    A    -- have to be a -- just manager.

18    Q    Okay.  Do you remember how many transactions

19  Jesse purchased on December 3, 2016?

20    A    I think he purchased 40.  And he only bring

21  38.

22    Q    Okay.  Do you remember how many orders he --

23  he purchased?

24    A    I don't remember.

25    Q    Okay.  I'm going to show you Exhibit number 6.

1    Tell me if these look like the receipts from that

2    purchase.

3         A    Yes, I believe it is.

4         Q    They are?  Okay.  Can you tell me what times

5    those different receipts indicate?

6         A    The time?  Did they have time?  Oh, wait.

7    Yeah.  6:44.

8         Q    Okay.

9         A    6:34, 6:42, 6:45.

10        Q    So those are about 10-15 minutes apart?  Was

11   that correct?

12        A    Yes.

13        Q    Okay.  Would those normally be on one

14   transaction, or would they be on four separate

15   transactions?

16        A    One.

17        Q    Okay.

18        A    We don't know why -- why it's four and why --

19   why she did it like this.

20        Q    Okay.

21        A    And this purchase was buy one, get -- get one

22   half price, and they didn't do that here.

23        Q    Okay.

24        A    So everything is weird here.

25        Q    Okay.  Okay.  And then can you tell me who the

58

1  cashier was?

2      A     Rebecca.

3      Q     Okay.  Was there anybody else with Jesse when

4  he purchased that, do you know?

5      A     She said it was a lady with him.  I believe is

6  his girlfriend.

7      Q     Okay.  Okay.  Could you tell me if these were

8  the goods that were purchased by him that day?

9      A     I'm not sure, but I guess if this what he

10 have, yeah, this what he bought.

11     Q     Okay.  Could you tell me if those look like --

12 if those match the receipt?

13     A     It's hard to say because -- everything is

14 custom made, so I don't know which one is which.

15     Q     Okay.  Are those the type of goods that would

16 be carried in your store?

17     A     Yes.

18     Q     Okay.

19     A     I still have merchandise of Flogrown with

20 Hanes and Gildan in my stores.

21     Q     Okay.

22     A     So we can bring some to show.

23     Q     Okay.  This one is from a company -- and it

24 sold for 29.99; is that correct?

25     A     This one?

COPY

1       Q    Yeah.

2       A    Yes, this is a company I work with.

3       Q    Okay.   That's a company that only you work

4  with.

5       A    Yes.

6       Q    Okay.

7       A    And it's not a T-shirt company.

8       Q    Okay.

9       A    They -- they sell jackets and --

10      Q    They only sell jackets --

11      A    -- dresses --

12      Q    -- and shirts?

13      A    They sell dresses and other stuff.

14      Q    Does Jesse work with them?

15      A    No.

16      Q    Jesse does not work with them?

17      A    No.

18      Q    Okay.

19      A    I give him this merchandise.

20      Q    Okay.   You gave him that merchandise.

21      A    Yes.

22      Q    Okay.   Okay.   So this one right here with this

23  Pacific & Co. is the company that you work with; is that

24  correct?

25      A    Yes.

1       Q     And is that the one shown here?

2       A     Yes.

3       Q     Okay.  So if Jesse doesn't carry this,

4   correct?

5       A     Correct.

6       Q     Am I correct to say Jesse doesn't carry this

7   brand?

8       A     No.

9       Q     Okay.  Then how is the Flogrown mark on this?

10      A     He print for me.

11      Q     He printed --

12      A     This is --

13      Q     -- that for you?

14      A     Yes, this is one of the jackets that I bring

15   him --

16      Q     Okay.

17      A     -- to his warehouse.  He print for me, back

18   and front.

19      Q     Okay.

20      A     A week later I come and pick that up, and by

21   mistake, I got the invoice for these jackets, the pink

22   and black.

23      Q     Okay.  So that was -- this was a mistake.

24      A     No, by mistake, I got the invoice for that.

25   Usually, he doesn't give me invoice for printing shirts.

COPY

61

```
 1        Q      He doesn't.

 2        A      That -- what he print for me.

 3        Q      Okay.  So if I understand you correctly, he

 4   would not normally charge you for custom printing?

 5        A      No, he did charge.

 6        Q      Okay.

 7        A      But he will not give me an invoice.

 8        Q      Okay.  He would charge --

 9        A      -- for custom.

10        Q      He would charge you, but he wouldn't give you

11   an invoice --

12        A      Yes.

13        Q      -- is that correct?  Okay.  So there is some

14   transaction history; is that correct?  He would

15   charge -- you would have to pay for that, correct?

16        A      Yes.

17        Q      Okay.  Do you have receipts from that?

18        A      He doesn't give me invoice.  He doesn't give

19   me receipts for -- for custom made.

20        Q      Right.  But you paid for those, right?

21        A      Yes.

22        Q      How did you pay for those?

23        A      Cash.

24        Q      Only cash?

25        A      Yes.
```

COPY

62

1    Q    Okay.  So in this -- in the four or five or

2    six times that you purchased stuff --

3    A    And this time --

4    Q    -- from Flogrown --

5    A    -- it was cash.

6    Q    -- it was always with cash.

7    A    Yes.

8    Q    Okay.

9    A    And this time, I remember I gave it -- the

10   cash to Kumacho (phonetic) --

11   Q    Uh-huh.

12   A    -- his employee.  He called Jesse.  He put the

13   cash -- Jesse told him to put the cash in the -- in the

14   safe --

15   Q    Okay.

16   A    -- and Kumacho gave me the receipt.  And

17   without him to knowledge that Jesse doesn't want to give

18   me receipt --

19   Q    Uh-huh.

20   A    -- for the printing, he put 72 print shirt --

21   print jackets.

22   Q    Uh-huh.

23   A    So we have it just by mistake.

24   Q    Okay.  Let me ask you a couple more questions

25   with that.  So this is a sweatshirt, right?  Plaintiff's

```
1   Exhibit number 10?
2        A    Yes.
3        Q    And that's a shirt that you -- you know that
4   Jesse produced?
5        A    Yes.  I provide the jackets, he provide -- he
6   print for me.
7        Q    He did the custom printing.
8        A    Yes.
9        Q    Okay.
10       A    And Jesse have the machine to do that.
11       Q    What kind of machine is that?  Do you know?
12       A    I'm not --
13       Q    What's that called?
14       A    I'm not sure what it's called, but he does
15  window stickers --
16       Q    Uh-huh.
17       A    -- and he sell them to me.
18       Q    Okay.
19       A    And this is expensive machine.  It's like
20  $10,000, 20- -- $20,000 machine.  And this machine, if
21  you change the paper --
22       Q    Uh-huh.
23       A    -- you can do that.  I don't have these
24  machines.
25       Q    Okay.  Okay.  A little while ago, you
```

**COPY**

64

1  mentioned that this is a Flogrown mark, correct?

2      A    Yes.

3      Q    Okay.  Can you tell me how this mark is

4  different from this mark?

5      A    No.  It's the same.

6      Q    Are you sure it's the same?

7      A    Yeah.

8      Q    Okay.  Can you look in -- in the side, the

9  State of Florida, do you see colors on this -- on the

10  genuine mark?

11      A    What do you mean, "colors"?

12      Q    Do you see lines going through the State of

13  Florida?

14      A    Yeah.

15      Q    And what color are those lines going through

16  the State of Florida?

17      A    White.

18      Q    Okay.  Do you see lines going through the

19  State of Florida on this?

20      A    You can't see it because it's white on white.

21      Q    Okay.  So are these the same mark?

22      A    Yes.

23      Q    Okay.  Let me ask you another question with

24  that.  On the genuine Flogrown mark, right?

25      A    Yes.

COPY

65

1       Q     Okay.  Do you see how the cursive at the G is

2   at the top?

3       A     Yes.

4       Q     The cursive at the G is not at the top here.

5       A     I never saw it before, or maybe the shirt is

6   bent a little bit.  I'm not sure.  But I know he provide

7   me -- to do that and that and that, and that, he have the

8   knowledge what to do and how to do, and he did it.

9       Q     So why would you think that Mr. Welsh would

10  not put the genuine Flogrown mark on the -- on his own

11  goods?

12      A     He does.  But he have 50 of those -- 50

13  different.  He doesn't have just one.

14      Q     Okay.  So you're saying that this is a

15  different mark that this?

16      A     It look to me the same, but I'm not sure if he

17  use this one that you have here on this, because he have

18  50 of those, 50 different --

19      Q     He has 50 different ones of these?

20      A     Yes.

21      Q     Okay.  Do you have any receipts to show

22  there's 50 different ones?

23      A     No.

24      Q     Do you keep a log to know --

25      A     When I -- when I bought the merchandise in

**COPY**

1    that time --

2         Q    Uh-huh.

3         A    -- I didn't check what he's putting, and if

4    the G's the same G.  I didn't -- I didn't think about it

5    in that time to -- to check what -- if it's different G

6    or different G.  I just see the Flogrown, he print for

7    me, I pay, I sell.  That's it.

8         Q    All right.  Now, you said there's, like, 50

9    different marks; is that correct?

10        A    With him.

11        Q    Okay.  How do you keep track of those 50

12   different marks?  How do your employees know which ones

13   are the real ones and -- and which ones are fake?

14        A    Nobody know -- and even I that I work 20 years

15   with T-shirt, I don't know what he use.

16        Q    Okay.  So could you -- could it be plausible

17   that an employee could put the wrong mark on a shirt?

18             MS. LEITNER:  Object to form.

19        A    No.  No way that we put this on a shirt.

20   Jesse send me -- many times, people to the store that

21   ask if we can do it on a shirt, and he came up with

22   empty handed because we don't do Flogrown in our stores.

23        Q    Uh-huh.

24        A    Second things, our store's open to the public

25   10:00 o'clock in the morning to 9:00 o'clock at night

1    every day, and Jesse and his employees and his friend

2    and his girlfriend come all the time to our stores.  So

3    they can see any -- any things we have.

4         Q    Okay.

5         A    It's something personal against me.  It's not

6    against the 20 pieces of the brand.

7         Q    Why do you think it's something personal?

8         A    Because he got obsessed with his brand and he

9    start to come and bother my stores about his competition

10    that I start to carry.  And he offer me many times to

11    take them out and pay for them.  He offer me many times

12    money to put them in the garbage and I didn't want.  And

13    he start to get upset and obsessed and come to the

14    stores and start to talk with employees and start to

15    bother us until, you know, I send him a letter from --

16    with attorney -- with our attorney to tell him not to

17    come to our stores anymore.

18         Q    Okay.

19         A    And he got upset that I told that I'm going to

20    have this guy that is -- was his competition.  And what

21    I understand, I'm not sure that they used to be friends,

22    so they're like a cat and a dog now.

23         Q    Okay.  Did Jesse ever make any disparaging

24    marks about Flo -- or about Dixie Heritage stores?

25         A    What do you mean?

COPY

68

1      Q      Did he ever say anything bad to anybody else
2   about your stores?
3      A      Many times.
4      Q      Okay.  And who are those people he made those
5   remarks to?
6      A      People that I work with, customers, people
7   that work in the office of the malls.
8      Q      Can you give me the names?
9      A      Yes.  Crystal is the lady that leasing two of
10  my malls.
11     Q      Okay.
12     A      He came to --
13     Q      What's Crystal's last name?
14     A      I'm not sure.
15     Q      Okay.
16     A      He came to try to get stores close to me to
17  try to destroy me.
18     Q      Okay.
19     A      And she denied him.
20     Q      And when was this?
21     A      November, December.
22     Q      Of -- of 2016.
23     A      2016.
24     Q      And how do you know this?
25     A      Crystal told me.

COPY

69

```
 1        Q     Okay.
 2        A     And TJ.  TJ is the other lease company for a
 3   different store.
 4        Q     Okay.  And who at TJ did he talk to?
 5        A     TJ is the leasing person for Oviedo mall.
 6        Q     Okay.  And what's TJ's last name?
 7        A     I'm not sure.
 8        Q     Okay.  And when did he talk to TJ?
 9        A     November, December 2016.
10        Q     And how do you know he talked to TJ?
11        A     TJ came to me and told me.
12        Q     TJ came to you.
13        A     And he emailed me.
14        Q     But you don't know TJ's last name?
15        A     I'm not sure.
16        Q     TJ emailed you that?
17        A     TJ emailed me, yeah.
18        Q     So do you have a copy of that?
19        A     I believe I can get it, yeah.
20        Q     Okay.  Is there any reason why you haven't
21   given that to us yet?
22        A     They didn't ask me for that.
23        Q     Who didn't ask you for that?
24        A     You guys.
25        Q     Okay.
```

**COPY**

70

1      A    I --

2      Q    Is there any other --

3      A    I really didn't have time, too.

4      Q    You didn't have --

5      A    I -- I only have four -- four days to come

6  here.

7      Q    Okay.

8      A    So I didn't have time to --

9      Q    But these were -- these were asked over a

10  month ago.

11      A    I -- so if you ask a month ago, we do have the

12  e-mail in our attorney office.

13      Q    Okay.  So you sent it to your attorney?

14      A    Yes.

15      Q    Okay.  Okay.  Is there any reason why we

16  haven't got that yet?

17      A    I don't know.  Maybe we just split this --

18  just didn't think it's any -- I'm not sure why.

19      Q    Didn't think it was important?

20      A    Yeah.

21      Q    Okay.  Was there anybody else that Jesse made

22  bad remarks to?

23      A    Our employees and a lot of customers came and

24  said that he told them not to buy from us because all

25  our stuff is counterfeit and stuff like that.

COPY

1    Q    Which employees did he made these remarks to?

2    A    I remember one employee in particular, that

3    she told me that she got scared because he got, like,

4    very upset.

5    Q    Okay.

6    A    Her name is Robin.

7    Q    Okay.

8    A    She doesn't work with us anymore.

9    Q    What's Robin's last name?

10    A    I'm not sure what's her last name.

11    Q    You don't know --

12    A    But I can get it for you.

13    Q    Okay.  You don't know your former employees'

14    names?

15    A    Usually, I don't -- I'm not good with last

16    names.

17    Q    Okay.  Do you remember how long she worked for

18    you?

19    A    She worked for me for maybe a year and a half.

20    Q    And you didn't get her last name in a year and

21    a half?

22    A    No.

23    Q    Okay.  And where was she when Jesse made these

24    remarks?

25    A    She was in Sanford mall.

**COPY**

72

1      Q    Okay.  Do you guys have cameras in your

2  stores?

3      A    We do.

4      Q    Do you record?

5      A    No.

6      Q    Why not?

7      A    Because we didn't know how to make them

8  recording.

9      Q    Okay.  So you have cameras, they just never

10  worked.

11      A    No, they work, like, if I -- if I see a corner

12  that I can't see if I'm helping somebody, so I have -- I

13  can see it through my monitor.

14      Q    But there's no recording.

15      A    No recording.  It's more to make the customers

16  not stealing so they think they have cameras.

17      Q    Okay.  Okay.  Was there any witnesses when

18  Jesse made these bad remarks to Robin?

19      A    I believe it was only Robin there.

20      Q    Only Robin there.  So there was --

21      A    Yeah.

22      Q    -- no witnesses.

23      A    No.

24      Q    Okay.  How'd you hear about it?

25      A    She called me and she told me that he -- the

COPY

73

1   way he talked to her --

2        Q    Okay.

3        A    She got scared and she got a little bit upset,

4   and she didn't like it -- the way he was acting there.

5        Q    Okay.  So he was getting more and more

6   hostile?

7        A    Right.

8        Q    Okay.  Is there any reason why you didn't

9   think to record when he would come in?

10       A    If he think?  Or I --

11       Q    That -- did you think?

12       A    Record what?

13       Q    Record him coming into the store.

14       A    I didn't know he was going.  He would go

15  every -- all the time.  And I don't know --

16       Q    He'd come to your -- how often would he come

17  to your store?

18       A    He come there -- either with him, his friends,

19  his employees, people he know, it was probably once a

20  month.  They come all the time to check everything.

21       Q    Okay.  Let's take a break here.

22            (OFF THE RECORD)

23            BY MR. RAPACKE:

24       Q    All right.  Welcome back.  I just have a

25  couple -- couple more questions.  I don't anticipate

COPY

74

1    more than 30 minutes --

2         A    All right.

3         Q    -- at the most.  I want to go back, and I want

4    to ask you about custom printing by Flogrown for you

5    guys.

6         A    Yes.

7         Q    Okay.  Can you tell me when you dropped off

8    the sweatshirts, roughly?

9         A    Roughly, was October, November 2015.

10        Q    Okay.  Okay.  How about -- I'm trying to

11   think.  How about kids' shirts?

12        A    Roughly around May 2015.

13        Q    Did you only do it once?

14        A    No, I did it a couple times jackets, couple

15   time shirts, couple time -- one time, onesies.  That was

16   one time.

17        Q    Okay.  Okay.  And then what about ladies'

18   shirts?

19        A    Yeah, it was one of the time that we did with

20   the T-shirt and onesies, one time.

21        Q    Do you remember when?

22        A    I believe it was May 2015.

23        Q    May 2015?

24        A    Yes.

25        Q    Do you have any invoices from that date?

1      A    He never gave me invoices for the printed

2    shirts, for the custom that he did for me.

3      Q    But you paid him?

4      A    Yes.

5      Q    Okay.  How about the onesies, when did you

6    drop off the onesies?

7      A    Same time, around May 2015.

8      Q    Okay.  Was there an invoice for that?

9      A    No, he didn't give me --

10     Q    He never gave you an invoice?

11     A    No.

12     Q    Okay.  How about any e-mails back and forth to

13   say, "Here's when your work will be completed"?

14     A    I don't know that -- I don't know for one.  I

15   don't have one.

16     Q    You don't have an e-mail back and forth

17   between you?

18     A    No.  Not for this -- the -- the -- the

19   merchandise that I give him, I think it was just

20   talking.  I said, "I give you the merchandise, you print

21   for me."  He said, "Okay, bring them."  Then I come,

22   bring them, and then he bring them back after a week.

23     Q    Okay.  Did you guys regularly exchange

24   e-mails?

25     A    No.

1    Q    That was all phone call or in person?

2    A    No, just if I want to order something --

3    Q    Okay.

4    A    -- I call him.  And sometimes he doesn't have

5    time to give me invoice, so he e-mail me invoice.

6    Q    So he would e-mail you an invoice.  So we have

7    invoices somewhere.  We just don't have them yet; is

8    that correct?

9    A    Not for the custom made.

10   Q    Okay.  Okay.  Okay.  Let's go back to December

11   3rd.  So Jesse and his girlfriend come in, you said,

12   correct?

13   A    I think so.  I don't know if his girlfriend or

14   his -- what the -- what's his situation with her, but

15   yeah.

16   Q    Okay.

17   A    That's --

18   Q    And then Rebecca was told to call who?

19   A    I don't know who she talked to.  She called

20   Patti.

21   Q    She called Patti.  Okay.

22   A    Yes.

23   Q    Was it normal for an employee to call the

24   supervisor when a purchase was made?

25   A    No.

1       Q    Okay.  Why did she do it this time?

2       A    We need to ask her.

3       Q    Okay.  So you think that she did it on her

4 own?

5       A    Yes.

6       Q    Okay.  Did Patti call anybody after?

7       A    Yes.

8       Q    Who did Patti call?

9       A    No, Patti told Rebecca, "Anything you want to

10 ask or anything you need to call, you need to call Abby

11 (phonetic) or Asher, because I don't know nothing."

12       Q    Okay.

13       A    So Patti --

14       Q    What would she know about?  I mean, why would

15 she say, "I don't know nothing"?

16       A    It was weird for Rebecca to call to Patti --

17       Q    Right.

18       A    -- and say, "Someone bought $800 merchandise."

19 But Patti said -- because Rebecca told her that it's

20 looked weird to her that he buy all these jackets.  So

21 Patti told her to call Abby or Asher.

22       Q    Okay.  To call Abby or Asher.  Okay.

23       A    Yeah.  Because she doesn't know anything.  She

24 doesn't really -- one -- she could help her -- she

25 couldn't help her.

COPY

78

1    Q    Okay.

2    A    Because she wanted to ask questions, I guess.

3    Q    Did she speak -- did she speak with Abby that

4    night, do you remember?

5    A    She did call Abby.

6    Q    Okay.  Did she speak with you that night?

7    A    No.

8    Q    Did she speak with Yeniset that night?

9    A    Yes, I believe.

10    Q    Okay.  Do you know what they told her?

11    A    I believe Abby told her to -- just to relax,

12    everything is okay, don't worry about it, things like

13    this.  And then he called my wife and told her call

14    Rebecca and just relax her that her that everything's

15    okay, because my wife speak better English so she -- if

16    she feel calm -- more comfortable to talk to her.

17    Q    Has an employee ever called you or your wife

18    or Albert over a purchase before?

19    A    Never.

20    Q    So this was very unusual.

21    A    Right.

22    Q    Okay.  Okay.  All right.  So let's -- let's

23    fast forward this to December 8th.  Okay.  December 8th,

24    Jesse Welsh comes into the store.  Okay.  Do you

25    remember that -- the events --

**COPY**

1        A      Yes.

2        Q      -- that happened on December 8th?

3        A      Yes.

4        Q      Okay.  Can you tell me what happened on

5    December 8th?

6        A      Yes.  First of all, Rebecca, on this day

7    supposed to work, but she didn't show up.  So here I

8    think -- it's just thinking --

9        Q      Uh-huh.

10       A      -- that he came to see her.  He came to see

11   Rebecca.  This is why we start to think that Jesse

12   working with Rebecca because she worked for me for a

13   very short time, she asked to work for this day, he come

14   and one hour after the manager leaving, buy the stuff,

15   talking with Rebecca, coming back a couple days later to

16   talk with Rebecca, and then he saw my wife.  And I

17   went -- I was with my wife there but I went to the gas

18   station, I believe.

19       Q      Okay.  How long did Rebecca Goodine work for

20   Dixie Heritage?

21       A      I believe 60 days.

22       Q      Only 60 days?

23       A      Yeah.

24       Q      Did you interview her when she came in for a

25   job?

COPY

80

1       A       I believe it was Patti, the manager.

2       Q       Okay.  Who has the authority to hire somebody

3   or fire somebody?

4       A       Me.

5       Q       Okay.  So did you talk to Patti after the

6   interview?

7       A       Yes.

8       Q       Okay.  And what did Patti tell you?

9       A       Patti said, "She coming back every day to ask

10  for the job" --

11      Q       Okay.

12      A       -- "and she look like she need it because she

13  have two kids."

14      Q       Okay.

15      A       And we said, "Okay.  We give her a chance."

16      Q       Okay.

17      A       You know.

18      Q       Okay.  Okay.

19      A       And it's what look weird to me that somebody

20  that work for you and you give him -- you help him, call

21  the police all of a sudden, and leaving day -- a couple

22  days after, everything was start to be suspicion that

23  they worked together.

24      Q       Okay.  Do you think Rebecca called the police?

25      A       I think, yes.

1      Q     Okay.  Do you think that Jesse called the
2   police?
3      A     If I think -- I'm not sure.  I think he told
4   her to call.
5      Q     Okay.  Do you have any evidence to show that
6   Jesse called the police?
7      A     No.
8      Q     Do you have any evidence to believe that Jesse
9   made somebody else call the police?
10      A     Yes.  No, I don't have evidence, but I believe
11   he told her, Rebecca --
12      Q     Okay.
13      A     -- to call.
14      Q     Okay.  So in your answer, you make the
15   counterclaim that Jesse caused a false police department
16   report to be made.  Do you have any evidence to prove
17   that?
18      A     That -- that he -- he called the police?
19      Q     He caused a police report to be made.
20      A     I don't have that report, but I know it's
21   false.
22      Q     I -- I'm not sure I understand you.  Do you
23   have any evidence to back up that counterclaim that
24   Jesse made a false police report?
25      A     Yes, because he's saying that -- he's saying

COPY

1  that he didn't bring for me the jackets.  And I have an

2  invoice.

3      Q    I -- Mr. Torgeman, I want to ask you about

4  that incident.  Do you have any evidence to show --

5      A    Oh, on -- on December 8th?  On December --

6           on --

7      Q    Do you have any evidence to show at any time

8  that Jesse caused a police report to be made?

9           MS. LEITNER:  Object to form.

10     A    That -- that my wife called the police?

11          MS. LEITNER:  I don't think he's understanding

12     the question.

13     A    I don't understand who called.  Did Jesse call

14  the police?

15     Q    Right.  Do you have any evidence to --

16     A    On -- on this day?

17     Q    Do you have any evidence to show that Jesse

18  ever called the police?

19     A    No.

20     Q    Okay.  Do you have -- the -- then, what is

21  your basis for making that counterclaim in your answer?

22          MS. LEITNER:  Object to form.

23     A    Because it's look like -- it's look like weird

24  what everything is match -- what Rebecca did and what he

25  did.

**COPY**

1    Q    Do you have a good faith basis to make that

2  counterclaim in your answer?

3    A    I don't.

4         MS. LEITNER:  Object to form.

5    Q    Can you please answer the question?

6    A    I don't.

7    Q    You don't.

8    A    No.

9    Q    So you made that counterclaim without a good

10 faith basis?

11        MS. LEITNER:  Object to form.

12   A    No.

13   Q    Can you please answer the question?  Did you

14 make that counterclaim without any good faith basis?

15   A    No.

16        MS. LEITNER:  Object to form.

17   Q    Okay.  What basis did you have?

18   A    I'm just thinking.  I don't have basis.

19   Q    You do not have a basis; is that correct?

20   A    I don't know.

21        MS. LEITNER:  Object to form.

22   Q    You do not have a basis; is that correct?

23        MS. LEITNER:  Object to form.

24   A    Basis for what?

25        MR. RAPACKE:  What -- what form -- what issues

1      with form do we have?

2           MS. LEITNER:  You have -- you're asking --

3      calling for a legal conclusion.  You're asking him -

4      - you're admitting facts not entered into evidence

5      yet.  So those -- that's the basis of the objection.

6           BY MR. RAPACKE:

7      Q    Okay.  And you can still answer that question.

8      A    I don't understand the question.

9      Q    Okay.  Do you -- what basis do you have for

10     making a counterclaim that Jesse made a police report?

11          MS. LEITNER:  Object to form.

12     A    I don't know.

13     Q    I don't know.  You -- you don't have one?

14     A    I'm not sure if -- if I have one or not.

15          MS. LEITNER:  He doesn't understand the

16     question.

17     A    I don't understand what's you asking.

18     Q    You don't understand the question.  Okay.  Do

19     you have any evidence to support the allegation that

20     Jesse caused a police report to be made?

21          MS. LEITNER:  Object to form.

22     A    I'm not sure.

23     Q    You're not sure.

24     A    Not sure.

25     Q    Do you have any evidence that Jesse called the

**COPY**

1  police?

2          MS. LEITNER:  Object to form.

3      A    I don't know if he called or not.  How -- how

4  I can have evidence?

5      Q    So previously you said no, you don't.  Now,

6  you say you don't know.

7      A    I don't -- I don't know if he called or not.

8  What -- do I check his phone?

9      Q    Well, why did you say no previously?

10         MS. LEITNER:  Object to form.

11     A    You ask me if he called the police.  I don't

12  know.

13     Q    Okay.  I'm going to ask you very, very

14  clearly, do you have any basis -- do you have any

15  knowledge that Jesse Welsh made a police report to be

16  made with the Lakeland Police Department?

17     A    I'm not sure.  I don't know.  I don't know if

18  I have anything against him or not.  I'm not sure.

19     Q    Okay.  Wait, in your answer, in your

20  counterclaim, you make an allegation that he caused a

21  police report to be made; is that true, yes or no?

22         MS. LEITNER:  Object to form.

23     A    If he did it, I'm not sure.

24     Q    Is that yes or no?

25     A    He -- I'm asking you.  Did he call the police?

COPY

86

1  I don't know if he called the police or not.  I don't

2  have any proof if he called the police or not.

3          MS. LEITNER:  Object to form.

4      A    I don't understand the question.  If Jesse

5  called the police?  Do I know if Jesse called the police

6  or not?

7      Q    Do you know if Jesse called the police or not?

8      A    I don't.

9          MS. LEITNER:  Object to form.

10     A    You know?

11     Q    You don't --

12     A    Do you know if he call --

13     Q    Do you -- do you know or not?

14     A    I don't know if he called or not.

15     Q    Okay.  Then why --

16     A    Do you know if he called or not?

17     Q    Then why did you put a counterclaim in your

18  answer for that?

19          MS. LEITNER:  Object to form.

20     A    I don't know.  I don't know what you're

21  talking about.  What is --

22     Q    You don't --

23     A    No, I don't understand.

24          MS. LEITNER:  Objection.

25     Q    So you didn't have a basis to say that?

COPY

1          MS. LEITNER:  Object to form.

2      A    Basis for what?

3      Q    For the counterclaim that you made that Jesse

4  called the police.

5          MS. LEITNER:  Object to form.

6      A    I don't know if he called or not.  I'm telling

7  you I don't know.

8      Q    Okay.  So --

9      A    How do I can know what he does?  What -- I'm

10 responsible for his fingers?

11     Q    Right.  So you don't know if he made that or

12 not.

13     A    I don't know.

14         MS. LEITNER:  Object to form.

15     A    I'm -- I -- we know now that he has sue me,

16 but I don't know what he did.

17     Q    Okay.  So you don't know -- so -- just to make

18 sure I understand you correctly.  You don't know if

19 Jesse --

20     A    I'm not sure what he did.

21     Q    Okay.  You're not sure what he did.

22     A    No.  If he called --

23     Q    So what you're saying --

24     A    -- not called, if he did or doesn't do, I

25 don't know.

COPY

1     Q    So you don't have a good faith basis?

2     A    I'm not sure.

3     Q    Okay.  Okay.  Thank you.  Okay.  So December

4 8th -- let's go back to December 8th.  We'll cool down,

5 have a drink, okay?  December 8th, Jesse comes into the

6 store and -- and he's met by who?

7     A    Jesse come to the store where?  To, like --

8     Q    Jesse came to the Dixie Heritage store on

9 December 8, 2016, correct?

10    A    Oh, he met -- he come into the store --

11    Q    Okay.

12    A    -- and he saw my wife.

13    Q    Okay.

14    A    And he start to threaten her like, "You will

15 see what happen to you.  I will see you in the -- in the

16 parking lot when you come out."  And he told her why

17 she's with me, she should divorce me, and everything

18 against me.

19    Q    Uh-huh.

20    A    And she called the police, she called the

21 security, and she called me.  By the time we came, he

22 ran away.

23    Q    Okay.  Was he with anybody or was he by

24 himself?

25    A    No, he was by himself.

**COPY**

1    Q    There was nobody else there?

2    A    No.

3    Q    Okay.  Did you go confront Jesse after that

4    incident?

5    A    Confront him?

6    Q    Did you go to Flogrown and talk to Jesse after

7    that incident?

8    A    No.

9    Q    You never did that?

10   A    No.

11   Q    Did you ever go to -- to Flogrown and say that

12   you have a brother, Havi (phonetic), and he's a bad guy?

13   A    Never.

14   Q    No.

15   A    No.

16   Q    Okay.  Do you have --

17   A    Why should I said it to my brother?

18   Q    Okay.  Do you have any recordings of the

19   December 8th incident?

20   A    Recording?

21   Q    Right.  Security camera recordings or any

22   other recordings?

23   A    No.

24   Q    Okay.  And there were no witnesses?

25   A    No.  There -- the security came, he saw Jesse

COPY

1    running away, and he went after him, but he didn't catch

2    him.  And the police came, and the police told my wife

3    because he didn't hit her or because he didn't -- they

4    really cannot do much, but they can just keep an eye --

5         Q    Okay.

6         A    -- to see what's going on.

7         Q    Okay.  Do you know the names of the security

8    guard that came that day?

9         A    No.

10        Q    Does he -- did you get a statement from him?

11        A    No.

12        Q    Did he make a statement to the police?

13        A    I think that he talked to the police, yeah.

14   But I'm not sure if he make a -- what they said and

15   whatnot.

16        Q    But you don't know who he is?

17        A    No.

18        Q    Okay.  Okay.  Let me ask you on December 12th.

19   On December 12th, Rebecca Goodine came into the Dixie

20   Heritage store; is that correct?

21        A    Yes.

22        Q    Okay.  Do you remember why she came in?

23        A    Yes.

24        Q    Why did she come in?

25        A    To bring the key back and to pick up her

COPY

91

1    check.

2         Q     And to pick up her check.  Okay.

3               MR. RAPACKE:  Can I see the --

4               COURT REPORTER:  Yeah.

5               MR. RAPACKE:  -- exhibit, please?

6               COURT REPORTER:  Give me one second.

7                BY MR. RAPACKE:

8         Q     Okay.  This is Plaintiff's Exhibit number 8.

9    Can you tell me what that is?

10        A     Yes.  This is a terminate letter that

11   Rebecca Goodine quit, and she signed -- she signed that

12   the -- she never print Flogrown and she never sold any

13   counterfeit, and she did sign it --

14        Q     Okay.

15        A     -- after I gave her, of course, she give me

16   the key, I gave her the check.  And then I told her if

17   she want to sign it because I knew already what is

18   planning, so she signed it.

19        Q     Who created that letter?

20        A     My wife.

21        Q     Okay.  Your wife created this letter?

22        A     Yes.

23        Q     And did you give this to her before she

24   received her paycheck, or after?

25        A     After.

**COPY**

92

1    Q    You gave this to her after she received her
2    paycheck.
3    A    Yes.
4    Q    So she was paid and then she signed this.
5    A    And Patti -- and Patti the manager was with
6    me.  I gave her the check.  She gave me the key.  And
7    then I asked her to do that please, because we needed to
8    show that she quit and she never sold anything.
9    Q    So you asked her to sign this?
10    A    I did, yes.
11    Q    Okay.  Okay.  So did she voluntarily sign
12    this?
13    A    Yes.
14    Q    Or did you ask her to sign this?
15    A    No, she said, "Yeah, I" -- "I would sign it,
16    of course."
17    Q    Okay.  Is this typical that you would give to
18    other employees that quit?
19    A    We -- we do give this letter to employees that
20    they resign.
21    Q    Okay.  You do give this to other employees
22    that resign.
23    A    Yes.
24    Q    Okay.
25    A    And at that time, we did the -- give this to

COPY

1    all the -- all our employees.

2         Q    Okay.  So you gave this to all your employees?

3         A    In that time in -- in Dixie Heritage, like --

4         Q    Okay.

5         A    -- in the store.

6         Q    Can you -- can you tell me who else had signed

7    something like this?

8         A    I think, if I'm not mistaken, Patti.

9         Q    Okay.  Who else?

10        A    That's it.

11        Q    Okay.  By -- but other employees would sign

12   something like this if they resigned.

13        A    If they resigned?

14        Q    Yes.

15        A    Yes.

16        Q    Okay.

17        A    Not -- not the same thing, but the resign

18   letter, yeah.  We do that.

19        Q    Okay.  So that's a -- so you only gave this

20   type of letter to Rebecca?

21        A    Rebecca and Patti.

22        Q    Why did you give this to Rebecca and Patti?

23        A    Because I had a suspicions that he -- he's

24   doing something with Rebecca.

25        Q    Were you advised to create a letter like this?

COPY

1     A    Advised by who?

2     Q    By anybody?

3     A    No.

4     Q    Who told -- who -- who came up with the idea

5 of making this letter?

6     A    Me and my wife.

7     Q    Okay.  All right.  Let me circle back on my

8 questions and then I think I'm just about done.

9     A    All right.

10    Q    Can I get a -- can you send me a printout of

11 all the payroll that you've had for the last two years

12 showing what you've paid all your employees and the

13 names of your employees?

14    A    I -- I think we can create something, yeah.

15    Q    Okay.  So there is records?

16    A    I believe there are, yeah.

17    Q    Okay.  Okay.  Now, you -- do you -- you --

18 now, just to make sure I understand this, do you keep

19 accounting records?

20    A    No.

21    Q    Do you keep inventory records?

22    A    No.

23    Q    So there's no inventory or accounting records?

24    A    No.

25    Q    Okay.  Can you tell me when the website was

COPY

95

1   put up?

2        A    I believe it was in March 2017 -- between

3   February, March, something like this, 2017.

4        Q    March 2017?

5        A    Yes.

6        Q    So about a year ago, yeah?

7        A    Yeah.

8        Q    Okay.

9        A    I never had Flogrown.

10       Q    Never had --

11       A    I never --

12       Q    -- Flogrown.

13       A    -- had Flogrown on this website.

14       Q    Okay.  If I went on that website, would I be

15   able to buy something from your store?

16       A    Yes.

17       Q    Okay.  Can you tell me, again, Charlie is the

18   name of the guy that you bought transfer papers from?

19       A    Yes.

20       Q    How long have you been buying transfer papers

21   from Charlie?

22       A    Over ten years, I said.

23       Q    Over ten years?

24       A    Yeah.

25       Q    Is he the only person that you buy transfer

COPY

96

1   papers from?

2       A    Yes.

3       Q    Okay.  And you're going to provide me all the

4   receipts from the purchases from Flogrown; is that

5   correct?

6       A    Yes, I can provide it.

7       Q    Okay.

8       A    Not the one for the custom made because he

9   never gave me one for those, but I can provide 80

10  percent of what he gave me and -- him and me.

11      Q    Okay.

12      A    And I believe you can ask him to provide you

13  everything.

14      Q    Okay.  Can I see this.  Okay.  I don't have

15  anything else.  Layla [sic], do you have any --

16          MS. LEITNER:  Leia.

17          MR. RAPACKE:  Leia.

18              CROSS EXAMINATION

19          BY MS. LEITNER:

20      Q    Sure, just one thing.  I just want to clarify,

21  earlier today we talked about -- the counsel was asking

22  about questions -- concerning your questions about your

23  transactions with Jesse Welsh and obtaining Flogrown

24  items and so that you could sell it at Dixie.  Do you

25  remember that conversation, or the -- that testimony?

COPY

97

1    A    If I -- if I give him to print for me?

2    Q    When you obtain any of the Flogrown items from

3 Jesse -- do you remember that conversation -- that

4 testimony we discussed?

5    A    Yes.

6    Q    Okay.  And so -- and you testified earlier

7 that from that transaction, you have about hundreds of

8 invoices, correct?

9    A    Yes.

10   Q    Okay.  So of those 100 -- hundreds of invoices

11 you have from Flogrown, did any of those invoices

12 pertain to the custom and printed Flogrown shirts that

13 relate to this lawsuit?

14   A    No.

15   Q    Okay.  And do you have all of your invoices

16 from Jesse Welsh --

17   A    No.

18   Q    -- that pertain to --

19   A    No.

20   Q    -- these actions of Flogrown?

21   A    I can have 70, 80 percent.

22   Q    Do you have -- so you'll have some?

23   A    Yes.

24   Q    Okay.  All right.  And -- and we'll be able to

25 produce those documents --

COPY

1      A      Yes.

2      Q      -- to you guys.  Okay.  All righty.  That's

3  all that I have.

4                   REDIRECT EXAMINATION

5              BY MR. RAPACKE:

6      Q      Can I ask one more follow-up question?

7      A      Yes.

8      Q      How many times -- how many individual

9  purchases did you have with Flogrown for onesies?

10     A      One time.

11     Q      Only one time.

12     A      Yes.

13     Q      Do you remember how many you purchased?

14     A      I believe it's between 12 -- 12 pieces or 13

15  pieces -- 12 pieces, I think.  I'm not sure if --

16     Q      You can remember the number -- you can

17  remember the date, but there's no --

18     A      12 pieces.

19     Q      -- there's no invoice for that?

20     A      I believe it's 12 pieces.  No, he never wanted

21  to give me invoices for printing shirts.

22     Q      Okay.

23     A      I think he did it behind his mom back or

24  something.

25     Q      Let me ask you a question.  In your opinion,

COPY

99

1    why does -- why do you think Rebecca Goodine called the

2    police?

3            MS. LEITNER:  Object to form.

4        A    I don't know.

5        Q    Okay.  Do you know where those goods that --

6    that Jesse purchased that day on December 3, 2016 came

7    from?

8        A    From Dixie Heritage, Lakeland.

9        Q    Okay.  And were those -- those were all goods

10   that you had given to Jesse to screen print and then

11   sell in your -- your Lakeland store; is that correct?

12       A    Exactly, yes.

13       Q    Okay.  All right.  That's all I have.

14           MS. LEITNER:  Yes, and Mr. Torgeman will read,

15       and we will want copies of the TXT files for the

16       transcript only.  Okay.

17           COURT REPORTER: And would you guys like the

18       transcript and the video or --

19           MR. RAPACKE:  Please.

20           COURT REPORTER:  Okay.  All right.

21            (DEPOSITION CONCLUDED AT 3:11 P.M.)

22

23

24

25

**COPY**

100

CERTIFICATE OF TRANSCRIPTIONIST

STATE OF FLORIDA

COUNTY OF ORANGE

    I, the undersigned, certify that I was authorized
to and did transcribe to the best of my ability the
foregoing audio provided to me by the Offices of
Milestone Reporting Company, Inc., and that the
transcript is a true and accurate representation of the
recording as heard by me.

    I further certify that I am not a relative,
employee, attorney or counsel of any of the parties nor
am I a relative or counsel connected with the parties'
attorneys or counsel associated with the action, nor am
I financially interested in the outcome of the action.

Submitted on: March 30, 2018.

_____

KATIE O'MALLEY

## $

**$10 (2)**
17:11;43:25
**$10,000 (1)**
63:20
**$100,000 (4)**
19:9,10;24:19;
34:18
**$19.99 (1)**
43:21
**$20 (3)**
17:12;43:18,19
**$20,000 (1)**
63:20
**$3,600 (1)**
20:12
**$800 (1)**
77:18
**$97,000 (1)**
21:1

## [

**[sic] (2)**
28:12;96:15

## A

**Abby (6)**
77:10,21,22;78:3,5,
11
**ability (1)**
100:7
**able (1)**
95:15;97:24
**Absolutely (1)**
25:16
**accident (1)**
54:10
**account (1)**
26:15
**accounting (2)**
94:19,23
**accurate (1)**
100:10
**accuse (1)**
48:12
**accused (2)**
48:10,11
**acting (1)**
73:4
**action (2)**
100:16,17
**actions (1)**
97:20
**Actually (1)**
14:22
**additional (1)**
43:7
**address (5)**
7:17,19;8:3;25:3,5

**admitting (1)**
84:4
**advertise (1)**
10:4
**advertising (1)**
9:17
**advised (3)**
39:13;93:25;94:1
**affirm (1)**
5:19
**afternoon (3)**
5:2;6:1,2
**again (2)**
8:1;95:17
**against (9)**
31:10,14;34:16,17;
53:23;67:5,6;85:18;
88:18
**agent (1)**
8:22
**ago (9)**
32:11,12;51:9;
52:16;54:1;63:25;
70:10,11;95:6
**agree (5)**
16:22;19:14;20:12,
25;44:19
**agreement (5)**
5:10;17:1;44:2,4,18
**agreements (2)**
44:7,9
**Albert (3)**
25:23;39:24;78:18
**allegation (2)**
84:19;85:20
**allegations (2)**
48:7,15
**alleged (1)**
31:10
**alleging (1)**
31:5
**Allian (1)**
37:5
**allow (1)**
6:14
**always (5)**
21:4;42:16;56:8,11;
62:6
**amount (1)**
19:18
**Andrew (2)**
5:13;6:3
**anticipate (2)**
6:15;73:25
**anymore (2)**
67:17;71:8
**Anytimes (1)**
46:2
**apart (1)**
57:10
**appearance (1)**
5:12
**appreciate (1)**

53:3
**approve (1)**
44:14
**approximately (2)**
16:10;24:20
**army (1)**
13:3
**Around (9)**
7:20;12:23;19:9;
21:21;24:22;49:24,
25;74:12;75:7
**Asher (6)**
5:8,19;7:12;77:11,
21,22
**ashertorgeman@hotmailcom (1)**
25:4
**associated (1)**
100:16
**assume (1)**
6:20
**attached (1)**
42:16
**Attitude (1)**
13:2
**attorney (10)**
6:5,25;53:18,19,25;
67:16,16;70:12,13;
100:14
**attorneys (1)**
100:16
**audio (1)**
100:8
**August (5)**
47:22,22,23;48:2,3
**authentic (2)**
16:22;34:5
**authority (1)**
80:2
**authorized (1)**
100:6
**aware (2)**
7:7;53:4
**away (3)**
51:5;88:22;90:1

## B

**back (23)**
15:23;25:19;26:13;
36:4,5;50:14,24,25;
55:1;60:17;73:24;
74:3;75:12,16,22;
76:10;79:15;80:9;
81:23;88:4;90:25;
94:7;98:23
**bad (4)**
68:1;70:22;72:18;
89:12
**bank (7)**
23:19,21;24:1,2;
38:3,5,11
**basis (15)**
82:21;83:1,10,14,

17,18,19,22,24;84:5,
9;85:14;86:25;87:2;
88:1
**become (1)**
22:2
**begin (1)**
5:23
**beginning (1)**
16:7
**behind (3)**
42:9;43:9;98:23
**bent (1)**
65:6
**best (3)**
7:4;26:1;100:7
**better (3)**
27:22;46:7;78:15
**beyond (1)**
15:2
**big (1)**
44:14
**birth (1)**
7:15
**bit (6)**
9:6;12:11;20:24;
22:2;65:6;73:3
**black (1)**
60:22
**blank (1)**
45:24
**born (3)**
14:9,11,12
**both (1)**
5:9
**bother (2)**
67:9,15
**bottom (4)**
18:17;19:18,25;
27:23
**bought (13)**
11:22;26:18;50:10;
51:10,21;52:4,14,17;
54:23;58:10;65:25;
77:18;95:18
**Boulevard (1)**
5:6
**boxes (1)**
21:22
**brand (12)**
13:14;22:2;44:14;
45:4;46:1,19;47:7,15,
17;60:7;67:6,8
**brands (19)**
12:21,23,24;21:16;
27:21,22,22;33:21;
40:8,9;44:10,21,22;
45:1,8,9,10,25;47:14
**break (3)**
25:15;36:16;73:21
**bring (16)**
13:7;23:8,22;26:4;
29:18;40:16;41:1;
45:17;56:20;58:22;

60:14;75:21,22,22;
82:1;90:25
**brother (20)**
7:25;8:2,3;11:4,5,8,
11,14,17;12:21;
25:22;26:1;37:7;
41:21,22;54:25,25;
56:12;89:12,17
**brother's (5)**
12:3,15,18;13:16;
26:6
**Browning (1)**
13:3
**Bucked (1)**
13:5
**Business (6)**
15:1;21:14;25:13;
36:14;51:20;52:18
**buy (29)**
9:7;11:11;17:17;
20:24;25:24;26:5,7,
11,14,14,19,20;34:18;
44:15;45:25,25;46:1,
2,6,7;47:8;49:10;
53:3;57:21;70:24;
77:20;79:14;95:15,25
**buyer (1)**
11:4;12:18
**buying (3)**
9:25;11:13;95:20
**buys (1)**
26:9

## C

**call (26)**
16:25;21:21;28:9;
30:23;31:4;45:24;
76:1,4,18,23;77:6,8,
10,10,16,21,22;78:5,
13;80:20;81:4,9,13;
82:13;85:25;86:12
**called (44)**
13:4;18:2;35:14;
48:25;49:8;50:1;
54:24,25;55:1,1;
62:12;63:13,14;
72:25;76:19,21;
78:13,17;80:24;81:1,
6,18;82:10,13,18;
84:25;85:3,7,11;86:1,
2,5,5,7,14,16;87:4,6,
22,24;88:20,20,21;
99:1
**calling (1)**
84:3
**calm (1)**
78:16
**came (21)**
24:18;55:3,19;
66:21;68:12,16;
69:11,12;70:23;
79:10,10,24;88:8,21;

Case 6:17-cv-00983-GKS-GJK   Document 57-2   Filed 05/11/18   Page 103 of 110 PageID 1592

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

ASHER TORGEMAN
March 20, 2018

89:25;90:2,8,19,22;
94:4;99:6
**camera (1)**
89:21
**cameras (3)**
72:1,9,16
**Can (87)**
7:10,13;8:1;9:6;
10:9,20;12:24;13:7,8,
13;14:7,9;15:16,24;
17:22;19:10,17,17,24;
21:21;22:9,19;23:5,8,
22;28:2,5,16;29:11;
30:22;32:2,13;34:21;
36:9,18,19;39:20;
42:21;45:4;46:7;
47:17,21;48:1;49:2,
12,13,16;52:24;53:2;
54:16;57:4,25;58:22;
63:23;64:3,8;66:21;
67:3;68:8;69:19;
71:12;72:13;74:7;
79:4;83:5,13;84:7;
85:4;87:9;90:4;91:3,
9;93:6,6;94:10,10,14,
25;95:17;96:6,9,12,
14;97:21;98:6,16,16
**Candice (3)**
36:22,24;37:5
**card (3)**
19:1;23:17,20
**carried (7)**
45:8;46:10,14,15;
47:3,14;58:16
**carries (1)**
44:22
**carry (15)**
12:21;13:14;15:19;
16:2;40:8;42:4,9;
44:23,24;46:12,22;
47:4;60:3,6;67:10
**cash (10)**
19:2;23:17;26:13;
61:23,24;62:5,6,10,
13,13
**cashier (1)**
58:1
**cat (1)**
67:22
**catch (1)**
90:1
**caused (5)**
81:15,19;82:8;
84:20;85:20
**Center (1)**
48:17
**certain (1)**
44:19
**CERTIFICATE (1)**
100:1
**certify (2)**
100:6,13
**chance (1)**

80:15
**change (1)**
63:21
**charge (6)**
41:19;61:4,5,8,10,
15
**Charlie (7)**
40:18,19;41:14,19;
42:5;95:17,21
**Charlotte (2)**
8:5;21:8
**cheap (1)**
32:13
**cheaper (2)**
46:6,7
**check (13)**
19:1;23:17;26:14,
15;49:2;66:3,5;73:20;
85:8;91:1,2,16;92:6
**checkbook (1)**
26:8
**choose (1)**
41:7
**Christmas (1)**
20:23
**circle (2)**
25:19;94:7
**claims (1)**
31:17
**clarify (1)**
96:20
**clear (1)**
43:6
**clearly (1)**
85:14
**close (2)**
20:23;68:16
**closed (3)**
11:1;49:23;52:1
**clothes (1)**
30:25
**Co (10)**
45:14,16,19;46:13,
14,17,19;47:4,5;59:23
**college (1)**
14:23
**color (1)**
64:15
**colors (3)**
16:18;64:9,11
**comfortable (1)**
78:16
**coming (4)**
6:3;73:13;79:15;
80:9
**commence (1)**
5:10
**companies (5)**
10:1;13:7;34:10;
40:14;46:5
**company (9)**
13:3;44:17;58:23;
59:2,3,7,23;69:2;

100:9
**competition (2)**
67:9,20
**completed (1)**
75:13
**concerning (1)**
96:22
**CONCLUDED (1)**
99:21
**conclusion (1)**
84:3
**confront (2)**
89:3,5
**connected (1)**
100:15
**contact (1)**
53:2
**conversation (2)**
96:25;97:3
**cool (2)**
15:21;88:4
**copies (2)**
22:6;99:15
**copy (2)**
22:4;69:18
**corner (1)**
72:11
**corporate (2)**
25:10,12
**correctly (2)**
61:3;87:18
**Counsel (9)**
5:11,13,15,23;
16:20;96:21;100:14,
15,16
**counter (2)**
42:9;43:10
**counterclaim (10)**
81:15,23;82:21;
83:2,9,14;84:10;
85:20;86:17;87:3
**counterfeit (14)**
31:6,10,18;34:16,
17,17,19;48:7,9,16;
53:1,23;70:25;91:13
**Country (1)**
13:2
**COUNTY (1)**
100:4
**couple (10)**
6:7;25:19;62:24;
73:25,25;74:14,14,15;
79:15;80:21
**course (5)**
21:13;34:13,19;
91:15;92:16
**COURT (13)**
5:2,3,4,17,23;6:5,9,
9;29:13;91:4,6;99:17,
20
**Craigslist (1)**
32:13
**create (3)**

34:21;93:25;94:14
**created (2)**
91:19,21
**credit (2)**
23:17,20
**CROSS (1)**
96:18
**Crystal (2)**
68:9,25
**Crystal's (1)**
68:13
**current (4)**
7:17;10:14;36:25;
37:4
**currently (3)**
9:19;11:17;39:21
**cursive (2)**
65:1,4
**custom (16)**
29:18,20,23;41:1,4,
8;58:14;61:4,9,19;
63:7;74:4;75:2;76:9;
96:8;97:12
**customers (5)**
16:1;22:1;68:6;
70:23;72:15
**cyclic (1)**
29:25

**D**

**date (3)**
7:15;74:25;98:17
**day (22)**
33:24,24;47:17;
48:1;49:8;54:18;55:5,
5,6,7,8,12,15;58:8;
67:1;79:6,13;80:9,21;
82:16;90:8;99:6
**days (5)**
70:5;79:15,21,22;
80:22
**debit (1)**
19:1
**December (25)**
28:7,12;48:13;
54:15,16;55:4,5;
56:19;68:21;69:9;
76:10;78:23,23;79:2,
5;82:5,5;88:3,4,5,9;
89:19;90:18,19;99:6
**decide (1)**
16:1
**decided (1)**
15:24
**defendants (1)**
5:16
**Delaney (1)**
37:6
**deliver (4)**
21:4,5,5,7
**delivered (3)**
21:9,14,17

**denied (1)**
68:19
**department (2)**
81:15;85:16
**depend (1)**
20:23
**deposition (5)**
5:8;6:8,23;7:8;
99:21
**describe (2)**
21:23,25
**description (1)**
18:9
**design (2)**
35:7,10
**designs (1)**
33:19
**destroy (3)**
51:1,3;68:17
**destroyed (1)**
54:6
**difference (2)**
34:11;41:3
**different (16)**
13:7;17:15,22;45:1;
57:5;64:4;65:13,15,
18,19,22;66:5,6,9,12;
69:3
**digital (1)**
5:3
**DIRECT (1)**
5:24
**discovered (1)**
23:24
**discovery (10)**
22:3,22;23:5,11;
38:15,18;39:9,13;
53:4,12
**discussed (1)**
97:4
**disparaging (1)**
67:23
**display (1)**
34:25
**divide (1)**
27:21
**divorce (1)**
88:17
**Dix (2)**
31:14,24
**Dixie (43)**
5:9;8:15,16,19,22,
25;9:3,20,23;10:4;
11:5,8,11;12:4,6,8,16;
13:21;14:2;15:8,10;
24:4;25:5;26:5,7,17;
31:10,14,15,24;32:4,
17;43:17;48:8;50:18;
54:10;67:24;79:20;
88:8;90:19;93:3;
96:24;99:8
**documents (1)**
97:25

**dog (1)**
67:22
**done (1)**
42:12;94:8
**double (3)**
17:11;44:3,6
**down (2)**
11:1;88:4
**dresses (2)**
59:11,13
**drink (1)**
88:5
**Drive (1)**
7:18
**drop (2)**
21:22;75:6
**dropped (2)**
30:6;74:7
**DTF (1)**
13:5

**E**

**Earlier (4)**
47:2,13;96:21;97:6
**early (1)**
47:22
**easy (2)**
33:19,19
**Either (4)**
18:1;26:13;56:12;
73:18
**electronic (1)**
24:24
**else (10)**
43:10;47:6;58:3;
68:1;70:21;81:9;89:1;
93:6,9;96:15
**e-mail (17)**
15:18,23;22:11;
25:3,5,10,10,12;
52:21;53:16,21,22;
54:4;70:12;75:16;
76:5,6
**emailed (3)**
69:13,16,17
**e-mails (5)**
22:17;25:2;33:23;
75:12,24
**employee (12)**
10:7;11:8;54:24;
55:14;56:6,13;62:12;
66:17;71:2;76:23;
78:17;100:14
**employees (48)**
11:14,19,24;12:3,7,
15;25:9;28:21;30:11;
33:12;36:6,9,11,15,
25;37:4,8,10,14,16,
18,19,22;38:1,4,20,
25;39:15,18;40:2,6,9;
41:24;50:21;66:12;
67:1,14;70:23;71:1;

73:19;92:18,19,21;
93:1,2,11;94:12,13
**employees' (1)**
71:13
**empty (2)**
24:11;66:22
**end (3)**
16:6;55:21,22
**English (1)**
78:15
**enough (1)**
34:1
**entered (1)**
84:4
**essentially (1)**
6:8
**even (2)**
43:15;66:14
**evening (1)**
55:17
**events (1)**
78:25
**everything's (1)**
78:14
**evidence (14)**
16:21;81:5,8,10,16,
23;82:4,7,15,17;84:4,
19,25;85:4
**exactly (3)**
16:9;54:7;99:12
**EXAMINATION (3)**
5:24;96:18;98:4
**example (2)**
30:24;44:22
**Excellent (2)**
7:3;13:15
**except (2)**
32:16;48:20
**exchange (1)**
75:23
**Exhibit (18)**
17:1,3;18:14;19:11,
20;20:2;27:5;29:11,
17;30:23,24;31:2,4,7;
56:25;63:1;91:5,8
**exhibits (1)**
19:10
**Exist (1)**
13:3
**expensive (1)**
63:19
**exposed (1)**
52:19
**extra (3)**
18:12;42:24;43:1
**eye (1)**
90:4

**F**

**facts (1)**
84:4
**faith (4)**

83:1,10,14;88:1
**fake (1)**
66:13
**false (3)**
81:15,21,24
**family (1)**
25:12
**far (2)**
13:17;23:22
**fast (1)**
78:23
**February (1)**
95:3
**feel (2)**
22:12;78:16
**few (3)**
19:2;28:3;34:17
**fight (3)**
34:16,16;53:23
**file (1)**
35:7
**files (1)**
99:15
**fill (1)**
18:2,10,13,19;
44:11,14
**filled (2)**
18:6,7
**financial (1)**
38:2
**financially (1)**
100:17
**fingers (1)**
87:10
**finish (1)**
6:14
**fire (1)**
80:3
**First (2)**
17:10;79:6
**Five (9)**
9:2;12:2;15:12,13;
28:7,16;29:7;53:25;
62:1
**fix (2)**
9:7;26:3
**Flo (2)**
53:9;67:24
**Flogrown (82)**
5:9,14;6:6;15:5,6,6,
6,16,17;16:14,16,23;
17:2,18;18:8,20;19:7,
15,22;20:6,20;21:3,
24;22:9;23:16;24:23;
25:20;26:10,22;27:1,
7,10,13,24,25;28:18,
25;29:3,18;30:25;
41:11,16;42:12;43:3,
24;45:7,8,18;46:9,20;
47:23;48:16,19,20,25;
49:9,14;53:5,6,11;
58:19;60:9;62:4;64:1,
24;65:10;66:6,22;

74:4;89:6,11;91:12;
95:9,12,13;96:4,23;
97:2,11,12,20;98:9
**Florida (10)**
5:7;7:18;8:5;10:16,
17;64:9,13,16,19;
100:3
**follow-up (1)**
98:6
**foregoing (1)**
100:8
**forgot (1)**
36:22
**form (36)**
12:10;13:24;18:3,6,
6,8,8,15,16,19;31:13,
20;44:14,16;66:18;
82:9,22;83:4,11,16,
21,23,25;84:1,11,21;
85:2,10,22;86:3,9,19;
87:1,5,14;99:3
**former (1)**
71:13
**forms (1)**
44:11
**forth (2)**
75:12,16
**forward (1)**
78:23
**Four (20)**
11:21;14:20;28:16;
29:7;32:8,17,17;
37:11,14,17,18,18;
39:15,16;53:25;
57:14,18;62:1;70:5,5
**friend (1)**
67:1
**friends (3)**
26:1;67:21;73:18
**front (2)**
16:2;60:18
**Fruit (1)**
44:23
**full (1)**
7:10
**full-time (5)**
37:8,10,14,18;
39:15
**further (1)**
100:13

**G**

**Gainesville (5)**
49:17,18;50:2;
51:25;53:16
**garbage (1)**
67:12
**gas (1)**
79:17
**gave (18)**
18:8;28:22;30:19;
51:14;59:20;62:9,16;

75:1,10;91:15,16;
92:1,6,6;93:2,19;96:9,
10
**generally (2)**
43:16;56:10
**genuine (6)**
34:2,3,4;64:10,24;
65:10
**Gildan (8)**
44:24;45:12;46:6,6,
10,15,24;58:20
**girlfriend (4)**
58:6;67:2;76:11,13
**given (3)**
38:18;69:21;99:10
**giving (2)**
7:4,7
**God (1)**
5:21
**goes (1)**
27:23
**Good (11)**
5:2;6:1,2;17:17;
21:25;34:17;71:15;
83:1,9,14;88:1
**Goodine (4)**
79:19;90:19;91:11;
99:1
**goods (34)**
9:23,23;11:11,12;
17:9,25;18:20;21:4,
14;26:9;27:24;28:2,
18,20;29:1,18,21;
30:6;31:5,6,17,22;
42:11;48:7,16,19;
53:11;54:6,9;58:8,15;
65:11;99:5,9
**ground (1)**
6:8
**Group (1)**
6:4
**grow (1)**
14:13
**G's (1)**
66:4
**guard (1)**
90:8
**guess (3)**
30:10;58:9;78:2
**Guy (7)**
12:25;30:13;44:13,
23;67:20;89:12;95:18
**guys (9)**
22:25;24:4;44:7;
69:24;72:1;74:5;
75:23;98:2;99:17

**H**

**half (6)**
17:19,20;19:6;
57:22;71:19,21
**half-half (2)**

26:19,20
**hand (1)**
  5:18
**handed (1)**
  66:22
**handle (5)**
  9:9,13,16,17;10:7
**Hanes (7)**
  44:23;46:7,7,20,23,
  24;58:20
**hang (8)**
  26:2;42:16,18,24;
  43:1,3,7,9
**hanging (1)**
  49:9
**happen (1)**
  88:15
**happened (5)**
  29:7;48:1;54:16;
  79:2,4
**happens (1)**
  35:19
**happy (2)**
  15:22,23
**hard (1)**
  58:13
**Harvey (3)**
  12:25;44:13,23
**hats (1)**
  26:23
**Havi (1)**
  89:12
**head (1)**
  6:18
**hear (1)**
  72:24
**heard (1)**
  100:11
**heat (15)**
  31:25;32:8,10,16,
  19,22,23,25;33:6,13;
  34:22,24;35:25;36:7;
  40:3
**Heidi (2)**
  36:21;37:5
**help (13)**
  5:20;13:17,19;16:2,
  17,18;21:25;25:22;
  26:2,3;77:24,25;
  80:20
**helping (1)**
  72:12
**here's (3)**
  20:2;29:17;75:13
**Heritage (42)**
  5:9;8:15,17,19,23,
  25;9:4,20,23;10:5;
  11:6,8,11;12:4,6,8,16;
  13:22;14:2;15:8,10;
  24:5;25:5;26:6,7,17;
  31:10,14,15,24;32:4,
  17;43:17;48:8;50:18;
  54:10;67:24;79:20;

88:8;90:20;93:3;99:8
**high (2)**
  14:15;46:3
**himself (2)**
  88:24,25
**hire (1)**
  80:2
**history (2)**
  23:19;61:14
**hit (1)**
  90:3
**home (4)**
  7:24;8:4;21:14,17
**homes (1)**
  7:22
**hostile (1)**
  73:6
**hot (1)**
  33:16
**hour (1)**
  79:14
**house (3)**
  21:9,10,19
**How'd (1)**
  72:24
**Hundreds (6)**
  20:16,16;22:5;
  34:14;97:7,10
**hurt (1)**
  34:19

**I**

**idea (2)**
  22:5;94:4
**IDENTIFICATION (3)**
  17:3;31:2,7
**identified (1)**
  32:22
**important (1)**
  70:19
**inadvertently (1)**
  50:21
**Inc (1)**
  100:9
**incident (6)**
  47:23;48:23;82:4;
  89:4,7,19
**indicate (1)**
  57:5
**indicated (1)**
  5:4
**individual (1)**
  98:8
**information (1)**
  13:9
**instead (1)**
  25:10
**institution (1)**
  38:3
**interested (1)**
  100:17
**interview (2)**

79:24;80:6
**into (9)**
  15:15;18:4;55:3;
  73:13;78:24;84:4;
  88:5,10;90:19
**inventory (4)**
  24:4,7;94:21,23
**invoice (26)**
  18:22,25;19:4,12,
  14,21;20:3,6;22:6;
  29:14,17;30:14,20;
  60:21,24,25;61:7,11,
  18;75:8,10;76:5,5,6;
  82:2;98:19
**invoices (31)**
  20:11,14,15;21:1;
  22:4,5,7,8,9,10,14,15,
  16,17,18,22,23,24;
  23:8;24:4,15,24;
  54:22;74:25;75:1;
  76:7;97:8,10,11,15;
  98:21
**involve (1)**
  30:10
**Island (3)**
  10:16;39:22,23
**Israel (3)**
  14:12,13,15
**issues (1)**
  83:25
**item (1)**
  29:21
**items (2)**
  96:24;97:2

**J**

**jackets (12)**
  26:24;28:4,23;59:9,
  10;60:14,21;62:21;
  63:5;74:14;77:20;
  82:1
**Jane (1)**
  36:21
**January (1)**
  7:16
**Jesse (58)**
  29:4,5;30:10,20;
  31:5;48:12;53:2;54:9,
  18;55:8;56:19;58:3;
  59:14,16;60:3,6;
  62:12,13,17;63:4,10;
  66:20;67:1,23;70:21;
  71:23;72:18;76:11;
  78:24;79:11;81:1,6,8,
  15,24;82:8,13,17;
  84:10,20,25;85:15;
  86:4,5,7;87:3,19;88:5,
  7,8;89:3,6,25;96:23;
  97:3,16;99:6,10
**job (2)**
  79:25;80:10
**jump (1)**

15:15

**K**

**KATIE (1)**
  100:24
**keep (14)**
  24:7,15;25:20;
  27:16,18;33:21;38:9,
  11;43:14;65:24;
  66:11;90:4;94:18,21
**key (3)**
  90:25;91:16;92:6
**kids (1)**
  80:13
**kids' (3)**
  26:24;28:3;74:11
**kind (5)**
  14:3;17:1;24:11;
  36:14;63:11
**kiosk (6)**
  49:4,6;51:23;52:9,
  11;53:1
**knew (3)**
  47:4;54:21;91:17
**knock (1)**
  34:6
**knowledge (3)**
  62:17;65:8;85:15
**koozies (1)**
  26:23
**Kumacho (2)**
  62:10,16

**L**

**ladies' (2)**
  28:3;74:17
**lady (2)**
  58:5;68:9
**Lakeland (12)**
  10:23,25;11:3,18,
  19,23;32:4;39:25;
  40:1;85:16;99:8,11
**large (3)**
  18:12;27:7,10
**last (11)**
  7:13;40:19,20;
  68:13;69:6,14;71:9,
  10,15,20;94:11
**late (1)**
  15:13
**later (2)**
  60:20;79:15
**Lauren (1)**
  36:21
**Law (1)**
  6:4
**lawsuit (2)**
  10:2;97:13
**Layla (1)**
  96:15
**lease (1)**

69:2
**leasing (2)**
  68:9;69:5
**least (2)**
  11:16;17:19
**leave (1)**
  36:15
**leaving (2)**
  79:14;80:21
**left (2)**
  37:1;55:20
**legal (1)**
  84:3
**Leia (3)**
  5:15;96:16,17
**Leitner (37)**
  5:15,15;12:10;
  13:24;14:2;15:14;
  25:15;31:13,20;
  53:21;66:18;82:9,11,
  22;83:4,11,16,21,23;
  84:2,11,15,21;85:2,
  10,22;86:3,9,19,24;
  87:1,5,14;96:16,19;
  99:3,14
**letter (9)**
  67:15;91:10,19,21;
  92:19;93:18,20,25;
  94:5
**Level (3)**
  45:21;46:25;47:1
**Life (1)**
  13:3
**line (1)**
  29:21
**lines (3)**
  64:12,15,18
**list (5)**
  13:7,8,13;38:20;
  40:8
**little (7)**
  9:6;12:11;20:24;
  22:2;63:25;65:6;73:3
**lived (2)**
  7:19;21:10
**lives (1)**
  7:24
**living (1)**
  8:11
**LLC (24)**
  5:14;8:15,17,20,23;
  9:1,4,20;11:6,9;12:4,
  6,8,16;13:22;14:3;
  15:5,8,11;24:5;26:6,
  17;31:10;48:8
**location (3)**
  10:14,20;54:10
**locations (1)**
  32:17
**log (1)**
  65:24
**logo (1)**
  27:4

**long (10)**
7:19;8:25;17:17;
21:12;32:11;36:17;
51:12;71:17;79:19;
95:20
**Longwood (1)**
8:5
**look (12)**
16:20;30:19,22;
38:7;57:1;58:11;64:8;
65:16;80:12,19;
82:23,23
**looked (2)**
34:1;77:20
**Loom (1)**
44:23
**lot (7)**
17:24;22:1,10;
24:14;43:13;70:23;
88:16
**low (1)**
46:3

**M**

**machine (5)**
63:10,11,19,20,20
**machines (1)**
63:24
**maintain (1)**
37:24
**makes (1)**
43:5
**making (4)**
5:5;82:21;84:10;
94:5
**mall (10)**
49:4,13,16,18;50:2;
52:22;53:17,24;69:5;
71:25
**malls (2)**
68:7,10
**manager (10)**
54:25,25;55:20;
56:8,11,12,17;79:14;
80:1;92:5
**managers (1)**
55:19
**manufacturing (1)**
44:22
**many (27)**
10:9,18;11:14,19,
22,24;15:4,10;17:22;
28:6,15;32:2;37:10,
16;45:9,10;50:9;
52:17;56:18,22;
66:20;67:10,11;68:3;
98:8,8,13
**March (6)**
5:6;53:5;95:2,3,4;
100:19
**mark (17)**
16:14,16,23;27:25;

**mistaken (1)**
93:8
**misunderstanding (1)**
12:12
**mix (2)**
45:2;47:15
**mom (1)**
98:23
**money (2)**
19:18;67:12
**monitor (1)**
72:13
**month (8)**
20:21,21;36:15;
40:24;42:12;70:10,
11;73:20
**months (4)**
16:11;36:15;40:23;
54:1
**more (17)**
9:6;13:6;20:15,24;
22:1;28:20;30:8;
36:22;46:24;62:24;
72:15;73:5,5,25;74:1;
78:16;98:6
**morning (2)**
55:20;66:25
**Morse (1)**
5:6
**most (3)**
27:1;41:20;74:3
**move (2)**
52:1;54:15
**moving (1)**
25:20
**much (5)**
17:9;19:7;43:16,23;
90:4
**myself (1)**
34:19

**N**

**name (22)**
5:2;7:10,13;8:9,14;
15:21;36:22;40:17,
19,20;51:20;52:7,18,
19;68:13;69:6,14;
71:6,9,10,20;95:18
**names (8)**
13:14;36:18,19;
68:8;71:14,16;90:7;
94:13
**name's (1)**
6:3
**navy (3)**
13:4;14:20,21
**need (8)**
9:8;13:4;18:10,12;
77:2,10,10;80:12
**needed (1)**
92:7
**next (8)**

6:25;26:19;35:19;
45:21;46:25;47:1,17,
18
**nicer (1)**
26:3
**night (5)**
55:25;66:25;78:4,6,
8
**nine (1)**
32:11
**nobody (3)**
22:25;66:14;89:1
**nod (1)**
6:17
**non-custom (1)**
41:4
**nor (2)**
100:14,16
**normal (2)**
21:13;76:23
**normally (3)**
26:16;57:13;61:4
**notice (1)**
5:4
**November (3)**
68:21;69:9;74:9
**number (13)**
17:1;18:14;19:11,
20;20:2;24:19,22;
29:12,17;56:25;63:1;
91:8;98:16
**numbers (2)**
12:1;35:2

**O**

**Object (25)**
12:10;13:24,25;
31:13,20;66:18;82:9,
22;83:4,11,16,21,23;
84:11,21;85:2,10,22;
86:3,9,19;87:1,5,14;
99:3
**objection (2)**
84:5;86:24
**obsessed (2)**
22:2;67:8,13
**obtain (1)**
97:2
**obtaining (1)**
96:23
**o'clock (2)**
66:25,25
**October (1)**
74:9
**OFF (2)**
25:17;30:6;34:6;
44:1;73:22;74:7;75:6
**offer (2)**
67:10,11
**offered (1)**
14:4
**office (3)**

53:24;68:7;70:12
**Offices (1)**
100:8
**often (5)**
20:19;28:5,6;40:22;
73:16
**O'MALLEY (1)**
100:24
**once (8)**
20:21,22;40:23,24;
42:5,12;73:19;74:13
**one (53)**
7:23;9:21,21;21:5;
28:19,21;30:5,19;
32:4,5,7;33:11;35:4;
36:15,21,22;37:13;
40:21;45:25;48:23,
23;49:8,17;57:13,16,
21,21;58:14,23,25;
59:22;60:1,14;65:13,
17;71:2;74:15,16,19,
20;75:14,15;77:24;
79:14;84:13,14;91:6;
96:8,9,20;98:6,10,11
**ones (9)**
34:2,2;36:17;44:24;
65:19,22;66:12,13,13
**onesies (6)**
28:3;74:15,20;75:5,
6;98:9
**only (18)**
8:19;20:14;29:5;
34:9;55:14;56:20;
59:3,10;61:24;70:5;
72:19,20;74:13;
79:22;93:19;95:25;
98:11;99:16
**open (4)**
36:2,3;56:11;66:24
**opened (1)**
10:2
**operate (3)**
13:15,17,19
**operated (1)**
13:16
**operates (1)**
11:2
**opinion (3)**
22:8;31:22;98:25
**ORANGE (1)**
100:4
**Orbits (1)**
13:4
**order (9)**
18:1;20:7;28:20;
30:8;33:23;40:16;
41:8,25;76:2
**ordered (4)**
20:19;41:11,16;
48:6
**ordering (1)**
41:19
**orders (1)**

**MARKED (3)**
17:3;31:2,7
**marketing (3)**
9:13,14,16
**marks (4)**
34:1;66:9,12;67:24
**married (1)**
8:7
**match (2)**
58:12;82:24
**matter (1)**
5:9
**may (12)**
5:23;28:6,12;34:5;
44:23;49:24,25;
50:21;74:12,22,23;
75:7
**maybe (13)**
16:6;19:2;20:21;
21:5;22:19;23:7;
27:22;28:7,16;49:12;
65:5;70:17;71:19
**mean (4)**
34:4;64:11;67:25;
77:14
**means (1)**
7:8
**medium (1)**
18:12
**meet (1)**
15:24
**Melbourne (4)**
10:16,22;39:22,23
**mentioned (2)**
6:5;64:1
**mentioning (1)**
50:20
**merchandise (22)**
16:3;17:4;18:4;
19:5,7;23:17;25:24;
26:4,5,21;27:2;34:18;
48:4;54:21,24;58:19;
59:19,20;65:25;
75:19,20;77:18
**Merritt (3)**
10:16;39:22,23
**met (2)**
88:6,10
**middle (2)**
16:7,8
**Milestone (1)**
100:9
**military (1)**
14:17
**mind (1)**
25:15
**minutes (2)**
57:10;74:1
**mistake (4)**
60:21,23,24;62:23

**30:25;34:5,5;60:9;**
64:1,3,4,10,21,24;
65:10,15;66:17

Case 6:17-cv-00983-GKS-GJK Document 57-2 Filed 05/11/18 Page 107 of 110 PageID 1596

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

ASHER TORGEMAN
March 20, 2018

56:22
**original (2)**
   34:9,20
**Orlando (1)**
   7:18
**out (9)**
   18:6,7,13,19;26:2;
   50:17,21;67:11;88:16
**outcome (1)**
   100:17
**outstanding (1)**
   21:1
**over (7)**
   6:11,12;32:11;70:9;
   78:18;95:22,23
**Oviedo (3)**
   10:21;48:16;69:5
**own (23)**
   7:21,22,23;9:19,21,
   21;10:10,13,18;11:17,
   18;15:6,6,7,8;31:25;
   32:3,16,19;39:21,24;
   65:10;77:4
**owned (9)**
   8:25;10:23;15:5,10;
   25:13
**owner (5)**
   8:16,19;11:4,5;29:4

**P**

**Pacific (13)**
   45:14,15,16,19;
   46:13,14,17,17,19;
   47:3,4,5;59:23
**paid (9)**
   12:3,16;19:2;23:20;
   44:3;61:20;75:3;92:4;
   94:12
**paper (7)**
   22:16;35:8,14;36:5;
   39:3;40:11;63:21
**papers (4)**
   22:13;95:18,20;
   96:1
**Park (1)**
   5:7
**parking (1)**
   88:16
**part (3)**
   13:21;27:7,10
**particular (1)**
   71:2
**parties (2)**
   5:10;100:14
**parties' (1)**
   100:15
**part-time (4)**
   37:16,19;39:16,17
**Patti (24)**
   36:20;37:5;55:16,
   19,21;56:1;76:20,21;
   77:6,8,9,13,16,19,21;

80:1,5,8,9;92:5,5;
93:8,21,22
**pay (15)**
   18:25;23:16;26:13,
   16;37:22;38:1,1,2,3,4,
   5;61:15,22;66:7;
   67:11
**paycheck (2)**
   91:24;92:2
**payroll (10)**
   12:6,8;37:22,24;
   38:7,21,22;39:2,3;
   94:11
**peel (3)**
   35:20;36:4,5
**people (8)**
   16:1,3;38:24;66:20;
   68:4,6,6;73:19
**percent (10)**
   18:3,21;22:19,20;
   27:15,16,20;44:1;
   96:10;97:21
**percentage (1)**
   27:13
**person (3)**
   69:5;76:1;95:25
**personal (3)**
   25:10;67:5,7
**pertain (2)**
   97:12,18
**phone (2)**
   76:1;85:8
**phonetic (8)**
   31:9;36:20,23;37:6,
   6;62:10;77:11;89:12
**pick (5)**
   21:4;28:20;48:4;
   60:20;90:25;91:2
**picked (2)**
   19:4;30:15
**picture (4)**
   16:12;30:18;32:21;
   41:7
**pieces (6)**
   67:6;98:14,15,15,
   18,20
**pink (1)**
   60:21
**placed (2)**
   35:16;54:9
**places (1)**
   32:13
**Plaintiff (3)**
   5:8,14;30:23
**Plaintiff's (4)**
   16:25;30:24;62:25;
   91:8
**planned (1)**
   54:23
**planning (1)**
   91:18
**plausible (1)**
   66:16

**Please (12)**
   5:18;6:14,15,17;
   7:13;29:11,15;83:5,
   13;91:5;92:7;99:19
**PM (1)**
   99:21
**police (33)**
   80:21,24;81:2,6,9,
   15,18,19,24;82:8,10,
   14,18;84:10,20;85:1,
   11,15,16,21,25;86:1,
   2,5,5,7;87:4;88:20;
   90:2,2,12,13;99:2
**popular-selling (1)**
   27:1
**practice (2)**
   25:9;56:5
**prepared (1)**
   6:23
**press (14)**
   32:19,22,23,25;
   33:6,13;34:22,24;
   35:11,23,25,25;36:7;
   40:3
**presses (4)**
   31:25;32:8,10,16
**preventing (1)**
   7:4
**previously (3)**
   32:22;85:5,9
**price (3)**
   43:25;44:19;57:22
**prices (2)**
   46:3;47:20
**print (20)**
   28:24;29:22,23,25,
   25;30:1,4,13;33:18;
   60:10,17;61:2;62:20,
   21;63:6;66:6;75:20;
   91:12;97:1;99:10
**printed (4)**
   29:1;60:11;75:1;
   97:12
**printing (7)**
   28:14;60:25;61:4;
   62:20;63:7;74:4;
   98:21
**printout (1)**
   94:10
**prior (1)**
   48:12
**Probably (6)**
   12:2;24:14;27:15;
   32:12;40:23;73:19
**proceeding (1)**
   5:11
**PROCEEDINGS (1)**
   5:1
**produce (2)**
   53:16;97:25
**produced (1)**
   63:4
**product (1)**

44:19
**production (1)**
   22:3
**proof (1)**
   86:2
**properties (1)**
   7:21
**prove (1)**
   81:16
**provide (11)**
   13:13;19:3;22:9;
   52:24;63:5,5;65:6;
   96:3,6,9,12
**provided (1)**
   100:8
**public (1)**
   66:24
**purchase (17)**
   17:14;18:20;25:1;
   26:22;32:10,14;
   40:11;42:11;43:23;
   53:5,6,8,10;57:2,21;
   76:24;78:18
**purchased (18)**
   18:23;19:8;24:16;
   48:19;50:13;51:17;
   53:11;54:18,21;55:8;
   56:19,20,23;58:4,8;
   62:2;98:13;99:6
**purchases (2)**
   96:4;98:9
**purposes (1)**
   5:7
**push (1)**
   16:3
**put (28)**
   16:2,21;18:4;27:25;
   28:22;30:14;31:1;
   34:19;35:7,10,23;
   42:18,21,21;43:15;
   45:24;50:17,21,25;
   62:12,13,20;65:10;
   66:17,19;67:12;
   86:17;95:1
**putting (1)**
   66:3

**Q**

**quantity (2)**
   17:13,16
**QuickBooks (1)**
   38:2
**quit (3)**
   91:11;92:8,18

**R**

**racks (1)**
   54:9
**raise (1)**
   5:18
**ran (1)**

88:22
**random (1)**
   46:2
**Rapacke (22)**
   5:13,13,25;6:4,4;
   13:25;14:6;16:20;
   25:16,18;29:11,14,16;
   73:23;83:25;84:6;
   91:3,5,7;96:17;98:5;
   99:19
**read (1)**
   99:14
**ready (1)**
   5:10
**real (3)**
   16:23;34:5;66:13
**realize (1)**
   24:12
**really (4)**
   38:8;70:3;77:24;
   90:4
**reason (8)**
   22:21;23:13,24;
   38:17;53:15;69:20;
   70:15;73:8
**Rebecca (29)**
   36:20;55:13,14,21,
   23;56:1,2;58:2;76:18;
   77:9,16,19;78:14;
   79:6,11,12,15,16,19;
   80:24;81:11;82:24;
   90:19;91:11;93:20,
   21,22,24;99:1
**recall (1)**
   50:20
**receipt (12)**
   28:17,19,22,24;
   30:5,7,7;50:6;52:5;
   58:12;62:16,18
**receipts (7)**
   24:2;57:1,5;61:17,
   19;65:21;96:4
**receive (5)**
   18:22;19:21;23:10;
   28:17;42:5
**received (5)**
   19:15;20:15;29:18;
   91:24;92:1
**record (9)**
   6:10;7:11;25:17;
   47:2;72:4;73:9,12,13,
   22
**recording (7)**
   5:5,7;72:8,14,15;
   89:20;100:11
**recordings (3)**
   89:18,21,22
**records (15)**
   10:7;27:16,18;
   28:11;32:14;37:22,
   24;38:9,11;40:2,5;
   94:15,19,21,23
**REDIRECT (1)**

Case 6:17-cv-00983-GKS-GJK   Document 57-2   Filed 05/11/18   Page 108 of 110 PageID 1597

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

ASHER TORGEMAN
March 20, 2018

98:4
**registered (2)**
8:16,22
**regular (2)**
25:9;56:5
**regularly (5)**
17:14;20:5;24:23;
26:21;75:23
**reimburse (1)**
26:17
**relate (1)**
97:13
**relationship (3)**
15:16,17;21:23
**relative (2)**
100:13,15
**relax (2)**
78:11,14
**remark (1)**
54:12
**remarks (5)**
68:5;70:22;71:1,24;
72:18
**remember (41)**
13:5,6;17:6,22;
19:6;30:7;36:13;
44:16;47:9;49:20,22;
50:9;51:13,17,20;
52:7,15,17,18;53:12,
22;54:5,7,8;55:2,3;
56:18,22,24;62:9;
71:2,17;74:21;78:4,
25;90:22;96:25;97:3;
98:13,16,17
**rental (3)**
7:22,24;8:4
**rep (1)**
40:13
**rephrase (1)**
6:19
**report (9)**
81:16,19,20,24;
82:8;84:10,20;85:15,
21
**REPORTER (11)**
5:2,4,17,23;6:5,9;
29:13;91:4,6;99:17,
20
**reporter's (1)**
6:10
**Reporting (1)**
100:9
**represent (1)**
40:14
**representation (1)**
100:10
**request (8)**
22:22;23:5,11;39:9;
53:4,13;55:16,25
**requested (1)**
43:7
**resell (1)**
17:9

**residence (1)**
32:19
**resign (3)**
92:20,22;93:17
**resigned (2)**
93:12,13
**respect (1)**
14:2
**respond (2)**
23:11,13
**responsibilities (1)**
9:3
**responsible (1)**
87:10
**rest (1)**
22:22
**retail (2)**
8:13,14
**right (43)**
5:18;6:1;7:10;
10:11,12,13;11:18,21;
13:6;15:4,15,15;
23:18;24:13;31:24;
33:17;34:21;36:6;
37:20;39:1;52:3;54:8,
14;59:22;61:20,20;
62:25;64:24;66:8;
73:7,24;74:2;77:17;
78:21,22;82:15;
87:11;89:21;94:7,9;
97:24;99:13,20
**righty (1)**
98:2
**Riverton (1)**
7:18
**Robin (5)**
36:21;71:6;72:18,
19,20
**Robin's (1)**
71:9
**room (1)**
50:25
**roughly (3)**
74:8,9,12
**routine (1)**
28:9
**rule (1)**
6:8
**run (1)**
25:23
**running (1)**
90:1

**S**

**safe (1)**
62:14
**safety (1)**
33:14
**sales (9)**
9:9,10,11;27:8,11,
13,16,18;28:11
**same (16)**

6:16;9:25;10:1;
23:8;31:5;33:11,11;
45:9;46:6;64:5,6,21;
65:16;66:4;75:7;
93:17
**Sanford (6)**
10:21;11:18,19;
39:25;40:1;71:25
**Saturday (3)**
55:6;56:7,7
**saw (5)**
34:11;65:5;79:16;
88:12;89:25
**saying (5)**
24:3;65:14;81:25,
25;87:23
**scared (2)**
71:3;73:3
**school (1)**
14:15
**screen (1)**
99:10
**Scribes (1)**
5:3
**second (3)**
36:21;66:24;91:6
**security (4)**
88:21;89:21,25;
90:7
**sell (22)**
9:23;10:1,25;11:1;
13:3;17:4,5,11,12,17;
24:10;35:22;44:3,6,
19;59:9,10,13;63:17;
66:7;96:24;99:11
**sellers (1)**
24:9
**selling (2)**
24:14;53:1
**Seminole (1)**
48:17
**send (13)**
22:10;24:23;27:24;
38:19,20;52:21;
53:18,23,24,25;66:20;
67:15;94:10
**sense (1)**
43:5
**sent (6)**
15:18,23;22:5;
53:16,19;70:13
**separate (2)**
26:9;57:14
**separately (1)**
13:16
**served (1)**
39:9
**sheet (1)**
20:7
**shelves (1)**
50:17
**shift (3)**
55:17,25,25

**shirt (13)**
34:21,24;35:10,17,
22;36:1,5;62:20;63:3;
65:5;66:17,19,21
**shirts (32)**
13:4;18:9;42:16,19;
43:3,16;45:4,6,24;
46:23;47:7;49:6,9,14;
50:9,12,17,21,23;
51:1,3,15;52:13,15;
59:12;60:25;74:11,
15,18;75:2;97:12;
98:21
**short (1)**
79:13
**show (21)**
16:12;18:14;19:11,
20;25:5,20;29:11;
30:18;32:21;33:14,
18;39:3;56:25;58:22;
65:21;79:7;81:5;82:4,
7,17;92:8
**showing (2)**
31:21;94:12
**shown (2)**
27:4;60:1
**side (1)**
64:8
**Sidebender (1)**
5:3
**Sided (1)**
29:25
**sign (10)**
44:7,9,18;91:13,17;
92:9,11,14,15;93:11
**signature (1)**
18:17
**signed (6)**
18:3;91:11,11,18;
92:4;93:6
**similar (1)**
10:1
**Simply (1)**
13:2
**single (1)**
56:5
**sitting (1)**
6:25
**situation (1)**
76:14
**six (9)**
12:2;28:7,16;29:8;
49:9;50:11;52:13,15;
62:2
**size (1)**
18:10
**small (1)**
35:6
**sold (7)**
43:16;48:8,9,16;
58:24;91:12;92:8
**somebody (6)**
35:6;72:12;80:2,3,

19;81:9
**Someone (1)**
77:18
**Sometime (1)**
26:3
**sometimes (10)**
20:21;21:18,19;
26:2;36:14;41:21,22;
42:20,23;76:4
**somewhere (1)**
76:7
**sorry (4)**
8:1;15:9;29:14;
31:9
**Southern (2)**
13:2,2
**speak (7)**
6:11,12;78:3,3,6,8,
15
**specifically (1)**
13:25
**spell (1)**
7:13
**split (1)**
70:17
**spot (1)**
49:15
**spouse's (1)**
8:9
**spring (1)**
36:16
**standard (1)**
46:1
**start (16)**
15:18;16:3,4;22:1;
35:13;44:15;55:19,
20;67:9,10,13,14,14;
79:11;80:22;88:14
**started (2)**
15:17;16:11
**state (6)**
5:11;64:9,12,16,19;
100:3
**statement (3)**
24:2;90:10,12
**station (1)**
79:18
**stay (2)**
55:21,21
**stealing (1)**
72:16
**stickers (2)**
26:23;63:15
**still (4)**
37:3;51:7;58:19;
84:7
**stopped (1)**
28:8
**store (39)**
10:23,25;11:3,23;
13:20;17:5;26:3,18;
29:2;32:4,7;33:2,8,
11;37:6,13;49:23;

Case 6:17-cv-00983-GKS-GJK   Document 57-2   Filed 05/11/18   Page 109 of 110 PageID 1598

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

ASHER TORGEMAN
March 20, 2018

50:14,24;52:1,7;
54:19;55:1,3;56:11;
58:16;66:20;69:3;
73:13,17;78:24;88:6,
7,8,10;90:20;93:5;
95:15;99:11
**stores (42)**
8:13,13,14;9:7,8,
25;10:4,9,15,18,20;
11:15,17;12:19,22;
13:11,16;16:3;18:5;
21:19;25:23;26:6;
32:3;34:18,25;36:11;
39:20,24;40:13;42:6,
7;43:17;58:20;66:22;
67:2,9,14,17,24;68:2,
16;72:2
**store's (1)**
66:24
**Street (1)**
8:5
**Strike (1)**
15:9
**study (1)**
14:25
**stuff (16)**
9:7;10:1;15:19;
16:2;26:24;30:8,11;
38:9,12,15,18;59:13;
62:2;70:25,25;79:14
**Submited (1)**
100:19
**sudden (1)**
80:21
**sue (1)**
87:15
**Sunday (1)**
55:6
**supervisor (1)**
76:24
**support (1)**
84:19
**supposed (1)**
79:7
**sure (53)**
12:1;16:9;23:1;
24:21;29:24;31:21;
32:12;38:13,19;39:8;
40:21;43:6;46:9,12,
14,15,24;47:5,8,10,
12;49:9;51:9;52:3;
55:7;58:9;63:14;64:6;
65:6,16;67:21;68:14;
69:7,15;70:18;71:10;
81:3,22;84:14,22,23,
24;85:17,18,23;87:18,
20,21;88:2;90:14;
94:18;96:20;98:15
**suspicion (1)**
80:22
**suspicions (1)**
93:23
**swear (2)**

5:17,19
**sweatshirt (2)**
26:24;62:25
**sweatshirts (7)**
28:4,23;29:22;
30:14,16,19;74:8
**system (1)**
24:4

**T**

**tags (7)**
42:16,18,24;43:1,3,
7,9
**talk (10)**
15:24;47:21,21;
67:14;69:4,8;78:16;
79:16;80:5;89:6
**talked (5)**
69:10;73:1;76:19;
90:13;96:21
**talking (5)**
40:4;47:6;75:20;
79:15;86:21
**telling (3)**
39:1;54:8;87:6
**ten (6)**
7:20;32:11;40:14;
43:25;95:22,23
**terminate (1)**
91:10
**terms (1)**
17:7
**testified (1)**
97:6
**testimony (4)**
7:5;14:5;96:25;
97:4
**thinking (4)**
15:21;23:7;79:8;
83:18
**thought (1)**
47:6
**thousands (1)**
34:15
**threaten (1)**
88:14
**Three (7)**
10:19;20:11;22:6;
32:3,4;51:9;52:16
**throw (2)**
50:14;51:5
**times (18)**
19:2;21:6;28:15;
29:8;34:15,17;36:17;
42:15,15;43:13;57:4;
62:2;66:20;67:10,11;
68:3;74:14;98:8
**timetable (1)**
54:15
**TJ (10)**
69:2,2,4,5,8,10,11,
12,16,17

**TJ's (2)**
69:6,14
**today (8)**
5:5;6:6;7:5,8;46:6;
49:2,13;96:21
**together (3)**
15:25;26:2;80:23
**told (24)**
16:17;49:10;53:2,2;
62:13;67:19;68:25;
69:11;70:24;71:3;
72:25;76:18;77:9,19,
21;78:10,11,13;81:3,
11;88:16;90:2;91:16;
94:4
**took (1)**
50:24
**top (3)**
24:9;65:2,4
**Torgeman (11)**
5:8,19;6:1;7:12,15,
17;8:10,12;23:1;82:3;
99:14
**T-O-R-G-E-M-A-N (1)**
7:14
**total (3)**
19:18,24;20:11
**Towne (1)**
48:17
**track (2)**
33:21;66:11
**train (2)**
33:12;40:2
**trained (1)**
36:7
**training (1)**
40:5
**transaction (5)**
23:19;50:7;57:14;
61:14;97:7
**transactions (4)**
17:23;56:18;57:15;
96:23
**transcribe (1)**
100:7
**transcribing (1)**
6:13
**transcript (3)**
99:16,18;100:10
**TRANSCRIPTIONIST (1)**
100:1
**transfer (11)**
35:16,23;40:11;
41:4,4,12,16;45:24;
95:18,20,25
**Transfers (4)**
35:15;41:1;42:2,5
**Trey (1)**
5:3
**trouble (1)**
6:13
**true (3)**
47:4;85:21;100:10

**truth (3)**
5:19,20,20
**truthful (1)**
7:4
**try (2)**
68:16,17
**trying (1)**
74:10
**T-shirt (5)**
27:4;47:10;59:7;
66:15;74:20
**T-shirts (5)**
26:23,24;27:3;28:3,
4;33:18
**Twice (3)**
20:21;21:6;42:12
**two (12)**
10:13,14;11:16;
17:19,20;19:6;36:15;
40:23;42:13;68:9;
80:13;94:11
**Two-sided (2)**
30:1,4
**TXT (1)**
99:15
**type (2)**
58:15;93:20
**typical (1)**
92:17

**U**

**undergraduate (1)**
15:2
**undersigned (1)**
100:6
**understood (1)**
6:20
**unknown (1)**
16:1
**unusual (1)**
78:20
**Up (25)**
13:5;14:13;17:2,10;
19:4;20:11;21:4;
24:18;27:7,10,14;
28:20;30:15;44:3;
45:2;48:4;54:15;
60:20;66:21;79:7;
81:23;90:25;91:2;
94:4;95:1
**upset (4)**
67:13,19;71:4;73:3
**use (7)**
25:9;33:12;36:7;
40:2;46:23;65:17;
66:15
**used (7)**
25:8;45:10,12,14,
18;50:16;67:21
**using (1)**
47:9
**Usually (11)**

11:16;17:10;18:3;
19:1;21:18;28:19,23;
43:14;44:6;60:25;
71:15

**V**

**vendor (1)**
44:22
**vendors (1)**
24:16
**versus (1)**
34:5
**video (2)**
5:5;99:18
**visited (1)**
47:23
**voluntarily (1)**
92:11

**W**

**wait (2)**
57:6;85:19
**Warehouse (3)**
47:24;48:20;60:17
**way (5)**
18:1;26:13;66:19;
73:1,4
**website (10)**
9:19,22,24;10:2,5;
41:5,9;94:25;95:13,
14
**week (4)**
47:18;55:7;60:20;
75:22
**weird (5)**
57:24;77:16,20;
80:19;82:23
**Welcome (1)**
73:24
**Welsh (7)**
31:9;48:12;65:9;
78:24;85:15;96:23;
97:16
**West (1)**
5:6
**WFC (2)**
47:9,9
**What'd (3)**
14:19,25;50:12
**whatnot (1)**
90:15
**what's (16)**
6:13;7:15,17;8:3,
14;35:12;40:17;47:5;
63:13;68:13;69:6;
71:9,10;76:14;84:17;
90:6
**white (4)**
35:7;64:17,20,20
**whole (1)**
5:20

FLOGROWN, LLC v.
DIXIE HERITAGE, LLC

COPY

ASHER TORGEMAN
March 20, 2018

**who's (1)**
46:17
**wife (16)**
9:21;37:7;38:7;
55:1,1;78:13,15,17;
79:16,17;82:10;
88:12;90:2;91:20,21;
94:6
**wife's (1)**
9:24
**window (1)**
63:15
**Winter (1)**
5:6
**without (3)**
62:17;83:9,14
**witness (2)**
5:18,22
**witnesses (3)**
72:17,22;89:24
**word (1)**
29:25
**work (26)**
15:22,23,25;36:15;
37:7,7,7;38:24;55:11,
17;56:6;59:2,3,14,16,
23;66:14;68:6,7;71:8;
72:11;75:13;79:7,13,
19;80:20
**worked (7)**
20:5;55:16;71:17,
19;72:10;79:12;80:23
**working (6)**
19:7;55:12,14;56:3,
11;79:12
**worries (1)**
15:14
**worry (1)**
78:12
**wrong (1)**
66:17

**Y**

**year (4)**
16:5;71:19,20;95:6
**years (18)**
7:20;9:2;14:20;
15:4,10,12,13;17:19,
20;19:7;32:12;42:13;
51:9;52:16;66:14;
94:11;95:22,23
**Yeni (1)**
8:10
**Yeniset (1)**
78:8
**young (1)**
36:16

**1**

**1,724 (1)**
20:1

**10 (4)**
30:23,24;31:2;63:1
**10:00 (1)**
66:25
**100 (2)**
24:21;97:10
**10-15 (1)**
57:10
**107 (1)**
24:21
**11 (2)**
31:4,7
**12 (6)**
42:15;98:14,14,15,
18,20
**12:00 (2)**
55:24;56:1
**127 (1)**
22:6
**12th (2)**
90:18,19
**13 (1)**
98:14
**16 (1)**
48:2
**16th (1)**
48:3
**1970 (1)**
7:16

**2**

**2 (1)**
19:11
**20 (4)**
5:6;27:22;66:14;
67:6
**20- (1)**
63:20
**200 (1)**
35:6
**2014 (5)**
10:24;16:7,8,11;
17:2
**2015 (17)**
10:11,18;12:11,15;
21:24;27:8;28:6,7;
36:10;49:21,22,25;
74:9,12,22,23;75:7
**2016 (15)**
21:24;27:11;28:12,
12;47:22,22;48:13;
54:15,17;56:19;
68:22,23;69:9;88:9;
99:6
**2017 (3)**
95:2,3,4
**2018 (2)**
5:6;100:19
**24 (2)**
42:15,15
**280 (2)**
29:15;30:20

**29 (1)**
7:16
**29.99 (1)**
58:24

**3**

**3 (7)**
19:20;29:17;47:22,
22;54:16;56:19;99:6
**3:11 (1)**
99:21
**30 (2)**
74:1;100:19
**300 (1)**
35:4
**32750 (1)**
8:6
**32817 (1)**
7:18
**38 (1)**
56:21
**3rd (3)**
55:4,5;76:11

**4**

**4 (1)**
20:2
**40 (6)**
12:23;13:6;27:21,
22;44:10;56:20
**400 (1)**
35:4
**4726 (1)**
7:18

**5**

**5 (6)**
18:14;27:15,16,20;
29:12,14
**5:00 (2)**
55:20;56:1
**50 (10)**
27:21;49:14;65:12,
12,18,18,19,22;66:8,
11

**6**

**6 (1)**
56:25
**6:34 (1)**
57:9
**6:42 (1)**
57:9
**6:44 (1)**
57:7
**6:45 (1)**
57:9
**60 (2)**
79:21,22

**7**

**70 (1)**
97:21
**72 (4)**
29:22;30:14,16;
62:20

**8**

**8 (2)**
88:9;91:8
**80 (3)**
22:19;96:9;97:21
**874 (2)**
8:5;21:8
**8th (9)**
78:23,23;79:2,5;
82:5;88:4,4,5;89:19

**9**

**9 (4)**
17:1,3;27:5;44:1
**9:00 (2)**
55:24;66:25
**90 (3)**
18:3,21;22:19
**936.39 (1)**
19:19
**941 (1)**
5:6
**96 (1)**
24:21