**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**FLOGROWN, LLC,**

        Plaintiff,

v.                                           Case No:   6:17-cv-983-Orl-18GJK

**DIXIE HERITAGE, LLC, ASHER**
**TORGEMAN and ALBERT**
**TOURGEMAN,**

        Defendants.

_____

## ORDER

    This cause is before the Court following a bench trial held on December 3, 2018. In March 2017, Plaintiff Flogrown, LLC ("FloGrown") initiated this case against Defendants Dixie Heritage, LLC ("Dixie"), Asher Torgeman ("Asher"), and Albert Tourgeman ("Albert") (collectively, "Defendants"). FloGrown claims that Dixie, as well as Asher and Albert in their individual capacities, willfully reproduced FloGrown's trademarks (the "FLOGROWN Marks") without FloGrown's authorization in order to create and sell counterfeit FloGrown merchandise. On June 20, 2017, Defendants brought counterclaims against FloGrown for FloGrown's alleged defamatory remarks and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq.*, Fla. Stat. On July 18, 2017, FloGrown filed its Amended Complaint alleging federal unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (Count I), common law trademark infringement (Count II), and a violation of FDUTPA. Counts I, II, and III, alleged against all of the Defendants, went to trial.

FloGrown's case-in-chief consisted of testimony from Jesse Welch ("Welch"), Heather Benthal ("Benthal"), and Rebecca Goodine ("Goodine"). Defendants presented testimony from Asher, Albert, Yeniset Torgeman ("Yeniset"), and Patti Rumore ("Rumore"). Both parties read portions of the deposition of Joseph Camacho ("Camacho") into evidence and submitted documentary evidence in support of their positions. The following exhibits were entered into evidence:

1. Exhibits 1-2
2. Exhibits 4-5
3. Exhibits 7-15
4. Exhibits 21-29
5. Exhibits 31-36

(*See* Docs. 94, 95.) After FloGrown presented its case-in-chief, Defendants moved *ore tenus* for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure as to Albert and Asher on Counts I, II, and III (Doc. 96). The Court reserved ruling (*see* Doc. 93 at 2), and Defendants subsequently filed a Renewed Motion for Judgment on Partial Findings (Doc. 99), to which FloGrown filed a response in opposition (Doc. 103), and Defendants replied (Doc. 106). After Defendants presented their case, FloGrown moved *ore tenus* for judgment in its favor on Defendants' counterclaims (Doc. 97), which the Court granted (Doc. 98).

The Court, having considered the evidence, argument, and relevant legal authority, and having made determinations on the credibility of the witnesses, hereby renders its decision on the merits of this case pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. STIPULATED FACTS

The parties stipulated to the following facts, as set forth in their Joint Final Pretrial Statement

(Doc. 75):

1. FloGrown, incorporated in Florida on April 26, 2011, is a national clothing apparel company based out of Central Florida.

2. Flogrown makes its garments using the process of screen printing.

3. Defendants Asher and Albert are the owners of the Dixie Heritage Stores retail which are located in Oviedo, Sanford, Lakeland, and Melbourne, Florida.

4. Dixie makes and sells custom clothing garments made by using a heat-press to fuse a printed design from a transfer sheet onto the fabric. Dixie also resells branded garments it purchases at wholesale from manufacturers.

5. Since May 12, 2011, FloGrown has owned a Federal trademark registration for FLOGROWN in standard characters, Reg. No. 4,207,092, having the following description of goods: "Clothing, namely t-shirts."

6. Since February 9, 2016, FloGrown has owned a Federal trademark registration for FLOGROWN in a stylized design, Reg. No. 5,044,931 having the following description of goods: "Clothing, namely, t-shirts, sweatshirts, hats, athletic wear, and swimwear."

7. Dixie only has retail locations in the State of Florida.

8. FloGrown consistently gave Dixie a discount on buying its goods provided that Dixie agreed not to sell goods from Local Brand Only at its stores.

9. Jesse Welch purchased forty (40) separate articles of clothing, each bearing the mark "FLOGROWN" in a stylized script font, in four (4) consecutive transactions from the Dixie Heritage Lakeland location on December 3, 2016, totaling $811.70. The cashier for this transaction was Rebecca Goodine. The goods purchased in this transaction are

being held as evidence by the Lakeland Police Department.

(*Id.* at 10-11.)

## II. FINDINGS OF FACT

A. FloGrown's Relationship with Defendants

FloGrown, an apparel company owned by Welch, designs and sells a variety of products branded with its FLOGROWN Marks. FloGrown sells its products to customers throughout the United States via its website. In 2014, FloGrown began selling its branded merchandise at wholesale prices to Dixie. By December 2016, Dixie operated multiple retail stores in Florida, one of which was located in Lakeland (the "Lakeland Store") (collectively, the stores will be referenced as the "DH Stores"). Yeniset, Asher's wife and a representative of Dixie that identified herself as a "Dixie Heritage manager," owns a website that lists location information for the DH Stores and sells goods from companies that the DH Stores carry. Yeniset launched said website in 2017, after Welch purchased the allegedly counterfeit goods at issue in this case, and there is no evidence that FLOGROWN branded merchandise has ever been sold via the website.

Through Asher, Dixie bought merchandise from FloGrown for re-sale in the DH Stores. Purchase transactions between FloGrown and Dixie were typically recorded in an invoice, seventy-two (72) of which were submitted at trial. The parties agree that all invoices were made between FloGrown and Dixie as a whole, but they disagree that the invoices presented at trial represent all transactions that took place between the parties. FloGrown never authorized Defendants to reproduce merchandise with the FLOGROWN Marks and did not routinely create custom items for Defendants. However, FloGrown sold misprint items to Dixie at a discounted price, as reflected in Invoice # 306. Also, FloGrown indisputably created custom camouflage hoodies for Dixie to sell on at least one (1) occasion, as reflected in Invoice # 280. The parties disagree whether the

transaction set forth in Invoice # 280 represents the only custom job FloGrown created for Dixie. Asher and Yeniset testified that FloGrown created multiple custom jobs for Dixie for which Dixie paid in cash and did not receive an invoice, including but not limited to a job for customized onesies.[1] Yeniset and Asher testified that Asher occasionally provided "naked items," including but not limited to blank onesies and sweatshirts, to Welch so that FloGrown could customize these items. Asher testified that he bought forty-eight (48) blank onesies in May 2015 from a company named Color-Touch, Inc., and Defendants submitted a receipt to reflect this purchase. Asher testified that he provided some of the purchased onesies to Welch for customization. Welch testified that FloGrown never sold or even produced onesies and that FloGrown does not have the equipment to produce onesies. However, Camacho, a former senior designer for FloGrown, previously testified that FloGrown has produced onesies, albeit he surmised that said production occurred after December 3, 2016. The Court notes that Welch admittedly maintains all of FloGrown's accounting records or transactions with its customers and that Welch maintained FloGrown's year-end inventory lists for 2015 and 2016, which were admitted into evidence and did not list onesies.

As stated *supra*, Asher purchased the FloGrown merchandise that was sold in the DH Stores. Asher routinely picked up the purchased merchandise from FloGrown's warehouse or, alternatively, the merchandise was delivered directly to the DH Stores. FloGrown merchandise was also delivered to Asher's residence on at least one (1) occasion and was delivered to Albert's residence on one (1) occasion. There is no evidence that Albert picked up FloGrown merchandise from FloGrown's warehouse or otherwise participated in ordering or purchasing FloGrown

---

[1] A "onesie" is defined as "a bodysuit for an infant having a snap closure at the crotch and not covering the legs." Merriam-Webster Online Dictionary, onesie (Jan. 18, 2019), *available at* http://merriam-webster.com/dictionary/onesie.

merchandise for the DH Stores. Welch admitted that Albert never maintained a personal or business relationship with Welch or FloGrown and that he has never seen Albert sell FloGrown merchandise anywhere. Welch also testified that he has never seen Asher sell Flogrown merchandise outside of the DH Stores.

The business relationship between FloGrown and Dixie continued until December 2016, although the parties had conflict prior to this date, at least in part, due to Dixie carrying Local Brand Only merchandise. During their business relationship, FloGrown sold approximately $100,000.00 in goods to Dixie. Welch testified that Dixie's alleged act of selling counterfeit FLOGROWN branded merchandise contributed to FloGrown's loss in sales of approximately $172,000.00 in 2016 and negative product reviews on FloGrown's social media account.

B. The Suspect Items

On December 3, 2016, Welch visited the Lakeland Store with his girlfriend and purchased over $800.00 of merchandise bearing the FLOGROWN Mark in a stylized script font (the "Suspect Items") from the store. The parties stipulated that Welch purchased forty (40) items; however, only thirty-eight (38) items were presented at trial. The items presented to the Court and identified by Benthal consist of eleven (11) onesies, seventeen (17) youth shirts, four (4) women's shirts, and six (6) hoodies. The Court admitted the Suspect Items that Benthal brought to trial into evidence, with photographs serving as their substitute. Goodine, an employee at the Lakeland Store at the time, rung up Welch's purchase of the Suspect Items on four (4) separate receipts. The receipts listed the Suspect Items as either "custom items" or "onesies." Welch testified that he did not take any pictures of the Suspect Items in the Lakeland Store. Welch also stated that he did not want to tip Goodine off as to what he was doing but that he was obviously worked up when purchasing the Suspect Items. After purchasing the Suspect Items and leaving the Lakeland Store, Welch brought

the Suspect Items to FloGrown's Orlando warehouse and took the pictures of the items that were ultimately submitted as evidence at trial. Approximately seven (7) weeks later, Welch provided the Suspect Items to Benthal, although Welch only provided thirty-eight (38) items to Benthal. Welch testified that he believes each of the Suspect Items are counterfeits.

Soon after Welch's purchase, Goodine resigned from the Lakeland Store. On the day she turned in her store key and picked up her final check, Goodine was presented with paperwork to sign stating that she had no knowledge of Dixie partaking in infringing activities. Goodine signed the paperwork and testified that she was made to do so before receiving her final check. After receiving her final check, Goodine called the Lakeland Police Department to report Defendants based on her alleged concerns that Defendants were selling counterfeit FLOGROWN branded goods.

C. Proof that the Suspect Items are Counterfeit

Welch compared pictures of the Suspect Items with pictures of other FLOGROWN branded products and explained the differences between the logos, testifying that the logos on the Suspect Items were plainly heat pressed, rather than screen printed. Admittedly, however, Welch has never performed heat pressing. Like Welch, Benthal testified that the Suspect Items are demonstrably counterfeit. Benthal testified that the logos on the Suspect Items pull apart and the logos are clearly heat pressed. However, Benthal does not have any personal experience with heat pressing or screen printing. Also, Benthal admitted that her opinions regarding same are based on instructions from Welch on how to tell the difference between genuine FloGrown products and heat pressed products. Further, Benthal purchased FLOGROWN branded merchandise from the Lakeland Store during her investigation in an effort to locate counterfeit items, and all of the items Benthal purchased were deemed to be genuine. Importantly, FloGrown failed to present the Court

with any physical examples of professed genuine FloGrown merchandise. Without any such example, the Court was unable to make a physical comparison with the Suspect Items.

Goodine identified the Suspect Items admitted into evidence in this case as the items that Welch purchased from the Lakeland Store on December 3, 2016. Goodine purported to recognize the Suspect Items as counterfeit because the tags and quality appeared different from allegedly genuine FloGrown merchandise sold in the Lakeland Store. However, Camacho testified during his deposition that FloGrown has provided genuine FloGrown merchandise to Asher for re-sale by Dixie that did not have hang tags. Also, Goodine stated that she originally learned that Dixie sold counterfeit goods through conversation with Rumore, but Goodine was unable to recall details about any such conversation, and Rumore testified that no such conversation took place. In contradiction to Goodine's testimony, Rumore testified that she has never been in other Dixie Heritage stores and has never informed Goodine that other DH Stores sold counterfeit FloGrown merchandise or counterfeit goods of any kind. Rumore, hired by Asher in 2015 as an employee at the Lakeland Store, also testified that she never personally affixed the FLOGROWN Marks to any merchandise at the Lakeland Store and that she has never seen employees or anyone else do so.

Notably, it is undisputed that Dixie had a heat press machine in its Lakeland Store during the relevant time period. However, FloGrown did not present any witness testimony that anyone ever observed Asher, Albert, a non-party company, or any employee of Dixie in possession of a FLOGROWN Mark template for use in heat pressing.

### III. CONCLUSIONS OF LAW

Importantly, "analysis under the Lanham Act for trademark infringement also applies to claims of trademark infringement and unfair competition under Florida common law." *Carnival Corp. v. Seaescape Casino Cruises*, 74 F. Supp. 2d 1261, 1264 n.2 (S.D. Fla. 1999); *see Suntree*

*Techs., Inc. v. Ecosense Int'l,, Inc.* 693 F.3d 1338 (11th Cir. 2012) (applying the same legal analysis to Lanham Act, FDUPTA, and Florida state common law claims for infringement and unfair competition). The Lanham Act, 15 U.S.C. § 1114, provides liability for trademark infringement if, without the consent of the registrant, a person "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" that "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Similarly, § 1125 of the Lanham Act provides liability if a person "uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125 (a)(1)(A). Under the Lanham Act, the word "commerce" is defined as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Indubitably, "the Lanham Act creates a federal cause of action for unfair competition . . . limited to interstate commercial activities." *Univ. of Florida v. KPB, Inc.*, 89 F.3d 773, 775 (11th Cir. 1996). However, "[i]t is well settled that as defined 'commerce' includes any intrastate transaction which 'affects' interstate commerce." *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1356 (11th Cir. 1983) (citation omitted). Thus, "a defendant's wholly *intrastate* activities will be subject to section 43(a)'s [the Lanham Act's] apparently long reach if those activities may be said to affect plaintiff's business and that business is interstate." *Demetriades v. Kaufmann*, 698 F. Supp. 521, 524 (S.D.N.Y. 1988) (citation omitted) (emphasis in original).

In order to prevail on its trademark infringement claims, a plaintiff must prove that "(1) its mark was used in commerce by defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2008) (quoting *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir. 1983)). In *Blackwall Group, LLC v. Sick Boy, LLC*, 771 F. Supp. 2d 1322, 1325 (M.D. Fla. 2011), the Middle District, citing the Eleventh Circuit, set forth several factors to be weighed in a likelihood of confusion analysis in any trademark infringement case:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Id.* (citations omitted). Additionally, "[t]he Supreme Court has made clear that, in the context of a 'passing off'/'false designation of origin' claim under [the Lanham Act]n 43(a), the use of the word 'origin' refers to a false or misleading suggestion as to 'the producer of the tangible goods that are offered for sale.'" *Optimum Techs., Inc.*, 496 F.3d at 1248 (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003)). Moreover, "[n]atural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). Specifically, "[i]f an individual actively and knowingly caused the infringement, he is personally liable." *Id.*

A. Albert and Asher's Personal Liability (Count I, Count II, Count III)

FloGrown failed to establish, by a preponderance of the evidence, that Albert or Asher actively and knowingly caused the alleged infringement in this case. Goodine testified as to Albert and Asher's roles in the Lakeland Store; however, Goodine did not substantially participate in the

purchase of FloGrown merchandise for re-sale and never observed FloGrown merchandise coming in to the Lakeland Store. Goodine's testimony is accorded little to no weight in assessing Asher and Albert's relationship with FloGrown and their role, if any, in procuring FloGrown merchandise for re-sale in the DH Stores or elsewhere. The lack of evidence as to Albert's involvement in business dealings between FloGrown and Dixie, especially the complete dearth of evidence to show that Albert ever ordered FloGrown goods, personally sold FloGrown goods, or affixed the FLOGROWN Marks to apparel or other items, is glaring and irrefutable. Also, FloGrown did not present evidence to show that Albert or Asher possessed FLOGROWN branded transfers, had the ability to make FLOGROWN branded transfers, or that they used a heat press or other method to put FLOGROWN Marks on merchandise. FloGrown's claims against Albert and Asher in their individual capacities are unsubstantiated, and both Albert and Asher are entitled to judgment in their favor on Counts I, II, and II.

Additionally, "[i]n an exceptional trademark infringement case . . . a court may award reasonable attorneys' fees to the prevailing party." *Welding Servs., Inc. v. Forman*, 301 F. App'x 862, 862-63 (11th Cir. 2008). After review of the testimony and evidence in this case, and noting the fact that FloGrown persisted with federal litigation against Albert for almost two (2) years, the Court finds that Albert is entitled to an award of attorneys' fees. An award of attorneys' fees to Albert as a prevailing defendant is justified because FloGrown "brought an obviously weak Lanham Act claim [against Albert] and the evidence shows that [FloGrown] acted in bad faith and with an improper motive." *Welding Servs., Inc. v. Forman*, 301 F. App'x 862, 862-63 (11th Cir. 2008) ("In an exceptional trademark infringement case . . . a court may award reasonable attorney's fees to the prevailing party."); *see Harley-Davidson Motor Co. v. Iron Eagle of Cent. Fla., Inc.*, 973 F. Supp. 1421, 1426 (M.D. Fla. 1997) (citing *Safeway Stores, Inc. v. Safeway Discount*

*Drugs,* 675 F.2d 1160, 1166 (11th Cir.1982)) ("The Eleventh Circuit has interpreted [15 U.S.C. § 1117] to allow fees to a prevailing party where there is evidence of fraud or bad faith.").

B. Dixie's Liability (Count I, Count II, Count III)

FloGrown is located in Florida, delivered goods to Dixie in Florida, and failed to establish that any of Dixie's customers bought FLOGROWN branded goods outside Florida. Although the Court believes Welch's testimony that FloGrown's products are sold to customers in all fifty (50) states via its own website, there is no evidence that Dixie has ever sold FLOGROWN branded goods via a website. The Court accords little weight to Yeniset's testimony that the website she manages is her personal website, especially in light of the website's domain name (www.dixieheritagestores.com) and the fact that it lists location information for the DH Stores and sells goods from companies that the DH Stores carry; however, there is no evidence that Dixie has ever transported or sold goods bearing the FLOGROWN Marks outside Florida, via a website or otherwise. In fact, there is no credible evidence or testimony to show that Dixie sold any of its goods via any website prior to the initiation of this case in March 2017. FloGrown is thus unable to show that Dixie "used in commerce" misleading representations about goods bearing a FLOGROWN Mark for purposes of establishing interstate commerce under the Lanham Act. Additionally, there is no credible evidence that Dixie's intrastate activities affected FloGrown's interstate business to such a degree as to subject Dixie to potential liability under the Lanham Act. Accordingly, Dixie is entitled to judgment in its favor on Count I.

Additionally, the Court afforded great weight to Asher and Yeniset's testimony that Dixie purchased customized merchandise from FloGrown and that such purchases are not fully reflected in the invoices submitted at trial. Although the Court believes Welch's testimony that the seventy-two (72) invoices presented at trial accurately reflect transactions between FloGrown and Dixie,

the Court is not persuaded that the invoices memorialize every single transaction between the parties. The Court is also not persuaded that the lack of onesies on FloGrown's 2015 and 2016 inventory lists shows that FloGrown never customized onesies for Defendants or that Defendants never received onesies from Welch. Welch admittedly maintained such records and is a very interested witness in this case; thus, the Court accords little weight to Welch's testimony regarding the completeness of FloGrown's records.

Further, although the Court finds Benthal and Welch to be credible witnesses overall, their testimony regarding how to tell the difference between heat pressed goods and screen printed goods is afforded little weight. Likewise, Goodine's testimony regarding her knowledge of the existence of counterfeit goods in Dixie Heritage stores and how she identified the Suspect Items as counterfeit is given little weight in light of contradictory testimony and Goodine's lack of experience with screen printing. The mode of production is a seminal issue in this case, and the lack of expert testimony on whether the logos on the Suspect Items are heat pressed or screen printed is significant.

Moreover, the Court gives little weight to Goodine's testimony pertaining to her signing paperwork denying knowledge of or liability for infringing acts prior to receiving her final check from Dixie. Regardless of the order in which Goodine signed such paperwork and received her final check, the act of encouraging Goodine and other employees to sign said paperwork does not evince that Defendants actually committed infringing acts. Rather, it seems reasonable to request employees to fill out such paperwork denying liability for infringing activities in light of Welch's recent visit to the Lakeland Store and the circumstances surrounding same.

There is simply a lack of direct, credible evidence to show that Asher, Albert, Dixie, or any Dixie employees obtained, let alone used, transfers with any FLOGROWN Marks on the Suspect

Items or any other items sold in the DH Stores. FloGrown failed to show that Defendants falsely represented FloGrown as the source of the Suspect Items or the source of any other FLOGROWN branded items sold by Dixie. Because FloGrown failed to present sufficient evidence to support its position that Defendants used a FLOGROWN Mark without FloGrown's authorization, the Court need not address whether Defendants' alleged misconduct was "likely to cause confusion, or to cause mistake or to deceive." The analysis of FloGrown's state law and common law claims is co-extensive with the analysis of FloGrown's Lanham Act claims, and there is insufficient evidence to show, by a preponderance of the evidence, that Dixie willfully and without authorization reproduced FloGrown's federally registered FLOGROWN Marks to create counterfeit merchandise. Dixie is, therefore, entitled to judgment in its favor on Count II and Count III.

## IV. CONCLUSION

The Court has considered the entirety of the testimony and admitted evidence in this case. As set forth above,[2] Plaintiff FloGrown, LLC failed to establish its claims against Defendants Dixie Heritage, LLC, Asher Torgeman, or Albert Tourgeman by a preponderance of the evidence. The Court's findings under Rule 52(a) of the Federal Rules of Civil Procedure render moot Defendants' *ore tenus* Rule 52(c) motion for judgment on partial findings (Doc. 96) and

---

[2] To the extent that any of the Court's findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

Defendants' Renewed Motion for Judgment on Partial Findings (Doc. 99). Accordingly, it is hereby **ORDERED** and **ADJUDGED** as follows:

1. The Clerk of Court is directed to **ENTER FINAL JUDGMENT** in favor of Defendants Dixie Heritage, LLC, Asher Torgeman, and Albert Tourgeman and against Plaintiff FloGrown, LLC.

2. Defendants Dixie Heritage, LLC, Asher Torgeman, and Albert Tourgeman's *ore tenus* motion for judgment on partial findings (*see* Doc. 96) and Renewed Motion for Judgment on Partial Findings (Doc. 99) are **DENIED as moot.**

3. With the exception of Defendant Albert Tourgeman, all parties shall be responsible for their own attorneys' fees and costs.

4. The Court reserves jurisdiction to award attorneys' fees and costs by separate order to Defendant Albert Tourgeman, upon proper motion and submission of appropriate affidavits, within 14 days of the date of this order. Counsel for the parties shall confer in good faith in an effort to agree on the amount of fees and costs prior to the filing of the motion.

5. The Clerk is directed to **ENTER FINAL JUDGMENT** in accordance herewith.

**DONE** and **ORDERED** in Orlando, Florida on this ___18___ day of January, 2019.

G. KENDALL SHARP
SENIOR UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record